# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company, MSPA CLAIMS I, LLC, a Florida limited liability company, and Series PMPI, a designated series of MAO-MSO RECOVERY II, LLC, a Delaware series limited liability company, and MSP RECOVERY CLAIMS SERIES 44, LLC, on behalf of themselves and all others similarly situated,

Civil Action No.: 21-cv-21317-GAYLES

**DEMAND FOR JURY TRIAL**

**CLASS ACTION COMPLAINT**

Plaintiffs,

v.

CARING VOICE COALITION, INC., a Delaware corporation; UNITED THERAPEUTICS CORPORATION, an Idaho nonprofit corporation; and SMITHS MEDICAL ASD, INC., a Delaware corporation,

Defendants.

_____/

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, MSP Recovery Claims, Series LLC, MSPA Claims 1, LLC, Series PMPI, a

designated series of MAO-MSO Recovery II, LLC, and MSP Recovery Claims Series 44, LLC

(collectively, "Plaintiffs"), on behalf of themselves and other Medicare Advantage health plans

(the "Class Members"),[1] bring this action against Defendants, Caring Voice Coalition, Inc.

_____

[1] The Class Members consist of Medicare Advantage health plans—i.e., Medicare Advantage entities such as Medicare Advantage organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), and other Medicare first-tier, downstream, and related entities—and their assignees (collectively referred to as "MA Plans" or "Medicare Advantage health plans").

("CVC"), United Therapeutics Corporation ("UT"), and Smiths Medical ASD, Inc. ("Smiths") (collectively, "Defendants"), and allege:

## NATURE OF ACTION

1.      PAH is a life-threatening disease that causes high blood pressure in the arteries that run from the heart to the lungs.

2.      This case arises from UT's use of several conspiratorial schemes to increase the unit price and volume of its Pulmonary Arterial Hypertension ("PAH") drugs.[2] Plaintiffs' Assignors ("Assignors") and the proposed classes paid supra-competitive prices on behalf of their beneficiaries for UT's Hypertension Drugs.

3.      UT used exclusive dealing arrangements with Smiths, the manufacturer of the only device approved to administer the PAH drugs, as well as creating a scheme to circumvent the Congressionally mandated co-payment requirements (referred to herein as "Co-Payment Circumvention Enterprise") designed to suppress price inflation and non-medically necessary purchases.[3]

4.      UT engaged in multiple overt schemes to monopolize the market for PAH drugs causing antitrust injuries and fraudulently induced the reimbursement for these supra-competitively priced PAH drugs. These schemes encompassed the Co-Payment Circumvention

---

[2] The PAH drugs at issue in this litigation are Adcirca (tadalafil tablets), Remodulin (treprostinil injection), Tyvaso (treprostinil inhalation solution), and Orenitram (treprostinil extended-release tablets) (collectively, the "UT Hypertension Drugs").

[3] When Medicare beneficiaries, including those covered by Medicare Advantage health plans, obtain a prescription drug, the beneficiaries may be required to make a co-payment. Congress included co-payment requirements in the Medicare structure, in part, to encourage market forces to serve as a check on health care costs, specifically including the prices that pharmaceutical companies can demand for their drugs. Austin, Frerick A., *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 (hereinafter "Social Responsibility").

Enterprise above, as well as entering into exclusive contracts with the company that manufactures the only device used to administer PAH drugs subcutaneously.

5.      In December 2017, UT entered into a Settlement Agreement with the United States of America ("Settlement"), acting through the United States Department of Justice ("DOJ") and on behalf of the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") (collectively, the "United States") regarding the same general conduct at issue in this lawsuit. (*See* UT Settlement Agreement, attached as **Exhibit A**). UT paid the United States $210 million to settle the United States' claims that UT violated the Anti-Kickback Statute and False Claims Act.

6.      While the Settlement addressed a portion of the damage suffered by the federal government, it did not address or settle the injuries suffered by Plaintiffs and other Medicare Advantage health plans who administer Medicare benefits pursuant to Medicare Part C and Part D.  None of the parties or agencies to the Settlement represented the interests of Plaintiffs, their Assignors, or the putative class members in this case. The Settlement terms fail to redress the claims brought by Plaintiffs in this lawsuit.

7.      Defendants' conduct is anticompetitive in that it funneled patients away from competing drugs (e.g., brand-name drugs like Flolan, Veletri, and generic epoprostenol) by ensuring that the large sums of money UT continuously paid to CVC improperly influenced CVC's practices. In addition, UT's exclusive dealing agreement with Smiths made it impossible for generic alternatives to gain a foothold in the market.

8.      Plaintiffs bring this lawsuit to redress injuries suffered by Plaintiffs' Assignors and the similarly situated putative class members ("Class Members"), as a result of Defendants' unlawful schemes to stifle competition for UT's PAH drugs.

9. The improper conduct described herein has enabled UT to stifle competition and maintain supra-competitive prices thus injuring Plaintiffs' Assignors and the putative class members.[4]

## PARTIES, JURISDICTION, AND VENUE

a. *Plaintiffs*

10. Plaintiffs are companies that have obtained assignments from their Assignors to recover reimbursement or payment from Defendants. Plaintiffs' Assignors provide health insurance coverage, pursuant to Medicare Part C, to individual beneficiaries subscribed to their plans ("Enrollees"). Specifically, the Assignors made payments on behalf of, or otherwise became financially responsible for, their Enrollees' medical expenses which may have been incurred as a result of Defendants' defective Subject Products. Said assignments are alleged in Appendix A to this complaint.

### *MSPRC*

11. MSPRC is a Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series.

12. MSPRC has established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other Company assets, and in order to account for and associate certain assets with certain particular series. Pursuant to MSPRC's limited liability agreement, all designated series form a part of MSPRC. MSPRC may

---

[4] Defendants conducted two distinct schemes and have harmed two distinct putative classes: (i) all third parties who reimbursed for the cost of Remodulin during UT's anti-competitive conduct with Smiths regarding the CADD-MS 3 pump; and (ii) all third parties who reimbursed for the cost of the UT Hypertension Products whose beneficiaries' co-payments were provided by CVC.

receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name or it may elect to bring suit in the name of its designated series.

13.     MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to MSPRC.

*MSPA*

14.     MSPA is a limited liability company that is duly organized, validly existing, and in good standing under the laws of Florida, with its principal place of business in Coral Gables, Florida.

*MAO-MSO*

15.     MAO-MSO Recovery II, LLC, Series PMPI, a segregated series of MAO-MSO Recovery II, LLC, is a series limited liability company that is duly organized, validly existing, and in good standing under the laws of Delaware, with its principal place of business located in Cresskill, New Jersey.

*Series 44*

16.     Series 44 is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Series 44 established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and

associate certain assets with certain particular series.

17. Series 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Series 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

18. Defendants' Co-Payment Circumvention Enterprise triggered payment obligations of Plaintiffs' Assignors and other members of the putative class. Additionally, Defendants' exclusive dealing relationship with Smiths effectively made a generic version of Remodulin unavailable to beneficiaries. Each of these actions caused the Assignors and members of the putative class to pay artificially inflated prices for the UT Hypertension Drugs. The anticompetitive conduct described herein directly caused damage to Plaintiffs' Assignors and the putative class members.

b. *Defendants*

*United Therapeutics Corporation*

19. Defendant UT is a Delaware corporation with its principal place of business in Silver Spring, Maryland. UT is a pharmaceutical manufacturer. At all relative times herein, UT advertised, marketed, and sold pharmaceutical products, including the UT Hypertension Drugs,

throughout all states and territories in the United States, including Florida. UT derived substantial revenue related to the UT Hypertension Drugs from its business throughout each of the states and territories of the United States, including Florida.

20.     As a preliminary matter, by its motion to transfer this case, UT consented to the jurisdiction of this Court. In addition, this Court has personal jurisdiction over UT because the Co-Payment Circumvention Enterprise alleged herein, which UT was a party to, constitutes a tortious act pursuant to Section 48.193(1)(a)(2), Florida Statutes. UT engaged in substantial and not isolated activity throughout the State of Florida, including the marketing and sale of the UT Hypertension Drugs. In addition, as a result of the Co-Payment Circumvention Enterprise, Plaintiffs' Assignors and the putative class members, sustained financial injuries in Florida. UT maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. UT purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

### Caring Voice Coalition

21.     Defendant CVC is an Idaho nonprofit corporation claiming 501(c)(3) status for tax purposes, with its principal place of business in Richmond, Virginia.[5] CVC was established in 2003 and operates disease funds, including the PAH fund, to pay the co-payments of certain patients, including Medicare patients.

22.     This Court has personal jurisdiction over CVC because the Co-Payment Circumvention Enterprise alleged herein, which CVC was a party to, constitutes a tortious act pursuant to Section 48.193(1)(a)(2), Florida Statutes. CVC engaged in substantial and not isolated

_____

[5] Pursuant to a July 31, 2019 filing with the Commonwealth of Virginia, CVC moved its principal place of business to Henrico, Virginia.

activity throughout the State of Florida relating to the Co-Payment Circumvention Enterprise, resulting in Plaintiffs' Assignors and the putative class members sustained financial injuries in Florida. CVC maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. UT purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

*Smiths Medical ASD, Inc.*

23.    Defendant Smiths is incorporated under Delaware law, with its principal place of business in Minneapolis, Minnesota. Smiths is a leading global manufacturer of specialty medical devices. At all relative times herein, Smiths advertised, marketed, and sold a device called a CADD-MS 3 pump. Smiths sold pumps throughout the United States including in the State of Florida, to the beneficiaries of Plaintiffs' Assignors and the putative class members.

24.    This Court has personal jurisdiction over Smiths because the Co-Payment Circumvention Enterprise alleged herein, which Smiths was a party to, constitutes a tortious act pursuant to Section 48.193(1)(a)(2), Florida Statutes. Smiths engaged in substantial and not isolated activity throughout the State of Florida, including the marketing and sale of the CADD-MS 3 pumps used to administer the UT Hypertension Drugs. In addition, as a result of the Co-Payment Circumvention Enterprise, Plaintiffs' Assignors and the putative class members sustained financial injuries in Florida. Smiths maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. Smiths purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

25.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The causes of action alleged herein arises under federal law.

26.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Plaintiffs are completely diverse from Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

28.      This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal claims as to form part of the same case or controversy.

29.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in Florida. Plaintiffs' Florida Assignors purchased the UT Hypertension Drugs in Florida. Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) because Defendants transact their affairs in Florida.

## STANDING

30.     Plaintiffs' Assignors provide Medicare benefits to beneficiaries who have elected coverage under Medicare Part C or Medicare Part D under either: (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans.

31.     The assignment agreements entered into between the Assignors and Plaintiffs are valid and binding contracts, empowering Plaintiffs to bring and recover on the claims asserted in this lawsuit.

32.     Although Plaintiffs seek recovery on behalf of each of their Assignors who paid for or reimbursed the cost of the UT Hypertension Drugs at inflated prices, one representative assignment for each Plaintiff is alleged in detail in the Appendix to establish standing. A copy of

each representative assignment is attached hereto as Exhibits B-D and explained in more detail in the Appendix.

33.     At all material times hereto, one or more of Plaintiffs' Assignors provided Medicare benefits to Medicare Advantage plan beneficiaries and paid inflated prices as a result of Defendants' anticompetitive conduct.

34.     Defendants' Co-Payment Circumvention Enterprise triggered payment obligations for UT Hypertension Drugs at inflated prices.

35.     Similarly, Defendants' exclusive dealing relationships effectively blocked generic versions of Remodulin from being prescribed and dispensed to beneficiaries.

36.     Plaintiffs' Assignors paid more than $24.8 million in claims on behalf of covered patients receiving UT Hypertension Drugs from January 1, 2010 through present.

37.     Plaintiffs' Assignors provided payment for the UT Hypertension Drugs throughout the United States, including in the state of Florida.

**Medicare**

38.     In 1965, Congress amended the Social Security Act to create the Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled. The Medicare Act consists of five parts – Parts A, B, C, D, and E. Parts A and B "create, describe, and regulate traditional fee-for-service, government-administered Medicare." *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 357 (3rd Cir. 2012) (citing 42 U.S.C. §§ 1395c-1395i-5; 1395j- 1395w). Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. 42 U.S.C. §§1395w-21-29.  Part D provides for

prescription drug coverage to Medicare beneficiaries. Plaintiffs' Assignors provide Medicare benefits under Parts C and D.  Part E includes "Miscellaneous Provisions."

39.     Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006. A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

40.     Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private-market model, wherein Medicare contracts with private entities, known as Part D "sponsors." These sponsors administer prescription drug plans, and plan sponsors must provide qualified prescription drug coverage.

41.     A Part D sponsor submits a bid the year before it is to deliver Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

42.     If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium. Centers for Medicare and Medicaid Services ("CMS") then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

43.     The chart below details the Medicare Part D Standard Benefit design in 2017:

**Standard Part D Coverage for 2017**

| Coverage | | Part D Plan Pays | Beneficiary Pays |
|---|---|---|---|
| Annual Deductible ($400) | | $0 | $400 |
| Initial Coverage Period (>$400-$3,700) | | 75% of $3,300 | 25% of $3,300 |
| Coverage Gap ("Donut Hole") Once your total drug costs (what you and your plan pay) exceed $3,700, you are in the 'donut hole.' | | $0 (For brand name drugs, the 50% discount comes from drug manufacturers + 10% subsidy. For generic drugs, there is a 49 subsidy.) | 40% of covered brand name drugs; 51% of covered generic drugs |
| Catastrophic Coverage This begins once you've reached your 'out-of-pocket threshold' of $4,950 in 2017. ($400 deductible + $825 initial coverage + $3,725 'donut hole') | | 95% or the drug cost minus the copay | Greater of 5% of the drug costs or $3.30 for a generic drug or $8.25 for a brand name drug |

44.     Medicare Advantage entities and other Medicare Part C entities play an important role in the American healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation." *In re Avandia, Sales Practices & Products Liability Litigation*, 685 F.3d 353, 363 (3d Cir. 2012). In 2017, 33% of Medicare-eligible individuals got their health insurance from Medicare Advantage entities.

45.     Medicare Advantage entities cannot play the vital role that Congress intended if they are hamstrung by a competitive disadvantage. When Medicare Advantage entities "faithfully pursue and recover from liable third parties," they "will have lower medical expensesand will therefore be able to provide additional benefits to their enrollees." *Id.* (quoting *Policy and Technical Changes to Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19678, 19797 (April 15, 2010)).

## **PHARMACEUTICAL INDUSTRY BACKGROUND**

### **The Statutory and Regulatory Framework of the FDA Approval Process**

46.     Physicians generally consult two sources prior to writing a prescription: the

patients' health insurance formulary,[6] and the Orange Book.[7]

47.    Under the Federal Food, Drug and Cosmetic Act ("FDCA"), branded drug manufacturers must obtain FDA approval to sell a new drug product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392.

48.    The NDA must include information pertaining to the drug's purported safety, efficacy, and pertinent patents.[8]

49.    The FDA does not investigate or verify the identified patents or uses, relying instead on representations made by the applicant. As the FDA does not verify patent authenticity, the system is subject to manipulation—a shortcoming that UT has repeatedly taken advantage of.[9]

50.    The FDCA was amended by the Drug Price Competition and Patent Term Restoration Act of 1984, which authorized the manufacture and sale of generic versions of brand-name drugs, thus incentivizing generic manufacturers to bring low-cost generics drugs to the market. 21 U.S.C. § 355. These amendments are known as the Hatch-Waxman Amendments.

51.    The Hatch-Waxman Amendments aim to: (1) induce pioneering research and development of new drugs; and (2) enable competitors to bring low-cost generic copies of existing

_____

[6] A list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits. Glossary, U.S. Centers for Medicare & Medicaid Services, https://www.healthcare.gov/glossary/formulary/ (last visited October 7, 2021).

[7] The Orange Book is the Food and Drug Administration's book that states a pharmaceutical's approved usage and any approved therapeutic equivalents, including the "patents that can reasonably be asserted against a drug manufacturer that makes, uses, or sells a generic version of the brand before patent expiration." *See* 21 C.F.R. § 314.53(b)(1); *see also*, https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm (last visited October 7, 2021).

[8] Food and Drug Administration, New Drug Application, (last updated June 10, 2019) https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

[9] The FDA defers to the Patent and Trademark Office on all matters involving the construction and validity of patent claims. Small Business Assistance: Frequently Asked Questions on the Patent.

drugs to market. As a result, the cost of drug prices should be reduced—a benefit to third-party payers and consumers.

52.     Rather than file an NDA, generic manufacturers[10] seek approval to sell generic versions of branded drugs by filing an Abbreviated New Drug Application ("ANDA").[11]

53.     Through the ANDA process, the generic manufacturer attempts to show that its product is bioequivalent to its branded counterpart, referred to as the "reference listed drug" ("RLD"). An RLD is an "approved drug product to which new generic versions are compared to show that they are bioequivalent," that is, the generic version "performs in the same manner as the Reference Listed Drug."[12]  A drug company seeking approval to market a generic equivalent must refer to the RLD in its ANDA. *Id.* Once the FDA approves an ANDA, the generic firm may manufacture and market the safe, effective, and affordable generic alternative to the public. *Id.*

54.     A generic drug contains the same active ingredients as the brand-name drug but typically sells at a lower price than the brand-name drug. As a result, generic drugs are frequently prescribed as a substitute for brand-name drugs in an effort to control healthcare costs, and they represent an increasing portion of the medicines used in the United States. The Generic Pharmaceutical Association (now known as the Association for Accessible Medicines) estimates that from 2001 through 2010, the nation's healthcare system saved $931 billion from the use of generic drugs. Achieving cost savings through generic substitutions is critical for expensive, life-

---

[10] *Hatch-Waxman Letters*, FDA, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/hatch-waxman-letters (last updated July 19, 2018).

[11] *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

[12]     *Glossary     of     Terms*,     U.S.     Food     &     Drug     Administration, http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#RLD (last updated Nov. 14, 2017).

saving treatments like Remodulin.

55.     The introduction of a generic drug as an alternative to a brand-name drug typically results in a dramatic reduction in the brand-name drug's market share, and the rate of reduction is particularly dramatic in the first six months.

56.     To achieve balance between protecting brand manufacturers and promoting generic competition, Congress requires that generic drug manufacturers applying for approval to certify one of the following:

a.      no patent information for the brand-name drug has been filed with the FDA;

b.      the relevant patent has expired;

c.      the relevant patent will expire, and the applicant does not seek to market its generic drug before the date of expiration; or

d.      the relevant patent is invalid or will not be infringed by the applicant's generic drug product (commonly known as "Paragraph IV Certification").

21 U.S.C. §§ 355(j)(2)(A)(vii)(I)-(IV).

57.     An applicant filing a Paragraph IV Certification must notify the patent holder of its ANDA. *After receiving this notice, the brand manufacturer can obtain a 30-month stay on the generic's market entry by filing a patent infringement suit (regardless of merit) against the applicant within 45 days of receiving notice of the ANDA.* 21 U.S.C. § 355(j)(5)(C)(i)(1)(aa) (emphasis added).

58.     The litigation by the brand manufacturer delays all generic competition because the FDA is barred from approving the proposed applicant's ANDA until the earliest of: (1) expiration of the patent; (2) district court resolution of the patent litigation in favor of the generic drug manufacturer; or (3) the expiration of the automatic 30-month stay. 21 U.S.C. § 355(j)(5)(B)(iv).

59.     It is no secret that brand manufacturers, like UT, benefit from a lack of competition, which enables them to artificially inflate the prices of their drugs to supra-competitive price levels.

60.     Therefore, in order to avoid substantial price competition and a loss of market share, brand manufacturers, like UT, actively seek to exclude generic manufacturers from competing by misusing the legal framework intended to incentivize generics in the marketplace. When that fails, however, brand manufactures, like UT, find alternative, unconventional means to stifle competition by creating artificial barriers, thus crippling generic competitors ability to sell, as was the case here.

61.     When artificial barriers are erected by brand manufacturers, like UT in this case, competition is stifled and third-party payers, like Plaintiffs' Assignors and the putative class members, pay supra-competitive prices.

62.     In summary, the availability of generic alternatives on the market is critical to maintaining affordable drug prices. To that end, Congress enacted laws to promote competition and combat monopolistic pricing. Federal and state laws encourage the cost savings made possible by generic competition.

## **FACTUAL ALLEGATIONS**

*UT and Smiths Make Exclusive Deal for CADD-MS 3 Pumps Blocking Generic Competition for Remodulin*

63.     The most common symptoms of PAH are shortness of breath, chest pain, exhaustion, dizziness or fainting, and heart palpitations. The New York Heart Association created four functional classes for evaluating heart failure, and those classes are often used to classify the severity of a PAH patient's symptoms: Class I patients have no observable symptoms; Class II patients experience symptoms when active; Class III patients experience symptoms at rest; and Class IV patients are severely affected by PAH at all times.

64.     Doctors typically prescribe treprostinil injections for Class III and Class IV patients. As it is necessary to maintain constant levels of treprostinil, a parenteral[13] delivery system is required.

65.     Remodulin is a parenterally administered (injected) form of treprostinil. It is administered in one of two ways: (1) under a patient's skin (subcutaneous injections); or (2) directly into a patient's veins (intravenous injections).

66.     Currently, PAH patients who are prescribed subcutaneous treprostinil injections receive their Remodulin injections only through the CADD-MS 3 pump, manufactured exclusively by Smiths.



67.     There are no other medical devices that are currently being used to administer subcutaneous treprostinil injections in the United States.

_____

[13] Parenteral administration are drugs given by routes other than digestive tract. Parenteral usually refers to injection or infusion. Jasmeet Soar & Jon Standing, Chapter 7: Parenteral Drug Administration, in *Medication Safety: An Essential Guide* (2010).

*UT and Smiths Agreements Per Se Violate Antitrust Statutes*

68.     The per se rules are invoked only when surrounding circumstances make the likelihood of anticompetitive conduct so great as make further examination of the challenged conduct unjustified.

69.     Smiths entered into agreements with UT to distribute the pump exclusively for the administration of branded Remodulin.

70.     These agreements equate to a naked restraint of trade with no purpose except to stifle competition.

71.     Accordingly, the agreements are each a per se violation of the antitrust laws for which a rules of reason analysis does not apply as the nature and necessary effect of which are so plainly anticompetitive that no elaborate study of the industry is needed to establish the illegality.

*History of Remodulin and Generic Remodulin*

72.     The FDA first approved Remodulin for subcutaneous injections in the United States in 2002. From 2002 until March 25, 2019, there was no generic alternative to Remodulin on the market.

73.     In 2011, Sandoz submitted an ANDA to the FDA, requesting permission to market a generic version of treprostinil for use in both subcutaneous and intravenous injections.

74.     In its ANDA, Sandoz certified that UT's patents related to Remodulin were invalid or would not otherwise be infringed by its generic version of treprostinil.

75.     In response, UT initiated three separate patent infringement lawsuits (on March 14, 2012, January 16, 2013, and September 2, 2014) against Sandoz where it argued that Sandoz should be precluded from selling generic treprostinil until the patents expired.

76.     Sandoz and UT settled their patent litigation on September 29, 2015. Pursuant to

the terms of the settlement agreement, Sandoz was permitted to start marketing its generic treprostinil alternative in June 2018.

77.     Following the settlement, UT began telling its investors that it expected "a risk of generic Remodulin erosion in the second half of 2018," but reassured investors that it had plans to take "a couple steps to ameliorate that." Specifically, UT aimed to "make generic barbaric" by developing new, proprietary methods of administering Remodulin injections and pushing patients and specialty pharmacies to adopt them. According to UT's CEO, "that little mantra reminds us that our job is to advance the state of patient care so rapidly that generic technologies and generic drugs delivered to old devices will seem barbaric." In other words, following the settlement with Sandoz, where it was agreed that a generic alternative to Remodulin would be available to market in 2018, Remodulin publicly shifted its focus to finding a more superior method of administering treprostinil injections so that patients would still prefer Remodulin over the generic brands (like the one created by Sandoz) that would still require the "barbaric" use of a CADD-MS 3 pump to administer treprostinil injections.

78.     As part of this strategy, UT partnered with Medtronic to develop an implantable pump called the "RemoSynch" that would serve as an alternative to intravenous injections. According to UT's CEO that pump would "greatly diminish the opportunity for generic penetration" because patients would prefer an implantable pump that only needed to be refreshed every few months over an external pump that needed to be refreshed every few days. Importantly, UT also ensured that Medtronic's new pump would only be offered "with branded treprostinil, in other words Remodulin included in it."

79.     UT initially planned for the new, implantable pump to be launched in 2017—well before Sandoz could sell its generic treprostinil injections. However, on April 3, 2017, UT

announced that it would not obtain FDA approval in time to launch its pump in 2017. Although the implantable pump was finally approved by the FDA in July 2018, it still could not be used with Remodulin until Medtronic satisfies certain conditions established by the FDA.

80.    For the subcutaneous segment of the market, UT implemented the same strategy by partnering with DEKA Research and Development Corporation ("DEKA") to create a disposable Remodulin pump, which it called the "RemUnity" pump. UT intended for the RemUnity pump to replace the CADD-MS 3 pump that patients use for subcutaneous treatment. According to UT's CEO, "per [UT's] agreement with DEKA, only branded Remodulin can be used in this pump."

81.    In November 2017, the FDA approved the Sandoz ANDA for generic treprostinil for both subcutaneous and intravenous injections.

82.    In February 2018, DEKA and UT filed for FDA approval of the RemUnity pump; however, the RemUnity pump is still not available for use by patients today.

83.    UT has also announced several other projects for the development of pumps for subcutaneous administration of treprostinil, including one project called RemoLife that is being developed by Defendant Smiths, and another one called Trevyent that was acquired by UT when it purchased SteadyMed Ltd. in August 2018.  Upon information and belief, these new pumps will also be subject to the same restrictions, in that, they will be exclusively reserved for use with Remodulin.

84.    In August 2018, Sandoz and RareGen agreed to jointly market and sell generic treprostinil for subcutaneous and intravenous injections.

85.    By late 2018, Sandoz and RareGen were preparing to commercially launch generic treprostinil for both subcutaneous and intravenous treatments.  But with its new pumps awaiting FDA approval, UT still had not come up with a way to effectively stifle competition with Plaintiffs'

generic alternative in the subcutaneous segment of the market.

86.     Given the well-known fact that the price of brand-name drugs substantially declines during the first six months after a generic alternative is first introduced to the market, UT decided to take desperate measures to totally eliminate any means of administering the new generic alternative that Sandoz was about to launch on the market.

87.     In doing so, UT decided to seek control of the entire supply of available CADD-MS 3 pumps, which is the only pump available in the United States for subcutaneous treprostinil injections.

88.     Through three separate contractual agreements occurring in or around March 2016, July 2017, and December 2019, UT conspired with Smiths to ensure that all CADD-MS 3 pumps would be exclusively reserved for use by branded Remodulin users only – thereby creating an additional artificial barrier of entry and completely blocking potential competitors from delivering treprostinil to patients receiving subcutaneous injections.

89.     As a result of this anti-competitive conduct, Sandoz was unable to obtain CADD-MS 3 pumps or cartridges to test its drug prior to launch.

90.     In furtherance of this conspiracy to monopolize the market and harm competition, Smiths then instructed specialty pharmacies that it would not sell CADD-MS 3 cartridges for use with generic treprostinil injections, and that any CADD-MS 3 cartridges they obtained could only be used with Remodulin.

91.     In or around April 2019, and in furtherance of this anticompetitive scheme, Smiths agreed to sell all remaining cartridges and the resin necessary to manufacture the cartridges to UT, thereby allowing UT to manage all sales functions for Smiths products – just days after Sandoz officially launched its generic treprostinil drug to market.

92.     In furtherance of this anticompetitive scheme, when Sandoz and RareGen later sought to order CADD-MS 3 cartridges from Smiths' distributors, Defendants blocked those orders, instructing the distributors that they could only sell the cartridges for use with branded Remodulin.

93.     As a result of this anticompetitive scheme, Defendants successfully blocked the generic entry of treprostinil in the marketplace, thereby enabling UT to maintain supra-competitive prices for Remodulin.  This allowed UT to maintain a monopoly despite the approval of a generic equivalent.

94.     As a result of Defendants' anticompetitive conduct, patients are being deprived of a lower-cost- generic form of treprostinil that can be administered subcutaneously.

95.     Defendants' anticompetitive conduct stifled competition by artificially restricting the number of alternatives for subcutaneous treprostinil injections, allowing UT to maintain high prices for Remodulin, which are ultimately born by Plaintiffs' Assignors. Plaintiffs' Assignors are harmed by Defendants' anticompetitive scheme, and the injuries sustained (i.e., paying supra-competitive prices for the only option available for a highly critical medical treatment) are the type of injuries the antitrust laws were meant to prevent, and they flow from the harm to competition caused by Defendants' monopolistic conduct.

*Using Patient Assistance Programs and Kickbacks to Remove Market Barriers for All UT Hypertension Products*

96.     "Part D enrollees with high drug costs can have difficulty affording their medications when they are in the deductible phase [and] when they reach the coverage gap—the period in which they are required to pay a larger share of total drug costs." Congressional Research Service, *Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)*, June 15, 2017. Patient assistance programs ("PAPs") are designed to help financially needy patients afford

necessary medications during this difficult period.

97.     There are two ways that pharmaceutical companies give to PAPs. First, manufacturers can establish their own PAPs. "Under this option, pharmaceutical companies give drugs directly to patients who cannot afford them or donate the drugs to a foundation that then gives them to patients. The second option is through independent charity PAPs (herein referred to as "co-payment charities")." *See Social Responsibility*. CVC is an independent charity PAP, or co-payment charity.

98.     For co-payment charities, pharmaceutical companies donate money to the charity, and people who cannot afford their drugs but have insurance (usually non-insureds, and Medicare) can apply to these charities to cover all or a portion of their drug costs.

99.     There are two key differences between these two options. "First, companies donate drugs in option 1 and money in option 2. Second, pharmaceutical companies receive no money besides a [tax] deduction in option 1, **but under option 2 they receive a [tax] deduction and money from the insurer paying the other portion of the drug costs**. Thus, assistance provided by option 2 reduces out-of-pocket costs to insured patients but do[es] not reduce the price of prescription drugs to the healthcare payer. These are one-sided discounts." *Id*. (emphasis added).

100.     A small donation to a co-payment charity results in a pharmaceutical company receiving a substantial portion of the prescription's cost from Medicare Advantage Plans, such as Plaintiffs' Assignors.[14]

---

[14] *See* Michael Banigan, *A Guide to Patient Assistance Programs: What You Need to Know to Promote Patient Advocacy and Maximize Charitable Contributions*." Chronic Disease Fund Inc. (2016) (providing that pharmaceutical companies can calculate their profitability, or "charitable margin," as a result of their donations to co-payment charities and can stand to earn 220 percent charitable margins). *See also* Austin Frerick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 (explaining that example of

101.    As pharmaceutical drug company "giving" to co-payment charities rises, the co-payment charity benefits as well. In fact, executives at co-payment charities are among some of the *highest paid executives* in the United States, CVC is not an outlier in this phenomenon. With theincrease in CVC donations, came an increase in CVC executive salaries. Pamela R. Harris, the President and Chairman of CVC received a salary of $233,457 in 2011. By comparison, in 2015, she received a salary of $378,200. This salary increase has a direct correlation to the amounts of donations CVC received from pharmaceutical manufacturers, like UT. CVC's contributions and grants increased from $49 million in 2011, to more than $131 million in 2015.

102.    Accordingly, in this context, pharmaceutical companies and co-payment charities have a mutually beneficial purpose—to receive donations, establish additional disease funds to cover co-payments of the pharmaceutical company's expensive, specialty drugs, and ensure federal healthcare programs bear the cost of these expensive, specialty drugs, so the co-payment charity can demonstrate "results" for the pharmaceutical company to justify increased donations.

103.    Given these shared economic incentives, it's no surprise that charitable assistance from co-payment charities increased from $11 million in 2004 to nearly $868 million in 2014. *See Social Responsibility* (noting that from 2007 to 2009, during the Great Recession, pharmaceutical giving increased by nearly $1.5 billion, whereas overall corporate giving decreased by $1.2 billion). The chart below details total giving for certain co-payment charities,including CVC, from 2001-2014.

---

"charitable margin" can yield a "charitable margin of 220 percent"); *see also* Citi Research, *The Straw that Could Break the Camel's Back*: *DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 (explaining that "[e]ach $1m industry donation to a charitable foundation to enable Medicare patients Xtandi access or similar high priced drugs has the potential to generate up to $21m for the sponsor company, **funded by the US Government.**") (emphasis added).

| Table A-1 Total Giving in Dollars for Independent Charity Patient Assistance Programs (PAPs), 2001-2014 | | | | | | |
|---|---|---|---|---|---|---|
| | Patient Access Network Foundation^a | Chronic Disease Fund/ Good Days^b | Caring Voice Coalition^c | Healthwell Foundation^d | Patient Services | Subtotal: Independent Charity PAPs |
| 2001 | — | — | — | — | $2,328,611 | $2,328,611 |
| 2002 | — | — | — | — | $3,296,181 | $3,296,181 |
| 2003 | — | — | — | — | $5,118,345 | $5,118,345 |
| 2004 | — | — | $80,393 | — | $6,932,842 | $11,301,748 |
| 2005 | $7,587,312 | $5,597,689 | $5,287,805 | $15,856,793 | $15,719,269 | $49,988,866 |
| 2006 | $18,652,884 | $66,279,917 | $9,850,206 | $47,289,619 | $15,333,700 | $157,406,276 |
| 2007 | $24,880,629 | $63,551,700 | $15,816,549 | $59,391,157 | $21,467,030 | $185,107,065 |
| 2008 | $32,825,596 | $82,133,885 | $27,943,050 | $57,521,456 | $35,269,942 | $235,693,929 |
| 2009 | $37,323,252 | $136,713,152 | $37,530,533 | $71,425,660 | $29,594,995 | $312,587,592 |
| 2010 | $37,562,665 | $172,488,043 | $38,166,963 | $84,233,714 | $37,440,434 | $369,891,819 |
| 2011 | $28,379,485 | $195,647,202 | $46,827,156 | $49,521,777 | $39,983,874 | $360,359,494 |
| 2012 | $108,460,641 | $182,365,638 | $58,221,721 | $36,995,288 | $50,332,148 | $436,375,436 |
| 2013 | $174,340,174 | $194,448,004 | $67,435,466 | $31,135,498 | $60,897,475 | $528,256,617 |
| 2014 | $496,427,781 | $170,628,203 | $98,027,589 | $29,039,150 | $73,735,080 | $867,857,753 |

Source: ProPublica's Nonprofit Explorer Database.
Notes: These totals come from line 13 titled "Total Grants" on Form 990, although for some entities before 2008, the totals come from line 23, part II.
^a Excluded 2004 return because it was an initial return.
^b Excluded 2004 return because it was an initial return.
^c Excluded 2002 return because it was an initial return and their reporting years run July to June.
^d Excluded 2004 return because it was an initial return.

104.    The rise of co-payment charities and pharmaceutical corporate giving to such charities (with the economic incentives detailed above) is tied to the enactment of public insurance programs expanding the number of Americans with prescription drug coverage, the growth of specialty drugs, and the federal anti-kickback law.

105.    First, this increased giving to co-payment charities occurred during a period in which there was a major increase in the number of Americans with prescription drug coverage as a result of the enactment of Medicare Part D and, subsequently, the passing of the Affordable Care Act in 2010 ("ACA"), which expanded Medicaid in providing prescription drug benefits. "Before these public insurance expansions, federal government spending on prescription drugs was 25 percent of total spending in 2005. In 2014 it was 41 percent." *Id.*

106.    Second, in addition to these public insurance programs, specialty drugs (*i.e.*, generally defined as expensive prescriptions requiring extra handling or administration in treating complex diseases) have contributed to the growth of co-payment charities. "In recent years, spending for specialty drugs has grown faster than spending for other pharmaceuticals. Although specialty medications account for only one percent of prescriptions, they account for almost a third of U.S. prescription spending.  For Medicare Part D, specialty drugs accounted for a quarter of a

percent of prescriptions in 2013 but eleven percent of total drug cost." *Id.*

107.    Co-payment charities allow pharmaceutical companies to manage price sensitivity for these more expensive specialty drugs. The OIG noted that PAPs "may steer patients toward and lock them into a particular manufacturer's product, even when other equally effective and less costly alternatives are available. *Id.*

108.    Moreover, the rise of co-payment charities was in response to federal anti-kickback law. The Antikickback statute ("AKS") made the receipt of kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and Medicaid programs a crime. The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person to purchase or recommend any good, service, or item covered under a federal health care program. *See* 42 U.S.C. § 1320a-7b(b).

109.    As it relates to PAPs, the OIG has stated that the AKS could be violated "if a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to influence the patient to purchase (or induce the patient's physician to prescribe) certain items." 79 Fed. Reg. at 31121.

110.    Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FAC"). *See* 42 U.S.C. § 1320a-7b(g).

*OIG Guidance for Co-Payment Charities*

111.    Since 2005, in advance of Medicare Part D taking full effect, the OIG has provided guidance to co-payment charities regarding compliance with applicable laws and regulations, including the AKS and FCA. In this guidance, the OIG made clear that such charities will run

afoul of those laws and regulations if they do not follow specified rules. Those rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity, or receive information from such a charity, that would allow the manufacturer to link the amount it donates to additional profits from the sale of a particular drug.

112.    In 2005, the OIG initially issued a special advisory bulletin on PAPs (the "2005 Special Advisory Bulletin"). The 2005 Special Advisory Bulletin provided that certain cost-sharing subsidies provided by bona fide, independent PAPs unaffiliated with drug manufacturers do not raise AKS concerns, even if the PAPs receive manufacturer contributions. See OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), attached as **Exhibit E**. The 2005 Special Advisory Bulletin also set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following:

a.  No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

b.  The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;

c.  the PAP awards assistance without regard to the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

d.  The PAP provides assistance based upon a reasonable verifiable, and uniform measure of financial need that is applied in a consistent manner; and

e.  the drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. *Id.* at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices.")

113.    In 2014, the OIG issued an updated bulleting raising concerns about the conduct of

co-payment charities and intensifying its scrutiny of arrangements between pharmaceutical companies and co-payment charities (the "2014 Special Advisory Bulletin"). *See* Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120 (May 30, 2014), attached as **Exhibit F**. In the 2014 Special Advisory Bulletin, the OIG stated that although PAPs can provide an important safety net assistance to financially needy patients, these programs also present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not sufficiently independent from donors. *Id.*

114. The OIG thereafter noted three additional areas of concern related to disease funds, eligible recipients, and the conduct of donors, and required co-payment charities to certify to the OIG that:

    a. The co-payment charity will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

    b. The co-payment charity will not maintain any disease fund that provides co-payment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates; and

    c. The co-payment charity will not limit its assistance to high-cost or specialty drugs. Instead, the co-payment charity will make assistance available for all products, including generic or bioequivalent drugs covered by Medicare or other insurers, when prescribed for the treatment of the disease state(s) covered by the fund.

*Id.*

115. With respect to the "conduct of donors," the 2014 Special Advisory Bulletin reiterated its prior focus [from the 2005 Special Advisory Bulletin] on co-payment charities not giving a "donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP." *Id.* Notably, the OIG warned that:

> [t]he procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to co-payments of its own products, which would implicate the antikickback statute.

*Id.*

*CVC's Growth and OIG's Communications*

116.    CVC was founded in 2003 as a national 501(c)(3) non-profit, charitable organization aimed at providing monetary support for financially needy patients with certain chronic or life-threatening diseases. CVC established certain disease funds, including the PAH fund, which were funded by donors, including UT. As detailed above, CVC grew from receiving $80,383 from donors in 2004 to receiving over $131 million from donors in 2015. UT's Settlement with the United States generally describes UT's giving to CVC, including UT specifically contributing to CVC's PAH fund. But neither the Settlement nor CVC's annual Form 990 Tax filings detail UT's specific annual donations (Schedule B of CVC's Form 990 Tax Filings provide "Total contributions" amounts without specifically identifying the contributor).

117.    CVC violated one of the most basic rules that separates legitimate co-payment charities from illegal ones—it provided information so UT could correlate its donations with its increased profits on the sale of specific drugs—and then CVC lied about it to the OIG.

118.    In 2006, CVC certified to the OIG that it would comply with the requirements outlined above in the OIG's 2005 Special Advisory Bulletin. CVC subsequently requested an advisory opinion from the OIG inquiring whether its "Proposed Arrangement" as a nonprofit, tax-exempt, charitable corporation's proposal to provide financially needy Medicare beneficiaries with assistance and cost-sharing obligations under Medicare Part B, Medicare Part D, Medigap, ***and Medicare Advantage*** would constitute grounds for sanctions under certain federal laws, including

29

the AKS. In response, on April 20, 2006, the OIG issued an Advisory Opinion to CVC. *See* OIG,

Adv. Op. 06-04 (April 20, 2006), attached as **Exhibit G**. The 2006 CVC Advisory Opinion noted

CVC's certification that, among other requirements, no donor had exerted or will exert "any direct

or indirect influence or control" over CVC. *Id.* ("[CVC] has certified that no donor or affiliate of

any donor (including, without limitation, any employee, agent, officer shareholder, or contractor

(including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) has

exerted or will exert any direct or indirect influence or control over [CVC] or any of [CVC]'s

programs.").

119.     The 2006 CVC Advisory Opinion provided that upon request and as a courtesy,

donors will be informed monthly of the aggregate number of patients who qualify for assistance in

a category, but highlighted CVC's certification that "the monthly data will not contain any

information that enable a donor to correlate the amount or frequency of its donation with the

number of subsidized prescriptions or orders for its products or the volume or medical condition of

patients choosing its services." *Id.* ("No individual patient information will be conveyed to donor,

nor will any data related to the identity, amount, or nature of products or services subsidized under

the Proposed Arrangement.").

120.     The OIG concluded, in part, that "based on the facts certified in [CVC's] request

for an advisory opinion and supplemental submissions . . . [and subject to various limitations set

forth by the OIG] while the Proposed Arrangement could potentially generate prohibited

remuneration under the anti-kickback statute, if the requisite intent to induce or reward referrals

of Federal health care program business were present, the OIG would not impose administrative

sanctions on [CVC] under [federal laws regarding civil monetary penalties] in connection with the

Proposed Arrangement." *Id*.

121.     In December 2015, the OIG published a Modified Advisory Opinion to CVC following the OIG's request that CVC certify compliance with the additional factors outlined in the 2014 Special Advisory Bulletin (the "2015 CVC Modified Advisory Opinion"), attached as **Exhibit H**. *See* OIG, Adv. Op. 06-04 (Dec. 23, 2015). The 2015 CVC Modified Advisory Opinion stated that CVC had certified compliance to each additional factor, and further that CVC had proposed additional modifications to its current operations. *Id*. The OIG concluded in the 2015 CVC Modified Advisory Opinion that CVC's PAP was sufficiently low risk and the OIG would not impose civil monetary penalties or sanctions on CVC under the AKS. *Id*.

122.     CVC was admittedly on notice of the OIG's guidance, cautionary language, and the certification requirements set forth in the 2005 and 2014 Special Advisory Bulletins, as well as the Advisory Opinions OIG provided specifically to CVC. In fact, CVC even designed a "Compliance Program" "to assist CVC in preventing, detecting and responding to illegal, improper and unethical conduct . . . [and to] serve as a procedural framework for enhancing and monitoring compliance with applicable law, regulation, the CVC Code of Conduct and organizational policies and procedures. ***The Compliance Program is based on . . . applicable [OIG] guidance.***" (*See* Summary of the CVC Compliance Program, attached at **Exhibit I** (emphasis added). In turn, CVC's "Code of Conduct" purports to "describe[] the commitment that [CVC] expects of itself . . . to maintain the highest ethical standards of honesty and integrity as well as to comply with all laws and legal requirements applicable to [CVC], including [OIG] guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified, and industry guidance, including the Independent Charitable Patient Assistance Program Code of Ethics ('IPAP Code of Ethics')." (*See* CVC's Code of Conduct, attached at **Exhibit J**.)  According to CVC's Code of Conduct, based on its "core values," CVC represented that it was "dedicated to the following

values/ethical principles . . . [among others]":

      a.    Act with honesty, integrity, and objectivity, and in a manner that will merit the continued trust and confidence of patients and stakeholders.

      b.    Operate independently, free from the influence of CVC donors.

      c.    Comply with all federal, state, and local laws, regulations, and legal requirements applicable to CVC, including OIG guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified.

      d.    Be vigilant in the detection and prevention of potential fraud, waste or abuse.

      e.    Promptly investigate and address potential violations of applicable law, regulation, OIG guidance, CVC's Advisory Opinion, IPAP Code of Ethics, this Code, or Company policies and procedures.

*Id.*

     123.    The referenced IPAP Code of Ethics that CVC committed to comply with similarly provides that co-payment charities "[o]perate under the auspices of an ongoing compliance with an organization-specific [OIG] Advisory Opinion," and "[o]perate independently, free from the influence of donors," which included "[r]efrain[ing] from providing donors or other entities with information that could permit the correlation of the amount or frequency of donations with the number of patients assisted by the [co-payment charity] who use a donor's products or services or the volume of those products supported by the [co-payment charity]." (*See* IPAP Code of Ethics, attached at **Exhibit K.**).  Nonetheless, CVC shared with UT the very information it promised it wouldn't share and steered patients toward the UT Drugs in violation of the OIG's general guidance, the OIG's specific guidance to CVC, CVC's certifications to the OIG, CVC's internal "compliance" policies the FCA, and the AKS. Because of this, in November 2017, the OIG rescinded its prior advisory opinions issued to CVC (the "2017 CVC Rescission Letter"). *See* OIG, Adv. Op. 06-04 (Nov. 28, 2017), attached as **Exhibit L**. The 2017 CVC Rescission Letter was

based on CVC's "failure to fully, completely, and accurately disclose all material facts to OIG," and CVC's failure to comply with certain factual certifications made to the OIG. *Id.*

124.    The Recission Letter stated:

Specifically, we have determined that, in contravention of the certifications [CVC] made, [CVC]: (i) provided patient specific data to one more donors that would enable the donor(s) to correlate the amount and requency of their donations with the number of subsidized prescriptions or orders for their products, and (ii) allowed donors to directly or indirectly influence the identification o delineation of [CVC's] disease categories."

*Id.*

125.    The 2017 CVC Recission letter concluded that:

[CVC]'s failure to comply with these certifications materially increased the risk that CVC served as a conduit for financial assistance from a drug manufacturer donor to a patient, and thus increased the risk that the patients who sought assistance from [CVC] would be steered to federally reimbursable drugs that the manufacturer donor sold. This type of steering can harm patients and the Federal health care programs, because, for example, patients may be urged to seek, and physicians may be more likely to prescribe, a more expensive drug if co-payment assistance is available for that drug but not for less expensive but therapeutically equivalent alternatives. In these circumstances manufacturers may have greater ability to raise the prices of their drugs while insulating patients from the immediate out-of-pocket effects of price increases, leaving Federal healthcare programs like Medicare (and the taxpayers who fund those programs) to bear the cost.

*Id.* (emphasis added).[15]

*The DOJ Settlement*

126.    The UT Settlement and facts alleged therein, which specifically relate to the conduct identified by the OIG in its 2017 CVC Rescission Letter, represent one result of a much larger ongoing investigation by the DOJ and OIG, along with the U.S. Attorney's Office for the

---

[15] CVC subsequently announced that in light of the 2017 CVC Rescission Letter, it would not open financial assistance for any disease fund in 2018. See http://www.caringvoice.org/decision-2018-financial-assistance.

District of Massachusetts, into schemes by various drug manufacturers and co-payment charities that violated the AKS and FCA.[16] As recognized by pharmaceutical-industry financial analysts, these investigations could "impede industry returns." *See* Citi Research, *The Straw that Could Break the Camel's Back: DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 (noting that "[t]he ongoing multiple DOJ/OIG investigations into financial donations by pharmaceutical companies to independent foundations has the potential to severely limit future revenues for several high-priced blockbuster Medicare Part D drugs through (i) lowered overall funding for patient out-of-pocket assistance (ii) lesser ability for individual pharmaceutical donors to guide their funding towards specific drugs.").

127.    The December 2017 UT Settlement with the United States was based on the United States' claims that UT's conduct violated the AKS and FCA, thereby leaving a Federalhealthcare program (in this case, Medicare) "bear[ing] the cost."

128.    Specifically, the United States alleged the following:

UT made donations to CVC's PAH fund and used it as a conduit to pay the co-payment obligations of thousands of Medicare patients taking the [UT] Drugs, to eliminate price sensitivity of patients purchasing or physicians prescribing the [UT] Drugs, and to induce those patients' purchases of the [UT] Drugs. From February 2010 through January 2014, UT routinely obtained data from CVC detailing how

---

[16] Other recent results involving the resolution of AKS and FCA claims brought by the United States on behalf of Medicare (not Medicare Advantage) against drug manufacturers participating in improper schemes with co-payment charities include, but are not limited to: (i) Jazz Pharmaceuticals PLC ("Jazz") agreeing in May 2018 to pay the United States $57 million related to claims involving Jazz's relationship with CVC to fund co-payment for Jazz's narcolepsy drug Xyrem; (ii) Pfizer Inc. ("Pfizer") agreeing in May 2018 to pay the United States $23.8 million related to claims involving Pfizer's relationship with Patient Access Network Foundation to fund co-payments for Pfizer's renal cell carcinoma drugs Sutent and Inlyta and Pfizer's arrhythmia drug Tikosyn; (iii) H. Lundbeck A/S ("Lundbeck") agreeing in June 2018 to pay the United States $52.6 million related to claims involving Lundbeck's relationship with CVC to fund co-payment for Lundbeck's Huntington's Disease drug Xenazine; and (iv) Actelion Pharmaceuticals US, Inc. ("Actelion") agreeing in December 2018 to pay the United States $360 million related to claims involving Actelion's relationship with CVC to fund co- payment for Actelion's Hypertension drugs Tracleer, Ventavis, Veletri, and Opsumit.

many patients on each [UT] Drug CVC had assisted and how much CVC had spent on those patients. In deciding whether and how much to donate to CVC, UT considered the revenue it would receive from prescriptions for Medicare patients who received assistance from CVC to cover their co-payments for the [UT] Drugs. UT used data from CVC to confirm that UT's revenue far exceeded the amount of UT's donations to CVC. At the same time, UT had a policy of not permitting Medicare patients to participate in its free drug program, which was open to other financially needy patients, even if those Medicare patients could not afford their co-payments for UT Hypertension Drugs. Instead, in order to generate revenue from Medicare and to induce purchases of the [UT] Drugs, UT referred Medicare patients prescribed the [UT] Drugs to CVC, which resulted in claims to federal healthcare programs to cover the cost of the drugs.

(UT Settlement Agreement at 2, attached at **Exhibit A**.)

129.     Under the terms of the Settlement, UT agreed to pay the United States $210 million

resolve the United States' AKS and FCA claims on behalf of Medicare. The UT Settlement does

not redress the harm the Defendants' illegal conduct caused to Medicare Advantage plans, such as

Plaintiffs' Assignors and the Class Members.

*The Impact on Plaintiffs and Medicare Advantage*

130.     The UT Settlement did not settle any claims that Plaintiffs' Assignors and the Class

Members may have against Defendants.

131.     Defendants' misconduct damaged Plaintiffs' Assignors and the Class Members.

132.     Specifically:

    a. UT made donations to CVC's PAH fund and used it as a conduit to pay the co-payment obligations of thousands of Medicare Advantage patients taking the UT Hypertension Drugs;

    b. Defendants' conduct eliminated price sensitivity of patients purchasing or physicians prescribing UT Hypertension Drugs, which in turn enabled UT to raise the price of UT Hypertension Drugs to supracompetitive prices, quickly and outside of ordinary market conditions. Medicare Advantage programs were left to bear the cost, while CVC was able to demonstrate "results" to UT – if UT "donated" money to CVC, it would make money, not only off the new "customers" but also by its ability to raise prices, and ensure that the drugs were still prescribed, dispensed, and reimbursed;

    c. Defendants' conduct caused Medicare Advantage patients to purchase the UT

Hypertension Drugs;

d. UT routinely obtained data from CVC detailing how many patients, including Medicare Advantage patients, on each [UT] Drug CVC had assisted and how much CVC had spent on those patients;

e. In deciding whether and how much to donate to CVC, UT considered the revenue it would receive from prescriptions for Medicare Advantage patients who received assistance from CVC to cover their co-payments for the UT Hypertension Drugs;

f. UT used data from CVC to confirm that UT's revenue far exceeded the amount of UT's donations to CVC;

g. UT ensured that Medicare Advantage bore the cost of UT Hypertension Drugs by employing a policy of not permitting Medicare Advantage patients to participate in UT's free drug program (*i.e.*, Option 1 described above), which was open to other financially needy patients, even if those Medicare Advantage patients could not afford their co-payments for UT Hypertension Drugs; and

h. To generate revenue from Medicare Advantage patients prescribed the UT Hypertension Drugs to CVC, which upon CVC approving coverage of patients' co-payments, triggered Plaintiffs' Assignors' obligations to cover of the UT Hypertension Drugs.

133. Because of Defendants' scheme, Plaintiffs' Assignors and putative class members paid for prescriptions they would not have otherwise paid and there was a direct relationship between the misconduct at issue here and the payments Plaintiffs' Assignors and the putative class members made for Medicare Advantage patients.

134. Defendants knew and intended that their scheme would increase the number of prescriptions used by Medicare Advantage patients for the UT Hypertension Drugs.

135. Plaintiffs' Assignors and the putative class members were the primary and intended victimsof Defendants scheme and the injury to them was a foreseeable and natural consequence of the scheme.

136. Plaintiffs' Assignors and the putative class members suffered direct economic injury as a direct and proximate cause of Defendants' scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this Complaint.

137. UT and CVC had the shared goal of growing CVC's PAH fund and thereby enabling CVC's directors and officers *to use the non-profit charities increased funds to justify a substantial increase in their own compensation.* The Co-Payment Circumvention Enterprise increased the number of Medicare Advantage (among other Federal healthcare programs) who were receiving co-payment assistance for UT's Hypertension Drugs from CVC's PAH fund, triggering Plaintiffs' Assignors' coverage obligations for these Medicare Advantage patients, eliminating price sensitivity to UT Hypertension Drugs, and allowing UT to increase its revenues and profits for UT Hypertension Drugs.

138. For Defendants, this was a "win-win" arrangement. UT's donations to CVC were directed by UT to CVC's PAH fund and, in return, co-payment assistance for these UT Hypertension Drugs was provided by CVC for patients covered by Medicare Advantage. As CVC illegally provided data and information to UT regarding the profitability of UT's donations to CVC's PAH fund, UT increased its donations to the PAH fund. UT's increasing donations to CVC's PAH fund resulted in more Medicare Advantage patients receiving co-payment assistance, the elimination of price sensitivity for UT Hypertension Drugs, and increased profits for UT. And all along the way, as UT's donations to CVC's PAH fund continued to rise, CVC's executives increased their own compensation and benefits.

139. With respect to the elimination of price sensitivity for UT Hypertension Drugs noted above, information from the Centers for Medicare and Medicaid Services ("CMS") and Plaintiffs' Assignors demonstrates how Defendants' scheme eliminated price sensitivity of patients purchasing or physicians prescribing UT Hypertension Drugs and resulted in Federal healthcare programs bearing the cost. For example, CMS's Medicare Part D data shows that for UT's best-selling PAH drug, Adcirca, Medicare spending rose from $62 million in 2012, to $111

million in 2013, to $156 million in 2014, to $212 million in 2015, to more than $275 million in 2016.

      140.    The CMS Medicare Part D data further provides that the Annual Growth Rate in Spending per dose rose during this 2012-2016 period at a rate of 20.6%—from $23.90 per dose in 2012, to $28.67 per dose in 2013, to $34.21 per dose in 2014, to $41.59 per dose in 2015, to $50.47 per dose in 2016. The chart below illustrates Adcirca's rising price and UT's revenue growth from Adcirca[17] sales from Medicare—and the corresponding lack of price sensitivity for Adcirca and the burden imposed on Federal healthcare programs.



---

[17] UT markets and sells Adcirca under a license agreement with Eli Lilly & Co.



141.    Plaintiffs' Assignors' data for their covered beneficiaries yields similar findings. Plaintiffs' Assignors paid for Adcirca prescriptions on behalf of covered beneficiaries in a total amount of over $15 million.

142.    Plaintiffs' Assignors paid over $24.8 million in claims for the UT Hypertension Drugs from January 1, 2010 through 2017. Information in the exclusive control of Defendants will demonstrate that a significant portion of the co-payments paid on behalf of the beneficiaries of Plaintiffs' Assignors were made by CVC in connection with Defendants' Co-Payment Circumvention Enterprise.

143.    Plaintiffs' Assignors were not privy to which financially needy patients' co-payments were being provided by UT's donations to CVC's PAH fund. Plaintiffs' Assignors' obligations to cover claims for the UT Hypertension Drugs only arose when covered patients satisfied their co-payment obligations and Plaintiffs' Assignors did not and could not have known that their reimbursement obligations were caused by Defendants' misconduct.

144.    Defendants' documents and disclosures clearly demonstrate that they possess information to show exactly which patients received co-payment assistance. For example:

145.     CVC's Form 990 Tax Filings state in Supplemental Information to Schedule I, Part

I, Line 2:

> Financial grants are given when an individual specifies he/she has a disease
> supported by Caring Voice and he/she meets stated income guidelines. Individuals
> fill out an application for financial assistance which must be accompanied by a
> medical certification from their physician documenting their diagnosis. Grant funds
> are paid to third party pharmacies or insurance companies after proof is received
> that the patient has incurred therapy costs associated with the specific diagnosis.
> ***Caring Voice monitors the use of grant funds for individuals using proprietary
> database software. The database maintains all records to substantiate the amount
> of an individual's grant, the grantee's eligibility and payments made on the
> grant***.[18]

146.     CVC's Code of Conduct (adopted by CVC's Board of Directors on July 22, 2017)

states that CVC will:

> Maintain accurate and complete books and records, including accounting and
> financial data, and retain such books and records in accordance with applicable
> federal, state and local laws and regulations, Company's record retention policies
> and procedures and Company instructions.[19]

147.     Plaintiffs' Assignors' data confirms that the volume (or quantity) of the UT

Hypertension Drugs paid for by Plaintiffs' Assignors declined dramatically after Defendants' Co-

Payment Circumvention Enterprise was uncovered. This provides direct evidence of the causal

effect of Defendants' conspiracy and misconduct.

148.     For example, as set forth in the following chart, AvMed, one of Plaintiffs'

Assignors, paid $1,024,062.53 in claims for the UT Hypertension Drugs in 2018 while paying

merely $81,136.54 in claims for the UT Hypertension Drugs in 2019—a 92% decrease.

---

[18] *See* CVC's Form 990 Tax Filings, attached as **Exhibit M**.
[19] *See* CVC's Code of Conduct, attached as **Exhibit J**.



149. As noted above, Defendants' scheme benefited CVC and its executives. During the time period Defendants carried out the Co-Payment Circumvention Enterprise, CVC's President was Pamela R. Harris. Ms. Harris, along with her daughter, Samantha Harris (Ms. Samantha Harris later changed her name to Samantha Green), who served as CVC's Vice-President, were among a handful of executives whose compensation is set forth in Part VII of CVC's annual Form 990 Tax Filings. CVC's Form 990 Tax Filings demonstrate that Pamela R. Harris' total executive compensation (not including certain rental income she received from CVC and other potential benefits) rose nearly 70% between 2011 and 2015, from around $248,000 in 2011 to over $421,000 in 2015. (*See* CVC's Form 990 Tax filings, attached as **Exhibit M**). Similarly, Samantha Harris' compensation doubled. *See id.*

## CADD-MS3 Pump Exclusive Dealing Relevant Product Market (Remodulin)

150. Three classes of drugs have been approved by the FDA to treat PAH. They are

called: (1) Endothelin Receptor Antagonists ("ERAs"); (2) Phospodiesterase Type 5 inhibitors ("PDE-5s"), and (3) Prostacyclins.

151.    The active ingredient in Remodulin is treprostinil, which is a synthetic form of prostacyclin.

152.    The treatment program used by a PAH patient (i.e., the drug and delivery mechanism) is based on the severity of the patient's symptoms and the treating physician's judgment. The selection of one drug class over another, or of a particular administration method, is not based on the underlying price of the treatments. Thus, a small, but significant, and non-transitory increase in the price of one class of drugs would not cause treating physicians and patients to substitute in significant numbers to a different class of drugs; and a small, but significant, and non-transitory increase in the price of one administration method would not cause treating physicians and patients to substitute in significant numbers to a different administration method.

153.    ERA and PDE-5 treatments are not reasonable substitutes for prostacyclin treatments because they are indicated for less severe forms of PAH. As a patient's symptoms become worse, they will typically progress to prostacyclin treatments. As United Therapeutics' CEO has explained:

> There are the PDE-5 inhibitors of which the two brand names that are most well-known, Viagra and Cialis, are of that category. And those drugs have been rebranded to be used in pulmonary hypertension. You have to take them every day for the rest of your life.
>
> And they are able to effectuate some dilation in those distal pulmonary arteries and help patients for a while. But almost every patient disease ends up progressing through the benefits given by the PDE-5 inhibitors.
>
> So, I will also mention that PD[E]-5 inhibitors are the least expensive drugs for treating this disease and are generally the first line therapy provided to the patient. Once their disease progresses through these PDE-5 inhibitors, the patient[s] next

have a line of drugs called endothelium receptor antagonists, or ERAs for short. . . .

They help the group one pulmonary arterial hypertension patient for a while. But as with the PDE-5s, the patient disease progresses through the benefits of the ERAs. And on average the patients will stay on an ERA for something like one to two years before their disease has progressed and they need yet a stronger medicine.

And then at the end of the – at the end of this progression is a third class of medicines of what are called the prostacyclin class. . . .

See Sandoz, Inc. v. United Therapeutics, Corp., 2020 WL 697137 [No. 3:19-cv-10170-BRM-LHG, Complaint at ¶56])

154.    Within the class of prostacyclin-based PAH treatments, there are at least two relevant antitrust product markets that are affected by Defendants' unlawful conduct: (1) the market for subcutaneously injected treprostinil; and (2) the market for injected prostacyclins.

**Subcutaneously Injected Treprostinil**

155.    Prostacyclin-based therapies administered by injection are highly differentiated. At one end of the spectrum are treatments based on epoprostenol (which include the brand-name drugs Flolan and Veletri) and at the other end of the spectrum are treatments based on treprostinil (such as Remodulin). There are significant differences between the two sets of medications that make one of them, or the other, the best alternative for a particular patient that needs to receive prostacyclin injections.

156.    As United Therapeutics explained in its 10-K filing with the SEC:

Remodulin is stable at room temperature, so it does not need to be cooled during infusion and patients do not need to use cooling packs or refrigeration to keep it stable. treprostinil is highly soluble and highly potent, which enables us to manufacture Remodulin in concentrated solutions. This allows therapeutic concentrations of Remodulin to be delivered at very low flow rates via miniaturized infusion pumps for both subcutaneous and intravenous infusion. Remodulin can be continuously infused for up to 48 hours intravenously or 72 hours subcutaneously before refilling the external infusion pump. This profile contrasts favorably with

the other continuously infused prostacyclin therapies in the market—Flolan, Veletri and generic epoprostenol.

Flolan and generic epoprostenol are not stable at room temperature (and therefore require refrigeration or the use of cooling packs), but Veletri may be stable at room temperature depending on its concentration. Flolan, generic epoprostenol, and Veletri have shorter half-lives than Remodulin, requiring mixing prior to pump refills. None of these competitive products may be administered via subcutaneous infusion, and therefore may only be delivered intravenously.

(**Exhibit N**, p. 6: United Therapeutics 10-K, February 26, 2020).

157.    Because of the substantial differences between injected treprostinil treatments and those based on epoprostenol, treprostinil is the only PAH treatment that can be administered through subcutaneous injections in the United States today.

158.    As of March 2020, there are approximately 2,000 patients in the United States who are currently being treated for PAH with subcutaneous Remodulin injections. Those patients have been prescribed Remodulin by their treating physicians and their treatment program relies on subcutaneous injections using the CADD-MS 3 pump.  Those patients will not switch to other PAH treatments in response to a small, but significant, and non-transitory increase in the price of subcutaneously injected treprostinil.

159.    Subcutaneously injected treprostinil therefore constitutes a relevant antitrust product market.

### Injected Prostacyclins

160.    Prostacyclin-based treatments for PAH can be administered through: (1) inhaled treatments, such as inhaled treprostinil (including the branded drug Tyvaso, which is sold by United Therapeutics); (2) oral treatments, such as treprostinil in tablet form (including the branded drug Orenitram, also sold by United Therapeutics); or (3) injected treatments (such as Remodulin).

161.    Inhaled and oral prostacyclin treatments are not reasonable substitutes for injected

prostacyclin treatments.

162. As United Therapeutics' CEO has explained, whether patients "go onto Orenitram first and then Tyvaso, or Tyvaso first and then Remodulin, or straight to Remodulin" is "simply a consequence of their doctor's judgment as to how much prostacyclin they require and in what form."

163. If a patient is diagnosed with PAH before their symptoms become severe, they typically will start a treatment program based on oral prostacyclins, and progress over time to other forms of treatment as their symptoms change. Again, United Therapeutics' CEO explained:

> [T]here is an entire family of the most potent treatments for pulmonary hypertension across the cyclin family that you can start with orally. As the patient's disease progresses, you can move to an inhaled therapy for them, which is less invasive . . . than parenteral, but still getting the medicine more directly to where it's needed in the distal portions of the pulmonary vascular bed via Tyvaso. And then finally, if the patients and disease continues to progress, which unfortunately the vast majority [do], the kind of drugs you can transition the patient on to parenteral, Remodulin, either subcutaneous or intravenous.

164. According to United Therapeutics' CEO, Remodulin "is the medicine that physicians reach for when patients are struggling with managing their pulmonary hypertension due to the oral treatments not being able to halt the progression of the disease."

165. For all these reasons, patients who have been prescribed injected prostacyclin treatments will not switch to other prostacyclin treatments in response to a small, but significant, and non-transitory increase in the price of injected prostacyclin.

166. Injected prostacyclins therefore constitute a relevant antitrust product market.

**CADD-MS3 Pump Exclusive Dealing Relevant Geographic Market**

167. The relevant geographic market is the United States and its territories. Due to FDA regulations and the importance of this life-preserving treatment, a small, but significant, and non-transitory increase in the price of subcutaneously injected treprostinil or injected prostacyclins

would not cause treating physicians and patients to substitute in significant numbers to other treatments that are not available in the United States or its territories.

**CADD-MS3 Pump Exclusive Dealing Market Share**

168.    Before the entry of generic competition, United Therapeutics sold 100% of the treprostinil administered through subcutaneous injections in the United States, and as a result of the restrictions related to the CADD-MS 3 cartridges, United Therapeutics continues to sell 100% of the treprostinil administered through subcutaneous injections in the United States.

169.    The market for injected prostacyclins is highly concentrated in the United States, with United Therapeutics holding a share of the market in excess of 70%. In 2016, for example, United Therapeutics estimated that it "own[ed] about 82% share in the parenteral market." And as of June 2018, United Therapeutics boasted "Remodulin is the most prescribed continuous pump therapy for WHO Group 1 pulmonary arterial hypertension (PAH). Seven out of 10 patients on continuous therapy are prescribed Remodulin."[20] "WHO Group 1" refers to PAH caused by arteries in the lungs becoming narrowed, thickened or stiff, which is the type of PAH treated by injected prostacyclins like Remodulin.

170.    At all relevant times, UT had monopoly power over its drugs because it had the power to raise and/or maintain the price of its drugs at supracompetitive levels without losing substantial sales.

171.    As a result of Defendants' anticompetitive conduct, UT was able to sell its drugs well in excess of marginal costs, and in excess of the competitive price, and enjoyed unusually highly and grossly inequitable profit margins.

---

[20] Which is also likely due, in large part, to UT's illegal usage of CVC and the Co-Payment Circumvention Enterprise.

## CADD-MS3 Pump Exclusive Dealing Barriers to Entry

172.    Barriers to entry into the relevant antitrust markets are high. In the United States, prescription drugs cannot be marketed and sold without FDA approval. Patients in the United States cannot be treated with prescription medications that have not been approved by the FDA. Obtaining FDA approval for new injected prostacyclin treatments is difficult and expensive. There are currently only five forms of injected prostacyclins that have been approved by the FDA (Remodulin, Flolan, Veletri, generic epoprostenol and generic treprostinil).

173.    Even with FDA approval to start marketing generic treprostinil, no firm can sell their generic alternative to Remodulin to treat patients who are being treated with subcutaneous injections. Defendants' unlawful restrictions have entirely foreclosed that segment of the market.

## CADD-MS3 Pump Exclusive Dealing Anticompetitive Effects

174.    Defendants' anticompetitive scheme delayed entry of less expensive generic versions of treprostinil in the United States. Further, it enabled UT to fix, raise, maintain or stabilize the prices of Remodulin at supra-competitive levels while preserving 100% of the U.S. market for itself.

175.    But for Defendants' conduct, generic alternatives to UT's Hypertension Drugs would have entered the market earlier. As a result, Plaintiffs sustained substantial losses in the form of overcharges, the exact amount of which will be the subject of proof at trial.

176.    But for Defendants' conduct (which includes bribing CVC to funnel beneficiaries to UT's Hypertension Drugs), UT would not have been able to maintain supra-competitive prices for its drugs. As a result, Plaintiffs sustained substantial losses in the form of overcharges, the exact amount of which will be the subject of proof at trial.

177.    During the relevant period, Plaintiffs and other members of the Classes purchased

substantial amounts of UT's Hypertension Drugs. As a result of Defendants' illegal conduct as alleged herein, Plaintiffs and other members of the Classes were compelled to pay, and did pay, artificially inflated prices for UT's Hypertension Drugs. Plaintiffs and other Class members paid prices for UT's Hypertension Drugs that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein.

178.   As a consequence, Plaintiffs and other members of the Classes have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

*CADD-MS3 Pump Exclusive Dealing Effect on Interstate And Intrastate Commerce*

179.   At all material times, UT's Hypertension Drugs, manufactured and sold by UT, were shipped across state lines and sold to customers located outside its state of manufacture.

180.   During the relevant time period, in connection with the purchase and sale of UT's Hypertension Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

181.   During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

182.   Defendants' anticompetitive conduct also has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering cheaper generic UT Hypertension Drugs to end-payors inside each respective state. The foreclosure of generic forms of UT's Hypertension Drugs directly impacts and disrupts commerce for end-payors within each state.

183.   Plaintiffs bring this action on behalf of themselves and the following classes:

Federal RICO / State RICO / State Consumer Protection Statute Class 1:

> All Medicare Advantage Organizations and at-risk, first-tier, and downstream entities in the United States and its territories that from February 1, 2010 through present, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased the subject pharmaceuticals, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of UT Hypertension Drugs resulting from CVC's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal RICO / State RICO / State Consumer Protection Statute Class 2:

> All self-funded, third-party payors and related entities in the United States and its territories that from February 1, 2010 through present, provided services, purchased the subject pharmaceuticals, provided reimbursement, or possess the recovery rights to reimbursement for some or all ofthe purchase price of UT Hypertension Drugs resulting from CVC's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

State Antitrust / State Consumer Protection Statute Class 1:

> All Medicare Advantage Organizations and at-risk, first-tier, and downstream entities in the United States and its territories that from February 1, 2010 through present, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased the Remodulin, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of Remodulin during the UT-Smiths Exclusive Dealing Contracts. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

State Antitrust / State Consumer Protection Class 2:

> All self-funding, third-party payors and related entities in the United States and its territories that from February 1, 2010 through present, who purchased and/or paid for some or all of the purchase price of Remodulin. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

> 184.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 both

individually and on behalf of a national damages class.

185.     As discussed in this Complaint, the Co-Payment Circumvention Enterprise triggered coverage obligations and resulted in increased sales of UT Hypertension Drugs, the cost of which were borne by Plaintiffs' Assignors and the Class Members. The damages suffered by Plaintiffs apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations that assigned their rights to Plaintiffs). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Plaintiffs and other third-party payers, class resolution is an effective tool to redress the harm.

186.     Similarly, the UT-SMITH CADD-MS3 Pump exclusive dealing contracts blocked generic competition from entering the market, forcing Plaintiffs' Assignors and the Class Members to pay supra-competitive prices, even though a generic version of Remodulin had already been approved. The damages suffered by Plaintiffs apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations that assigned their rights to Plaintiffs). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Plaintiffs and other third-party payers, class resolution is an effective tool to redress the harm.

187.     Plaintiffs' Assignors and Class Members have been deprived of property and money by being caused to pay for prescriptions of UT Hypertension Drugs due to and as a result of Defendants triggering the Class Members' coverage obligations by forming the Co-Payment Circumvention Enterprise and engaging in the anti-competitive conduct and racketeering activities as alleged throughout this Complaint.

188.     The Classes are properly brought and should be maintained as nationwide class actions under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality,

typicality, and adequacy:

> Numerosity: There are hundreds of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States whose coverage obligations and subsequent payment for UT Hypertension Drugs were triggered and caused by the Co-Payment Circumvention Enterprise. Thus, the numerosity element for class certification is met.

> Commonality: Questions of law or fact are common to all members of the Classes. Defendants' co-payment assistance conspiracy scheme and racketeering activity carried out by the Co-Payment Circumvention Enterprise have a common, adverse effect on all Class Members. Defendants' misconduct was directed at all members of these Classes. Defendants' unlawful co-payment assistance conspiracy scheme and racketeering activity carried out by the Co-Payment Circumvention Enterprise had a common, adverse effect on all purchasers of the UT Hypertension Drugs whose coverage obligations were triggered by Defendants' conduct. Therefore, common questions of law or fact are prevalent throughout the classes, i.e., whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' coverage obligations and subsequent payment for UT PAH Drug prescriptions. Each Class Member shares the same needed remedy, i.e., reimbursement for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' co-payment assistance conspiracy scheme and racketeering activity that triggered Class Members' coverage obligations.

> Typicality: Plaintiffs' claims are typical of the claims of the Classes because their claims arise from the same course of conduct by Defendants, i.e., Defendants' formation of the Co-Payment Circumvention Enterprise and racketeering activity unlawfully triggering Class Members' coverage obligations and subsequent submission of bills for payment for UT Hypertension Drugs and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Classes.

> Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs' interests in vindicating these claims are shared with all members of the Classes. In addition, Plaintiffs are represented by competent and experienced counsel in class action litigation.

189.    The Classes are properly brought and should be maintained as a class action under

Rule 23(b) because a class action is the superior method for resolving these claims. Pursuant to

Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only

individual members of the Classes. Defendants deliberately conspired to trigger Plaintiffs'

Assignors' coverage obligations for the UT Hypertension Drugs through the formation of the Co-Payment Circumvention Enterprise that subsequently resulted in the submission and payment of UT Hypertension Drugs by Plaintiffs' Assignors that otherwise would not have been paid. Additionally, Defendants deliberated entered exclusive dealing contracts for the CADD-MS3 Pumps thereby blocking generic Remodulin from being prescribed and dispensed at a cheaper price by Plaintiffs Assignors and the members of the putative class.

190. Plaintiffs' Assignors paid for prescriptions of UT Hypertension Drugs that they otherwise would not have paid but for Defendants' Co-Payment Circumvention Enterprise and racketeering activity.

191. Members of the Classes are so numerous that joinder is impracticable. Plaintiffs believe the Class includes hundreds of thousands, if not millions, of consumers, and thousands of third-party payors.

192. Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct by Defendants, i.e., they paid artificially inflated prices for UT's Hypertension Drugs and were deprived of the benefits of competition from less-expensive generic versions of UT's Hypertension Drugs as a result of Defendants' wrongful conduct.

193. Plaintiffs will fairly and adequately protect and represent the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Classes.

194. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation in the pharmaceutical industry.

195. Questions of law and fact common to the members of the Classes predominate over

questions, if any, that may affect only individual class members because Defendants acted on grounds generally applicable to the entire class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

196. Additional questions of law and fact common to some or all the Classes include:

a. Whether UT unlawfully maintained monopoly power through all or part of its overarching scheme;

b. Whether Defendants' anticompetitive scheme suppressed generic competition to UT's Hypertension Drugs;

c. As to those parts of Defendants' challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Defendants' challenged conduct was the least restrictive means of achieving, that offset the harm to competition in the market(s) in which UT's Hypertension Drugs is sold;

d. Whether direct proof of UT's monopoly power is available, and if available, whether it is sufficient to prove UT's monopoly power without the need to also define a relevant market;

e. Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

f. Whether Defendants' scheme, in whole or in part, caused antitrust injury to the business or property of Plaintiffs and members of the Classes in the nature of overcharges;

g. Whether Defendants engaged in a kickback scheme and thereby committed commercial bribery;

h. The effect of such unlawful bribery on the prices on UT's Hypertension Drugs;

i. Whether Defendants participated in a contract, combination, or conspiracy to fix, maintain, and stabilize the price of UT's Hypertension Drugs;

j. The duration and extent of the alleged contract, combination, or conspiracy;

k. Whether such a contract, combination, or conspiracy is *per*

*se* unlawful under the Sherman Act;

l.      The effect of the contract, combination and conspiracy on the prices of UT's Hypertension Drugs; and

m.      The quantum of overcharges paid by the Classes in the aggregate.

197.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

198.    Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## Tolling of the Statute of Limitations

### *Discovery Rule Tolling*

199.    Plaintiffs, their Assignors, and the putative class members had no way of knowing about the Co-Payment Circumvention Enterprise until after UT disclosed the DOJ's investigation in their SEC form 10-Q for the period ending June 30, 2016 (published on July 28, 2016), even this disclosure was shrouded in secrecy with no mention of the UT drugs affected or which PAP's the investigation involved.

200.    Defendants failed to disclose the Co-Payment Circumvention Enterprise. Rather, at all times before the public disclosure and the UT Settlement Agreement, CVC certified compliance

with the OIG's requirements and UT certified compliance with the AKS and FCA when seeking payment for UT Hypertension Drugs from Plaintiffs' Assignors and the Class Members. Accordingly, Plaintiffs' Assignors and the Class Members did not have actual or constructive knowledge that they were defrauded and injured by the Co-Payment Circumvention Enterprise.

201.    Plaintiffs, their Assignors, and the Class Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were participating in the Co-Payment Circumvention Enterprise. Accordingly, Plaintiffs, their Assignors, and the Class Members did not know, and could not have known, that they had been defrauded and injured by Defendants' Co-Payment Circumvention Enterprise

202.    For these reasons, all applicable statutes of limitations are tolled by operation of the discovery rule with respect to Plaintiffs' claims alleged herein.

### *Equitable Estoppel*

203.    Defendants were under a continuous duty to disclose to Plaintiffs' Assignors the existence and true nature of the Co-Payment Circumvention Enterprise, including the subsequent obligations for payment triggered by Defendant's misconduct.

204.    The existence of Defendants' co-payment assistance scheme was a material fact, and Defendants concealed its existence and instead falsely represented that they were in compliance with federal regulations including the FCA and AKS. When Defendants made these misrepresentations and concealed their co-payment assistance conspiracy scheme, they had knowledge of the facts surrounding the scheme's existence. Defendants concealed the co- payment assistance conspiracy scheme and made misrepresentations about it with the intention that Plaintiffs' Assignors and Class Members would rely on said misrepresentations and would pay for UT's Hypertension Drugs. Defendants' concealment induced Plaintiffs to reasonably rely and act

upon these misrepresentations and were misled into paying for UT Hypertension Drugs. *See Safe Environment of America, Inc. v. Employers Ins. of Wausau,* 278 F. Supp. 2d 121, 126-27 (D. Mass. 2003).

205. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## CLAIMS FOR RELIEF

### COUNT I

**Violations of 18 U.S.C. § 1962 (c)**
***Against UT and CVC***

206. Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

207. At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

208. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

209. The elements of a RICO claim under § 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### *Description of the Co-Payment Circumvention Enterprise*

210. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

211.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

212.    The Co-Payment Circumvention Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants UT and CVC, including their employees and agents.

213.    The Co-Payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-Payment Circumvention Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Enterprise.

214.    The Co-Payment Circumvention Enterprise had a common purpose that united its members. This purpose was to profit from the illegal kickbacks and referrals. The common purpose was accomplished by: (1) growing CVC's PAH fund and CVC's executive compensation and (2) by increasing the number of patients who had their drugs purchased by Plaintiffs' Assignors, thereby increasing the amount of money UT made from the UT Hypertension Drugs. By funneling and steering people into CVC's PAH fund for the UT Hypertension Drugs, the Co-Payment Circumvention Enterprise increased UT's number of Medicare-covered "customers," thereby triggering Plaintiffs' Assignors' coverage obligations for these Medicare Advantage patients and eliminating price sensitivity to UT Hypertension Drugs. These two strands of the plan worked hand-in-hand and resulted in a vicious cycle that expanded profits for both CVC's officers and directors and UT—at the cost to Plaintiffs' Assignors and other MA Plans, and UT "customers."

215.    Each of the Defendants received substantial revenue from participating in the Co-Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have

been in the absence of such Enterprise. Each portion of the Enterprise benefitted from the existence of the other parts.

216.    The Co-Payment Circumvention Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant.

217.    There were interpersonal relationships between those associated with the Co-payment Circumvention Enterprise. This includes relationships: (1) among CVC's officers and directors and relationships among UT's officers, directors, principals, and agents; and (2) relationships between CVC and UT. This is evidenced by CVC sending UT the data and information UT used to evaluate how much profit it was making from donating money and directing "customers" to CVC. The OIG explicitly warned CVC not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and CVC certified its understanding and compliance with the OIG's warnings.  But CVC and UT participated in this conduct anyway. UT settled the DOJ's AKS and FCA claims for $210 million for this illegal conduct. This conduct shows that CVC and UT were communicating information important to their scheme through the mail and wires to profit illegally and that they had a relationship.

218.    The Co-Payment Circumvention Enterprise had the longevity sufficient to permit its associates to pursue the enterprise's purpose. It lasted for years, during which time its purposes were pursued. CVC grew its fund for the UT Hypertension Drugs as UT increased its annual "donations" to CVC. And CVC's officers and directors increased their annual compensation, as detailed in CVC's Form 990 Tax Filings. Moreover, UT insulated the price sensitivity of its Hypertension Drugs, as demonstrated by the 20.6% annual increase in the price of UT Hypertension Drugs. UT also increased the number of "customers" buying UT Hypertension

Drugs, which allowed UT to increase its profits.

219.    UT carried out its business activities both with CVC and without CVC, including marketing and selling UT Hypertension Drugs to other entities besides CVC.

220.    Moreover, CVC carried out its business activities both with UT and without UT as evidenced by CVC's co-payment funding of other diseases besides hypertension.

### Conduct of the Enterprise's Affairs

221.    Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-Payment Circumvention Enterprise's affairs. Both Defendants were associated with the Co-Payment Circumvention Enterprise and both operated and managed the Co-Payment Circumvention Enterprise. Such participation included, but is not limited to: (1) CVC managing, collecting, and sharing data with UT so that UT could see its profit margin andreturns on its donations to the CVC PAH fund; (2) UT managing the finances, providing CVC with the "donations" necessary for the co-payments, so the payment obligations of Plaintiffs' Assignors and the purported Class would be triggered; and (3) both CVC and UT steering and funneling patients to CVC's PAH fund.

222.    At all relevant times, each Defendant has been aware of the Co-Payment Circumvention Enterprises' conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

### Defendants' Pattern of Racketeering Activity

223.    To carry out, or attempt to carry out, their scheme to defraud, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-Payment Circumvention Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in

violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

224. Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Plaintiffs' Assignors and Class Members.

225. As set forth throughout this Complaint, Defendants were engaged in a scheme to defraud Medicare and MA Plans, including Plaintiffs' Assignors. They funneled and steered patients into CVC's PAH fund for UT Hypertension Drugs, knowing Medicare and Plaintiffs' Assignors would ultimately bear the cost of the drugs. Defendants knew their scheme to funnel, steer, and refer were violated the AKS and the FCA and that they were transmitting fraudulent information through mail and wire communications.

226. Defendants use of the mails and wires to perpetuate their fraudulent Co-Payment Circumvention Enterprise involved thousands of communications which involved, among others, the following:

> a. Communications from UT and CVC to people steering them away from UT's manufacturer-sponsored free-drug fund and into CVC's PAH fund;
>
> b. Transmittal of "donations" by UT to CVC so that CVC could pay the co-payments of UT's "customers" in CVC's PAH fund;
>
> c. Submission of certifications by UT and CVC in which they claimed to be in compliance with federal law, including the AKS and FCA;
>
> d. Submissions of data from CVC to UT so that UT could

determine how much money it was making from its "donations" to CVC and how much more money it could may by increasing its "donations";

e.     Causing False claims, in violation of the FCA and AKS, to be submitted by pharmacies to Plaintiffs' Assignors and Class Members;

227.   The predicate acts of mail and wire fraud had the same purpose; that is, to make money by growing CVC's PAH fund as large as possible so that CVC's officers and directors could justify increasing their compensation and so that UT could get as many "customers" as possible for its UT Hypertension Drugs at the expense of Plaintiffs' assignors and other MA Plans. All of the predicate acts detailed above, including the certifications made by UT and CVC, as well as the wire communications in furtherance of their scheme, were for this purpose. If the certifications by UT to CMS had not been made, Plaintiffs' Assignors would not have purchased UT's products. If CVC's certifications had not been made, CVC would not have been permitted to administer its PAH Fund and Plaintiffs' Assignors would not have paid for the claims resulting from the unlawful conduct. The false certifications and contracts Defendants caused pharmacies to send over the mail and wires were done so UT could make larger "donations" to CVC's PAH fund and cause damage to Plaintiffs' Assignors.

228.   These predicate acts allowed the continuance of the scheme to increase prescriptions and process for the UT Hypertension Drugs As a result, Plaintiffs' Assignors and Class Members paid increased claims for prescriptions where CVC paid the co-payment.

229.   CVC and UT, including officers, directors, agents, and principals of both organizations, participated in all of the predicate acts. These individuals sent or caused to be sent all of the fraudulent certifications and false contracts through the mails. And they are the ones who communicated among one another and others in furtherance of the scheme. This includes, but is

not limited to, Pamela R. Harris and her daughter Samantha Harris (Green), who increased their compensation every year as CVC took in more "donations."

230.     The victims of the predicate acts and the fraudulent scheme Plaintiffs' Assignors, Medicare, other Medicare part C organizations and Medicare Advantage health plans, the patients who needed these drugs and paid more in co-payments for them, and the several states that contribute to Medicaid. The fraudulent scheme orchestrated by the Co-Payment Circumvention Enterprise injured multiple people and stakeholders in the United States healthcare system, causing multiple distinct injuries.

231.     The acts of mail and wire fraud included transmission of fraudulent claims and the unlawful transmission of data and communications to further the racketeering scheme over period of at least five years involving harm to multiple parties.

232.     Additionally, CVC was involved in similar fraudulent schemes with other drug manufacturers. It was engaged in similar schemes with Jazz, Lundbeck, and Actelion, each of which resulted in settlements with the United States for violations of the AKS and FCA in 2018. Specifically, Jazz settled for $57 million, Lundbeck settled for $52.6 million, and Actelion settled for $360 million. CVC's multi-faceted fraud involved multiple victims and predicate acts and is the type of broad and persistent racketeering activity that RICO was intended to stop.

233.     The Co-Payment Circumvention Enterprise's fraudulent scheme and its predicate acts affected interstate commerce, distorting drug prices across several states.

234.     Moreover, the Co-Payment Circumvention Enterprise's fraudulent scheme and its predicate acts proximately caused injury to Plaintiffs' Assignors' business and property. Plaintiffs' Assignors' duty to purchase UT Hypertension Drugs was triggered by Defendants' illegal scheme. This proximately caused Plaintiffs' Assignors' injuries. Defendants' predicate acts directly led to

Plaintiffs' Assignors buying UT Hypertension Drugs for Plaintiffs' Assignors' enrollees in CVC's PAH fund.

235.     Accordingly, Defendants' violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Plaintiffs' Assignors, entitling Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### Violations of 18 U.S.C. § 1962(d)
### *Against UT and CVC*

236.     Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

237.      Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

238.     Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-Payment Circumvention Enterprise described previously through a pattern of racketeering activity.

239.     UT knowingly agreed with CVC that UT would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that UT performed were steering people away from its manufacturer-sponsored free-drug fund and into CVC's PAH fund. UT also provided CVC with "donations" so that CVC could pay the co-payments of UT's "customers" in CVC's PAH fund. UT also sent certifications over the interstate mails and wires claiming it was in compliance with federal law, including the AKS and FCA. UT also used the data CVC sent it, in violation of the

AKS and FCA, to determine how much money it was making from its "donations" to CVC and how much *more* money it could make by increasing its "donations." Indeed, this exchange of data shows that UT and CVC were not engaged in parallel conduct but were working together and had a meeting of the minds that they could both profit from the Co- payment Circumvention Enterprise. The shared data showed how much money UT made the prior year before from its "donations" to CVC and how much more it could make by increasing its "donations." It thus set out a roadmap of illegal activities and profits.

240.    Further, CVC knowingly agreed with UT that CVC would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that CVC performed were steering people into its CVC PAH fund. CVC also sent certifications over the interstate mails and wires claiming it was in compliance with federal law, including the AKS and FCA. CVC also sent UT data, in violation of the AKS and FCA, so UT could see how much money it was making from its "donations" to CVC and how much *more* money it could make by increasing its "donations." Indeed, this sharing of data shows that UT and CVC were not engaged in parallel conduct but were working together and had a meeting of the minds that they could both profit from the Co- payment Circumvention Enterprise. CVC knew that the more money it accepted in "donations" from UT, the more money CVC could justify paying its officers and directors in compensation.  By illegally giving UT this data, CVC was soliciting greater contributions.

241.    UT knowingly agreed with CVC that one or both of them would commit at least two instances of mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). UT had actual or constructive knowledge that CVC had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer

people to particular drugs. In short, UT knew that CVC had certified that it would abide by the AKS and FCA. UT knew that the scheme it was engaged in or was going to engage in was going to make all these certifications false (as well as the 2015 certifications). It also knew that each time a pharmacy filled a prescription for someone in CVC's PAH fund, any certifications the pharmacist made that he or she would abide by federal law would be false. UT also knew that any certifications it made to HHS or the Government about its compliance with federal law would be false.

242. CVC knowingly agreed with UT that one or both of them would commit at least two instances of mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). CVC knew it had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer people to particular drugs. In short, CVC knew it had certified that it would abide by federal law and the FCA, and it knew that the scheme it was engaged in or was going to engage in was going to make all these certifications false (as well as its 2015 certifications). It also knew that each time a pharmacy filled a prescription for someone in its PAH Drug fund, any certifications the pharmacist made that he or she would abide by federal law would be false. CVC also knew that any certifications UT made to HHS or the Government about UT's compliance with federal law would be false.

243. And both UT and CVC knew that any communications they had over the telephone, e-mail, or text message in furtherance of the scheme would be predicate acts.

244. In short, both UT and CVC agreed to pursue the same objective of profiting illegally from the Co-Payment Circumvention Enterprise. They agreed to divide the work of accomplishing this objective. UT would make the "donations"; CVC would provide data; they would both steer clients and make false certifications. Both UT and CVC intended to further this endeavor, which,

as described above, when completed, amounted to a violation of 18 U.S.C. § 1962(c) that proximately and directly caused injury to Plaintiffs' assignors.

245.    Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d).

## COUNT III

### Monopolization in Violation of State Antitrust Laws
### *Against UT and Smiths*

246.    Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

247.    At all relevant times, UT possessed substantial market power (i.e., monopoly power) in the relevant market. UT possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

248.    Through the overarching anticompetitive scheme alleged herein, and with the aid of CVC and Smiths, UT willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff's Assignors thereby.

249.    It was UT's conscious objective to further its dominance in the relevant market by and through the overarching anticompetitive scheme.

250.    UT's scheme harmed competition. To the extent UT is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for UT's actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects. Even if there were some conceivable such justification that UT were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose

251.    As a direct and proximate result of Defendants' illegal and monopolistic conduct,

Plaintiffs' Assigners and Class Members were injured.

252.     By engaged in the foregoing anticompetitive conduct, Defendants violated the following state laws:

> a.   Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to payments in California by Plaintiffs' Assignors;
>
> b.   Conn. Gen. Stat. § 35-24, et seq., and Conn. Gen. Stat. § 42-110, et seq., with respect to payments in Connecticut by Plaintiffs' Assignors;
>
> c.   Fla. Stat. §§ 501.201, et seq., with respect to payments in Florida by Plaintiffs' Assignors;
>
> d.   Mass. Gen. L. Ch. 93A, et seq., with respect to payments in Massachusetts by Plaintiffs' Assignors, which paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;
>
> e.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to payments in Michigan by Plaintiffs' Assignors;
>
> f.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to payments in New York by Plaintiffs' Assignors;
>
> g.   Ohio Rev. Code Ann. § 4165, et seq., with respect to payments in Ohio by Plaintiffs' Assignors;
>
> h.   10 L.P.R.A. § 251, et seq., with respect to payments in Puerto Rico by Plaintiffs' Assignors; and
>
> i.   Wis. Stat. § 133.03, et seq., with respect to payments in Wisconsin by Plaintiffs' Assignors.

253.     By engaging in the foregoing conduct, Defendants have intentionally and wrongfully engaged in the restraint of trade in violate of the following state laws:

> a.   Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to payments in California by Plaintiffs' Assignors;
>
> b.   Conn. Gen. Stat. § 35-24, et seq., and Conn. Gen. Stat. § 42-110, et seq., with respect to payments in Connecticut by Plaintiffs' Assignors;

     c.   Fla. Stat. §§ 501.201, et seq., with respect to payments in Florida by Plaintiffs' Assignors;

     d.   Mass. Gen. L. Ch. 93A, et seq., with respect to payments in Massachusetts by Plaintiffs' Assignors, which paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;

     e.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to payments in Michigan by Plaintiffs' Assignors;

     f.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to payments in New York by Plaintiffs' Assignors;

     g.   Ohio Rev. Code Ann. § 4165, et seq., with respect to payments in Ohio by Plaintiffs' Assignors;

     h.   10 L.P.R.A. § 251, et seq., with respect to payments in Puerto Rico by Plaintiffs' Assignors; and

     i.   Wis. Stat. § 133.03, et seq., with respect to payments in Wisconsin by Plaintiffs' Assignors.

254.    Each of the above referenced statutes allows for Plaintiffs to collect their reasonable attorneys' fees and costs associated with the prosecution of this Action.

## COUNT IV

**Attempted Monopolization in Violation of State Antitrust Laws**
***Against UT and Smiths***

255.    Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

256.    At all relevant times, UT possessed substantial market power (i.e., monopoly power) in the relevant market. UT possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

257.    Through the overarching anticompetitive scheme alleged herein, and with the aid of CVC and Smiths, UT willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured

Plaintiff's Assignors thereby.

258.    It was UT's conscious objective to further its dominance in the relevant market by and through the overarching anticompetitive scheme.

259.    UT's scheme harmed competition. To the extent UT is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for UT's actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects. Even if there were some conceivable such justification that UT were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose

260.    As a direct and proximate result of Defendants' illegal and monopolistic conduct, Plaintiffs' Assigners and Class Members were injured.

261.    By engaged in the foregoing anticompetitive conduct, Defendants violated the following state laws:

   a.  Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to payments in California by Plaintiffs' Assignors;

   b.  Conn. Gen. Stat. § 35-24, et seq., and Conn. Gen. Stat. § 42-110, et seq., with respect to payments in Connecticut by Plaintiffs' Assignors;

   c.  Fla. Stat. §§ 501.201, et seq., with respect to payments in Florida by Plaintiffs' Assignors;

   d.  Mass. Gen. L. Ch. 93A, et seq., with respect to payments in Massachusetts by Plaintiffs' Assignors, which paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;

   e.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to payments in Michigan by Plaintiffs' Assignors;

   f.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to payments in New York by Plaintiffs' Assignors;

    g.  Ohio Rev. Code Ann. § 4165, et seq., with respect to payments in Ohio by Plaintiffs' Assignors;

    h.  10 L.P.R.A. § 251, et seq., with respect to payments in Puerto Rico by Plaintiffs' Assignors; and

    i.  Wis. Stat. § 133.03, et seq., with respect to payments in Wisconsin by Plaintiffs' Assignors.

262.    By engaging in the foregoing conduct, Defendants have intentionally and wrongfully engaged in the restraint of trade in violate of the following state laws:

    a.  Cal. Bus. Code §§ 16700, et seq., and Cal. Bus. Code §§ 17200, et seq., with respect to payments in California by Plaintiffs' Assignors;

    b.  Conn. Gen. Stat. § 35-24, et seq., and Conn. Gen. Stat. § 42-110, et seq., with respect to payments in Connecticut by Plaintiffs' Assignors;

    c.  Fla. Stat. §§ 501.201, et seq., with respect to payments in Florida by Plaintiffs' Assignors;

    d.  Mass. Gen. L. Ch. 93A, et seq., with respect to payments in Massachusetts by Plaintiffs' Assignors, which paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;

    e.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to payments in Michigan by Plaintiffs' Assignors;

    f.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to payments in New York by Plaintiffs' Assignors;

    g.  Ohio Rev. Code Ann. § 4165, et seq., with respect to payments in Ohio by Plaintiffs' Assignors;

    h.  10 L.P.R.A. § 251, et seq., with respect to payments in Puerto Rico by Plaintiffs' Assignors; and

    i.  Wis. Stat. § 133.03, et seq., with respect to payments in Wisconsin by Plaintiffs' Assignors.

263.    Each of the above referenced statutes allows for Plaintiffs to collect their reasonable attorneys' fees and costs associated with the prosecution of this Action.

## COUNT V

### Violations of State Consumer Protection Laws
### *Against UT and CVC*

264.     Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

265.     Defendants engaged in unfair, false, unconscionable, or deceptive acts or practices in violation of various state consumer protection laws, as set forth below.

266.     Defendants directly misrepresented to Plaintiffs' Assignors and Class Members that they were complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

267.     Defendants intended payers such as Plaintiffs' Assignors and Class Members to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose was to procure payment for UT Hypertension Drugs. These representations and certifications were made in an effort by Defendants to have the consuming public use the CVC PAH fund and were addressed to the market generally by having improper and unnecessary prescriptions for UT Hypertension Drugs paid for by Medicare, Plaintiffs' Assignors, and Class Members. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare.

268.     Plaintiffs' Assignors relied on these misrepresentations to their detriment, which were material to their decision to pay for UT Hypertension Drugs.

269.     Plaintiffs' Assignors and Class Members were directly and proximately injured by Defendants' conduct suffered an injury in fact, and suffered actual, ascertainable damages.

270.     Plaintiffs' Assignors and Class Members would not have reimbursed for nearly as much of the UT Hypertension Drugs as they did, had Defendants refrained from engineering the

false representations or otherwise disclosed its schemes.

271.     Accordingly, Plaintiffs and other similarly situated payers in the Class in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and cost of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

### Connecticut Unfair Trade Practices Act
### (Conn. Gen. Stat. §§ 42-110a, *et seq.*)

272.     Plaintiffs, Plaintiffs' Assignors, and Defendants are "persons" within the meaning of Connecticut Unfair Trade Practices Act ("Connecticut UTPA"). Conn. Gen. Stat. Ann. § 42-110a(3).

273.     Defendants challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

274.     The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

275.     Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.

276.     Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

277.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

278.     Defendants' conduct alleged in this Complaint occurred throughout the United

States, including in the State of Connecticut.

279.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Connecticut.

280.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. § 42-110g.

281.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

### Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. Ann. §§ 501.201, *et seq.*)

282.    Plaintiffs and Plaintiffs' Assignors are "interested persons" and "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  Fla. Stat. Ann. § 501.203(6)-(7).

283.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

284.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"Fla. Sta. § 501.204(1).

285.    Defendants' conduct constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

286.    Defendants knew or should have known that their conduct was in violation of FDUTPA

287.    Defendants' illegal conduct substantially affected Florida commerce and consumers.

288.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

289.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Florida.

290.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Florida.

291.     Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs pursuant to Fla. Stat. Ann. §§ 501.211(2) and 501.2105(1).

### Massachusetts Regulation of Business Practice & Consumer Protection Act
### (Mass. Gen. Laws Ch. 93a, §§ 1, *et seq.*)

292.     Plaintiffs, Plaintiffs' Assignors and Defendants are "persons" within the meaning of the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA"). Mass. Gen. Laws ch. 93A, § 1(a).

293.     Defendants are engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

294.     The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. ch. 93A, § 2(a).

295.     Defendants' conduct constitutes "unfair or deceptive acts or practices" under Massachusetts CPA.

296.     Defendants knew or should have known that their conduct was in violation of Massachusetts CPA.

297.    Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

298.    Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

299.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Massachusetts.

300.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Massachusetts.

301.    Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11.

302.    Plaintiffs also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA.

### New York General Business Law
### (N.Y. Gen. Bus. Law § 349)

303.    The New York General Business Laws ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen.Bus. Law § 349.

304.    Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

305.     Defendants' illegal conduct substantially affected New York commerce and consumers.

306.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

307.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of New York.

308.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of New York.

309.     As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available pursuant to N.Y. Gen. Bus. Law § 349.

### Pennsylvania Unfair Trade and Consumer Protection Law
### (73 Pa. Cons. Stat. §§ 201-1, *et seq.*)

310.     Plaintiffs, Plaintiffs' Assignors and Defendants are "persons" within the meaning of the Pennsylvania Unfair Trade and Consumer Protection Law ("Pennsylvania UTPA").  73 Pa. Cons. Stat. § 201-2(2).

311.     Defendants are engaged in "trade or commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

312.     The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices," including

"[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

313.    Defendant's conduct constituted "unfair or deceptive acts or practices" in violation of the Pennsylvania UTPA.

314.    Defendants knew or should have known that their conduct was in violation of the Pennsylvania UTPA.

315.    Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

316.    Plaintiffs' Assignors relied upon the Defendants' material misrepresentations regarding the certifications their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

317.    Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

318.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Pennsylvania.

319.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Pennsylvania.

320.    Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available pursuant to 73 Pa. Cons. Stat. § 201-9.2(a).

## South Carolina Unfair Trade Practices Act
### (S.C. Code Ann. §§ 39-10, et seq.)

321. Plaintiffs, Plaintiffs' Assignors, and Defendants are "person[s]" under the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"). S.C. Code Ann. § 39-5-10(a).

322. Defendants are engaged in "trade or commerce" as defined by the South Carolina UTPA. S.C. Code Ann. § 39-5-10(b).

323. The South Carolina UTPA makes unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. S.C. Code Ann. § 39-5-20.

324. Defendants' conduct constitutes "unfair or deceptive acts or practices" in violation of the South Carolina UTPA. Defendants knew or should have known that their conduct was in violation of the South Carolina UTPA.

325. Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

326. Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

327. Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of South Carolina.

328. Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of South Carolina.

329. Because Defendants' unfair and deceptive practices caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $200, whichever is greater, discretionary punitive damages, reasonable attorney's fees and costs, injunctive relief, and all other proper and

just relief available under the South Carolina UTPA.

## Wisconsin Deceptive Trade Practices Act
### (Wis. Stat. § 100.18)

330.     Plaintiffs and Plaintiffs' Assignors are "the public" within the meaning of the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"). Wis. Stat. § 100.18(1).

331.     Plaintiffs and Plaintiffs' Assignors are "persons" within the meaning of Wis. Stat. § 100.18(1).

332.     Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

333.     The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

334.     Defendants' conduct constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

335.     Defendants knew or should have known that their conduct was in violation of the Wisconsin DTPA.

336.     Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

337.     Plaintiffs Assignors' suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

338.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Wisconsin.

339.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the

UT Hypertension Drugs in the State of Wisconsin

340.    No business relationship, contractual or otherwise, existed or exists between Plaintiffs' Assignors and Defendants.

341.    Plaintiffs seek damages, court costs and attorneys' fees under Wis. Stat. §100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

## COUNT VI

### Tortious Interference With Plaintiffs' Business Expectancy
### *Against UT and CVC*

342.    Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

343.    To prevail on a tortious interference claim, the plaintiff must provide that (1) the plaintiff had an advantageous relationship with a third party (*e.g.*, a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

344.    Accordingly, Defendants conspired to tortiously interfere with Plaintiffs' Assignors' business expectancy, entitling Plaintiffs to bring this action on their behalf for their actual damages (including loss of profits), costs of suit, and reasonable attorneys' fees.

## COUNT XI

### Civil Conspiracy to Tortiously Interfere with Plaintiffs' Business Expectancy
### *Against UT and CVC*

345.    Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

346.    Defendants conspired to tortiously interfere with Plaintiffs' Assignors' contractual

relations with their beneficiaries.

347.     Defendants conspired to increase the number of Medicare-covered "customers" using the CVC PAH, which triggered Plaintiffs' Assignors' coverage obligations for these Medicare Advantage patients and eliminating price sensitivity to UT Hypertension Drugs.

348.     Accordingly, Defendants conspired to tortiously interfere with Plaintiffs' Assignors' contractual relations, entitling Plaintiffs to bring this action on their behalf for their actual damages (including loss of profits), costs of suit, and reasonable attorneys' fees.

## COUNT XII

### Unjust Enrichment
### *Against UT*

349.     Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

350.     To plead a claim for unjust enrichment, the plaintiff must allege:(1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

351.     As a result of the Co-Payment Circumvention Enterprise and Defendants' unlawful conduct described above, Defendants have been unjustly enriched by, at a minimum, receipt of payments for UT Hypertension Drugs from Plaintiffs' Assignors at unlawfully inflated prices.

352.     Because Defendants concealed the Co-Payment Circumvention Enterprise and their Co-Payment assistance conspiracy scheme and deception, Plaintiffs' Assignors were not aware of the true facts concerning the Co-Payment Circumvention Enterprise and co-payment assistance conspiracy scheme described herein and did not benefit from Defendants' misconduct.

353.     Defendants knowingly accepted the unjust benefits of their Co-Payment Circumvention Enterprise and co-payment assistance conspiracy scheme.

354.     As Defendants benefited from their unlawful conduct with knowledge that it was receiving increased revenues and profits for its UT Hypertension Drugs at inflated prices, it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

355.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be returned to Plaintiffs, in an amount to be proven at trial.

## COUNT XIII

### Violations of the Civil Remedies for Criminal Practices Act, Fla. Stat. 771.101, *et seq.* *Against UT and CVC*

356.     Plaintiffs re-allege and incorporate by reference paragraphs 1-205 of this Complaint as if fully set forth herein.

357.     At all times, as set forth above, UT and CVC's actions were unlawful under Section 772.103(3), Florida Statutes, as they were all "…employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity."

358.     UT and CVC violated Section 772.101, et seq., Florida Statutes by participating in or conducting the affairs of the Co-Payment Circumvention Enterprise (as described more fully above) through a pattern of racketeering activity.

359.     Plaintiff and Assignor are "persons" as defined in Section 1.01, Florida Statues, injured in their business or property, by reason of UT and CVC's racketeering violations.

### *Description of the Co-Payment Circumvention Enterprise*

360.     UT and CVC are "persons" within the meaning of Section 1.01, Florida Statutes.

361.     UT and CVC are members of and constitute an "association-in-fact enterprise."

362.     The Co-Payment Circumvention Enterprise is an association-in-fact of individuals and corporate entities within the meaning of Section 772.102, Florida Statues, and consists of "persons" associated together for a common purpose.

363.     The purpose of the Co-Payment Circumvention Enterprise was to maximize UT's profits and CVC's executive compensation.

364.     The Co-Payment Circumvention Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. UT is the source of the schemes alleged herein, including providing kickbacks to subsidize payments for UT Hypertension Drugs whose co-payments were provided by CVC.

365.     For CVC's part, CVC accepted these kickbacks and provided the unlawful co-payments for the UT Hypertension Drugs.

366.     UT and CVC, individually and collectively fulfilled their roles in the Co-Payment Circumvention Enterprise.

367.     UT and CVC were separate and distinct legal entities with distinct purposes. UT is the architect of the Co-Payment Circumvention Enterprise, with the sole purpose to make as much money off of the UT Hypertension Drugs as possible before generic competition entered the market. For CVC, it was to raise the amount of money in the funds to justify providing higher salaries to their executives.

368.     The Co-Payment Circumvention Enterprise had an existence that was separate and distinct from the pattern of racketeering in which UT and CVC engaged. Specifically, UT and CVC conspired with each other to minimize and/or conceal the amount of information Plaintiffs' Assignors and the putative members of the lass received regarding the claims for payment of the UT Hypertension Drugs, materially resulting in Assignor to reimburse for UT Hypertension Drugs

that they would not have paid for. See Section 817.234, Florida Statues.

369.    At all relevant times herein, UT and CVC operated, controlled, and managed the Co-Payment Circumvention Enterprise, through a variety of actions. First, CVC submitted falsely submitted the level of control that UT had over CVC in the PAP to the OIG on numerous occasions. Second, UT and CVC failed to disclose a material fact regarding the existence of the kickbacks in violation of Section 817.234, Florida Statues.

370.    UT and CVC's participation in the Co-Payment Circumvention Enterprise was necessary for the successful operation of the schemes. The members of the Co-Payment Circumvention Enterprise all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was a kickback, while minimizing the amount of information Plaintiffs' Assignors and members of the putative class knew about the programs. These affirmative acts and strategic omissions were material to Plaintiffs' Assignors' decision to issue payment for the UT Hypertension Drugs. The Co-Payment Circumvention Enterprise's actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for the UT Hypertension Drugs alleged herein.

371.    Section 772.102, Florida Statutes, provides that criminal activity is any activity chargeable by indictment or information by amongst other statutes Section 817.234, Florida Statutes. Section 817.234, Florida Statutes, criminalizes situations where health care companies, such as Plaintiffs' Assignors, are provided incomplete or misleading information concerning any fact or thing material to a claim for payment. As set forth below, UT and CVC have committed violations of Section 817.234, Florida Statutes, by providing incomplete or misleading information material to Assignor's decision to issue payment for the UT Hypertension Products

372.    UT and CVC committed numerous acts of racketeering by providing incomplete or misleading information related to the UT Hypertension Drugs. UT and CVC knew or had reason to know that they were providing incomplete or misleading information regarding these claims.

373.    UT and CVC knew or had reason to know that they were not providing complete or non-misleading information pursuant to Section 817.234, Florida Statutes. Despite knowledge of these facts, they induced Plaintiffs' Assignors to make payment for claims that they otherwise would not have paid. Instead, UT and CVC knowingly provide incomplete information to enrich their bottom line.

374.    Based on these omissions, Assignor provided payments for the UT Hypertension Drugs, based on half-truths, inaccurate information, and deliberate omissions. UT and CVC's omissions were material to the OIG's clearance of these programs, and material to the payment of the UT Hypertension Drugs Plaintiffs' Assignor provided payment for. Had Assignor known of the Co-Payment Circumvention Enterprise, Plaintiffs' Assignor would not have submitted payment for the UT Hypertension Drugs.

375.    Plaintiffs' Assignor was the primary victim of UT and CVC's unlawful scheme. Plaintiffs' Assignor paid for the UT Hypertension Drugs based on UT and CVC omissions of material information pursuant to Section 817.234, Florida Statutes.

376.    As part of this scheme, UT and CVC omitted material information required to be sent to the OIG, and misled Plaintiffs' Assignors when causing the submission of payments to Plaintiffs Assignors. UT and CVC conducted or participated, directly or indirectly, in the Co-Payment Circumvention Enterprise through a pattern of unlawful activity.

377.    By reason of and as a result of the conduct of UT and CVC, and in particular, their pattern of criminal activity, Plaintiffs' Assignor was injured in its business or property.

378.     UT and CVC's violations have directly and proximately caused injuries and damages to Plaintiffs' Assignor, and Plaintiff has a right to bring this action for the damages alleged herein.

379.     Pursuant to Section 772.11, Florida Statues, Plaintiff seeks its reasonable attorneys' fees and costs associated with prosecution of this action.

## DEMAND FOR JUDGMENT

Wherefore, Plaintiffs respectfully requests that this Court:

(a)     Certify the classes sought in this Complaint;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

(c)     Order Defendants to pay pre-judgment and post-judgment interest as provided forby law or allowed in equity;

(d)     Award the Plaintiffs damages (*e.g.*, three times overcharges or disgorgement of the monies paid for the UT Hypertension Drugs) in an amount to be determined at trial;

(e)     Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO and applicable state law;

(f)     Find that Defendants are jointly and severally liable for all claims; and

(g)     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 15, 2021                    */s/ Eduardo Bertran*
                                            Eduardo Bertran, FL Bar. No. 94087
                                            **ARMAS BERTRAN ZINCONE**
                                            4960 SW 72nd Ave., Ste 206
                                            Miami, FL 33155
                                            ebetran@armaslaw.com

Michael O. Mena (FL Bar No. 010664)
John W. Cleary (FL Bar No. 118137)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Rd., 10th Floor Coral
Gables, FL 33134
(305) 614-2222
serve@msprecoverylawfirm.com
mmena@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com

Shereef H. Akeel (MI Bar No. 54345)
Adam S. Akeel (MI Bar No. 81328)
Hasan Kaakarli (MI Bar No. 81099)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Rd. 420,
Troy, MI 48084
shereef@akeelvalentine.com
adam@akeelvalentine.com
hasan@akeelvalentine.com

## APPENDIX

### *Representative Assignments to Plaintiffs*

**A1**.    On June 18, 2017, Fallon Community Health Plan, Inc. entered into an assignment with MSP Recovery, LLC.  Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies from Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Massachusetts law. On June 20, 2017, MSP Recovery LLC, entered into an assignment with Series 17-04-631, LLC, a series of MSP Recovery Claims, Series, LLC, irrevocably assigning its right to recover payments as assigned from Fallon Community Health Plan.  Said assignment included the following language "[a]ssignor … hereby … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims," "Claims," "Assigned Assets," and "Assigned Documents"…whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party

pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Delaware law.

> **A2.** On December 14, 2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On February 20, 2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC). Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.

> **A3.** On May 3, 2016, Preferred Medical Plan, Inc. entered into an assignment with

MSP Recovery LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and /or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims',[] as also specified in Section 1.1." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On August 8, 2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc. Said assignment included the following language "[a]signer, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims . . . whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims.'" This second assignment contract

was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under New York law. Consideration was given between each party in executing these assignments.