**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 21-21317-Civ-GAYLES/TORRES

MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company, MSPA CLAIMS I, LLC, a Florida limited liability company, Series PMPI, a designated series of MAOMSO Recovery II, LLC, a Delaware series limited liability company, and MSP RECOVERY CLAIMS SERIES 44, LLC, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CARING VOICE COALITION, INC., a Delaware corporation; UNITED THERAPEUTICS CORPORATION, an Idaho nonprofit corporation; and SMITHS MEDICAL ASD, INC., a Delaware corporation,

Defendants.

______________________________________________/

**REPORT AND RECOMMENDATION**
**ON DEFENDANTS' MOTIONS TO DISMISS**

This matter is before the Court on Defendants', United Therapeutics ("UT") and Smiths Medical ("Smiths"), motions to dismiss Plaintiffs' amended complaint. [D.E. 93]; [D.E. 129]; [D.E. 143]. Plaintiffs responded to UT's motion on January 28, 2022, [D.E. 142], to which UT replied on February 18, 2022, [D.E. 148]. Plaintiffs responded to Smiths's motion on March 28, 2022, [D.E. 156], to which Smiths replied on April 21, 2022, [D.E. 161]. Therefore, Defendants' motions are now ripe for disposition. After careful consideration of the motion, response, reply,

relevant authority, and for the reasons discussed below, UT's motion to dismiss should be **GRANTED,** and Smiths's motion to dismiss should be **GRANTED**.

## *I.  BACKGROUND*

On October 15, 2021, Plaintiffs filed a thirteen-count complaint seeking relief under federal RICO law and state antitrust, consumer protection, tortious interference, unjust enrichment, and Florida Civil Remedies laws. [D.E. 93, ¶ 206–379]. Plaintiffs named UT as a defendant in each of the thirteen counts and Smiths in two state antitrust counts. *Id.*

Plaintiffs are assignees of various Medicare health insurance providers "the Assignors") tasked with recovering reimbursement or payment to Defendants. *Id.* at ¶10–17, Exh. B–D (providing an example of one representative assignment for each Plaintiff). Assignors offer Medicare benefits to enrollees through Part C and Part D Medicare coverage. *Id.* at ¶ 30–38. Medicare Part C outlines the Medicare Advantage program, allowing enrollees to contract with private insurers, the Assignors, to deliver their Medicare benefits. *Id.* at ¶ 38. Part D coverage enables private insurers to provide prescription drug coverage to enrollees in return for proper reimbursement. *Id.* at ¶ 38–45.

Patient Assistance Programs ("PAPs"), like Defendant Caring Voice Coalition ("CVC"), help financially needy patients afford necessary medications in conjunction with the Medicare Advantage program. *Id.* at 96–98. Pharmaceutical companies typically aid PAPs by donating prescription drugs or money for impoverished Medicare enrollees. *Id.* at 99. In return, these companies can receive tax deductions and reimbursements from insurers, like Plaintiffs' Assignors, who pay the other portion of patients' drug costs. *Id.* at 99–100. Independent charity

PAPs, like CVC, typically provide co-payment assistance to needy Medicare beneficiaries. *Id.* at ¶ 97.

Defendant UT is a pharmaceutical manufacturer for patients with Pulmonary Arterial Hypertension ("PAH"). *Id.* at 2–3, 19. Defendant Smiths is a specialty medical device manufacturer and develops the CADD-MS 3 pump ("CADD pump"). *Id.* at 24. PAH patients can take three forms of treatments: inhaled, oral, or injected treatments. *Id.* at 160. Inhaled and oral treatments are inadequate substitutes for injected treatments, such as Remodulin. *Id.* at 161. Injected treprostinil can be administered intravenously or subcutaneously. The CADD pump is the only device approved to administer treprostinil in the U.S. *Id.* at 65–67.

Generic drug manufacturers seek approval to sell generic versions of branded drugs, like Remodulin, through the Abbreviated New Drug Application ("ANDA") process. *Id.* at 52. Plaintiffs allege that three drug manufacturers filed ANDA applications for generic versions of Remodulin: Sandoz, SteadyMed, and Teva. *Id.* at 73; [D.E. 156 at 1]. After submitting ANDAs for generic treprostinil, UT sued for patent infringement. [D.E. 156 at 1]. UT subsequently settled with Sandoz and Teva, while SteadyMed was successful in proving the invalidity of UT's '393 patent, titled "Process to Prepare Treprostinil, the Active Ingredient in Remodulin®." *Id.*; [D.E. 93, ¶ 93]; *SteadyMed Ltd. v. United Therapeutics Corp.*, 2017 WL 1215714, at 1 (P.T.A.B. Mar. 31, 2017).

Furthermore, Plaintiffs allege that Defendants engaged in multiple schemes to monopolize a market for UT's PAH drugs and insulate price sensitivity for these drugs, particularly treprostinil (branded as Remodulin), while also

barring generic drug competition. *Id.* at 187. In turn, Plaintiffs allege this caused their Assignors to pay artificially inflated prices at a more consistent rate due to the agreements between UT and CVC, UT and Smiths, and the lack of generic drugs on the market. *Id.* at 18, 61–95. Plaintiffs even provided UT's 2017 Settlement agreement with the DOJ, wherein UT was ordered to pay $210 million for violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and using CVC as a conduit to eliminate the price sensitivity of patients purchasing UT's drugs and induce more patients to purchase their drugs. [D.E. 93, ¶4–7, 116–49, Exh. A].

Defendants move to dismiss Plaintiffs' claims on lack of standing, Federal Rule of Civil Procedure 12(b)(1), and failure to state a claim upon which relief can be granted, Federal Rule of Civil Procedure 12(b)(6). [D.E. 129]; [D.E. 143].

## *II. APPLICABLE PRINCIPLES AND LAW*

### *A. Motion to Dismiss Pursuant to 12(b)(1)*

To the extent Defendants challenge Plaintiff's standing to pursue their various claims, Rule 12(b)(1) applies. *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). "'Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Id.* (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)). "In the absence of Article III standing, the district court lack[s] jurisdiction to resolve MSPRC's claims on the merits." *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F. 3d 1305, 1316 (11th Cir. 2020) (citing *MAO-MSO Recovery II v. State Farm Mutual Automobile Ins. Co.*, 935 F. 3d 573, 581–82 (7th Cir. 2019)). "A dismissal for lack of subject matter jurisdiction is not a judgment

on the merits and is entered without prejudice." *MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*, 965 F. 3d 1210, 1221 (11th Cir. 2020) (citing *Stalley*, 524 F. 3d at 1232).

"A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack." *Id.* (quoting *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). "A facial attack on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *McElmurray v. Consol. Gov't of Augusta-Richmond, Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). To survive a facial challenge to standing, "each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *McElmurray*, 501 F.3d at 1251 (citations and internal quotation marks omitted). "[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Streib v. United States*, 2013 WL 4401036, at *2 (S.D. Fla. Aug. 12, 2013) (quoting *Lawrence*, 919 F.2d at 1529). "[N]o presumptive truthfulness

attaches to a plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* In short, "when a party mounts a factual attack, a district court is free to independently weigh facts, and may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56." *Int'l Broth. of Teamsters v. Amerijet Int'l, Inc.*, 932 F. Supp. 2d 1336, 1343 (S.D. Fla. 2013) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)).

### *B. Motion to Dismiss Pursuant to 12(b)(6)*

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory statements, assertions, or labels will not survive a 12(b)(6) motion to dismiss. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citation omitted). Additionally:

> Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). In evaluating the sufficiency of a plaintiff's pleadings, we make reasonable inferences in Plaintiff's favor, "but we are not required to draw plaintiff's inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

> Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. *Id.*; *see also Iqbal*, 556 U.S. at 681 (stating conclusory allegations are "not entitled to be assumed true").

*Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449, 453 n.2, (2012). The Eleventh Circuit has endorsed "a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

## *III. ANALYSIS*

Defendants present several arguments in favor of their motions to dismiss. First, Defendants claim that Plaintiffs lack standing to sue because Plaintiffs did not plead sufficient information about their Assignors' alleged injuries and failed to show whether they were valid assignments. Second, UT contends that Plaintiffs' RICO claims should be dismissed because Plaintiffs' Assignors were indirect purchasers, Plaintiffs failed to demonstrate a proximate, economic injury, Plaintiffs failed to allege a RICO enterprise, and, lastly, Plaintiffs failed to comply with Federal Rule of Civil Procedure 9(b). Further, both Defendants argue that Plaintiffs failed to plead an adequate antitrust injury. Finally, UT argues the other tag-along state law claims should be dismissed because they represent an impermissible "Shotgun Pleading" and fail to state a plausible cause of action. For these reasons, Defendants conclude that Plaintiffs' amended complaint should be dismissed.

### A. *Plaintiffs Adequately Pled Their Assignors Suffered an Injury in Fact and Conveyed a General Assignment Agreement*

The first question is whether Plaintiffs have the standing to sue Defendants. Standing is fundamental because it ensures that the federal courts stay within their constitutional role in resolving cases and controversies between parties. *See, e.g.*, U.S. Const. art. III, § 2; *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). "[C]ourts 'have an independent obligation to determine whether subject-matter jurisdiction exists,' even if no party raises the issue, and if the court determines that subject matter jurisdiction is lacking, it must dismiss the entire case." *In re Trusted Net Media*, 550 F.3d 1035, 1042 (11th Cir. 2008) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 503 (2006)).

"To have a case or controversy, a litigant must establish that he has standing," which requires proof of three elements. *See United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). The Supreme Court requires "(1) that the plaintiff have suffered an 'injury in fact'—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennet v. Spear*, 520 U.S. 154, 167 (1997) (quoting *Lujan*, 504 U.S. at 560). Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the

litigation." *Lujan*, 504 U.S. at 561. During the pleadings stage, "general factual allegations" showing these elements suffice. *Id.* As Defendants mount a facial attack on Plaintiffs' standing, this Court need only assess whether Plaintiff's general factual allegations meet the pleading requirements.

"[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor." *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1317 (11th Cir. 2019) (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008)). Thus, an assignee has "standing if (1) its ultimate assignor . . . suffered an injury-in-fact, and (2) [the] claim arising from that injury was validly assigned." *Id.* at 1318; *see, e.g., MSP Recovery, LLC v. Allstate Ins. Co.,* 835 F.3d 1351, 1358 (11th Cir. 2016) (holding the lack of a valid assignment defeats standing); *US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F. 3d 1112, 1120 (10th Cir. 2007) ("If a valid assignment confers standing, an invalid assignment defeats standing"). An injury in fact is an "invasion of a legally protected interest." *Tenet*, 918 F.3d at 1318 (quoting *Lujan*, 504 U.S. at 560). "An injury-in-fact must be both (1) particularized ("affect the plaintiff in a personal and individual way") and (2) concrete ("real, and not abstract")." *Tenet*, 918 F.3d at1318 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)); see, e.g., *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1038–39 (11th Cir. 2008) (holding standing established with a concrete, particularized financial injury traceable to a defendant's actions that could be remedied through the litigation (redressability)).

Furthermore, the issue of antitrust standing is "somewhat different from that of standing as a constitutional doctrine." *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31 (1983). "'Harm to

the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.'" *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (quoting *Associated Gen. Contractors*, 459 U.S. at 535 n. 31). "Whether a plaintiff is the 'proper party' involves considerations of 'doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages and privity of contract.'" *Gulfstream*, 995 F.2d at 429 (quoting *Associated Gen. Contractors*, 459 U.S. at 532–33).

The Supreme Court in *Brunswick Corp.* outlined an explicit two-part test for antitrust standing. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 477–78 (1977). To establish antitrust standing a plaintiff "must prove injury of the type that the antitrust laws were intended to prevent and [injury] that flows from that which makes the defendants' acts unlawful." *Id.* at 477. In addition, in applying this principle the Third and Fifth Circuits have found that "only an express assignment of an antitrust claim can be valid" to establish a proper party to assert antitrust claims. *Cf. Gulfstream*, 995 F. 2d at 438–39; *Texas Life, Acc. Health & Hosp. Service Ins. Guar. Ass'n v. Gaylord Entertainment Co.*, 105 F. 3d 210, 218 (5th Cir. 1997). Courts in our circuit have agreed and applied that principle. *See Tyntec Inc. v. Syniverse Techs., LLC*, No. 2019 WL 9829361, at *10 (M.D. Fla. Aug. 19, 2019), *report and recommendation adopted,* 2020 WL 2786873 (M.D. Fla. May 29, 2020) ("[E]ven if a claim had accrued that could be assigned, an explicit assignment of an antitrust claim . . . would be required.").

***1. Plaintiffs adequately pled their representative assignors conferred standing through a valid assignment and suffered an injury in fact.***

To begin, Defendants argue that Plaintiff's amended complaint falls short because Plaintiff fails to allege that its Assignors suffered an injury in fact. Defendants claim that Plaintiffs' standing derives from the representative assignors but that Plaintiffs fail to allege how those assignments confer standing. [D.E. 129 at 9–11]; [D.E. 143 at 6 (incorporating UT's standing arguments into Smith's motion to dismiss)]. Defendants similarly contend that Plaintiffs merely provided general allegations of "various unidentified assignors" and did not plead "a single fact" establishing that these assignors suffered an injury in fact. [D.E. 129 at 9]. The crux of Defendants' arguments falls on Plaintiffs' failure to plead that any representative assignor paid an insurance claim for Remodulin in any particular state. *Id.* at 9–13. So Defendants conclude that Plaintiffs failed to plead their representative assignors suffered an injury in fact traceable to the Defendants' conduct. *Id.*

Considering "general factual allegations" suffice in the pleadings stage to establish standing, Plaintiffs have sufficiently pled that their representative assignors conferred standing with valid assignments and suffered economic injuries fairly traceable to Defendant's actions. *Lujan*, 504 U.S. at 561. Although Plaintiffs do not name each representative assignor in the amended complaint, Plaintiffs describe and provide three representative assignments from Fallon Community Health Plan, Inc., Interamerican Medical Center Group, LLC (IMC), and Preferred Medical Plan, Inc. in Appendix A and Exhibits B through D. [D.E. 93, App. A1–A3, Exh. B–D]. Those assignments included similar language stating:

> [a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims.

*Id.* at App. A1–A3. The "Claims" refer to unpaid monies or damages arising from Medicare Part C and D coverage for UT's Hypertension drugs. *Id.* at ¶ 142. Plaintiffs allege that these representative contract assignments were valid and provide tangible evidence proving this allegation. Therefore, Plaintiffs plead with enough specificity to establish that their representative assignors conferred standing with valid assignments.

Furthermore, Plaintiffs sufficiently plead that these representative assignors, and others similarly situated, suffered an economic injury traceable to Defendants' actions. Assignors were responsible for reimbursing or directly paying for UT's hypertension drugs. [D.E. 93, ¶ 30, 143]. Plaintiffs also plead that Assignors paid over $24.8 million in claims for UT's hypertension drugs from 2010 until 2017 and provided specific facts showing UT's inflated revenue and a lack of price sensitivity. *Id.* at ¶ 138–42. For example, Plaintiffs state that Avmed paid $942,925.99 less in 2019 than its 2018 payments once UT and CVC's enterprise was uncovered. *Id.* at ¶ 142,147–48. Likewise, Plaintiffs allege that other Assignors have data similar to AvMed, and Defendants have corresponding data to show precisely which patients received co-payment assistance from Plaintiffs' Assignors. *Id.* at 141–44.

From these plausible factual allegations, it is possible to infer that Plaintiffs' representative assignors and others similarly situated suffered economic injury from increased drug prices. Plaintiffs allege that these injuries

were caused by UT's RICO enterprise conspiracy with CVC and UT's exclusive dealings with Smiths. From Defendants' actions, Plaintiffs' Assignors paid a higher premium for patients' hypertension prescriptions and more frequently because UT had successfully blocked generic versions of Remodulin from entering the market. [D.E. 93, ¶ 33–37]. Plaintiffs provided the states and state laws that Defendants' actions violated and stated their Assignors suffered injuries in these states. *Id.* at 260–62, 268–71. Considering these facts and Defendants' alleged illegal behavior, it is plausible that Plaintiffs' Assignors suffered a concrete, economic injury traceable to Defendants' anticompetitive and fraudulent conduct. There is no applicable heightened pleading requirement that requires greater specificity, as Defendants suggest, beyond what Plaintiffs have already alleged.

Consequently, Defendants' arguments challenging Plaintiffs' standing fail because Plaintiff has successfully alleged that their Assignors have suffered an injury in fact and were conveyed valid assignments. Plaintiffs also pled with enough specificity to allege a traceable injury to Defendants' alleged behavior. As Defendants do not challenge the redressability of Plaintiffs' claims, this Court finds that Plaintiffs have Article III standing at least at this stage for the bulk of their claims.

Nevertheless, Plaintiffs raise two antitrust claims founded on state law (Counts III and IV), which claims may require heightened specificity to assert standing. Defendants have also specifically challenged Plaintiffs' standing as to these claims, so we must analyze whether Plaintiffs have standing to assert these claims in particular.

2. ***While Plaintiffs adequately pled general claim assignments, they did not support the express assignment of antitrust claims.***

Defendants' alternative argument is that Plaintiff's complaint should be dismissed because Plaintiffs lack Article III standing to assert the state law antitrust claims. Like its previous arguments, UT argues that Plaintiffs lack Article III standing for the antitrust claims because they do not allege that representative assignors paid any specific claims within the relevant period. [D.E. 129 at 11]. Relying on Third Circuit precedent, Smiths argues that Plaintiffs lack Article III standing for their antitrust claims because they did not demonstrate that the representative assignors specifically intended to transfer antitrust claims. [D.E. 143 at 6–7]. Without specific assignments regarding antitrust claims, Plaintiffs do not have Article III standing to pursue these claims against Defendants. S*ee Gulfstream*, 995 F.2d at 438–39.

As stated above, the Supreme Court outlined a two-part antitrust standing test in *Brunswick* because antitrust standing is different from standard Constitutional standing. 429 U.S. at 477 (holding that a plaintiff must prove 1) injury of the type that the antitrust laws intended to prevent and 2) antitrust injury that flows from the defendant's actions); *see also Palazzo v. Gulf Oil Corp.*, 764 F. 2d 1381, 1387 (citing *Brunswick* to argue that this "limitation on standing is intended to forestall the multitude of claims for incidental or consequential injuries which theoretically could be traced to the 'ripple effect' of anti-competitive activity"). Following this precedent, this Court finds that Plaintiffs have failed to plead adequate antitrust standing. Plaintiffs generally pled that their Assignors purchased or reimbursed the cost of drugs in various states and provided generic data to prove the alleged injury. [D.E. 93, ¶ 279, 290, 300, 308, 319, 328, 339].

Plaintiffs also generically alleged that UT and Smiths's anticompetitive schemes caused this economic injury and the lack of generic drug competition. *Id.* at 7, 18, 247–49. While this is enough to satisfy standard Constitutional standing as found above, this does not ultimately suffice to find antitrust standing.

Nowhere in their complaint did Plaintiffs allege or provide specific factual data to coincide with the allegedly violated antitrust laws from nine different states. Plaintiffs generally cite these nine state antitrust laws, followed by "et seq," without explaining how Defendants violated which clauses or sections of each representative state law. Plaintiffs summarily alleged that UT "possessed substantial market power" and engaged in an "anticompetitive scheme" with Smiths to injure Plaintiffs Assignors. [D.E. 93, ¶ 247–48]. Nonetheless, it is unclear how Defendants' activities proximately injured Assignors or violated nine state antitrust laws without specifically alleging how Defendant violated each state law. *Supra* Section B1 (analyzing Plaintiffs' failure to plead a proximately caused injury pertaining to related RICO claims). In this manner, Plaintiffs have not satisfied either prong of the two-part *Brunswick* test. To satisfy this test Plaintiffs must amend their pleadings to provide greater specificity as to what actions violated **specific** parts of the state antitrust laws, and how Defendants' actions proximately caused antitrust injury to Plaintiffs Assignors.

Moreover, Smiths' standing challenge regarding the assignment issue ultimately succeeds as well. The Third Circuit in *Gulfstream* resolved a novel question of law finding that the plaintiff had antitrust standing because they had not expressly assigned the right to pursue federal antitrust claims to a third party. 995 F. 2d at 437. Appealing the jury verdict and district judge's denial of summary

judgment as to the plaintiff's antitrust claim, the defendant, a business aircraft manufacturer, challenged the plaintiff's federal antitrust standing. *Id.* at 428–31. The defendants argued that the plaintiff, a direct purchaser of a business aircraft, lacked standing because they had "unconditionally assigned its antitrust rights" to another party. *Id.* at 431. The plaintiff had transferred its interests to a third-party under the terms they "[sold], assigned[ed], transfer[red] and set over . . . all of its rights, title and interest in and to the [aircraft] and the Purchase Agreement . . ." *Id.* The plaintiff was essentially a consumer of business aircraft, purchasing units from defendant manufacturers years before their release, but often sold those aircraft rights years before receiving them. *Id.* at 429 n. 1.

In finding that the plaintiff had federal antitrust standing, the Court found that "the inclusion of antitrust claims in a general assignment would be disfavored under the direct purchaser rule." *Id.* at 438–39.[1] The Third Circuit applied historical and statutory analysis to determine that the assignment of federal antitrust claims is a matter of federal common law integral to the "development of interstitial federal common law" and cannot be left to potentially "differing state law." *Id.* at 438; *see also National Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 688 (1978) ("The legislative history [of the Sherman Act] makes it perfectly clear that [Congress] expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition[.]"); *see generally* 1A James W. Moore *et al.*, *Moore's Federal Practice*, pt. 2, ¶ 0.324 (1993).

[1] In brief summation, the direct purchaser rule is a bilateral rule that prevents indirect purchasers from raising antitrust claims, *Illinois Brick Co. V. Illinois*, 431 U.S. 720 (1977), and prevents a Clayton Act defendant from arguing a plaintiff suffered no "injury" because it passed on any injuries to other customers or assignees, *Hanover Shoe, Inc. V. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).

The Court ultimately ruled that allowing the general assignment of antitrust claims would be "an 'unwarranted and counterproductive exercise . . .' to the direct purchaser rule." *Gulfstream*, 995 F.2d at 440 (quoting *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 217). The Third Circuit pointed to the district court's declaration that "no language in plaintiff's assignment . . . so much as allude[d] to rights under the antitrust laws" to establish the plaintiff's general assignment of claims. *Id.* at 431. Because antitrust assignment is a matter of federal common law, and the direct purchaser rule governs federal antitrust law, the Third Circuit concluded that the plaintiff had federal antitrust standing because they had only conveyed a general assignment and retained the rights to pursue antitrust claims. *Id.* at 439; *but cf. Lerman v. Joyce Intern., Inc.*, 10 F.3d 106, 112–114 (3rd Cir. 1993) (finding that an assignment referring to "all causes of action" was express within the meaning of *Gulfstream* to assign related federal RICO claims); *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129 at *7–8 (D.N.J. 2019) (finding that an assignment with identical language to the present case was express within the meaning of *Gulfstream* to assign related federal RICO claims). Therefore, the plaintiff's general assignment did not abrogate the plaintiff's right to pursue the antitrust claim. *Id.*

We see no reason why the Third Circuit's application of standing to antitrust claims would not govern here. As a result, Plaintiffs did not plead the express assignment of state antitrust claims with particularity. In the Appendix, Plaintiffs included language which states:

> [a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has

> asserted against third parties arising from or relating to the Claims.

[D.E. 93, App. A1–A3, Exh. B–D]. These assignments appear to convey general rights like the assignment in *Gulfstream*, but as *Lerman and Sanofi* explained, this language may validly convey federal antitrust and RICO claims. Nonetheless, the aforementioned cases were interpreting assignments related to *federal* antitrust and RICO claims. This complaint presents us with the question whether Assignors adequately conveyed Plaintiffs the right to pursue several (potentially unrelated) *state* antitrust claims. Without a proper analysis of the state laws and whether or not they have adopted federal antitrust law and this novel assignment issue, this Court cannot conclude that Plaintiff is the "proper party" to raise antitrust claims. Nowhere in their briefing nor the complaint did Plaintiffs explain whether the nine state antitrust laws were modeled after federal antitrust law. Without a more thorough analysis of each state antitrust law and their connection with this federal antitrust assignment issue, this Court cannot properly rule on whether Plaintiffs are the proper party to pursue several potentially unrelated state antitrust claims. Thus, this Court finds that Plaintiffs have not satisfied their prima facie burden to plead that they are proper parties to pursue the state antitrust claims. That, of course, is a natural consequence of a complaint like this that lumps a bunch of plaintiffs into one federal action that is predicated in part on a bunch of state law causes of action. If Plaintiffs are intent on doing so, rather than streamlining the case to Florida plaintiffs for instance, then they have the burden of combing through nine state law statutes and satisfying their heightened

pleading burden for the antitrust claims. We will not assume that they can do so and thus cannot find that standing has been satisfied.

As a result, Plaintiffs lack Article III standing to assert antitrust claims. Without Article III standing, this Court does not have jurisdiction to rule on the merits of the antitrust claims. Following Eleventh Circuit precedent, Counts III and IV should be dismissed without prejudice because a dismissal with prejudice is a judgment on the claim's merits. *QBE Holdings*, 965 F. 3d at 1221. Therefore, UT's motion to dismiss is **GRANTED,** and Smiths's motion to dismiss is **GRANTED** as to Counts III and IV. Nevertheless, Plaintiffs have Article III standing over all other causes of action, and UT's 12(b)(6) arguments for failure to state a claim must be assessed**.**

### ***B. Plaintiffs Did Not State a Claim to Relief That Is Plausible on Its Face for Counts I, II, VI, XI, XII, and XIII***

Defendant UT's next argument is that Plaintiffs' amended complaint should be dismissed because it fails to state a claim as against UT on the non-antitrust claims. Count I and II are causes of action under 18 U.S.C. Section 1962 for UT's alleged racketeering enterprise. [D.E. 93, ¶ 206–45]. Count V is a cause of action for UT's alleged violation of consumer protection laws in Connecticut, Florida, Massachusetts, New York, Pennsylvania, South Carolina, and Wisconsin. *Id.* at ¶ 264–341. Counts VI and XI are causes of action for tortious interference and conspiracy to tortiously interfere with Assignors' businesses. *Id.* at ¶ 342–48. Count XII is a cause of action for unjust enrichment against UT. *Id.* at ¶ 349–55. Count XIII is a cause of action for UT's alleged violation of the Civil Remedies for Criminal Practices Act, Florida Statutes Section 771.101. *Id.* at 356–79. We address each claim in turn.


### 1. *Counts I & II should be dismissed because Plaintiffs fail to plead that Defendants' actions proximately caused Assignors' economic injuries.*

Plaintiffs raise RICO causes of action for violations of 18 U.S.C. Section 1962(c) and 1962(d), conspiracy to violate 1962(c). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "To recover, a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F. 3d 1340, 1348 (11th Cir. 2016). A civil plaintiff must also show "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* (citing *Williams v. Mohawk Indus., Inc.*, 465 F. 3d 1277, 1282–83 (11th Cir. 2006)).

"RICO defines an 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Almanza v. United Airlines, Inc.*, 851 F. 3d 1060, 1067 (11th Cir. 2017) (citing 18 U.S.C. § 1961(4)). Plaintiffs allege that Defendants formed an "associated-in-fact enterprise," which the Supreme Court defines as an enterprise with "(1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Almanza*, 851 F. 3d at 1067 (citing *Boyle v. United States*, 556 U.S. 938, 944, 946 (2009)). The Supreme Court has

found that an "association in fact" enterprise can be "formal or informal" as long as it "function[s] as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Further, Plaintiffs allege that Defendants committed wire and mail fraud to satisfy the "racketeering activity" element. Section 1961(1) lists wire and mail fraud as "racketeering activity" for raising a RICO cause of action. *See* 18 U.S.C. §§ 1341, 1343, 1961(1); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1291 (11th Cir. 2010). The Eleventh Circuit has ruled that following Rule 9(b) requires a plaintiff to allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997).

Pleading proximate cause of a RICO injury is also an essential component. The Eleventh Circuit affirmed dismissal of a complaint on this ground in *Ironworkers Local 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1361–70 (11th Cir. 2011). The plaintiffs in that case, various health insurance companies, claimed that the defendants, manufacturers of an antipsychotic prescription drug, committed mail and wire fraud that ultimately caused plaintiffs to pay more for their enrollees' prescriptions. *Id.* at 1355–57. Specifically, the plaintiffs argued that the defendants engaged in an "illegal off-label marketing

campaign" that falsely represented the heightened safety and effectiveness of the drug. *Id.* Affirming the dismissal of the plaintiffs' Section 1962(c) claim, the Eleventh Circuit held that the plaintiffs "did not adequately plead that AstraZeneca's false representations proximately caused the plaintiffs' purported economic losses." *Id.* at 1358. The Court reasoned that defendants who violate RICO laws are not liable to *all* civil plaintiffs who have been injured. *Id.* at 1361.

Specifically, *Ironworkers* discussed physicians' relationship with patients and prescription medications and how physicians are not obligated to analyze economic efficiency when prescribing medication. *Id.* at 1362–63. Even if there were a cheaper, generic alternative, the court reasoned that a physician prescribing the more expensive drug is not committing fraud to sustain a RICO claim unless the drug was unsafe or ineffective for the prescribed use. *Id.* So the Eleventh Circuit affirmed the district court's dismissal because the plaintiffs failed to show a "direct relation" between the defendant's fraudulent representations and the plaintiffs' loss. *Id.* at 1358–63; *see also Ray*, 836 F.3d at 1349–52 (stating that RICO plaintiffs must show but for *and* proximate cause to make a valid claim); *Anza*, 547 U.S. at 457 (stating that proximate causation requires a direct relation between the "injury asserted and the injurious conduct alleged"); *cf. Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("[I]ncorporating principles of proximate cause into [antitrust law], we have ruled that indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue.").

In addition, the Eleventh Circuit has explained that a Section 1962(d) RICO conspiracy claim must be raised in one of two ways: "(1) by showing that the

defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 950 (11th Cir. 1997)). The existence of a conspiracy can also be inferred from the participant's conduct. *Id.* But "a civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by any act in furtherance of a conspiracy that might have caused the plaintiff injury." *Beck v. Prupis*, 529 U.S. 494, 504–05 (2000). Instead, a civil conspiracy plaintiff must plead that her injury was caused by something "analogous to an 'act of tortious character'". *Id.* at 501–05 (quoting 4 Restatement (Second) of Torts § 876, Comment *b*); *see, e.g.*, *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1343 (S.D. Fla. 2011) ("'Additionally, an actionable conspiracy requires an actionable underlying tort or wrong.'") (quoting *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)).

In the present case, Plaintiffs have failed to state claims under Sections 1962(c) and 1962(d) because they have not adequately pled Defendants' actions proximately caused their injuries.[2] The RICO claim is based on a particularized

[2] We reach this issue first because Plaintiffs may have sufficiently alleged the existence of an "association in fact" enterprise. The amended complaint alleges that UT and CVC were engaged in this enterprise to maximize UT's profits and CVC's executive compensation. [D.E. 93, ¶ 214, 363]. Plaintiffs also allege this enterprise was an "ongoing and continuing unit" for about four years. *Id.* at ¶ 213, App. D. Lastly, Plaintiffs allege interpersonal relationships between CVC and UT's officers that allowed direct communication for the alleged fraudulent activity. *Id.* at ¶ 217. Moreover, Exhibit A in the amended complaint details the Settlement Agreement between UT and the U.S. surrounding UT and CVC's fraudulent behavior. This tangible evidence and well-pleaded allegations support the prima facie claim of an existence of a RICO enterprise.

allegation that CVC sent data and information about their profits to UT over the continuing period. [D.E. 93, ¶ 214–17, 221]. In turn, UT would "donate" funds to CVC for them to steer or "funnel" patients to UT's hypertension drugs. *Id.* While Plaintiffs fail to cite specific documents or statements made by either party, they discuss the OIG's investigation and subsequent settlement regarding the "association in fact" enterprise. *Id.* at ¶ 117–32, 217, Exh. A. The amended complaint alleges that this fraudulent conduct influenced more Assignors and Medicare insurers to aid CVC and enrollees with co-payments or similar reimbursements tied to UT's hypertension drugs. Related to the initial purpose behind this scheme, Plaintiffs incorporated the CVC's executive salary increases and the percent annual increase in the price of UT's hypertension drugs. [D.E. 93, ¶ 147–49, 218].

Assuming that this alleged fraud satisfies Rule 9(b) in the first place to sustain an "association in fact enterprise," it is not enough to establish a "direct relation" to the "injury asserted." An injury and subsequent settlement with the U.S. government does not directly support a RICO cause of action for insurers like Plaintiffs' Assignors. *See Anza*, 547 U.S. at 458 ("The direct victim of this conduct was the State of New York, not [the plaintiffs]. It was the State that was being defrauded and the State that lost tax revenue as a result."). Plaintiffs' amended complaint provides limited specificity regarding the existence of a potential RICO enterprise and fraud but then merely assumes in blanket fashion the existence of a proximately caused injury to the Assignors. Such an approach is contrary to well established Eleventh Circuit precedent.

Plaintiffs' Assignors are essentially in the same boat as the plaintiffs in *Ironworkers*. They are Medicare insurers who must pay directly or reimburse Medicare beneficiaries' prescription costs, while the *Ironworkers* plaintiffs were tasked with directly purchasing prescription medications for enrollees. Even if Defendants committed the fraudulent activity to benefit themselves, it is unclear how this activity proximately damaged Plaintiffs' Assignors nor caused price inflation that directly injured them.

Plaintiffs resort to making conclusory allegations that UT and CVC's enterprise influenced Plaintiffs' Assignors to purchase more UT hypertension drugs. But that is not enough.  After all, licensed physicians, pharmacies, and other healthcare actors must still prescribe and administer medications. Physicians may have increased their prescription rates for other easily inferable reasons: an uptick in PAH patients or a lack of competing generic drugs on the market due to UT's patent enforceability rights. [D.E. 93, ¶ 158 (stating only 2,000 PAH patients are using subcutaneously administered Remodulin injections as of March 2020)]. The limited number of PAH patients today cannot by itself plausibly support an inference that an uptick in PAH patients was proximately caused by Defendants' fraudulent activities.

And without more specific allegations supporting the proximate cause element, Plaintiffs ultimately fail to state a RICO claim in this amended complaint.  This is also the case because CVC was also tasked with paying a portion of Medicare beneficiaries' drug co-payments. The "cost-share assistance" program likely obligated Plaintiffs' Assignors to provide reimbursements, regardless of the cost of UT drugs. Like the plaintiffs in *Ironworkers*, Assignors

likely assumed the risk of price fluctuations by enrolling in these Medicare prescription drug plans. *See* [D.E. 93, ¶ 39–40]. The alleged fraudulent behavior occurred between 2010 and 2014, years *before* generic drug competition and patent litigation ensued, [D.E. 156 at 1], which can explain how UT dominated the PAH drug market. As for the Assignors who were direct payers of UT's hypertension drugs, their RICO claims fail for the same reasons relied upon in *Ironworkers*.

The resulting inevitable difficulty calculating damages between Assignors who paid directly for UT's drugs or simply reimbursed PAPs, like CVC, further shows that the proximate cause element has not been satisfied. Without a more plausible allegation of direct injury, this Court is left to speculate as to the portion of increased costs due to Defendants' fraudulent activity and how it disproportionately affected Assignors. Not only must this Court confront that issue, but Plaintiffs allege that UT's fraudulent activity with CVC caused Plaintiffs' Assignors to purchase more UT hypertension drugs. Plaintiffs mainly attribute the price changes to UT's "anticompetitive" patent litigation with generic drug manufacturers and buying specialty medical devices from Smiths; yet, importantly, Smiths is not a named Defendant in the RICO causes of action. The totality of these actions purportedly led to Plaintiffs' alleged injuries, but these circumstances also further complicate the causal chain. Ultimately, Plaintiffs attempt to tie Defendants' actions through independent actors, manipulated price influences, and fraudulent behavior but still fail to state a RICO cause of action. While this Court can fairly trace Plaintiffs' alleged injuries to meet Article III standing, Eleventh Circuit RICO law requires Plaintiffs to plead proximate cause more specifically. In this amended complaint, Plaintiffs did not specify how

independent actors, like physicians, played into these injuries, how Defendant Smiths' actions influenced these economic injuries, or how UT and CVC's "enterprise" proximately injured Assignors.

Plaintiffs could potentially solve these shortcomings by citing data or specific representations made to CVC physicians or those related. How were Medicare beneficiaries and Assignors/healthcare insurers tangibly influenced to purchase more UT hypertension drugs as a particular result of the RICO enterprise? Were physicians also affected by this fraudulent activity, and how can you represent this key fact in a pleading? That may be too much to bear for a claim governed by heightened pleading standards. But for the time being, Plaintiffs did not set forth plausible allegations in this complaint to plausibly suggest answers to these questions nor establish a valid causal chain to sustain a RICO violation claim. Thus, UT's motion to dismiss Count I should be **GRANTED**.

As for the Section 1962(d) claim for conspiracy to violate 1962(c), Plaintiffs have alleged that Defendants agreed to the overall objective of the conspiracy by pleading specific facts relating to their compensation over the enterprise years. Plaintiffs also alleged sufficient facts establishing fraud particularity according to Rule 9(b), which further shows proof of an agreement and arrangement between Defendants to conspire to commit RICO violations. However, without an underlying tort claim, Count I, Plaintiffs cannot sustain this conspiracy claim. Therefore, UT's motion to dismiss Count II should also be **GRANTED**.[3]

[3] While UT's motion to dismiss Counts I and II should be granted on the failure to specifically allege a proximately caused injury, the Court does not find UT's arguments concerning the Indirect Purchaser Rule (IDR) persuasive. [D.E. 129 at 14–16]; [D.E. 142 at 8–13]. RICO statutory law was heavily influenced by

### 2. *Counts V and XIII should be dismissed because Plaintiffs did not plead a proximate injury from UT's actions, and an unjust enrichment claim is improper.*

Next, Plaintiffs state that Defendants violated various state consumer protection laws and that Plaintiffs' Assignors unjustly enriched Defendants through inflated reimbursements. Plaintiffs rely on several related state consumer protection laws that Defendants allegedly violated, including the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See e.g.*, Fla. Stat. Ann. § 501.203(6)-(7); Mass. Gen. Laws Ch. 93a, §§ 1, et seq. As an example, FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Sta. § 501.204(1). To assert a valid consumer protection claim, a plaintiff must have suffered an injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of the defendant's illegal behavior. *Id.*

As to their unjust enrichment claim, a plaintiff must show:

> (1) the plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) the defendant has voluntarily accepted and retained the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

statutory antitrust law, *Anza*, 547 U.S. at 457, but that does not indefinitely preclude indirect purchasers from suing under RICO laws. UT relies on the *Apple* Supreme Court decision and several district court decisions to support this assertion, but *Apple* was an antitrust violation case that did not mention RICO. 139 S. Ct. at 1520 ("[W]e have ruled that indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue. Our decision in *Illinois Brick* established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers.") (citing *Illinois Brick v. Illinois*, 431 U.S. 720, 746). Although RICO jurisprudence prioritizes directness, which is ultimately why Plaintiffs fail to allege a direct economic injury and their claims must be dismissed, that does not mean every RICO case should follow a "bright-line" rule precluding indirect purchasers from suing antitrust violators.

*Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999) (quoting *Greenfield v. Manor Care, Inc.*, 705 So. 2d 926, 930–31 (Fla. 4th DCA 1997)). Further, unjust enrichment per se has nothing to do with legal liability to sustain the claim. *See Guyana Tel. & Tel. Co. v. Melbourne Int'l Comms., Ltd.*, 329 F.3d 1241, 1245 n.3 (11th Cir. 2003) (claim that right to restitution arose from unjust enrichment was not enough absent independent allegations of equitable liability); *Flint v. ABB, Inc.*, 337 F.3d 1326, 1330 n. 2 (11th Cir. 2003) (noting that when the plaintiff relies on a wrong to supply the unjust factor, "the causative event is a wrongful enrichment rather than an unjust enrichment"). A viable unjust enrichment claim (which is in effect an equitable remedy for a quasi-contractual obligation) must be analyzed independently of alleged generic wrongs. *See, e.g., State of Fla., Off. of Atty. Gen., Dep't of Legal Affs. v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1309 (S.D. Fla. 2005).

Here Plaintiffs' claims for Defendants' violations of state consumer protection laws and unjust enrichment should be dismissed. Following Plaintiffs' failed RICO claims, Plaintiffs cannot plead their injuries were proximately caused by Defendants' actions, nor can this Court trace Defendants' alleged actions to calculate Plaintiffs' damages. *Supra* Section B1. Plaintiffs merely restate similar assertions to match the attached state consumer protection laws. [D.E. 93, ¶ 272–341]. Nonetheless, the consumer protection claims must be dismissed because of unsettled causal relations and a similar failure to plead proximate cause clarity between Plaintiffs' injuries and Defendants' actions. If this Court cannot tie

Defendants' actions to federal law and damages, the same applies to the duplicative state law claims.

Moreover, Plaintiffs have not alleged an independent and viable unjust enrichment claim. Plaintiffs allege that they unjustly enriched UT with inflated reimbursements as a result of UT's illegal conduct. But they do not allege the predicate elements of liability for the claim. They simply seek a remedy of repayment of alleged infalted reimbursement numbers (assuming they can be calculated) because of UT's alleged "wrongs." Viable unjust enrichment cases do not simply focus on any "alleged wrongs," yet Plaintiffs only rely on "Defendants' misconduct" as a generic basis for this claim. [D.E. 93, ¶ 353–55]. An unjust enrichment claim (separate and apart from monetary remedies for the claims that have been properly alleged) is not a viable basis for recovery. Therefore, UT's motion to dismiss Counts V and XII should also be **GRANTED**.[4]

**3. *Counts VI and XI should be dismissed because Plaintiffs did not identify individual Medicare beneficiaries and failed to allege how Defendants' conspiracy interfered with business expectations.***

Plaintiffs also raise claims for Defendants' tortious interference and civil conspiracy to tortiously interfere with Plaintiffs' Business Expectancy. [D.E. 93, ¶ 342–48]. Plaintiffs do not allege a particular state's law, but under Florida law, a

[4] Defendants also urge the dismissal of the "tag-along" state law claims for Plaintiffs' impermissible shotgun pleading. [D.E. 129 at 22–29]. These arguments are not as persuasive considering Plaintiffs provided adequate notice to each Defendant with an in-depth factual allegations section, [D.E. 93, ¶ 63–198], and Plaintiffs explicitly named each Defendant in each count of the complaint, *Id.* at ¶ 206–379. Thus, Plaintiffs have provided adequate notice to each Defendant in the complaint, and the amended complaint is not an impermissible shotgun pleading. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F. 3d 1313, 1320 (11th Cir. 2015).

"plaintiff must demonstrate (1) the existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship; and (3) damage to the plaintiff as a result of the tortious interference with that relationship" to raise a valid tortious interference claim. *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010) (quoting *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336, 1348–49 (11th Cir.1987)). A plaintiff may allege "tortious interference with present or prospective customers, but no cause of action exists for tortious interference with a business's relationship to the community at large" *Lucky Accessories*, 752 F. Supp. 2d at 1273 (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (dismissing claim for tortious interference because plaintiff alleged a business relationship with the "community at large" rather than with "identifiable customers.").

In this amended complaint Plaintiffs nowhere mention the significance of specific buyers or Medicare beneficiaries. Plaintiffs broadly indicate that PAH patients connected to Medicare and independent co-pay charities, like CVC, purchased UT's hypertension drugs. [D.E. 93, ¶ 36, 77, 94]. Plaintiffs do not provide specific examples of business interference with individual Medicare beneficiaries.

Moreover, Plaintiffs do not allege that their relationships with Medicare beneficiaries or Medicare were harmed or severed. In fact, Plaintiffs' Assignors successfully reimbursed or directly purchased the necessary hypertension drugs for their respective beneficiaries. [D.E. 93, ¶ 32, 177–78]. Taking the pleadings at face value, the increased prices and prescription rates of UT's hypertension drugs

could not have damaged the business expectancies between Assignors and Medicare beneficiaries if the relationships were not severed in some tangible way. To the contrary, Plaintiffs allege these anticompetitive practices would have *increased* the rate of business between these parties, albeit at a higher price tag. That is not what a tortious interference claim is designed for.

Furthermore, Plaintiffs allege that UT and CVC fraudulently conspired to increase prescription rates and manipulate price sensitivity, *not* interfere with or damage the business practices of Medicare Advantage Organizations and Medicare beneficiaries. [D.E. 93, ¶ 210–34]. Yet substantial interference or injury to a business relationship is essential to sustain a tortious interference claim, and Plaintiffs do not provide an individual or specific example of this interference. [D.E. 129 at 28]. Plaintiffs attempt to rebut UT's argument by stating Defendants still "interfered with Plaintiffs' business relationship or expectancy by wrongfully increasing the number of Part D beneficiaries that used the CVC PAH fund." [D.E. 142 at 29]; [D.E. 93, ¶ 344, 347]. However, this argument fails because an *increase* in business, even done in an unlawful manner, does not imply interference or severance of a business or contractual relationship. After all, injury is an essential element of the cause of action.

Hence, if Plaintiffs conclude on reflection that they actually have viable tortious interference claims notwithstanding these glaring deficiencies, then they must plausibly plead how individual contracts or business relationships were tangibly damaged as a result of Defendants' tortious behavior. For now UT's motion to dismiss Counts VI and XI should also be **GRANTED**.

***4. Count XII should be dismissed because Florida's RICO statutes mirror federal RICO law.***

Plaintiffs' final cause of action is for Defendants' alleged violations of the Civil Remedies for Criminal Practices Act, Fla. Stat. 771.101. [D.E. 93, ¶ 356–79]. The Eleventh Circuit has consistently ruled that "the analysis we apply to the plaintiffs' federal RICO claims is equally applicable to [Florida's] state RICO claims." *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1263–64 (11th Cir. 2004) (citing *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir. 1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases.")); *Arthur v. JP Morgan Chase Bank, NA*, 569 F. App'x 669, 679 (11th Cir. 2014) ("The Florida RICO Act, patterned after the federal RICO Act, establishes civil liability when an enterprise engages in a pattern of criminal activity.").

Therefore, Plaintiffs' shortcomings regarding their federal RICO claims also apply to Florida's Civil Remedies laws. Plaintiffs must plead with particularity how Defendants' alleged conduct proximately injured Plaintiffs' Assignors. Thus, for the time being, UT's motion to dismiss Count XII should be **GRANTED**.

### C. ***Plaintiffs' Claims Should be Dismissed Without Prejudice Because Plaintiffs Could State a Plausible Cause of Action with an Amended Complaint***

The final question we should tackle is whether Plaintiffs' claims at issue here should be dismissed with or without prejudice. The Federal Rules of Procedure dictates that "'[a] party may amend its pleading once as a matter of course' within 21 days after serving it, or within 21 days after the earlier of service of any responsive pleading or service of a Rule 12(b) motion, but in all other cases a party may amend its pleading only by leave of the court or by written consent of the adverse party. *Joseph v. Bernstein*, 612 F. App'x 551, 558 (11th Cir. 2015)

(quoting Fed. R. Civ. P. 15(a)(1), (a)(2)). In favor of resolving disputes on the merits, district courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(1), (a)(2). Dismissal with prejudice is only proper when drafting a plausible complaint would be futile. *Joseph*, 612 F. App'x at 558; *Medberry v. Butler*, 185 F. 3d 1189, 1193 (11th Cir. 1999).

Accordingly, this Court recommends that all Counts be dismissed without prejudice. Defendants assert that *Ironworkers* forecloses Plaintiffs from raising economic injury from these RICO violations. Perhaps. But Plaintiffs could theoretically ascertain more information and plead better facts to establish proximate cause between Assignors' injuries and Defendants' fraudulent conduct. A viable and direct economic injury could allow Plaintiffs to state a cause of action for many of the supplemental state law claims (though the tortious interference and unjust enrichment claims are likely not salvageable). Likewise, Plaintiffs could provide specific antitrust assignments from other Assignors to establish antitrust standing (although the plausibility of these claims would still be in question). So though we share Defendants' skepticism, Rule 15 principles still govern. In favor of resolving these disputes on the merits, this Court **RECOMMENDS** that UT's motion to dismiss be **GRANTED** without prejudice and Smith's motion to dismiss be **GRANTED** without prejudice. [D.E. 129]; [D.E. 143].

## *IV. CONCLUSION*

For the foregoing reasons, the Court **RECOMMENDS** that UT's motion to dismiss be **GRANTED** without prejudice, and Smith's motion to dismiss be **GRANTED** without prejudice. [D.E. 129]; [D.E. 143].

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 21st day of July, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge