# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MSP RECOVERY CLAIMS, SERIES
LLC, a Delaware series limited liability
company, MSPA CLAIMS I, LLC, a Florida
limited liability company, and Series PMPI, a
segregated series of MAO-MSO RECOVERY
II, LLC, a Delaware series limited liability
company, and MSP RECOVERY CLAIMS
SERIES 44, LLC, on behalf of themselves and
all others similarly situated,

         Plaintiffs,

   v.

CARING VOICE COALITION, INC.;
UNITED THERAPEUTICS CORPORATION;
SMITHS MEDICAL ASD, INC.; EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS HOLDING
COMPANY; ACCREDO HEALTH GROUP; CVS
HEALTH CORPORATION; and ADIRA FOUNDATION;

         Defendants.

_____/

Civil Action No.: 21-cv-21317-GAYLES

**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ 1

PARTIES, JURISDICTION, AND VENUE ......................................................... 9

    A.   PLAINTIFFS ................................................................................................ 9

    B.   DEFENDANTS ............................................................................................ 13

STANDING ................................................................................................................ 20

    REGULATORY BACKGROUND ................................................................ 21

FACTUAL ALLEGATIONS ................................................................................. 24

    THE CO-PAYMENT CIRCUMVENTION SCHEME ................................ 25

        *OIG Guidance for Co-Payment Charities* ................................................ 29

        *CVC's Growth and OIG's Communications* ............................................ 31

        *The Co-Payment Circumvention Enterprise Successfully  Deceived Government Payors into*

        *Paying for AKS-Tainted Claims* .............................................................. 34

    THE GENERIC PREVENTION SCHEME ................................................. 75

        *The Statutory and Regulatory Framework of the FDA Approval Process* .............................. 75

        *The Generic Prevention Scheme* .............................................................. 78

    CADD-MS3 PUMP EXCLUSIVE DEALING RELEVANT PRODUCT MARKET (REMODULIN) ............ 93

        *Subcutaneously Injected Treprostinil* ...................................................... 94

        *CADD-MS3 Pump Exclusive Dealing Relevant Geographic Market* ...................................... 97

        *CADD-MS3 Pump Exclusive Dealing Market Share* ................................ 97

        *CADD-MS3 Pump Exclusive Dealing Barriers to Entry* .......................... 98

        *CADD-MS3 Pump Exclusive Dealing Anticompetitive Effects* .................. 98

*CADD-MS3 Pump Exclusive Dealing Effect on Interstate & Intrastate Commerce* .............. 99

TOLLING OF THE STATUTE OF LIMITATIONS .................................................................. 106

**CLAIMS FOR RELIEF** ...................................................................................................... **108**

COUNT I ............................................................................................................................. 108

*Civil Liability under 18 U.S.C. § 1964(c) for Violations of 18 U.S.C. § 1962(c)* .................. 108

Description of the Co-Payment Circumvention Enterprise ................................................ 108

Conduct of the Enterprise's Affairs .................................................................................... 111

Defendants' Pattern of Racketeering Activity .................................................................... 111

COUNT II ............................................................................................................................ 115

*Civil Liability Under 18 U.S.C. § 1964(c) for Violations of 18 U.S.C. § 1962(d)* ................ 115

COUNT III ........................................................................................................................... 118

*Monopolization in Violation of Section 2 of the Sherman Act* ................................................ 118

COUNT IV ........................................................................................................................... 120

*Attempted Monopolization in Violation of Section 2 of the Sherman Act* .............................. 120

COUNT V ............................................................................................................................ 122

*Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act* .............................. 122

COUNT VI ........................................................................................................................... 123

*Restraint of Trade in Violation of Section 1 of the Sherman Act* ........................................... 123

COUNT VII .......................................................................................................................... 125

*Monopolization in Violation of State Antitrust Laws* ............................................................. 125

COUNT VIII ......................................................................................................................... 128

*Attempted Monopolization in Violation of State Antitrust Laws* ........................................... 128

COUNT IX ........................................................................................................................... 130

*Conspiracy to Monopolize in Violation of State Antitrust Laws* ............................................. *130*

COUNT X ................................................................................................................................. 132

*Restraint of Trade in Violation of State Antitrust Laws* ........................................................ *132*

COUNT XI ............................................................................................................................... 134

*Violations of State Consumer Protection Laws* ...................................................................... *134*

    California Unfair Competition Law ...................................................................... 136

    Connecticut Unfair Trade Practices Act................................................................ 136

    Florida Deceptive & Unfair Trade Practices Act.................................................. 138

    Massachusetts Regulation of Business Practice & Consumer Protection Act................. 139

    Michigan Consumer Protection Act ...................................................................... 140

    New York General Business Law .......................................................................... 141

    Ohio Consumer Protections Laws ......................................................................... 142

    Pennsylvania Unfair Trade & Consumer Protection Law ................................... 143

    South Carolina Unfair Trade Practices Act ......................................................... 144

    Wisconsin Deceptive Trade Practices Act ............................................................ 145

COUNT XII .............................................................................................................................. 147

*Tortious Interference with Assignors' and Class Members' Business Expectancy*................ *147*

COUNT XIII.............................................................................................................................. 147

*Civil Conspiracy to Tortiously Interfere with Assignors' and Class Members' Business*

*Expectancy*............................................................................................................................... *147*

COUNT XIV............................................................................................................................. 148

*Unjust Enrichment*.................................................................................................................. *148*

COUNT XV ............................................................................................................................. 149

*Violations of the Florida Civil Remedies for Criminal Practices Act*................................... *149*

*(Fla. Stat. § 771.101 et seq.)*............................................................................................ *149*

**DEMAND FOR JUDGMENT** ...................................................................................... **153**

**JURY DEMAND**.............................................................................................................. **153**

**<u>APPENDIX</u>**..................................................................................................................... **155**

Plaintiffs, MSP Recovery Claims, Series LLC, MSPA Claims 1, LLC, Series PMPI, a segregated series of MAO-MSO Recovery II, LLC, and MSP Recovery Claims Series 44, LLC (collectively, "Plaintiffs"), on behalf of themselves and other Medicare Advantage health plans (the "Class Members"),[1] bring this action against Defendants, Caring Voice Coalition, Inc. ("CVC"), United Therapeutics Corporation ("UT"), Smiths Medical ASD, Inc. ("Smiths"), Express Scripts, Inc. ("Express Scripts" or "ESI"), Express Scripts Holding Company ("Express Scripts" or "ESI"), Accredo Health Group ("Accredo", "ESI", or "Express Scripts"), CVS Health Corporation ("CVS"), and Adira Foundation ("Adira") (collectively, "Defendants"), and allege:

## NATURE OF ACTION

1.      This case arises from UT's use of several conspiratorial schemes to increase the unit price and volume of its Pulmonary Arterial Hypertension ("PAH") Products. Plaintiffs' assignors ("Assignors") and the proposed Classes paid supra-competitive prices on behalf of their beneficiaries ("Enrollees") for UT's PAH products. Additionally, Assignors and the proposed Classes paid claims on behalf of Enrollees for UT's PAH products that were tainted by violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7(b)(1).

2.      UT conspired with Smiths, a medical device manufacturer of the only device approved to administer the PAH products, ("Generic Scheme" or "Generic Prevention Scheme") and simultaneously conspired with (1) CVC,[2] a sham 501(c)(3) charity, and (2) CVS (along with its

---

[1] The Class Members consist of Medicare Advantage health plans—i.e., Medicare Advantage entities such as Medicare Advantage Organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service Organizations ("MSOs"), Health Maintenance Organizations ("HMOs"), Part D Sponsors, and other Medicare first tier and downstream entities—and their assignees (collectively referred to as "MA Plans" or "Medicare Advantage health plans").

[2] As will be discussed, after the United States Government (the "Government") discovered CVC had been operating as a conduit for certain manufacturers to subsidize the use of their own products, CVC's management took steps to fraudulently transfer millions of dollars in assets out of CVC, and into a newly formed 501(c)(3) corporation (Adira) which is operated by the same individuals that

subsidiaries) and ESI (along with its subsidiaries, including Defendant Accredo) (collectively referred to as the "Specialty Pharmacies" or "Pharmacy Defendants") to circumvent Congressionally mandated co-payment requirements (referred to herein as "Co-Payment Circumvention Scheme", "Co-Payment Scheme", or "Charity Scheme") designed to suppress price inflation and non-medically necessary purchases.[3]

3.      To be clear, the Specialty Pharmacies were also complicit in the Generic Prevention Scheme, and, like the Charities, UT, and Smiths, are jointly and severally liable for the injuries caused by that scheme.

4.      PAH is a life-threatening disease that causes high blood pressure in the arteries that run from the heart to the lungs. The PAH drugs at issue in this litigation are Adcirca (tadalafil tablets), Remodulin (treprostinil injection), Tyvaso (treprostinil inhalation solution), and Orenitram (treprostinil extended-release tablets) (collectively, the "UT Hypertension Drugs" or "PAH Drugs").

5.      UT engaged in multiple overt schemes (collectively referred to as the "Schemes") to monopolize the market for PAH Drugs causing injuries to Assignors and Class Members by, among other ways, fraudulently inducing the reimbursement of PAH Drugs at supra-competitive prices.

6.      The Schemes encompassed the Charity Scheme, involving the Charities, the Specialty Pharmacies, and UT, as well as, the Generic Scheme, involving Smiths and the Specialty Pharmacies. These Schemes each resulted in cognizable economic damages as Assignors and Class Members lost

---

operated CVC. As such, Adira is liable for the conduct of its predecessor, CVC. References to "CVC" shall be treated as synonymous to references of "Adira". Both CVC and Adira will also be collectively referred to throughout as the "Charities" or "Charity Defendants".

[3] When Medicare beneficiaries, including those covered by Medicare Advantage health plans, obtain a prescription drug, the beneficiaries may be required to make a co-payment. Congress included co-payment requirements in the Medicare structure, in part, to encourage market forces to serve as a check on health care costs, specifically including the prices that pharmaceutical companies can demand for their drugs. Austin Frerick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016.

money and property that they otherwise would still have but for the Schemes.

7.      UT and CVC colluded and agreed that CVC would act as an illegal conduit, disguised as an independent charity, through which UT could increase the price and dispensing of PAH drugs through CVC's disease funds, by providing co-pay assistance to MA Plan patients and Medicaid Plan patients. UT and CVC agreed that CVC would create a PAH Fund that would exclusively, or nearly so, cater to patients taking UT Hypertension Drugs and that UT would be the sole donor to CVC's PAH Fund.

8.      UT bribed CVC to ensure that payments made by UT to CVC would be steered, or funneled towards, beneficiaries prescribed the PAH Drugs.

9.      Simultaneously, UT also colluded with, contracted with, and bribed the Specialty Pharmacies, to steer patients away from UT's free drug program, and towards CVC, the sham 501(c)(3) charity that UT funded and controlled.

10.      UT would routinely make large multi-million-dollar bribes to CVC (which were tax deductible when characterized as "donations" or "grants"), and would then publicly mischaracterize those bribes to the sham charity, as "grants to unaffiliated, not-for-profit organizations[.]"

11.      Doing so allowed the Co-Payment Circumvention Enterprise to profit off over a decade of racketeering activity, at the direct expense of Assignors, Class Members, and State and Federal healthcare plans (collectively, "Government Payors").

12.      As part of the Charity Scheme, UT routinely obtained data from CVC detailing how many patients taking each UT Hypertension Drug CVC had assisted, how much CVC had spent on those patients, and how much CVC expected to spend on those patients in the future. This information was used to ensure that CVC used the purported "donations" of "grants" exclusively to pay co-payments for UT Hypertension Drugs and allowed UT to perform return on investment ("ROI") calculations.

13.     As part of the Charity Scheme, UT created its own Patient Assistance Program ("UT PAP") that was supposedly designed to provide access to the PAH Drugs "at no charge" to certain patients "who are either indigent, under insured, or in jeopardy of losing insurance due to therapy costs." (**Exhibit Q**, p. 29 – 2010 UT 10-K).

14.     The Specialty Pharmacies (also referred to as "Administrators" or "Distributors") were designated "administrators" of the UT PAP, and, in exchange for money or a "fee-for-service" *bribe*, the Specialty Pharmacies were to perform certain responsibilities on UT's behalf, and implement certain criteria, as instructed, controlled, and directed by UT, in order to ensure Government Payors covered the cost of the PAH Drugs.

15.     For example, pursuant to the contracts with the Specialty Pharmacies ("Distribution Agreements"), UT provided exclusive rights to the Specialty Pharmacies to sell UT's PAH Drugs. The Specialty Pharmacies were also required to market and promote UT's PAH Drugs and were instructed to use and distribute UT-approved marketing materials.

16.     UT would routinely send (or "refer") patients to the Specialty Pharmacies. The Specialty Pharmacies were instructed to immediately contact the patients and obtain their information. If a patient did not have sufficient coverage for the PAH Drug, UT and the Specialty Pharmacies would routinely work with the patient to obtain coverage from Government Payors, including Assignors and Class Members. UT and the Specialty Pharmacies would also take an active role (via mail and wire) in assisting the patient in appealing any coverage denial decisions made by Government Payors.

17.     If UT and the Specialty Pharmacies were successful in obtaining coverage from Government Payors, the patient would be excluded from UT's PAP, and directed, *by UT and the Specialty Pharmacies,* to apply for co-pay coverage from CVC.

18.     CVC was bribed to accept all UT patients and grant co-pay coverage for Medicare and Medicaid beneficiaries and to serve as a conduit for UT to provide subsidies to patients taking the PAH Drugs.

19.     If a patient did not move forward with the purchase of UT's PAH Drug, the Specialty Pharmacy was to promptly contact the patient (and continue to follow up every couple of days) to determine the reason for the abandonment of UT's PAH Drug. If the patient advised the Specialty Pharmacies of financial concerns relating to the dispensing of UT's PAH Drug (i.e., co-pay or cost sharing obligations), the Specialty Pharmacies were required to assist the patient in obtaining funding from other sources, i.e., CVC. These relieved patients of any financial concerns relating to the pricing UT's PAH Drugs. The Specialty Pharmacies would then submit a request for service fees from UT, along with detailed reports of these actions to UT, and UT would pay the Specialty Pharmacies their promised bribes.

20.     This Scheme resulted in substantial injuries to Government Payors, including Assignors and Class Members. As discussed below, publicly available data (SEC Reports and CMS Data) reveal that **Government Payors accounted for 80% to 100% of UT's sales for certain PAH Drugs**.

21.     Unbeknownst to federal healthcare program beneficiaries, UT's bribes to CVC and Specialty Pharmacies, and Defendants' illegal renumerations to beneficiaries (i.e., co-payment assistance and free services in applying for Medicare enrollment and appealing any coverage denial) all constitute violations of the federal AKS, thereby rendering each claim **__unpayable__** by federal healthcare programs and disqualifying UT and the Specialty Pharmacies from receiving any payment from such programs for the UT Hypertension Drugs during the course of the scheme.

22.     UT ensured that the large sums of money continuously paid to CVC and Specialty Pharmacies improperly influenced CVC's and the Specialty Pharmacies' practices. Likewise,

Defendants ensured that the co-payment assistance grants—paid for and facilitated by UT and distributed by CVC—improperly influenced the practices of doctors prescribing, patients receiving, and/or the Specialty Pharmacies dispensing UT Hypertension Drugs.

23.     In doing so, Defendants eliminated the effects of price sensitivity—because the patients (i.e., consumers) were no longer incurring any cost—thereby eliminating price considerations, thus artificially increasing the amount of claims paid by Assignors and Class Members for UT Hypertension Drugs. Accordingly, with price sensitivity eliminated, the Co-Payment Circumvention Enterprise allowed UT to circumvent congressional safeguards and artificially increase the price of UT Hypertension Drugs to supra-competitive levels.

24.     As a result of the pattern of racketeering activity described herein, Assignors and Class Members unknowingly paid claims tainted by Defendants' AKS violations, entitling them to full reimbursement for those claims. This resulted in cognizable economic damages as Assignors and Class Members paid for claims they should not, and could not, have paid for.

25.     Also, as a result of the pattern of racketeering activity described herein, Assignors and Class Members paid artificially increased prices and volumes for UT Hypertension Drugs. This resulted in cognizable economic damages as Assignors and Class Members paid substantially more than they otherwise would have—but for the Co-Payment Circumvention Scheme.

26.     UT, a sophisticated pharmaceutical manufacturer, knew that the intended victims of the Scheme were the health plans Plaintiffs seek to represent. Indeed, after a patient's cost sharing obligation is paid, health plans such as Assignors and Class Members must then pay for UT Hypertension Drugs. To be clear, if a patient does not provide their cost sharing obligations (e.g., co-pay), a prescription will not be dispensed by the Specialty Pharmacies and neither the Specialty Pharmacies nor UT will make a profit. Therefore, UT and the Specialty Pharmacies both have a financial incentive to ensure patients go through with the purchase of the PAH Drugs, by removing

6

any financial obligations for the patient, resulting in Government Payors, including Assignors and Class Members, paying for UT's overpriced and over-dispensed PAH Drugs.

27.     In December 2017, UT paid $210 million and entered into a Settlement Agreement with the United States of America ("UT Settlement"), acting through the United States Department of Justice ("DOJ") and on behalf of the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") (collectively, the "United States") regarding the same general conduct at issue in this lawsuit (*See* UT Settlement Agreement, attached as **Exhibit B**). Under the terms of the UT Settlement, UT paid the United States $210 million to settle the United States' claims that UT violated the AKS and False Claims Act.

28.     While the DOJ's settlement with UT regarding the Co-Payment Circumvention Enterprise addressed some of the damage suffered by the Federal Government, it did not address or settle the injuries suffered by Assignors, Class Members, and other Medicare Advantage health plans, and related entities, who administer Medicare benefits pursuant to Medicare Part C and Part D.  None of the parties or agencies to the UT Settlement represented the interests of Plaintiffs, Assignors, or Class Members. The terms ofthe UT Settlement did not provide any remuneration or other relief to Plaintiffs, Assignors, and Class Members or otherwise address the claims Plaintiffs bring in this lawsuit.

29.     Defendants' conduct is not only anticompetitive in that it funneled patients away from obtaining drugs made by UT's competitors (e.g., brand-name drugs like Flolan, Veletri, and generic epoprostenol) by ensuring that the large sums of money UT continuously paid to CVC improperly influenced CVC's practices, but also UT's exclusive dealing relationship with Specialty Pharmacies (required to market, promote and advertise UT Hypertension Drugs) created artificial barriers of entry, and had anticompetitive effects, for less costly alternatives.

7

30.     Defendants profited tremendously from the Co-Payment Scheme and used the wire and mail in furtherance of this scheme to defraud.

31.     Defendants also used the mail and wire to engage in acts of bribery, violating state and federal law.

32.     Meanwhile, during the same time as UT's Charity Scheme, UT also implemented another scheme, the Generic Scheme, with Smiths and Specialty Pharmacies, to prevent competition and create artificial barriers of entry for generic alternatives to UT's Remodulin, enabling UT to charge supra-competitive prices for Remodulin.

33.      Plaintiffs bring this lawsuit to redress injuries caused to Assignors and Class Members, as a result of Defendants' unlawful schemes.

34.     The improper actions described below have allowed UT to maintain supra-competitive prices that thwart legitimate competition that would have benefited consumers and the public at large by drastically lowering the prices of these medically necessary drugs, and the provision of co-payments allowed UT to increase the price of its PAH products without regard to the relevant market conditions by insulating UT from the realities of beneficiaries not being able to afford congressionally mandated cost-sharing safeguards.[4]

35.     Defendants used mail and wires in furtherance of their racketeering schemes. UT used the wires to transmit "grants" to CVC, which, in reality, were bribes to CVC. CVC would then transmit data using the mail and wires, allowing UT to perform what amounted to ROI calculations on their "grants."

_____

[4] Defendants conducted two distinct schemes and have harmed two distinct putative classes: (i) all third parties reimbursed for the cost of Remodulin during UT's anticompetitive and fraudulent conduct with Smiths and the Specialty Pharmacies regarding the CADD-MS 3 pump and cartridges; and (ii) all third parties who reimbursed for the cost of the UT Hypertension Products tainted by AKS violations.

36.     UT used the mail and wires when it published and filed, in furtherance of its racketeering schemes, false or misleading 10-K and 10-Q reports with the U.S. Securities and Exchange Commission ("SEC") from 2007 through 2020.

37.     UT, Smiths, the Charities, and the Specialty Pharmacies used the mail and wires in furtherance of their schemes to limit competition and circumvent co-pay requirements. Some examples include, but are not limited to, (1) the distribution agreements (and amended agreements) entered into between UT and the Specialty Pharmacies; (2) the reports exchanged between UT and the Specialty Pharmacies, as required to occur on the tenth of each month; (3) communications exchanged between UT and the Specialty Pharmacies regarding the restriction of pumps and cartridges owned by the Specialty Pharmacies; (4) communications between Smiths and the Specialty Pharmacies regarding the restriction of pumps and cartridges owned by the Specialty Pharmacies; (5) communications between the Specialty Pharmacies and Sandoz to lull Sandoz into inaction, further preventing generic competition; (6) communications between the Specialty Pharmacies and CVC to circumvent cost-sharing obligations and receive subsidies for beneficiaries; (7) bribes and solicitation of bribes paid by UT to CVC and Specialty Pharmacies; and (8) Defendants' communications to patients and submissions of applications, correspondences, appeals, and AKS-tainted claims to Government Payors, including Assignors and Class Members, to induce them to pay for AKS-tainted claims, and claims for over-priced, over-dispensed drugs.

38.     Defendants' conduct violated the AKS, 42 U.S.C. § 1320a-7b, the Travel Act, 18 U.S.C. § 1952 ("Travel Act"), Mail Fraud, 18 U.S.C. § 1341, and Wire Fraud, 18 U.S.C. § 1343.

## PARTIES, JURISDICTION, AND VENUE

*a.  Plaintiffs*

39.     Plaintiffs obtained assignments from Assignors to recover reimbursement or payment from Defendants. Assignors provide health insurance coverage, and/or administer or provide services

pursuant to Medicare Part C and/or Part D, to individual Enrollees. Specifically, Assignors made payments on behalf of, or otherwise became financially responsible for, Enrollees' medical expenses incurred as a result of Defendants' anticompetitive and fraudulent schemes. Said assignments are alleged in Appendix A to this complaint.

*MSPRC*

40.     Plaintiff, MSP Recovery Claims, Series LLC ("MSPRC") is a Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more segregated Series.

41.     MSPRC has enumerated rights relating to its segregated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. tit. 6, § 18-215(a)–(c). Specifically, all rights and benefits arising from assignments to its series shall belong to MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC and the segregated series are authorized to pursue or assert any claim or suit capable of being asserted by any segregated series arising from, or by virtue of, an assignment to a segregated series. MSPRC retains the legal right to sue on behalf of each segregated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the segregated series. One or more health plans irrevocably assigned to certain series of this Plaintiff the right to assert the causes of action alleged in this complaint. As a result of said assignments, MSPRC, through its operating agreement, is authorized and empowered to pursue all claims and obtain all relief sought herein.

42.     MSPRC has established various segregated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series. Pursuant to MSPRC's limited

liability agreement, all segregated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name, or it may elect to bring suit in the name of its segregated series. MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to MSPRC. MSPRC's assignments, samples of which are alleged in detail in the Appendix to this complaint, are valid and binding contracts.

43.    Each and every cause of action identified in this complaint was expressly assigned to MSPRC.

### MSPA

44.    Plaintiff, MSPA Claims I, LLC ("MSPA") is a limited liability company that is duly organized, validly existing, and in good standing under the laws of Florida, with its principal place of business in Coral Gables, Florida. One or more health plans irrevocably assigned to MSPA the right to assert the causes of action alleged in this complaint. As a result of said assignments, MSPA is authorized and empowered to obtain the relief sought herein. MSPA's assignments, samples of which are alleged in detail in the Appendix to this complaint, are valid and binding contracts.

45.    Each and every cause of action identified in this complaint was expressly assigned to MSPA.

### MAO-MSO

46.    Plaintiff, MAO-MSO Recovery II, LLC, Series PMPI, a segregated series of MAO-MSO Recovery II, LLC ("MAO-MSO"), is a series limited liability company that is duly organized, validly existing, and in good standing under the laws of Delaware, with its principal place of business

located in Cresskill, New Jersey. One or more health plans irrevocably assigned to MAO-MSO the right to assert the causes of action alleged in this complaint. As a result of said assignments, MAO-MSO is authorized and empowered to obtain the relief sought herein. MAO- MSO's assignments, samples of which are alleged in detail in the Appendix to this complaint, are valid and binding contracts.

47.     Each and every cause of action identified in this complaint was expressly assigned to MAO-MSO.

*Series 44*

48.     Plaintiff, MSP Recovery Claims Series 44, LLC ("Series 44") is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more segregated series as permitted by Delaware law. Del. Code Ann. tit. 6, § 18-215(a). Accordingly, Series 44 established various segregated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series.

49.     Series 44 has enumerated rights relating to its segregated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. tit. 6, § 18-215(a)–(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the segregated series are authorized to pursue or assert any claim or suit capable of being asserted by any segregated series arising from, or by virtue of, an assignment to a segregated series. Series 44 retains the legal right to sue on behalf of each segregated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of

12

the segregated series. Series 44 assignments, samples of which are alleged in detail in the Appendix to this complaint, are valid and binding contracts.

50.     Each and every cause of action identified in this complaint was expressly assigned to Series 44.

51.     Defendants' Co-Payment Circumvention Enterprise triggered AKS-tainted payment obligations of Assignors and other members of the putative class. Additionally, Defendants' Generic Prevention Enterprise enabled UT to charge supra-competitive prices for Remodulin, while maintaining its monopoly over the relevant markets, as defined below. Each of these actions caused the Assignors and Class Members to pay artificially inflated prices and volumes for the UT PAH products. The anticompetitive and fraudulent conduct described herein directly caused damage to Assignors and the members of the putative class.

  b.  *Defendants*

    <u>United Therapeutics Corporation</u>

52.     Defendant UT is a Delaware corporation with its principal place of business in Silver Spring, Maryland. UT is a pharmaceutical manufacturer. At all relative times herein, UT advertised, marketed, and sold pharmaceutical products, including the UT Hypertension Drugs, throughout all states and territories in the United States, including Florida. UT derived substantial revenue related to the UT Hypertension Drugs from its business throughout each of the states and territories of the United States, including Florida.

53.     This Court has personal jurisdiction over UT because the Co-Payment Circumvention Enterprise and the Generic Prevention Enterprise alleged herein, each of which UT was central to, constitutes a tortious act pursuant to Fla. Stat. § 48.193(1)(a)(2). UT engaged in substantial and not isolated activity throughout the State of Florida, including the marketing and sale of the UT Hypertension Drugs. In addition, as a result of the Charity Scheme and Generic Scheme, Assignors

13

and the putative class members, sustained financial injuries in Florida. UT maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. UT purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

*The Charity Defendants*

54.    Defendant CVC is an Idaho nonprofit corporation claiming 501(c)(3) status for tax purposes. CVC's principal place of business during the duration of the Scheme was located at 6606 West Broad Street, Suite 403, Richmond, Virginia 23230, however, pursuant to a filing with the Commonwealth of Virginia, on July 31, 2019, CVC, changed their principal place of business to P.O. Box 28955, Henrico, VA 23228. CVC was established in 2003 and operates disease funds, including the PAH Fund, to pay the co-payments of certain patients, including Medicare patients.

55.    This Court has personal jurisdiction over CVC because the Co-Payment Scheme alleged herein, which CVC participated in, constitutes a tortious act pursuant to Fla. Stat. § 48.193(1)(a)(2). CVC engaged in substantial and not isolated activity throughout the State of Florida relating to the Co-Payment Circumvention Enterprise, resulting in Assignors and the putative class members sustaining financial injuries in Florida. CVC maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. UT purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

56.    Defendant Adira is a Virginia corporation claiming 501(c)(3) status for tax purposes. Adira's principal office is located at 7330 Staples Mill Road #288, Henrico, VA, 23228-4122. Adira, originally incorporated under the name Facilitating Patient Health, was established in 2019 and operates disease funds, including a Huntington's Disease Fund, to pay the co-payments of certain patients, including Medicare and Medicaid patients

57.     CVC made several transfers to Adira considered to be fraudulent and voidable pursuant to Va. Code Ann. § 55.1-400 *et seq*.

58.     Adira is the de facto successor of CVC. Adira was created by and has always been operated by the very same people who operated CVC—including, but not limited to Greg Smiley, James Rock, and Bruce Packett. Adira received the remainder of CVC's unrestricted and unobligated assets, including cash, investments, and valuable personal property. Adira received and continues to maintain all of CVC's data—often on the same computer equipment that CVC utilized—including taking ownership and control of what CVC described as its "home-grown patient portal for monitoring patient and grant data—known in shorthand by previous leadership as PAMS [which] was [CVC's] largest and most significant of assets." As CVC's successor, Adira is liable for CVC's debts and liabilities.

59.     For purposes of clarity, and unless otherwise indicated, references to "CVC" should be construed as synonymous to references to "Adira". CVC and Adira will also be collectively referred to as the "Charities".

### *Smiths Medical ASD, Inc.*

60.     Defendant Smiths is incorporated under Delaware law, with its principal place of business in Minneapolis, Minnesota. Smiths is a leading global manufacturer of specialty medical devices. At all relative times herein, Smiths advertised, marketed, and sold a device called a CADD-MS 3 pump, along with associated cartridges. Smiths sold pumps and cartridges throughout the United States including in the State of Florida, to the beneficiaries of Assignors and the putative class members.

61.     This Court has personal jurisdiction over Smiths because the Co-Payment Circumvention Scheme alleged herein, which Smiths participated in, constitutes a tortious act pursuant to Fla. Stat § 48.193(1)(a)(2). Smiths engaged in substantial and not isolated activity

throughout the State of Florida, including the marketing and sale of the CADD-MS 3 pumps and cartridges used to administer the UT Hypertension Drugs. In addition, as a result of the Co-Payment Circumvention Scheme, Assignors and the putative class members, sustained financial injuries in Florida. Smiths maintains systematic and continuous contacts in Florida, and regularly transacts business in Florida. Smiths purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

### *The Specialty Pharmacies*

62.     Unless otherwise indicated, Express Scripts Holding Company, Express Scripts, Inc., Accredo Health Group and CVS Health Corporation are collectively referred to as the "Specialty Pharmacies", or "Distributors" throughout this Complaint.

63.      Defendant Express Scripts Holdings Company ("Express Scripts" or "ESI") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Express Way, St. Louis, Missouri.

64.     Defendant Express Scripts Inc. ("Express Scripts" or "ESI") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at One Express Way, St. Louis, Missouri.

65.     Defendant Accredo Health Group, Inc. ("Accredo", "Express Scripts" or "ESI"), headquartered in Memphis, Tennessee, is a wholly owned subsidiary of Medco Health Solutions, Inc. ("Medco"). Accredo is one of the largest specialty pharmacies and, as of 2010, was the largest mail order pharmacy in the United States. Through so-called Therapeutic Resource Centers, Accredo provides specialty pharmacy and related services for individuals with complex and chronic health conditions.

66.     Accredo has operations in Warrendale, Pennsylvania, Corona, California, Greensboro, North Carolina, Orlando, Florida, Indianapolis, Indiana, and Nashville, Tennessee.

67.     On or about April 2012, Accredo's parent company, Medco, was acquired by Express Scripts.

68.     Medco Health Solutions, Inc. and Express Scripts, Inc. are agents and/or alter ego of Express Scripts Holding Company. For example, during the relevant time period, David Queller, President of both Express Scripts, Inc. and Medco Health Solutions, Inc., is also Senior Vice President of Sales & Account Management at Express Scripts Holding Company. Christine Houston, a Vice President at both Express Scripts, Inc. and Medco Health Solutions, Inc., is also Executive Vice President and Chief Operations Officer at Express Scripts Holding Company. John Mimlitz, a Vice President at both Express Scripts, Inc. and Medco Health Solutions, Inc., is also Vice President of Tax at Express Scripts Holding Company. Timothy Smith, a Vice President and Treasurer of both Express Scripts, Inc. and Medco Health Solutions, Inc., is also Corporate Treasurer and Vice President of Finance and Indirect Procurement at Express Scripts Holding Company. Rod Fahs, the Assistant Secretary of both Express Scripts, Inc. and Medco Health Solutions, Inc., is also Assistant General Counsel at Express Scripts Holding Company. Christopher McGinnis was a Vice President at Express Scripts, Inc., and also a Vice President and Chief Accounting Officer of Express Scripts Holding Company. Martin Akins, the only member of the Board of Directors of Express Scripts, Inc. and the only member of the Board of Directors of Medco Health Solutions, Inc., and Secretary of both Express Scripts, Inc. and Medco Health Solutions, Inc., is also Senior Vice President, General Counsel, and Corporate Secretary of Express Scripts Holding Company. All of the officers of Medco Health Solutions, Inc. are also officers of Express Scripts, Inc.

69.     For purposes of clarity, Plaintiffs herein collectively refer to Express Scripts Holding Company, Express Scripts, Inc., Medco Health Solutions, Inc., and Accredo Health Group as "Express Scripts."

70.     Defendant CVS Health Corporation ("CVS") is a retail pharmacy and healthcare company headquartered at One CVS Drive, Woonsocket, Rhode Island 02895 and incorporated in Delaware.

71.     CVS is the largest provider of prescription medications and the largest owner and operator of specialty pharmacies in the United States. CVS fills or manages more than one billion prescriptions per year.

72.     CVS, through its Pharmacy Services Segment, also provides pharmacy benefit management services to various health insurance entities on behalf of nearly 90 million health plan participants. In its 2016 Annual Report, CVS Health Corporation repeatedly referred to itself as a PBM, stating that it is "the largest integrated pharmacy health care provider in the United States" and that it "provides a full range of pharmacy benefit management services." In its 2016 Annual Report, CVS Health Corporation further stated that one of its three business segments is its Pharmacy Services Segment, which provides "a full range of pharmacy benefit management . . . solutions, including plan design offerings and administration, formulary management," and that approximately 60% of its 2016 revenues were derived from its Pharmacy Services Segment. The conduct complained of in this case can be traced to this defendant.

73.     Express Scripts (and its subsidiaries) and CVS (and its subsidiaries) provide a wide range of services, including, but not limited to, PBM services, formulary placement services, Medicare Part D Sponsor Services, specialty pharmacy services, co-pay assistance services, distribution services, marketing, and promotion services for brand name drugs, and more. These various services, in addition to the services required by nature of being publicly traded companies, necessarily require Express Scripts and CVS to abide by various statutory, contractual, and fiduciary obligations that irreconcilably conflict with duties and obligations owed by reason of other roles they

18

voluntarily assumed. These glaring conflicts of interest, further discussed below, resulted in, and continue to result in, tremendous fraud against Government Payors.

74.    For purposes of clarity, Plaintiffs herein collectively refer to Express Scripts (and its subsidiaries) and CVS (and its subsidiaries) as the "Specialty Pharmacies" or "Pharmacy Defendants".

75.    This Court has personal jurisdiction over the Specialty Pharmacies because the Schemes alleged herein, both of which the Specialty Pharmacies participated in, constitutes tortious acts pursuant to Fla. Stat § 48.193(1)(a)(2). The Specialty Pharmacies engaged in substantial and not isolated activity throughout the State of Florida, including the marketing, sale, promotion, and distribution of the PAH Drugs. In addition, as a result of the Schemes, Assignors and the putative class members, sustained financial injuries in Florida. The Specialty Pharmacies maintain systematic and continuous contacts in Florida, and regularly transacts business in Florida. The Specialty Pharmacies purposefully availed itself of the privilege of conducting activities in Florida, thus taking advantage of the protections and benefits of the law.

76.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The causes of action alleged herein arises under federal law.

77.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Plaintiffs are completely diverse from Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

78.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

79.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal claims as to form part of the same case or controversy.

80.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in Florida. Plaintiffs' Florida Assignors purchased the UT Hypertension Drugs in Florida. Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) because Defendants transact their affairs in Florida.

## STANDING

81.     Assignors provide Medicare benefits to beneficiaries who have elected coverage under Medicare Part C or Medicare Part D under either (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; or (ii) state and federal laws that provide for the reimbursement of payments made by the Assignor health plans.

82.     The assignments the Assignors provided to Plaintiffs are valid and binding contracts, empowering Plaintiffs to bring and recover on each of the claims and causes of action asserted in this lawsuit.

83.     Although Plaintiffs seek recovery on behalf of each of their Assignors who paid for or reimbursed the cost of the UT Hypertension Drugs during the relevant time period, one representative assignment for each Plaintiff is alleged in detail in the Appendix. A copy of each representative assignment is attached hereto as **Exhibits C–E** and explained in more detail in the Appendix.

84.     At all material times hereto, one or more Assignors provided Medicare benefits to Medicare Advantage plan beneficiaries and paid inflated prices as a result of Defendants' anticompetitive and/or fraudulent conduct.

85.     As intended, Defendants' Co-Payment Circumvention Scheme resulted in the submission of AKS-tainted claims that should have never been, but were, paid for by Assignors.

86.     Similarly, Defendants' Generic Prevention Scheme created artificial barriers of entry for generic competition, resulting in supra-competitive prices paid by Assignors for Remodulin.

87.     Assignors paid more than $24.8 million in claims on behalf of covered patients receiving UT Hypertension Drugs from January 1, 2010, through present.

88.     Assignors provided payment for the UT Hypertension Drugs throughout the United States, including in the states of California, Connecticut, Florida, Massachusetts, Michigan, New York, Ohio, Pennsylvania, Puerto Rico, South Carolina, and Wisconsin.

## REGULATORY BACKGROUND

89.     In 1965, Congress amended the Social Security Act to create the Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled. The Medicare Act consists of five parts: Parts A, B, C, D, and E. Parts A and B create, describe, and regulate traditional fee-for-service, government-administered Medicare. *See* 42 U.S.C. §§ 1395c–1395i-5, 1395j–1395w. Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. 42 U.S.C. §§ 1395w-21–1395w-29.  Part D provides for prescription drug coverage to Medicare beneficiaries. Part E includes "Miscellaneous Provisions."

90.     Assignors and Class Members provide Medicare benefits under Parts C and D.

91.     Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006. A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

92.     Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private-market model, wherein Medicare contracts with private entities, known as Part D "sponsors." These sponsors administer prescription drug plans, and plan sponsors must provide qualified prescription drug coverage.

93.     A Part D sponsor submits a bid the year before it is to deliver Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

94.     If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary must pay the difference as part of a monthly premium. Centers for Medicare and Medicaid Services ("CMS") then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

95.     The chart below details the Medicare Part D Standard Benefit design in 2017:

**Standard Part D Coverage for 2017**

| Coverage | | Part D Plan Pays | Beneficiary Pays |
|---|---|---|---|
| Annual Deductible ($400) | | $0 | $400 |
| Initial Coverage Period (>$400-$3,700) | | 75% of $3,300 | 25% of $3,300 |
| Coverage Gap ("Donut Hole") Once your total drug costs (what you and your plan pay) exceed $3,700, you are in the 'donut hole.' | | $0 (For brand name drugs, the 50% discount comes from drug manufacturers + 10% subsidy. For generic drugs, there is a 49 subsidy.) | 40% of covered brand name drugs; 51% of covered generic drugs |
| Catastrophic Coverage This begins once you've reached your 'out-of-pocket threshold' of $4,950 in 2017. ($400 deductible + $825 initial coverage + $3,725 'donut hole') | | 95% or the drug cost minus the copay | Greater of 5% of the drug costs or $3.30 for a generic drug or $8.25 for a brand name drug |

96.     All providers and suppliers of medical services and items—*including drug manufacturers* who supply covered medications—*must enroll with Medicare* to be eligible to receive any payment under Medicare. 42 CFR § 424.505. To enroll in Medicare, all providers and suppliers must submit an enrollment application to CMS and must "attests that the information submitted is accurate and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 CFR § 424.510(d)(3).

97.     The application forms used by all providers and suppliers to enroll in Medicare includes the following attestation: "I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in . . . this application. . . . I understand that payment of a claim by Medicare *is conditioned upon* the claim and the underlying transaction

22

complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)).”[5] (emphasis added).

98.    In addition, “in order for coverage to be available under Medicare Part D for applicable drugs of a manufacturer, the manufacturer must,” among other things, enter “into and have in effect an agreement described in § 423.2315(b).” 42 CFR § 423.2310(a). This manufacturer agreement requires that “[e]ach manufacturer . . . must comply with the requirements imposed by CMS . . . for purposes of administering the program.” 42 CFR § 423.2315. Congress has unequivocally instructed that “compliance with federal health care laws, including the [AKS], is a condition of payment by the Medicare program.” *McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256, 1260 (11th Cir. 2005).

99.    Likewise, MA Plans are required to certify compliance with the AKS and are prohibited from paying for claims that are tainted by an AKS violation or are rendered unpayable due to disqualifying conduct by the underlying provider or supplier. 42 CFR § 422.504(h)(1). Every subcontract that the MA Plan enters into must also contain this certification of compliance. 42 CFR § 422.504(i).

100.    Medicare Advantage entities and other Medicare Part C entities play an important role in the American healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, “Congress’s goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation.” *In re Avandia, Sales Pracs. & Prods. Liab. Litig.*, 685 F.3d 353, 363 (3d Cir. 2012).

---

[5]    Medicare Enrollment Application, CMS Form 855i available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf. *See also* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/Enrollment-Applications.

101.    "In 2022, more than 28 million people are enrolled in a Medicare Advantage plan, accounting for nearly half or 48 percent of the eligible Medicare population, and $427 billion (or 55%) of total federal Medicare spending (net of premiums)."[6]

102.    Medicare Advantage entities cannot play the vital role that Congress intended if they are hamstrung by a competitive disadvantage. When Medicare Advantage entities "faithfully pursue and recover from liable third parties," they "will have lower medical expenses and will therefore be able to provide additional benefits to their enrollees." *Id.* (quoting *Policy and Technical Changes to Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19678, 19797 (April 15, 2010)).

## **FACTUAL ALLEGATIONS**

103.    There are two schemes at issue in this lawsuit. Facts related to the first scheme, the Co-Pay Circumvention Scheme, serve as the basis for Plaintiffs' State and Federal RICO causes of action, as well as their State Consumer Protection claims and state law causes of action. The Defendants that are jointly and severally liable for the harms caused by this scheme includes, UT, the Charities, and the Specialty Pharmacies ("Co-Pay Circumvention Defendants" or "Co-Pay Circumvention Enterprise").

104.    Facts related to the second scheme, the Generic Prevention Scheme, serve as the basis for Plaintiffs' State and Federal Antitrust causes of action, as well as their State Consumer Protection claims and state law causes of action. The Defendants that are jointly and severally liable for the harms caused by this scheme includes, UT, Smiths, and the Specialty Pharmacies ("Generic Prevention Defendants" or "Generic Prevention Enterprise").

---

[6]    See Medicare Advantage in 2022: Enrollment Update and Key Trends: https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2022-enrollment-update-and-key-trends/#:~:text=In%202022%2C%20more%20than%2028,spending%20(net%20of%20premiums).

## THE CO-PAYMENT CIRCUMVENTION SCHEME

105.   UT, the Specialty Pharmacies, and every physician who prescribed any Subject UT Drug submitted a Medicare Provider and/or Supplier Application. Each of these entities explicitly certified compliance with the AKS and CMS regulations and program guidelines. These entities knew that this certification and compliance was a precondition for eligibility to receive payment for any services or items to provided—directly or indirectly—to Medicare beneficiaries.

106.   As an additional eligibility requirement to participate in the Part D program, on January 1, 2011, UT entered a contract with CMS—contract number P1186—agreeing to comply with all Medicare Program rules, including the AKS. Without this contract, none of UT's drugs would have been eligible for payment under Medicare Part D.

107.   "Part D enrollees with high drug costs can have difficulty affording their medications when they are in the deductible phase [and] when they reach the coverage gap—the period in which they are required to pay a larger share of total drug costs."[7] Patient assistance programs ("PAPs") are designed to help financially needy patients afford necessary medications during this difficult period.

108.   There are two ways that pharmaceutical companies "give" to PAPs. First, manufacturers can establish their own PAPs.  "Under this option, pharmaceutical companies give drugs directly to patients who cannot afford them or donate the drugs to a foundation that then gives them to patients.  The second option is through independent charity PAPs (herein referred to as 'co-payment charities')." Austin Frerick, *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 [hereinafter *Cloak of Social Responsibility*]. CVC is/was an "independent" charity PAP, or co-payment charity.

---

[7] Congressional Research Service, *Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)*, June 15, 2017.

109.     For co-payment charities, pharmaceutical companies donate money to the charity, and people who cannot afford their drugs but have insurance (usually non-insureds, and Medicare) can apply to these charities to cover all or a portion of their drug costs.

110.     There are two key differences between these two giving options. "First, companies donate drugs in option 1 and money in option 2.  Second, pharmaceutical companies receive no money besides a [tax] deduction in option 1, **but under option 2 they receive a [tax] deduction _and_ money from the insurer paying the other portion of the drug costs**. Thus, assistance provided by option 2 reduces out-of-pocket costs to insured patients but do[es] not reduce the price of prescription drugs to the healthcare payer. These are one-sided discounts." _Id_. (emphasis added).

111.     A small donation to a co-payment charity results in a pharmaceutical company receiving a substantial portion of the prescription's cost from Medicare Advantage Plans, such as Assignors and Class Members.[8]

112.     As pharmaceutical drug company "giving" to co-payment charities rises, the co-payment charity benefits as well. In fact, executives at co-payment charities are among some of the _highest paid executives_ in the United States.

113.     CVC is not an outlier in this phenomenon. With the increase in CVC donations, came an increase in CVC executive salaries. Pamela R. Harris, the President and Chairman of CVC received a salary of $233,457 in 2011. By comparison, in 2015, she received a salary of $378,200.

---

[8] _See_ Michael Banigan, _A Guide to Patient Assistance Programs: What You Need to Know to Promote Patient Advocacy and Maximize Charitable Contributions_, Chronic Disease Fund Inc. (2016) (providing that pharmaceutical companies can calculate their profitability, or "charitable margin," as a result of their donations to co-payment charities and can stand to earn 220 percent charitable margins). _See also Cloak of Social Responsibility_ (explaining that example of "charitable margin" can yield a "charitable margin of 220 percent"); _see also_ Citi Research, _The Straw that Could Break the Camel's Back_: _DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns_, May 16, 2017 (explaining that "[e]ach $1m industry donation to a charitable foundation to enable Medicare patients Xtandi access or similar high priced drugs has the potential to generate up to $21m for the sponsor company, _**funded by the U.S. Government.**_") (emphasis added).

This salary increase has a direct correlation to the amounts of donations CVC received from pharmaceutical manufacturers, like UT. CVC's contributions and grants increased from $49 million in 2011, to more than $131 million in 2015.

114.    Accordingly, in this context, pharmaceutical companies and co-payment charities have a coordinated and mutually beneficial purpose—to receive donations, establish additional disease funds to cover co-payments of the pharmaceutical company's expensive, specialty drugs, and ensure federal healthcare programs bear the cost of these expensive, specialty drugs, so the co-payment charity can demonstrate "results" for the pharmaceutical company to justify increased donations.

115.    Given these shared economic incentives, it is no surprise that charitable assistance from co-payment charities increased from $11 million in 2004 to nearly $868 million in 2014. *Cloak of Social Responsibility* (noting that from 2007 to 2009, during the Great Recession, pharmaceutical giving increased by nearly $1.5 billion, whereas overall corporate giving decreased by $1.2 billion). The chart below details total giving for certain co-payment charities, including CVC, from 2001 to 2014.

| Table A-1. Total Giving in Dollars for Independent Charity Patient Assistance Programs (PAPs), 2001-2014 | | | | | | |
|---|---|---|---|---|---|---|
| | Patient Access Network Foundation[a] | Chronic Disease Fund/ Good Days[b] | Caring Voice Coalition[c] | Healthwell Foundation[d] | Patient Services | Subtotal: Independent Charity PAPs |
| 2001 | — | — | — | — | $2,328,611 | $2,328,611 |
| 2002 | — | — | — | — | $3,296,181 | $3,296,181 |
| 2003 | — | — | — | — | $5,118,345 | $5,118,345 |
| 2004 | — | — | $80,383 | — | $6,932,842 | $11,301,748 |
| 2005 | $7,557,312 | $5,597,689 | $5,257,803 | $15,856,793 | $15,719,269 | $49,988,866 |
| 2006 | $18,652,834 | $66,279,917 | $9,850,206 | $47,289,619 | $15,333,700 | $157,406,276 |
| 2007 | $24,880,629 | $63,551,700 | $15,816,549 | $59,391,157 | $21,467,030 | $185,107,065 |
| 2008 | $32,825,596 | $82,133,885 | $27,943,050 | $57,521,456 | $35,269,942 | $235,693,929 |
| 2009 | $37,323,252 | $136,713,152 | $37,530,533 | $71,425,660 | $29,594,995 | $312,587,592 |
| 2010 | $37,562,665 | $172,488,043 | $38,166,963 | $84,233,714 | $37,440,434 | $369,891,819 |
| 2011 | $28,379,485 | $195,647,202 | $46,827,156 | $49,521,777 | $39,963,874 | $360,359,494 |
| 2012 | $108,460,641 | $182,365,638 | $59,221,721 | $36,995,288 | $50,332,148 | $434,375,436 |
| 2013 | $174,340,174 | $194,448,004 | $67,435,466 | $31,135,498 | $60,897,475 | $528,256,617 |
| 2014 | $486,427,781 | $170,628,203 | $98,027,599 | $29,039,150 | $73,725,080 | $867,857,753 |
| *Source*: ProPublica's Nonprofit Explorer Database. | | | | | | |
| *Notes*: These totals come from line 13 titled "'Total Grants'" on Form 990, although for some entities before 2008, the totals come from line 23, part II. | | | | | | |
| [a]Excluded 2004 return because it was an initial return. | | | | | | |
| [b]Excluded 2004 return because it was an initial return. | | | | | | |
| [c]Excluded 2002 return because it was an initial return and their reporting years run July to June. | | | | | | |
| [d]Excluded 2004 return because it was an initial return. | | | | | | |

116.     The rise of co-payment charities and pharmaceutical corporate giving to such charities (with the economic incentives detailed above) is tied to the enactment of public insurance programs expanding the number of Americans with prescription drug coverage, the growth of specialty drugs, and the federal anti-kickback law.

117.     First, this increased giving to co-payment charities occurred during a period in which there was a major increase in the number of Americans with prescription drug coverage as a result of the enactment of Medicare Part D and, subsequently, the passing of the Affordable Care Act ("ACA") in 2010, which expanded Medicaid in providing prescription drug benefits. "Before these public insurance expansions, federal government spending on prescription drugs was 25 percent of total spending in 2005. In 2014 it was 41 percent." *Cloak of Social Responsibility*.

118.     Second, in addition to these public insurance programs, specialty drugs (i.e., generally defined as expensive prescriptions requiring extra handling or administration in treating complex diseases) have contributed to the growth of co-payment charities. "In recent years, spending for specialty drugs has grown faster than spending for other pharmaceuticals. Although specialty medications account for only one percent of prescriptions, they account for almost a third of U.S. prescription spending.  For Medicare Part D, specialty drugs accounted for a quarter of a percent of prescriptions in 2013 but eleven percent of total drug cost." *Id*.

119.     Co-payment charities allow pharmaceutical companies to manage price sensitivity for these more expensive specialty drugs. The OIG noted that PAPs "steer patients toward and lock them into a particular manufacturer's product, even when other equally effective and less costly alternatives are available." *Id.*

120.     The rise of co-payment charities was in response to federal anti-kickback law. The AKS made the receipt of kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and Medicaid programs a crime. The AKS makes it a crime to knowingly and

willfully offer, pay, solicit, or receive any remuneration to induce a person to purchase or recommend

any good, service, or item covered under a federal health care program. *See* 42 U.S.C. § 1320a-7b(b).

121.    As it relates to PAPs, the OIG has stated that the AKS could be violated "if a donation

is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally

reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to

influence the patient to purchase (or induce the patient's physician to prescribe) certain items."

79 Fed. Reg. at 31121.

122.     Congress has determined that any Medicare claim "that includes items or services

resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the

False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). *See* 42 U.S.C. § 1320a-7b(g).

### OIG Guidance for Co-Payment Charities

123.    Since 2005, in advance of Medicare Part D taking full effect, the OIG has provided

guidance to co-payment charities regarding compliance with applicable laws and regulations,

including the AKS and FCA. In this guidance, the OIG made clear that such charities will run afoul

those laws and regulations if they do not follow specified rules. Those rules ensure that a

pharmaceutical manufacturer cannot control a co-payment charity, or receive information from such

a charity, that would allow the manufacturer to link the amount it donates to additional profits from

the sale of a particular drug.

124.    In 2005, the OIG initially issued a special advisory bulletin on PAPs (the "2005

Special Advisory Bulletin"). The 2005 Special Advisory Bulletin provided that certain cost-sharing

subsidies provided by *bona fide*, independent PAPs unaffiliated with drug manufacturers do not raise

AKS concerns, even if the PAPs receive manufacturer contributions. *See* OIG Special Advisory

Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov.

22, 2005), attached as **Exhibit F**. The 2005 Special Advisory Bulletin also set forth factors that the

OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following:

a. No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

b. The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;

c. the PAP awards assistance without regard to the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

d. The PAP provides assistance based upon a reasonable verifiable, and uniform measure of financial need that is applied in a consistent manner; and

e. the drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. *Id.* at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices.")

125.    In 2014, the OIG issued an updated bulletin raising concerns about the conduct of co-payment charities and intensifying its scrutiny of arrangements between pharmaceutical companies and co-payment charities (the "2014 Special Advisory Bulletin"). See *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120 (May 30, 2014), attached as **Exhibit G**.  In the 2014 Special Advisory Bulletin, the OIG raised concerns that these programs present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not sufficiently independent from donors. *Id.*

126.    The OIG thereafter noted additional areas of concern related to disease funds, eligible recipients, and the conduct of donors, and required co-payment charities to certify to the OIG that:

a. The co-payment charity will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

b.   The co-payment charity will not maintain any disease fund that provides co-payment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates; and

c.   The co-payment charity will not limit its assistance to high-cost or specialty drugs. Instead, the co-payment charity will make assistance available for all products, including generic or bioequivalent drugs covered by Medicare or other insurers, when prescribed for the treatment of the disease state(s) covered by the fund.

127.   With respect to the "conduct of donors," the 2014 Special Advisory Bulletin reiterated its prior focus [from the 2005 Special Advisory Bulletin] on co-payment charities not giving a "donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP." *Id.* Notably, the OIG warned that:

> [t]he procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to co-payments of its own products, which would implicate the antikickback statute.

*Id.*

### CVC's Growth and OIG's Communications

128.   "In 2003 Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, which created Medicare Part D, 'an optional prescription drug benefit . . . which went into effect in 2006.'"[9]

129.   With the enactment of Part D, Congress implemented co-pay requirements as a "safety-valve" against supra-competitive pricing.

130.   That same year, in 2003, CVC registered for status as a national 501(c)(3) non-profit, charitable organization aimed at providing co-payment assistance for patients with certain chronic

---

[9] *Patient Servs., Inc. v. United States*, No. 3:18CV16, 2019 WL 267872, at *4 (E.D. Va. Jan. 18, 2019) (quoting Centers for Medicare & Medicaid Services, History, CMS.gov (last accessed Oct. 17, 2018), https://www.cms.gov/About-CMS/Agency-Information/History/index.html).

or life-threatening diseases. CVC established certain disease funds, including the PAH fund, which were funded by donors, including UT.

131.    CVC grew from receiving $80,383 from donors in 2004 to receiving over $131 million from donors in 2015.

132.    With the increase in CVC donations, came an increase in CVC executive salaries. CVC's President was Pamela R. Harris during the period that the Co-Pay Circumvention Defendants carried out their Co-Payment Circumvention Enterprise. Ms. Harris, along with her daughter, Samantha Harris (Ms. Samantha Harris later changed her name to Samantha Green), who served as CVC's Vice- President, were among a handful of executives whose compensation is set forth in Part VII of CVC's annual Form 990 Tax Filings.[10] Pamela R. Harris received a salary of $234,886 in 2010. By comparison, in 2015, she received a salary of $421,672. The rest of the executive staff at CVC saw similar pay increases. *See* **Exhibit H** – CVC's Form 990 Filings. Samantha Harris received a salary of $38,083 in 2010. In 2015, Samantha Harris was paid $219,591. The same pattern is present for CVC's director of finance, Rebecca App: her salary was $97,786 in 2010, and rose to $181,054 by 2015. In addition, CVC managed to add at least four more employees—none of whom were on the payroll in 2011—who were paid six-figure salaries by 2015: Taylor Scott ($156,192), Ron Pisarz ($140,690), Jennifer Previtera ($124,989), and Robert Mayfield ($115,701). These salary increases have a direct correlation to the amounts of "donations," "grants," or "bribes," CVC received from pharmaceutical manufacturers, including UT.

133.    CVC violated one of the most basic rules that separates legitimate co-payment charities from illegal ones—it used the mail and wire to exchange information with UT so UT could

---

[10] For the years discussed here, CVC reported based on a fiscal year of July 1 to June 30. For example, a reference to CVC's 2011 990 (or salary paid in 2011) covers a period from July 1, 2011, to June 30, 2012.

correlate its donations with its increased profits on the sale of specific drugs—and then CVC used the mail and wire to lie about it to the OIG.

134.    In 2006, CVC used the mail and wire to certify to the OIG that it would comply with the requirements outlined above in the OIG's 2005 Special Advisory Bulletin. CVC subsequently requested an advisory opinion from the OIG inquiring whether its "Proposed Arrangement" as a nonprofit, tax-exempt, charitable corporation's proposal to provide Medicare beneficiaries with co-pay assistance under Medicare Part B, Medicare Part D, Medigap, ***and Medicare Advantage*** would constitute grounds for sanctions under certain federal laws, including the AKS.  In response, and in reliance on certifications and representations made by CVC, on April 20, 2006, the OIG issued an Advisory Opinion to CVC.  *See* OIG, Adv. Op. 06-04 (April 20, 2006), attached as **Exhibit I**. The 2006 CVC Advisory Opinion noted CVC's certification that, among other requirements, no donor had exerted or will exert "any direct or indirect influence or control" over CVC. *Id.*  ("[CVC] has certified that no donor or affiliate of any donor (including, without limitation, any employee, agent, officer shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) has exerted or will exert any direct or indirect influence or control over [CVC] or any of [CVC]'s programs.").

135.    The 2006 CVC Advisory Opinion provided that upon request and as a courtesy, donors will be informed monthly of the aggregate number of patients who qualify for assistance in a category, but highlighted CVC's certification that "the monthly data will not contain any information that enable a donor to correlate the amount or frequency of its donation with the number of subsidized prescriptions or orders for its products or the volume or medical condition of patients choosing its services." *Id.* ("No individual patient information will be conveyed to donor, nor will any data related to the identity, amount, or nature of products or services subsidized under the Proposed Arrangement.").

136.    The OIG concluded, in part, that "*based on the facts certified in [CVC's] request* for an advisory opinion and supplemental submissions . . . [and subject to various limitations set forth by the OIG] while the Proposed Arrangement could potentially generate prohibited remuneration under the anti-kickback statute, if the requisite intent to induce or reward referrals of Federal health care program business were present, the OIG would not impose administrative sanctions on [CVC] under [federal laws regarding civil monetary penalties] in connection with the Proposed Arrangement." *Id*.

### The Co-Payment Circumvention Enterprise Successfully Deceived Government Payors into Paying for AKS-Tainted Claims

137.    Meanwhile, in 2006, UT had generated approximately $152.5 million in sales of Remodulin, of which, 90%, or $137.2 million was in the United States. **Exhibit J**, p. 56 – 2007 UT 10-K.

138.    On March 14, 2006, CVS filed is 10-K Annual Report noting that, due in large part to the recent implementation of Medicare Part D, its business had been "adversely affected by . . . higher consumer co-payments and co-insurance agreements[.]" **Exhibit K**, p. 19 – 2005 CVS 10-K.

139.    On January 1, 2007, UT and Accredo entered into an arrangement where Accredo would have sole distribution rights for UT's Flolan. **Exhibit J**, p. 34, 2007 UT 10-K.

140.    On February 27, 2007, CVS again informed its investors that "pharmacy growth has also been adversely affected by . . . higher consumer co-payments and co-insurance arrangements[.]" **Exhibit L**, p. 20 – 2006 CVS 10-K.

141.    Meanwhile, in 2007, UT generated $200.9 million in revenue from Remodulin, of which, 87%, or $174.8 million was in the United States. **Exhibit J**, p. 56, 2007 UT 10-K.

142.    According to UT, in 2007, "between 35-50% of Remodulin sales in the United States [were] reimbursed under the Medicare and Medicaid programs." **Exhibit J**, p. 48, 2007 UT 10-K.

That means, *according to UT*, of the approximately $174.8 million in U.S. Remodulin sales, Government Payors paid between $61.2 million and $87.4 million in Remodulin sales.

143.    UT announced that it had distribution agreements with the Specialty Pharmacies to market, promote and distribute "subcutaneous and intravenous Remodulin in the United States" ("Distribution Agreements"). **Exhibit J**, p. 8, 2007 UT 10-K.

144.    UT announced, "[w]e have also established a patient assistance program in the United States, which provides qualified uninsured or underinsured patients with Remodulin at no charge." **Exhibit J**, p. 9, 2007 UT 10-K.

145.    Pursuant to the Distribution Agreements, the Specialty Pharmacies were designated by UT as "Administrators" for UT's PAP. The Specialty Pharmacies were/are also "responsible for assisting patients with obtaining reimbursement for the cost of Remodulin therapy and providing other support services", *on behalf of UT.* **Exhibit J**, p. 17-18, 2007 UT 10-K.

146.    According to UT, Specialty Pharmacies must "market, distribute, and sell Remodulin in the United States" and "are also responsible for convincing third-party payers to reimburse patients for the cost of Remodulin, which is very expensive." **Exhibit J**, p., 2007 UT 10-K.

147.    As distributors and promoters of UT's drugs, and as Administrators of UT's PAPs, uninsured and underinsured patients would be "referred" to the Specialty Pharmacies by UT and other sources.

148.    The Specialty Pharmacies would, on behalf of UT, direct and/or assist the referred patient with applying for Medicare and/or Medicaid enrollment and funds to pay for UT's drugs. The referred patient would be informed that he was "ineligible" for UT's PAPs until the referred patient showed proof of denial of government health benefits.

149.    If the referred patient was denied access to government health funds for UT's drugs, the Specialty Pharmacies, on behalf of UT as "administrators" of UT's PAPs, and often *with UT's*

*assistance,* would direct and/or assist the referred patient with pursuing a Level 1 and Level 2 appeal of the government's decision(s). The Specialty Pharmacies' and UT's free assistance in securing government healthcare program eligibility and enrollment for the patients itself constitutes an illegal renumeration, which was given for the express purpose of inducing the purchase of UT's drugs and sticking Government Payors with the bill.

150.    If the referred patient is still unsuccessful in obtaining government health funds to cover UT's drugs, Specialty Pharmacies would allow the referred patient to receive the drug for free under UT's PAP, but the same application and decision-making process would be repeated annually.

151.    If the referred patient was able to obtain approval for Medicare and/or Medicaid coverage, but the referred patient did not or could not cover the cost sharing requirements (*i.e.*, 25% under Part D), the Specialty Pharmacies, on behalf of UT, would refer the referred patient to "independent" PAPs, like CVC.

152.    If the referred patient expressed any financial concerns relating to the dispensing of UT's drugs, the Specialty Pharmacies, on behalf of UT, directed and assisted the referred patient in obtaining subsidies provided by UT through CVC.

153.    With the Specialty Pharmacies' assistance, the referred patient would then receive funds from UT, funneled through CVC as part of UT's bribery scheme with CVC to cover the cost sharing requirements of the drug.

154.    Once CVC, UT, and the Specialty Pharmacies used the wire and mail to ensure co-pay coverage for the referred patient, the Specialty Pharmacies would then dispense the UT drugs to the patients and submit an AKS-tainted claim to Assignors and Class Members.

155.    The Specialty Pharmacies would then use the mail and wire to provide detailed reports with patient specific information to UT.

156.    Similarly, CVC would use the mail and wire to provide detailed reports to UT,

36

allowing UT to conduct ROI calculations for its "grants", as further discussed below.

157.    In exchange for facilitating this illegal scheme, UT would make "fee-for-service" payments (*i.e.*, bribes) to both the Specialty Pharmacies and CVC.

158.    This arrangement was made possible by UT's establishment of its PAP, its agreements with the Specialty Pharmacies to "administer" its PAP, its agreements with the Specialty Pharmacies to market, distribute, and promote its drugs, and its agreements with CVC to ensure payments made by UT would be used to pay co-pay or cost sharing obligations of patients taking UT's drugs.

159.    This illegal scheme operated for over a decade until the DOJ and OIG began privately investigating the fraud, as discussed below.

160.    In 2008, UT generated approximately $240 million in U.S. Remodulin sales. **Exhibit M**, 2008 UT 10-K; **Exhibit N**, p. 50, 2009 UT 10-K.

161.    According to UT, Government Payors accounted for approximately 35-50% of UT's Remodulin sales, meaning, Government Payors (including Assignors and Class Members) paid between $84 million to $120 million to UT for Remodulin. **Exhibit N**, p. 58, 2009 UT 10-K.

162.    In 2009, UT began marketing and selling two additional PAH drugs, Tyvaso and Adcirca. **Exhibit N**, p. 7, 2009 UT 10-K.

163.    In 2009, UT generated $291.8 million in U.S. Remodulin sales, $20.3 million in U.S. Tyvaso sales, and $5.8 million in Adcirca sales. **Exhibit N**, p. 50, 2009 UT 10-K.

164.    In August 2009, UT entered into another distribution agreement with Accredo, providing for the same terms and conditions, and "fee-for-service" or bribes, as previously agreed upon but including Tyvaso. **Exhibit N**, p. 306, 2009 UT 10-K.

165.    The Distribution Agreements between UT and the Specialty Pharmacies require the Specialty Pharmacies (each individually referred to as either "Distributor" or "Administrator") to

"market, promote, and distribute" the PAH Drugs. **Exhibit N**, p. 31, 2009 UT 10-K. The Distribution

Agreements also contain the following relevant provisions:

a.    "DISTRIBUTOR has represented that it possesses the necessary expertise, financial resources and marketing organization to dispense and distribute UT Product (as hereinafter defined) and desires to acquire from UT the right to sell, market, distribute and maintain UT Product in the Territory";

b.    "UT shall provide DISTRIBUTOR . . . with reasonable quantities of . . . information material and other marketing literature ("UT Materials"), for use and distribution by DISTRIBUTOR in accordance with this Agreement. DISTRIBUTOR shall use the UT Materials in accordance with UT's written directions";

c.    "DISTRIBUTOR agrees to make available all personnel responsible for overseeing/managing the activities related to the distribution of UT Product for quarterly meetings with UT personnel at reasonably agreed upon times and places in order to review and assess DISTRIBUTOR performance relative to the various obligations described in this Article 4 and elsewhere in this Agreement";

d.    "DISTRIBUTOR shall engage in patient advocacy and upon receipt of inquiries from or Customers, provide notice to such Customers of alternate funding sources, certain hardship reimbursement support, and certain indigent and patient assistance programs, including UT's PAP as described in Attachment C hereto. DISTRIBUTOR shall send an application to all eligible Included Patients who request to participate in the PAP within one (1) business day from the date of such request, with notice to the referral source (via fax, email or mail) as well";

e.    "DISTRIBUTOR is responsible for collecting the necessary patient demographics, financial, and clinical information and the oversight of the completion of the PAP enrollment form application. In addition, the DISTRIBUTOR will follow these guidelines and associated SOPs (as developed by UT) and will make the necessary decisions for patient acceptance into the PAP. DISTRIBUTOR will maintain a detailed and retrievable record of all communications, correspondence, and activities related to the PAP including dispensing of UT Product, supplies, and equipment without charge to the PAP Included Patient, and will use reasonable attempts to aid in securing third party payer benefits for each PAP Included Patient where applicable . . . . If and when Included Patients are presented to DISTRIBUTOR who do not meet the designated UT criteria, then DISTRIBUTOR will consult with UT prior to any decision regarding PAP acceptance";

f.      "DISTRIBUTOR shall promptly respond to questions from managed care organizations and other Third-Party Payers about UT Product.";

g.      "Unless DISTRIBUTOR is otherwise required to contact Customer sooner or more often, DISTRIBUTOR shall contact Customer two (2) business days after receipt of a prescription/referral and every two (2) business days thereafter to update Customer on the status of a benefits investigation/prior authorization/appeal or other related matter. When required to obtain additional information to complete a valid prescription/coverage determination/prior authorization/appeal or related matter, DISTRIBUTOR shall communicate all required information to the appropriate party and continue to contact such party every business day until the needed information is received or the matter is otherwise closed";

h.      "DISTRIBUTOR shall provide UT with access to any reasonably requested documentation related solely to this Agreement during reasonable business hours";

i.      Distributor agreed to conduct "Continuing Patient Compliance, Support and Education Program" for Tyvaso in exchange for payment by UT. Distributor "shall submit detailed monthly invoices" and a description of services performed;

j.       "Upon completion of benefits investigation and, if necessary, after prior authorization, DISTRIBUTOR shall process Customer's order for UT Product if Customer chooses to place an order. If Customer elects not to place an order at the time that Included Patient benefits are reported, DISTRIBUTOR shall attempt to determine the reason for Customer's choice (e.g., "Included Patient to receive UT Product at an alternate facility", "physician elected not to order UT Product", or "Included Patient elected not to receive UT Product"). DISTRIBUTOR shall immediately record this information";

k.      "When the prescriber is the Customer, DISTRIBUTOR shall attempt to contact the Included Patient on the same day that the benefit verification has been completed for the Included Patient in order to inform the Included Patient of his or her cost share amount, if any, and to make arrangements with the Included Patient for collection such cost share amount, if any, and to introduce the Included Patient to the DISTRIBUTOR's services.

l.      "If, prior to the submission of a claim for reimbursement, a Third-Party Payer informs DISTRIBUTOR that the Customer or UT Product is not eligible for coverage, then, within one (1) business day, DISTRIBUTOR shall make such inquiries of the Third-Party Payer as shall be necessary to determine the requirements for submission of an appeal of the denial of coverage. DISTRIBUTOR shall promptly record the results of this inquiry and report such information to the Customer and to the UT managed markets designee.";

m.   "If a Customer notifies DISTRIBUTOR of a denial of coverage and DISTRIBUTOR determines that an appeal of the denial of coverage would require a Level 1 Appeal, then DISTRIBUTOR shall immediately notify the Customer. The Customer, at its option, may elect to pursue the Level 1 Appeal directly or request DISTRIBUTOR's assistance. If the Customer elects to have DISTRIBUTOR assist with the Level 1 Appeal, DISTRIBUTOR, at its cost, shall use reasonable efforts to assist Customer, and if an Included Patient is pursuing the Level 1 Appeal on his/her own behalf, DISTRIBUTOR, at its cost, shall promptly initiate (at the latest within one (1) business day) and pursue such Level 1 Appeal in accordance with the Third-Party Payer's processes. Upon request, UT shall provide reasonable assistance to DISTRIBUTOR, including assistance with preparing applications and participation in telephone conferences and meetings with representatives of the Third-Party Payer. DISTRIBUTOR shall notify the Customer immediately following any interim and final determinations by the Third Party Payer in response to any Level 1 Appeal. All documents prepared as part of a Level 1 Appeal, and any information obtained in connection therewith, shall be promptly recorded.";

n.   "If DISTRIBUTOR determines that an appeal of the denial of coverage would require a Level 2 Appeal, DISTRIBUTOR shall notify the Customer, the Included Patient, and UT (if DISTRIBUTOR deems necessary and if the Included Patient consents) immediately of such determination. The Included Patient, at his or her option, may elect to pursue the Level 2 Appeal directly or to request that Customer assist with pursuit of the Level 2 Appeal. If Customer assists with the pursuit of a Level 2 Appeal, DISTRIBUTOR shall provide reasonable assistance to Customer, including assistance with preparing applications and participation in telephone conferences and meetings with representatives of the Third-Party Payer.";

o.   "DISTRIBUTOR shall complete a series of regular reports as described in Attachment F hereto. The reports are due no later than the 10th of each month[.]";

p.   "DISTRIBUTOR shall use Commercially Reasonable Efforts to fund and support ongoing marketing of its distribution of UT Product… In addition, DISTRIBUTOR shall use its Commercially Reasonable Efforts to fund and support ongoing sale of UT Product.";

q.   Distributor must "Diligently investigat[e] and pursu[e] all leads and inquiries of potential Customers referred to DISTRIBUTOR by UT and report[] within 7 days on the status of all such leads and inquiries."; and

r.      All Medicaid and Medicare patient data must be provided to UT.[11]

**Exhibit N**, p. 245-359, 2009 UT 10-K.

166.    As explained by UT:

Our specialty pharmaceutical distributors are responsible for assisting patients with obtaining reimbursement for the cost of Remodulin and Tyvaso and providing other support services. Under our distribution agreements, we sell Remodulin and Tyvaso to our distributors at a transfer price that we establish. We have also established a patient assistance program in the United States, which provides eligible uninsured or under-insured patients with Remodulin and Tyvaso at no charge for a certain period of time.

**Exhibit O**, p. 16, 2012 UT 10-K.

167.    These Distribution Agreements, along with the SEC reports filed by the Specialty Pharmacies, reveal glaring conflicts of interest (by nature of their fiduciary, statutory, and contractual obligations) and AKS violations.

168.    For example, duties and obligations arising out of the Specialty Pharmacies' Distribution Agreements with manufacturers, like UT, directly conflicts with duties and obligations assumed by reason of the Specialty Pharmacies also serving as Pharmacy Benefits Managers ("PBMs"), supposedly acting in the best interest of insurers.

169.    Similarly, duties and obligations assumed as "distributors" and promoters for certain manufacturers, like UT, or "administrators" of drug manufacturers' programs, directly conflicts with duties and obligations assumed as designated Part D Sponsors of federal health benefits.

170.    Additionally, the fact these Specialty Pharmacies generate tens of billions of dollars in revenue from co-payments, further adds to the web of conflicts arising by reason of the Specialty Pharmacies wearing so many different hats.

---

[11]UT also bribed CVC to provide UT with such data. With the data obtained by the Specialty Pharmacies, and the data obtained by the Charities, UT was able to conduct ROI analysis to determine how much to "donate" or "grant" in order to maximize returns while increasing prices to supra-competitive levels.

171.   For example, below is an excerpt from CVS's 10-K discussing the various conflicting interests it serves, in furtherance of its own:

a.   "The Pharmacy Services segment provides a full range of pharmacy benefit management ("PBM") services including mail order pharmacy services, specialty pharmacy services, plan design and administration, formulary management and claims processing. Our clients are primarily employers, insurance companies, unions, government employee groups, managed care organizations and other sponsors of health benefit plans and individuals throughout the United States. In addition, through our SilverScript Insurance Company ("SilverScript") and Accendo Insurance Company ("Accendo") subsidiaries, we are a national provider of drug benefits to eligible beneficiaries under the Federal Government's Medicare Part D program. Currently, the pharmacy services business operates under the Caremark Pharmacy Services®, Caremark®, CVS Caremark™, CarePlus CVS/pharmacy™, CarePlus™, RxAmerica®, AccordantCare® and TheraCom® names. As of December 31, 2009, the Pharmacy Services segment operated 49 retail specialty pharmacy stores, 18 specialty mail order pharmacies and six mail service pharmacies located in 25 states, Puerto Rico and the District of Columbia."

b.   "Formulary Management - We utilize an independent panel of doctors, pharmacists and other medical experts, referred to as our Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on our drug lists. Our drug lists provide recommended products in numerous drug classes to ensure member access to clinically appropriate alternatives under the client's pharmacy benefit plan. To improve clinical outcomes for members and clients, we conduct ongoing, independent reviews of all drugs, including, but not limited to, those appearing on the drug lists and generic equivalent products, as well as of our clinical programs. Many of our clients choose to adopt our drug lists as part of their plan design."

c.   "Specialty Pharmacy - Our specialty pharmacies support individuals that require complex and expensive drug therapies. As of December 31, 2009, our specialty pharmacies were comprised of 18 specialty mail order pharmacies located throughout the United States and are used for delivery of advanced medications to individuals with chronic or genetic diseases and disorders. Through our TheraCom subsidiary, we provide new product launch services for manufacturers of specialty drugs."

d.   "Medicare Part D Services - We participate in the administration of the drug benefit added to the Medicare program under Part D of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") (the "Medicare Drug Benefit") through the provision of PBM services to our health plan clients and other clients that have qualified as Medicare Part D

> prescription drug plans ("PDP"). We also participate (i) by offering Medicare Part D pharmacy benefits through our subsidiaries, SilverScript and Accendo, which have been approved by the Centers for Medicare and Medicaid Services ("CMS"), as PDPs, and (ii) by assisting employer, union and other health plan clients that qualify for the retiree drug subsidy available under Medicare Part D by collecting and submitting eligibility and/or drug cost data to CMS in order for them to obtain the subsidy."

**Exhibit P**, p. 5-6, 2009 CVS 10-K.

172.   In addition to the conflicting roles willfully assumed by CVS (the same as which is assumed and carried out by Express Scripts), another conflict also arises due to the nature of CVS's (and Express Script's) duties to its shareholders.

173.   For example, CVS informed its investors that in 2009, "*Pharmacy revenue dollars continue to be <u>negatively impacted</u> in all years <u>by the</u> conversion of brand-named drugs to equivalent generic drugs, which typically have a lower selling price*. In addition, our pharmacy growth has also been affected by . . . higher consumer co-payments and co-insurance arrangements[.]" **Exhibit P**, p. 31, 2009 CVS 10-K.

174.   In other words, while certain roles require the Specialty Pharmacies to seek to minimize costs (and push for use of less costly, generic alternatives) for Government Payors and beneficiaries (*e.g.*, PBM services, formulary management services, Medicare Part D services, etc.), other roles require the Specialty Pharmacies to seek to maximize profits and increase costs (*e.g.*, distributing, marketing, and promoting drugs for certain brand manufacturers, maximizing profits for investors through co-payments, etc.).

175.   These conflicts are irreconcilable regardless of any precautionary measures taken.

176.   These conflicts are central to many of the cost-related fraud committed to state and federal healthcare programs. Further, these uncurable conflicts of interest violate the Medicare enrollment applications submitted by UT and the Specialty Pharmacies as well as the Part D contract agreement entered by UT. Thus, any entitlement to payment that Defendants had pursuant to these

agreements was voided and any obligation to pay claims that MA Plans had was eliminated.

177.    CVS generated $6.9 billion in revenue from co-payments in 2009. **Exhibit P**, p. 26, 2009 CVS 10-K.

178.    In 2010, UT generated $403.6 million in Remodulin sales, $151.8 million in Tyvaso sales, and $36.3 million in Adcirca sales. **Exhibit Q**, 2010 UT 10-K.

179.    That year, UT made "an increase of $1.5 million" and "an increase of $1.9 million in *grants* to *unaffiliated*, *not-for-profit* organizations that provide therapy-related financial assistance to patients suffering from PAH;" **Exhibit R**, p. 49, 53, July 2010 UT 10-Q.

180.    By using the wire and mail to falsely characterize bribes to conduits, as "grants" to "unaffiliated, not-for-profit" organizations, UT fraudulently concealed the true nature of its payments, resulting in AKS-tainted claims submitted to Assignors and Class Members.

181.    In October of 2010, UT also disclosed an increase of $1.3 million and "$3.2 million" "in grants to unaffiliated, not-for-profit organizations that provide therapy-related financial assistance to patients suffering from PAH[.]" **Exhibit S**, p. 68, 72, October 2010 UT 10-Q.

182.    These multimillion dollar "grants" or bribes to CVC, allowed UT to circumvent congressionally mandated co-pay requirements, thereby eliminating price sensitivity. That same year, UT made two price increases to Remodulin (9.6% increase and 13.3% increase), and one to Tyvaso (4.9%), resulting in an increase of $25.9 million in revenue. **Exhibit Q**, 2010 UT 10-K; **Exhibit S,** October 2010 UT 10-Q.

183.    UT also included Tyvaso in its PAP, administered by the Specialty Pharmacies, as discussed above.

184.    UT also provided "Patient Assistance Program Guidelines to Specialty Pharmacies", which included the following:

a.  The Specialty Pharmacies (or "distributors" or "administrators") "shall also make reasonable attempts to aid PAP patients in securing third party payer benefits when possible";

b.  "Patient must not have access to coverage from federal governmental programs or the Commonwealth of Massachusetts";

c.  Patient must demonstrate "application for and [receipt of denial] (written) from a State Medicaid Program. Copies of proof of application and denial are required"; and

d.  The Specialty Pharmacies "shall provide reasonable assistance to Customer, including assistance with preparing applications and participation in telephone conferences and meetings with representatives of the Third-Party Payer."

**Exhibit Q**, p., 2010 UT 10-K.

185.  In 2011, UT generated $430.1 million for Remodulin, $240.4 million for Tyvaso, and $70.6 million for Adcirca. **Exhibit T**, 2011 UT 10-K.

186.  In 2011, the United States accounted for $602 million in sales of Remodulin and Tyvaso.

187.  UT estimated "that between 35-50% of Remodulin, Tyvaso and Adcirca sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit T**, p. 56.

188.  That year, UT made "an increase of $5.3 million in grants to unaffiliated, not-for-profit organizations that provide therapy-related financial assistance and programs to patients suffering from PAH.**" Exhibit T**, p. 131.

189.  According to CVS, during this time, it earned substantial revenue from co-payments made on behalf of Medicare beneficiaries. **Exhibit U**, p. 38-39, 2010 CVS 10-K. In other words, by wearing one hat as a "distributor" or "administrator" of UT's PAP and drugs, CVS helped beneficiaries obtain co-pay subsidies funneled through CVC. By wearing another hat, as the Specialty Pharmacy, CVS was then able to pocket that co-pay subsidy for itself, where it then submitted AKS-tainted claims to Assignors and Class Members.

190.    During this time, the Specialty Pharmacies were also providing services as a Medicare Part D Sponsor, as a PBM, and as a formulary manager.

191.    In February of 2011, UT and Accredo, in furtherance of the scheme to defraud Assignors and Class Members, entered into another illegal arrangement to enable UT to ensure market safeguards like cost sharing requirements are no longer a factor for patients using its product. **Exhibit Q**, p. 634-669, 2010 UT 10-K.

192.    As of July 2011, *according to UT,* approximately 35% of UT's Adcirca patients were covered by Medicare Part D. **Exhibit V**, July 2011 UT 10-Q.

193.    In October of 2011, UT disclosed a "$1.7 million" and "$2.3 million" "increase in grants to unaffiliated, not-for-profit organizations that provide therapy-related financial assistance to patients suffering from PAH[.]" **Exhibit W**, p. 73, 79, October 2011 UT 10-Q.

194.    In 2012, UT made approximately $458 million from Remodulin, $325.6 million from Tyvaso, and $122.5 million from Adcirca. According to UT, of the total sales for Remodulin and Tyvaso, $714.5 million were made in the United States. **Exhibit O**, 2012 UT 10-K.

195.    According to UT, approximately "35-50% of Remodulin, Tyvaso and Adcirca sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit O**, p. 58.

196.    During this time, Government Payors (including Assignors and Class Members) accounted for at least $219.2 million for Remodulin, $167.3 million for Tyvaso, and $73.6 million for Adcirca.

197.    At that same time, CVS reported a $1.3 billion increase in revenue from co-payments. **Exhibit X**, p. 5, 2011 CVS 10-K.

198.    According to CVC, in 2011, it paid approximately $45.3 million in co-payments for 12,360 beneficiaries. **Exhibit H**.

199.    In February 2012, UT informed investors of an increase in $6.3 million "principally in grants to non-affiliated, not-for-profit organizations that provide financial assistance to patients with PAH" **Exhibit T**, p. 127, 2011 UT 10-K.

200.    In April of 2012, UT disclosed that it made "a $4.5 million payment to an unaffiliated, not-for-profit organization that will provide therapy-related financial assistance to patients suffering from PAH during 2012." **Exhibit Y**, April 2012 UT 10-Q.

201.    In November of 2012, UT disclosed a "$3.7 million" and "$3.5 million" "increase in grants to unaffiliated, not-for-profit organizations that provide financial assistance to PAH patients" **Exhibit Z**, November 2012 10-Q.

202.    That year, CVC reportedly received $57.5 million in "grants", and paid co-payments for 14,995 beneficiaries. **Exhibit H**.

203.    In February of 2013, CVS reported concern that "higher consumer co-payments and co-insurance arrangements" continued to "adversely" impact its business, but it also disclosed an increase in revenue from co-payments from $7.9 billion to $8.4 billion. **Exhibit AA**, p. 10, 34, 52, 2012 CVS 10-K.

204.    CVS also discussed its "responsibilities" under contracts with manufacturers, like UT, which includes, communicating and assisting the patient with co-pay requirements. **Exhibit AA**, p. 16, 2012 CVS 10-K.

205.    In February 2013, UT disclosed "a $6.3 million increase, principally in grants to non-affiliated, not-for-profit organizations that provide financial assistance to patients with PAH[.]" **Exhibit O**, 2012 UT 10-K.

206.    That year, UT generated $491.1 million from Remodulin, $438.8 million from Tyvaso, and $176.9 million from Adcirca.

207.     During this time, Government Payors (including Assignors and Class Members) accounted for at least $228.8 million for Remodulin, $222.4 million for Tyvaso, and $127.5 million for Adcirca.

208.     In April 2013, UT disclosed it made "a $4.0 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH[.]" **Exhibit BB**, April 2013 10-Q.

209.     In July 2013, UT disclosed it made a "$5.3 million" and "$9.1 million" "increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH[.]" **Exhibit CC**, July 2013 UT 10-Q.

210.     In October 2013, UT disclosed it made "a $9.0 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH[.]" **Exhibit DD**, October 2013 10-Q.

211.     In December 2013, the FDA approved UT's use and distribution of Orenitram for PAH patients.

212.     Also, in December of 2013, UT "received a subpoena from the Office of the Inspector General of the Department of Health and Human Services reflecting a civil investigation by the United States Department of Justice, principally represented by the United States Attorney's Office for the District of Maryland. The subpoena requests documents regarding Remodulin, Tyvaso and Adcirca, including our marketing practices relating to these products."

213.     In December of 2013, UT and Accredo used the mail and wire to enter into agreement in furtherance of the scheme to defraud third-party payors, like Assignors and Class Members. **Exhibit EE**, p. 30, 306-07, 2013 UT 10-K.

214.     That year, CVC reportedly received $82 million in "grants", and paid co-pay requirements for 22,494 beneficiaries. CVC's management also reportedly paid themselves in

millions of dollars in salary, other compensation, travel expenses, etc.

215.    On February 11, 2014, Express Scripts filed its 10-K Report, where it discussed a case pending in the U.S. District Court for the District of New Jersey, *United States ex rel. Steve Greenfield, et al. v. Accredo Health Grp., Inc., et al.,* Case No. 12-522, where it was alleged, "defendants Medco, Accredo Health Group, Inc. (for purposes of this Item 3, "Accredo") and Hemophilia Health Services, Inc. violated the federal False Claims Act, the Anti-Kickback Statute, and various state and local false claims statutes *when they made charitable contributions to non-profit organizations supporting hemophilia patients that were allegedly improper rewards or inducements for referrals of hemophilia patients to Accredo's pharmacy services.*" **Exhibit FF**, p. 30, 2013 ESI 10-K.

216.    Throughout its 10-K, ESI also discussed Accredo's "management of patient assistance programs" where Accredo generates revenue "earn[s] a fee" (or bribe) for providing "administrative" services on behalf of certain drug manufacturers, like UT. **Exhibit FF**, p. 6, 10, 34, 40, 62, 2013 ESI 10-K.

217.    Similarly, on February 20, 2014, CVS filed its 10-K where it discussed the over $12 million of revenue it receives from co-payment. **Exhibit GG**, p. 34, 2013 CVS 10-K.

218.    Importantly, in discussing co-payments under Medicare Part D, CVS admitted that it knew of cost sharing benefits (co-pay assistance) being provided to beneficiaries by brand pharmaceutical manufacturers. **Exhibit GG**, p. 40, 64, 2013 CVS 10-K ("Non-low-income members received a cost share benefit [from] brand pharmaceutical manufacturers.")

219.    On February 25, 2014, UT disclosed "a $9.2 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH due to the growth of patients using our products, in particular, Adcirca[.]" **Exhibit EE**, p. 125, 2013 UT 10-K.

220.    UT also estimated "between 35-50% of Remodulin, Tyvaso and Adcirca sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit EE**, p. 61.

221.    That year, UT generated $553.7 million for Remodulin, $463.1 million for Tyvaso, $221.5 million for Adcirca, and $41.3 million from Orenitram.

222.    Of that, U.S.-based sales for Remodulin, Tyvaso and Orenitram were $953.5 million.

223.    During this time, Government Payors (including Assignors and Class Members) accounted for at least $234.7 million for Remodulin, $267.8 million for Tyvaso, $177.7 million for Adcirca, and $16.1 million for Orenitram.

224.    In April of 2014, UT reported "a $2.7 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH." **Exhibit HH**, April 2014 UT 10-Q.

225.    UT reiterated that its estimates "35-50% of Remodulin, Tyvaso and Adcirca sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit HH**, April 2014 UT 10-Q.

226.    In May of 2014, due to concerns that certain charities, including CVC, were accepting bribes to serve as conduits for certain manufacturers, like UT, the OIG issued a Supplemental Bulletin and a letter to CVC that "highlighted areas of concern" and requested additional certifications of compliance. **Exhibit G**.

227.    In July 2014, UT reported a $2 million and "a $4.7 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH." **Exhibit II**, July 2014 UT 10-Q.

228.    In October 2014, UT reported a $7 million and "an $11.7 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH[.]" **Exhibit JJ**, October 2014 10-Q.

229.    That year, CVC reportedly received $131.4 million in "grants". Of that, 81% were from private companies, including UT. CVC reportedly paid $102.5 million in co-payments, leaving CVC with $30.5 million in profits. As of 2014, CVC reportedly held $82.8 million in assets, even after management took several millions in bribes for themselves. **Exhibit H**.

230.    On February 23, 2015, ESI filed its 10-K where it again admitted of knowledge that certain brand manufacturers provided "cost share benefit[s]" to "[n]on-low-income members" taking certain drugs. **Exhibit KK**, p. 59, 2014 ESI 10-K ("Non-low-income members received a cost share benefit under the coverage gap discount program with brand pharmaceutical manufacturers.")

231.    On February 24, 2015, UT filed its 10-K where it stated the following:

a.    UT made "an $8.7 million increase in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH";

b.    "We have also established patient assistance programs in the United States, which provides our treprostinil-based products to eligible uninsured or underinsured patients at no charge. Accredo and Caremark assist us with the administration of these programs." **Exhibit LL**, p. 26, 2014 UT 10-K;

c.    "Adcirca and Orenitram, oral drugs, are reimbursed under the Medicare Part D program." **Exhibit LL**, p. 53;

d.    "We estimate that between 35-50% of Remodulin, Tyvaso, Orenitram and Adcirca sales are reimbursed under the Medicare and Medicaid programs." **Exhibit LL**, p. 54; and

e.    "The commercial success of our products depends, in part, on the availability of reimbursements by governmental payers such as Medicare and Medicaid, and private insurance companies. An estimated 35-50% of Remodulin, Tyvaso and Adcirca sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit LL**, p. 66

232.    That year, UT generated $572.8 million from Remodulin, $470.1 million from Tyvaso, $278.8 million from Adcirca, and $118.4 million from Orenitram. **Exhibit MM**, 2015 UT 10-K.

233.    UT reported U.S.-based sales for Remodulin, Tyvaso, and Orenitram to be $1.06 billion.

234.    During that year, Government Payors (including Assignors and Class Members) accounted for at least $258.4 million for Remodulin, $275.4 million for Tyvaso, $245.7 million for Adcirca, and $70.4 million for Orenitram.

235.    In other words, as of 2015, U.S. Government Payors (**including Assignors and Class Members**) accounted for **45%** of Global Remodulin Sales, **59%** of Global Tyvaso Sales, **88%** of Global Adcirca Sales, and **59%** of Global Orenitram Sales.

236.    In July 2015, UT reported another "9.0 million increase in grants to non-profit organizations that provide financial assistance to patients with PAH." **Exhibit NN**, July 2015 UT 10-Q.

237.    In December 2015, the OIG published a Modified Advisory Opinion to CVC following the OIG's request that CVC certify compliance with the additional factors outlined in the 2014 Special Advisory Bulletin (the "2015 CVC Modified Advisory Opinion"), attached as **Exhibit OO**. See OIG, Adv. Op. 06-04 (Dec. 23, 2015). The 2015 CVC Modified Advisory Opinion stated that CVC had certified compliance to each additional factor, and further that CVC had made additional modifications to its current operations to address concerns it was aiding in the submission of AKS-tainted claims. *Id*.

238.    One of the tactics used by CVC to mislead the OIG was through the creation of a fake "Compliance Program" "to assist CVC in preventing, detecting and responding to illegal, improper and unethical conduct . . . [and to] serve as a procedural framework for enhancing and monitoring compliance with applicable law, regulation, the CVC Code of Conduct and organizational policies and procedures. ***The Compliance Program is based on . . . applicable [OIG] guidance.***" (*See* Summary of the CVC Compliance Program, attached at **Exhibit PP** (emphasis added). In turn,

CVC's "Code of Conduct" purports to "describe[] the commitment that [CVC] expects of itself . . . to maintain the highest ethical standards of honesty and integrity as well as to comply with all laws and legal requirements applicable to [CVC], including [OIG] guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, asmodified, and industry guidance, including the Independent Charitable Patient Assistance Program Code of Ethics ('IPAP Code of Ethics')." (*See* CVC's Code of Conduct, attached at **Exhibit QQ**).  CVC used the wire and mail to represent to the OIG and public that it was "dedicated to the following values/ethical principles . . . [among others]":

a.   Act with honesty, integrity, and objectivity, and in a manner that will merit the continued trust and confidence of patients and stakeholders.

b.   Operate independently, free from the influence of CVC donors.

c.   Comply with all federal, state, and local laws, regulations, and legal requirements applicable to CVC, including OIG guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified.

d.   Be vigilant in the detection and prevention of potential fraud, waste or abuse.

e.   Promptly investigate and address potential violations of applicable law, regulation, OIG guidance, CVC's Advisory Opinion, IPAP Code of Ethics, this Code, or Company policies and procedures.

*Id.*

239.   The referenced IPAP Code of Ethics that CVC committed to comply with similarly provides that it would "[o]perate under the auspices of an ongoing compliance with an organization-specific [OIG] Advisory Opinion," and "[o]perate independently, free from the influence of donors," which included "[r]efrain[ing] from providingdonors or other entities with information that could permit the correlation of the amount or frequency of donations with the number of patients assisted by the [co-payment charity] who usea donor's products or services or the volume of those products supported by the [co-payment charity]." (*See* IPAP Code of Ethics, attached at **Exhibit RR**).

240. CVC also publicly advertised its services as an "independent" charity, which it was not.

241. That year, CVC reportedly received $153.6 million in "grants", 80% of which were from private donors, including UT. Of the $153.6 million it received that year, CVC paid $126 million in co-payments for 29,898 beneficiaries. **Exhibit H**.

242. In 2016, UT generated $602.3 million from Remodulin, $404.6 million from Tyvaso, $372.2 million from Adcirca, and $157.2 million from Orenitram.

243. According to UT, U.S. based sales for Remodulin, Tyvaso, and Orenitram was over $1 billion.

244. During that year, Government Payors (including Assignors and Class Members) accounted for at least $272.9 million for Remodulin, $259.2 million for Tyvaso, $328.2 million for Adcirca, and $101.8 million for Orenitram.

245. In February 2016, ESI reported $9.1 million in revenue from co-payments. **Exhibit SS**, p. 71, 2015 ESI 10-K.

246. ESI also disclosed that brand manufacturers continued to provide "cost share benefit[s]" to "[n]on-low income members", and that its subsidiary, United BioSource Corporation ("UBC") partnered with certain pharmaceutical manufacturers "to design and operationalize patient access centers that assist patients and prescribers with navigating prescription drug coverage and pharmacy options through patient access programs, including patient assistance programs, reimbursement, alternate funding and compliance services." **Exhibit SS**, p. 6, 53, 2015 ESI 10-K.

247. In February of 2016, UT reported that the OIG closed its investigation relating to UT's "marketing practices" and that, *during the OIG's investigation*, there was "a $12.7 million *decrease*…of grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH[.]" **Exhibit TT**, 2015 UT 10-K.

54

248.     In April 2016, with UT believing it was no longer being investigated, UT reported an *increase* "to $37.0 million of charitable donations to a non-affiliated, non-profit organization that provides financial assistance to patients with PAH. These donations were made during the first quarter of 2016 and represent the full extent of our funding to this non-affiliated, non-profit organization for 2016. Our donations to the same non-affiliated, non-profit organization in 2015 totaled $17.0 million, all of which were paid during the second quarter of that year." **Exhibit UU**, April 2016 UT 10-Q.

249.     In May 2016, UT "received a subpoena from the U.S. Department of Justice requesting documents regarding our support of 501(c)(3) organizations that provide financial assistance to patients taking our medicines." **Exhibit VV**, July 2016 UT 10-Q.

250.     In July 2016, UT reported "a $20.0 million increase in charitable donations to a non-affiliated, non-profit organization that provides financial assistance to patients with PAH." **Exhibit VV**, July 2016 UT 10-Q.

251.     UT also stated, "[t]he commercial success of our products depends, in part, on the availability of reimbursements by governmental payers such as Medicare and Medicaid, and private insurance companies. An estimated 25-55% of Remodulin, Tyvaso, Adcirca and Orenitram sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit VV**, July 2016 UT 10-Q.

252.     In September 2016, Express Scripts also "received a subpoena duces tecum from the Department of Justice and United States Attorney's Office for the District of Massachusetts requesting information regarding relationships between pharmaceutical manufacturers, independent 501(c)(3) charitable foundations providing cost-sharing assistance to federal health care program beneficiaries, and specialty pharmacies." **Exhibit WW**, p. 29, 2016 ESI 10-K.

253.     In November and December 2016, UT entered into amended distribution agreements with Accredo relating to Remodulin and Tyvaso. **Exhibit XX**, p. 281-87, 2016 UT 10-K.

254.     In 2017, UT generated $670 million from Remodulin, $372.9 million from Tyvaso, $419 million from Adcirca, and $185.8 million from Orenitram. **Exhibit YY**, 2017 UT 10-K.

255.     According to UT, U.S. based sales of Remodulin, Tyvaso, and Orenitram were $1.04 billion.

256.     During that time, Government Payors (including Assignors and Class Members) accounted for at least $276.2 million for Remodulin, $232.8 million for Tyvaso, $382.8 million for Adcirca, and $117.3 million for Orenitram.

257.     In other words, of the total Global sales for each drug, U.S. Government Payors (including Assignors and Class Members) funded *at least* **41%** of Remodulin sales, **62%** of Tyvaso sales, **91%** of Adcirca sales, and **63%** of Orenitram sales.

258.     In February 2017, CVS reported $10.5 billion in revenue from co-payments. **Exhibit ZZ**, p. 5, 2016 CVS 10-K.

259.     In February 2017, ESI reported that it received "subsidies" from certain manufacturers to cover "cost share" obligations of "[n]on-low income members[.]" **Exhibit WW**, p. 57, 2016 ESI 10-K.

260.     ESI reported that it generated over $8.5 million in revenue from co-payments.

261.     On February 13, 2017, CVC reported the following for July 2015 to June 30, 2016:

   a.   CVC received $153.6 million in "grants" or "donations"

   b.   CVC paid $128.8 million in co-payments for 30,655 beneficiaries.

   c.   CVC paid directors wages of approximately $1.4 million, plus $2.6 million in "other salaries and wages", and millions of dollars in benefits;

   d.   CVC paid hundreds of thousands in advertisements and publications;

      e.   CVC held $36.7 million in publicly traded securities; and

      f.   CVC held $96.03 million in assets.[12]

**Exhibit H**.

262.    In March 2017, Advanced Care Scripts ("ACS"), a subsidiary of CVS, received a subpoena from the DOJ regarding its relationship with certain manufacturers and 501(c)(3) foundations. **Exhibit AAA**, p. 158, 2017 CVS 10-K.

263.    In April 2017, UT reported a $32 million "*decrease* in charitable donations to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH." **Exhibit BBB**, April 2017 UT 10-Q.

264.    UT informed investors of the following concerns:

> ***Patient assistance programs for pharmaceutical products have come under increasing scrutiny by governments, legislative bodies and enforcement agencies. These activities may result in actions that have the effect of reducing prices or harming our business or reputation.***
>
> Recently, there has been enhanced scrutiny of company-sponsored patient assistance programs, including insurance premium and co-pay assistance programs and donations to third-party charities that provide such assistance. If we, or our vendors or donation recipients, are deemed to have failed to comply with relevant laws, regulations or government guidance in any of these areas, we could be subject to criminal and civil sanctions, including significant fines, civil monetary penalties and exclusion from participation in government healthcare programs, including Medicare and Medicaid, actions against executives overseeing our business, and burdensome remediation measures.
>
> In May 2016, we received a subpoena from the U.S. Attorney's Office for the District of Massachusetts requesting documents related to our support of 501(c)(3) organizations that provide financial assistance to patients taking our medicines.

**Exhibit BBB**, April 2017 UT 10-Q.

_____

[12] The following year, while other 501(c)(3) charities (namely, Chronic Disease Fund and Patient Assistance Network), agreed to pay the DOJ million of dollars and enter into compliance agreements *in lieu of* rescinding the OIG's advisory opinions, CVC refused to cooperate – resulting in the November 2017 recisision of the OIG's advisory's opinions. Undeterred, CVC simply claimed it was "defunct", despite reporting over $96 million in assets, created a new 501(c)(3) company (Adira), and transferred its assets over to Adira.

265.    UT reported an "estimated 40-50 percent of Remodulin, Tyvaso, Adcirca and Orenitram sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit BBB**, April 2017 UT 10-Q.

266.    The next day, UT increased the price of Tyvaso.

267.    In May 2017, CVS received "a Civil Investigative Demand" regarding the "possible false claims submitted to Medicare in connection with reimbursements for prescription drugs under the Medicare Part D program. The Company has been cooperating with the government and providing documents and information in response to the Civil Investigative Demand." **Exhibit AAA**, p. 72, 2017 CVS 10-K.

268.    In July of 2017, UT reported the following,

In May 2016, we received a subpoena from the U.S. Department of Justice (DOJ) requesting documents related to our support of 501(c)(3) organizations that provide financial assistance to patients. Other companies have received similar inquiries. We are cooperating with this inquiry. At this time, we are engaged in settlement discussions and have recorded a $210 million accrual relating to this matter. We expect any such settlement will include a settlement payment to the government, and it may also include non-monetary obligations, such as our entering into a corporate integrity agreement (CIA). We may be required to incur significant future costs to comply with the CIA. If we do not reach a settlement with the DOJ, we may incur material losses in connection with the defense or resolution of any subsequent litigation with the government. Because matters such as this are inherently unpredictable, the ultimate outcome of this matter, including the amount of any loss, may differ materially from our estimates.

It is possible that any actions taken by the DOJ as a result of this inquiry or any future action taken by federal or local governments, legislative bodies and enforcement agencies could result in civil penalties or injunctive relief, negative publicity or other negative actions that could harm our reputation, reduce demand for our products and/or reduce coverage of our products, including by federal health care programs such as Medicare and Medicaid and state health care programs. If any or all of these events occur, our business, prospects and stock price could be materially and adversely affected.

**Exhibit CCC**, July 2017 UT 10-Q.

269.    UT reported "[a]n estimated 40-50 percent of Remodulin, Tyvaso, Adcirca and Orenitram sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit CCC**, July 2017 UT 10-Q.

270.    The DOJ's investigation of UT, CVC, and the Specialty Pharmacies, revealed, among other things, that CVC shared with UT the very information it promised it wouldn't share and steered patients toward the UT Drugs in violation of the OIG's general guidance, the OIG's specific guidance to CVC, CVC's certifications to the OIG, CVC's internal "compliance" policies for the FCA, and the AKS. Because of this, in November 2017, the OIG *rescinded* its prior advisory opinions issued to CVC (the "2017 CVC Rescission Letter"). *See* OIG, Adv. Op. 06-04 (Nov. 28, 2017), attached as **Exhibit DDD**. The 2017 CVC Rescission Letter was based on CVC's false and fraudulent certifications and representations made through the mail and wire.

271.    The Recission Letter stated:

Specifically, we have determined that, in contravention of the certifications [CVC] made, [CVC]: (i) provided patient specific data to one more donors that would enable the donor(s) to correlate the amount and frequency of their donations with the number of subsidized prescriptions or orders for their products, and (ii) allowed donors to directly or indirectly influence the identification or delineation of [CVC's] disease categories."

*Id.*

272.    The 2017 CVC Recission letter concluded that:

[CVC]'s failure to comply with these certifications materially increased the risk that CVC served as a conduit for financial assistance from a drug manufacturer donor to a patient, and thus increased the risk that the patients who sought assistance from [CVC] would be steered to federally reimbursable drugs that the manufacturer donor sold. This type of steering can harm patients and the Federal health care programs, because, for example, patients may be urged to seek, and physicians may be more likely to prescribe, a more expensive drug if co-payment assistance is available for that drug but not for less expensive but therapeutically equivalent alternatives. In these circumstances manufacturers may have greater ability to raise the prices of their drugs while insulating patients from the immediate out-of-pocket effects of price increases, leaving Federal healthcare programs like Medicare (and the taxpayers who fund those programs) to bear the cost.

*Id.* (emphasis added).[13]

273.     The following month, UT agreed to pay the DOJ $210 million to settle allegations relating to its kickback scheme with CVC and the Specialty Pharmacies resulting in millions of tainted claims submitted to and paid by Original Medicare. ("UT Settlement").

274.     The UT Settlement and facts alleged therein, which specifically relate to the conduct identified by the OIG in its 2017 CVC Rescission Letter, represent one result of a much larger, ongoing investigation by the DOJ and OIG, along with the U.S. Attorney's Office for the District of Massachusetts, into schemes by various drug manufacturers and co-payment charitiesthat violated the AKS and FCA.[14]  As recognized by pharmaceutical-industry financial analysts, these investigations could "impede industry returns." *See* Citi Research, *The Straw that Could Break the Camel's Back: DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 (noting that "[t]he ongoing multiple DOJ/OIG investigations into financial donations by pharmaceutical companies to independent foundations has the potential to severely limit future revenues for several high-priced blockbuster Medicare Part D drugs through (i) lowered overall

---

[13] CVC subsequently announced that in light of the 2017 CVC Rescission Letter, it would not open financial assistance for any disease fund in 2018. *See* http://www.caringvoice.org/decision-2018-financial-assistance. Instead, CVC's founder, Greg Smiley, fraudulently transferred CVC's assets to another 501(c)(3) company, Defendant Adira.

[14] Other recent results involving the resolution of AKS and FCA claims brought by the United States on behalf of Medicare (not Medicare Advantage) against drug manufacturers participating in improper schemes with co-payment charities include, but are not limited to: (i) Jazz Pharmaceuticals PLC ("Jazz") agreeing in May 2018 to pay the United States $57 million related to claims involving Jazz's relationship with CVC to fund co-payment for Jazz's narcolepsy drug Xyrem; (ii) Pfizer Inc. ("Pfizer") agreeing in May 2018 to pay the United States $23.8 million related to claims involving Pfizer's relationship with Patient Access Network Foundation to fund co-payments for Pfizer's renal cell carcinoma drugs Sutent and Inlyta and Pfizer's arrhythmia drug Tikosyn; (iii) H. Lundbeck A/S ("Lundbeck") agreeing in June 2018 to pay the United States $52.6 million related to claims involving Lundbeck's relationship with CVC to fund co-payment for Lundbeck's Huntington's Disease drug Xenazine; and (iv) Actelion Pharmaceuticals US, Inc. ("Actelion") agreeing in December 2018 to pay the United States $360 million related to claims involving Actelion's relationship with CVC to fund co- payment for Actelion's Hypertension drugs Tracleer, Ventavis, Veletri, and Opsumit.

funding for patient out-of-pocket assistance (ii) lesser ability for individual pharmaceutical donors to guide their funding towards specific drugs.").

275.    The December 2017 UT Settlement with the United States was based on the United States' claims that UT's conduct violated the AKS and FCA, thereby leaving a Federal healthcare program (in this case, Medicare) "bear[ing] the cost."

276.    Specifically, the United States alleged the following:

UT made donations to CVC's PAH fund and used it as a conduit to pay the co-payment obligations of thousands of Medicare patients taking the [UT] Drugs, to eliminate price sensitivity of patients purchasing or physicians prescribing the [UT] Drugs, and to induce those patients' purchases of the [UT] Drugs. From February 2010 through January 2014, UT routinely obtained data from CVC detailing how many patients on each [UT] Drug CVC had assisted and how much CVC had spenton those patients. In deciding whether and how much to donate to CVC, UT considered the revenue it would receive from prescriptions for Medicare patients who received assistance from CVC to cover their co-payments for the [UT] Drugs.UT used data from CVC to confirm that UT's revenue far exceeded the amount ofUT's donations to CVC. At the same time, UT had a policy of not permitting Medicare patients to participate in its free drug program, which was open to other financially needy patients, even if those Medicare patients could not afford their co-payments for UT Hypertension Drugs. Instead, in order to generate revenue from Medicare and to induce purchases of the [UT] Drugs, UT referred Medicare patients prescribed the [UT] Drugs to CVC, which resulted in claims to federal healthcare programs to cover the cost of the drugs.

(UT Settlement Agreement at 2, attached at **Exhibit B**.)

277.    Under the terms of the UT Settlement, UT agreed to pay the United States $210 million to resolve the United States' AKS and FCA claims on behalf of Medicare. The UT Settlement does not redress the harm the Defendants' illegal conduct caused to Medicare Advantage plans, such as Assignors and the Class Members.

278.    In 2018, UT continued to increase the prices of Remodulin and Tyvaso. The increase of Remodulin led to an additional $18.1 million of profits but a decrease in overall sales.

279.    Rather than continuing to increase year-after-year, for the first time since 2002, Remodulin sales *decreased.* UT experienced a $71 million drop in sales. Still, however, of the

approximately $599 million in revenue, $584.9 million of that was profit.

280.    During 2018, UT generated $599 million from Remodulin, $415.2 million from Tyvaso, $323.7 million from Adcirca, and $205.1 million from Orenitram.

281.    Of that, Government Payors (including Assignors and Class Members), paid for *at least* **47%** of Global Remodulin Sales, **59%** of Global Tyvaso Sales, **98%** of Global Adcirca Sales, and **64%** of Global Orenitram Sales.

282.    In February 2018, UT filed its 10-K where it stated that it anticipates revenues will decrease due to "reimbursement challenges of our oral therapies leading to increased utilization of *our* patient assistance programs." **Exhibit YY**, 2017 UT 10-K. In other words, now that the OIG had rescinded CVC's Advisory Opinions, and now that UT had been forced to pay the DOJ $210 million for AKS violations, UT could no longer rely on its scheme with CVC and the Specialty Pharmacies to cover co-payment requirements but would have to provide its drugs for free through its PAP.

283.    UT also reported "a $32.0 million decrease in grants to non-affiliated, non-profit organizations that provide financial assistance to patients with PAH;" and "a $9.4 million increase in legal fees incurred in connection with intellectual property litigation and the DOJ investigation of our support of 501(c)(3) organizations that provide financial assistance to patients[.]" **Exhibit YY**, 2017 UT 10-K.

284.    UT also noted the following,

> We are party to separate distribution agreements for Remodulin, Tyvaso and Orenitram with **two U.S.-based specialty pharmaceutical distributors, Accredo and CVS Caremark. The distribution agreements are similar to one another, and generally have one-year terms that renew automatically for additional one-year periods**, unless terminated earlier. The agreements contain contractual responsibilities relating to ordering specifications, inventory requirements and exchange rights. **We also have agreements with these distributors to perform certain services for us on a fee-for-service basis**.

**Exhibit YY**, p. 232, 2017 UT 10-K (emphasis added).

285.    CVS reported $10.8 billion in revenue from co-payments made the prior year. **Exhibit AAA**, 2017 CVS 10-K.

286.    In May 2018, UT again noted that "[t]he commercial success of our products depends, in part, on the availability of reimbursements by governmental payers such as Medicare and Medicaid, and private insurance companies", but expressed concern regarding new "reimbursement challenges . . . leading to increased utilization of our patient assistance programs." **Exhibit EEE**, May 2018 UT 10-Q.

287.    UT claimed "[a]n estimated 40-50 percent of Remodulin, Tyvaso, Adcirca and Orenitram sales in the United States are reimbursed under the Medicare and Medicaid programs", even though publicly available CMS Data suggests much more.[15]

288.    In August 2018, UT again stated it "expect[s] revenues will decrease as compared to 2017", in large part due to "reimbursement challenges . . . leading to increased utilization of our patient assistance programs." **Exhibit FFF**, August 2018 10-Q.

289.    UT also acknowledged that "[a] significant portion of Remodulin, Tyvaso, Adcirca, and Orenitram sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit FFF**, August 2018 10-Q.

290.    UT also informed investors that:

In December 2017, we entered into a civil Settlement Agreement with the U.S. Government to resolve a DOJ investigation related to our support of 501(c)(3) organizations that provide financial assistance to patients. During the second quarter of 2017, we recorded a $210.0 million accrual relating to this matter, *and ultimately paid this amount, plus interest, to the U.S. Government upon settlement*.

291.    In October 2018, UT reiterated that it "expect[s] revenues will decrease" due, in large

---

[15] *See CMS Drug Spending*,   https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/information-on-prescription-drugs; *See also CMS Research, Statistics, Data & Systems*,   https://www.cms.gov/Research-Statistics-Data-and-Systems/Research-Statistics-Data-and-Systems

part to, "reimbursement challenges for our oral therapies leading to increased utilization of our patient assistance programs that provide free drugs to patients unable to afford the cost of their therapy." **Exhibit GGG**, October 2018 UT 10-Q.

292. Due to reimbursement challenges, in 2019, UT finally decreased the price of Remodulin. **Exhibit HHH**, 2019 UT 10-K.

293. Even though UT successfully prevented generic competition of Remodulin from 2011 until 2019 (as discussed below), Remodulin sales substantially decreased without the availability of co-pay assistance through the Charity Scheme.

294. Before the DOJ and OIG put an end to the Charity Scheme (although discovery may reveal other methods in which UT continued its relationship with CVC through its successor, Adira), UT made approximately $670 million from Remodulin in 2017. After the Charity Scheme was revealed, sales plummeted, and, as of 2020, sales of Remodulin were $516.7 million.

295. The same was seen with Adcirca. Before the Charity Scheme was unveiled, UT generated $419.7 million in sales of Adcirca. After, however, sales plummeted, and, as of 2020, sales of Adcirca were $67.3 million. **Exhibit III,** 2020 UT 10-K.

296. While reported Global sales of Tyvaso and Orenitram did not plumet in the same way, the percentage of total U.S. sales attributed to Government Payors decreased.

297. In February 2020, CVS notified investors of the following information relating to the Charity Scheme:

> In March 2017, Advanced Care Scripts, a subsidiary acquired in the Omnicare transaction that is now part of the Company's PBM specialty operations, received a subpoena from the U.S. Department of Justice (the "DOJ") requesting documents *concerning its work with pharmaceutical manufacturers and charitable foundations that provide payment assistance to Medicare patients in connection with an investigation concerning potential violations of the federal Anti-Kickback Statute and/or federal False Claims Act.* The Company has been cooperating with the government with respect to this subpoena and additional requests for information.

The Company has received subpoenas, CIDs and other requests for documents and information from, and is being investigated by, Attorneys General of several states regarding its PBM practices, including pricing and rebates.

**Exhibit JJJ**, p. 158, 2019 CVS 10-K.

298.    In July 2020, UT provided the following updates:

***Company-sponsored patient assistance programs, including insurance premium and co-pay assistance programs and manufacturers' donations to third-party charities that provide such assistance, are subject to heightened scrutiny.***

The Department of Justice (DOJ) has taken enforcement action against pharmaceutical companies, including us in 2017, alleging violations of the Federal False Claims Act and other laws in connection with patient assistance programs. In December 2017, we entered into a civil Settlement Agreement with the U.S. Government to resolve the DOJ investigation related to our support of 501(c)(3) organizations that provide financial assistance to patients and paid $210.0 million, plus interest, to the U.S. Government upon settlement…Members of Congress have called upon the OIG to issue revised guidance about patient assistance programs. It is possible that these, or any other actions taken by the DOJ or other agencies as a result of this industry-wide inquiry, could reduce demand for our products and/or reduce coverage of our products, including by federal health care programs such as Medicare and Medicaid and state health care programs. If any or all of these events occur, our business, prospects, and stock price could be materially and adversely affected. Additionally, payers and pharmacy benefit managers (PBMs) have developed several different mechanisms to limit the benefits of co-pay assistance for commercially insured programs through co-pay accumulator programs. Under these programs, a patient using co-pay assistance is not able to count the manufacturer's co-payment contribution toward their annual out-of-pocket payment maximum. Therefore, patients on expensive therapies utilizing co-pay assistance to help cover the costs of their expensive medications are penalized financially for the use of these programs. Some states have passed legislation to limit the use of co-pay accumulator programs, while the Trump administration and other states have indicated that the use of these programs should be allowed to limit cost of care and encourage patients to use lower cost generics. Growing use of programs like these could affect patient access to our products and limit product utilization, which may, in turn, adversely affect our business, prospects, and stock price.

**Exhibit LLL**, July 2020 UT 10-Q.

## The Impact on Assignors, Class Members, and Medicare Advantage

299.    The UT Settlement did not settle any claims that Assignors and Class Members may have against Defendants.

300.   Defendants' misconduct caused economic injury to Assignors and Class Members.

301.   UT bribed CVC to act as a conduit to illegally pay the co-payment obligations of thousands of Medicare Advantage patients taking the UT Hypertension Drugs.

302.   Defendants' conduct eliminated price sensitivity of patients purchasing UT Hypertension Drugs, which in turn enabled UT to raise the price of UT Hypertension Drugs to supra-competitive prices, quickly and outside of ordinary market conditions. Medicare Advantage programs, such as Assignors, were left to bear the cost, while CVC was able to demonstrate "results" to UT, namely if UT "donated" money to CVC, it would make money, not only off the new "customers" but also by its ability to raise prices, and ensure that the drugs were still prescribed, dispensed, and reimbursed.

303.   Defendants' conduct caused Medicare Advantage patients to purchase the UT Hypertension Drugs.

304.   UT routinely obtained data from CVC detailing how many patients, including Medicare Advantage patients, on each UT drug CVC had assisted and how much CVC had spent on those patients.

305.   In deciding whether and how much to donate to CVC, UT considered the revenue it would receive from prescriptions for Medicare Advantage patients who received assistance from CVC to cover their co-payments for the UT Hypertension Drugs.

306.   UT used data from CVC to confirm that UT's revenue far exceeded the amount of UT's donations to CVC.

307.   UT ensured that Medicare Advantage bore the cost of UT Hypertension Drugs by employing a policy of not permitting Medicare Advantage patients to participate in UT's free drug program (i.e., Option 1 described above), which was open to other financially needy patients, even if those Medicare Advantage patients could not afford their co-payments for UT Hypertension Drugs.

308.   UT funneled Medicare Advantage patients prescribed the UT Hypertension Drugs to CVC, which upon CVC approving coverage of patients' co-payments, triggered Assignors' and Class Members' obligations to cover of the UT Hypertension Drugs.

309.   Defendants' Scheme violated the AKS prohibitions on illegal renumeration by UT bribing CVC to both (a) illegally funnel funds to federal healthcare program beneficiaries to induce the beneficiaries and (b) to illegally refer, recommend, and arrange for federal healthcare program beneficiaries to receive the UT Hypertension Drugs. 42 U.S.C. § 1320a-7b(b). Additionally, UT bribed the Specialty Pharmacies to provide free services to beneficiaries in violation of the AKS.

310.   Defendants also violated the AKS prohibitions on making and causing to be made false statements and representations by UT breaching its certifications to comply with the AKS, by, unbeknownst to Assignors and Class Members, causing the dispensing pharmacies to submit per se false claims to Assignors and Class Members, and by concealing and failing to disclose the illegal renumerations that render these claims false while also receiving payment for such claims. 42 U.S.C. § 1320a-7b(a). Assignors and Class Members had no way of knowing that these statements were false and the claims unpayable.

311.   Defendants violated their certifications to comply with the AKS. These violations voided Defendants rights under the agreements and contracts entered into with CMS. Therefore, all claims for the UT Hypertension Drugs generated or submitted during the course of the scheme were disqualified from being paid for by Assignors and Class Members.

312.   But-for the Defendants' conduct, Assignors and Class Members would not and could not have paid for any UT Hypertension Drugs.

313.   Because of Defendants' Scheme, Assignors and Class Members paid for prescriptions they would not have otherwise paid and there was a direct relationship between the misconduct at issue here and the payments Assignors and Class Members made for Medicare Advantage patients.

Such payments involved reimbursement of illegal and unpayable claims, artificially increased quantity of dispensed UT Hypertension Drugs, and supra-competitive prices on all UT Hypertension Drugs prescriptions.

314. Defendants knew and intended that their Scheme would generate disqualified claims and artificially inflate the quantity of dispensed UT Hypertension Drugs and allow UT to raise the prices of UT Hypertension Drugs to supra-competitive levels.

315. Assignors and Class Members were the primary and intended victims of Defendants' Scheme and the injury to them was a foreseeable and natural consequence of the scheme. The injury to them was a foreseeable and natural consequence of the Scheme because UT knew that third-party payers such as the MA Plans and the Medicaid Plans would pay for or reimburse the cost of UT Hypertension Drugs.

316. Assignors and Class Members suffered direct economic injury as a direct and proximate cause of Defendants' Scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this complaint.

317. In fact, Assignors and Class Members are likely the only entities harmed by the Defendants' Scheme. This is principally because there are no violations of law among the chain of distribution until the unlawful co-payment is provided through the conduit (i.e., CVC) and a bill is submitted to the third-party payer (i.e., Assignors and Class Members). Additionally, wholesale distributors, specialty distributors, and/or pharmacies actually benefit from the Scheme as their sales increase because *the rate of abandonment decreases*, as well as revenue from service fees which are

based on a percentage of the Wholesale Acquisition Cost ("WAC").[16, 17]

318.    UT knows or has reason to know that prescription abandonment and low medication adherence (i.e., taking the prescription as prescribed) are serious issues in treating PAH.[18, 19] High co-pay costs for patients is a major contributing factor to both abandonment and low adherence. Instead of lowering the cost of its PAH medication or allowing federal healthcare program beneficiaries to access its free drug program, UT chose to run an illegal and lucrative scheme to force Assignors and Class Members to shoulder the burden of its greed.

319.    UT and CVC had the shared goal of growing CVC's PAH fund and thereby enabling CVC's directors and officers to use the non-profit charities increased funds to justify a substantial increase in their own compensation. The Co-Payment Circumvention Enterprise increased the number of Medicare Advantage (among other Federal healthcare programs) who were receiving co-payment assistance for UT Hypertension Drugs from CVC's PAH fund, triggering Assignors' and

---

[16] Prescription abandonment—when a prescription is transmitted to the pharmacy but never filled—is a major concern for both providers and drug manufacturers. Prescription abandonment is multi-faceted, but it is widely understood that high co-payments are a leading cause and lowering co-payments significantly reduces abandonment for highly effective chronic treatments. Dana P. Goldman et al., *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health*. 298.1 JAMA 61, 61–69 (2007). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6375697/.

[17] Prescription abandonment causes an estimated 125,000 avoidable deaths in the U.S. annually. Regardless of whether patients and doctors are induced by PAP funds at the prescription stage, the data is clear that patients are induced by co-payment assistance at the dispensing stage. Hayden B. Bosworth et al., *Medication Adherence: A Call for Action*. 162.3 Am. Heart J. 412 (2011). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3947508/.

[18] Stephen Mathai et al., *Low Utilization of Prostacyclin Therapy Prior to Death Among Medicare Patients with Pulmonary Arterial Hypertension*, Vol. 158 Chest J. 4 (2020). Available at https://journal.chestnet.org/article/S0012-3692(20)34047-2/fulltext.

[19] Duncan Grady et al. *Medication and patient factors associated with adherence to pulmonary hypertension targeted therapies.* 2018 Pulm Circ. 8(1), (2018). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5731720/. Over 6% of the study sample was below 80% adherence over a two-year period, resulting in a significant increase in reported adverse events. Nisha B. Shah et al. *High rates of medication adherence in patients with pulmonary arterial hypertension: An integrated specialty pharmacy approach*, PLOS ONE 14(6): e0217798, (2019). Available at https://doi.org/10.1371/journal.pone.0217798.

Class Members' coverage obligations for these Medicare Advantage patients, eliminating price sensitivity to UT Hypertension Drugs, and allowing UT to increase its revenues and profits for UT Hypertension Drugs.

320.    For Defendants, this collusive bribery Scheme was a "win-win" arrangement. UT's donations to CVC were directed by UT to CVC's PAH fund and, in return, co-payment assistance for these UT Hypertension Drugs was provided by CVC for patients covered by Medicare Advantage. As CVC illegally provided data and information to UT regarding the profitability of UT's donations to CVC's PAH fund, UT increased its donations to the PAH fund. UT's increasing donations to CVC's PAH fund resulted in more Medicare Advantage patients receiving co-payment assistance, the elimination of price sensitivity for UT Hypertension Drugs, and increased profits for UT. And all along the way, as UT's donations to CVC's PAH fund continued to rise, CVC's executives increased their own compensation and benefits.

321.    With respect to the elimination of price sensitivity for UT Hypertension Drugs noted above, information from the Centers for Medicare and Medicaid Services ("CMS") and Assignors demonstrates how Defendants' Scheme eliminated price sensitivity of patients purchasing UT Hypertension Drugs and resulted in Federal healthcare programs bearing the cost. For example, CMS's Medicare Part D data shows that for UT's best-selling PAH drug, Adcirca, Medicare spending rose from $62 million in 2012, to $111 million in 2013, to $156 million in 2014, to $212 million in 2015, to more than $275 million in 2016.

322.    The CMS Medicare Part D data further provides that the Annual Growth Rate in Spending per dose rose during this 2012-2016 period at a rate of 20.6%—from $23.90 per dose in 2012, to $28.67 per dose in 2013, to $34.21 per dose in 2014, to $41.59 per dose in 2015, to $50.47 per dose in 2016. The chart below illustrates Adcirca's rising price and UT's revenue growth from

Adcirca[20] sales from Medicare—and the corresponding lack of price sensitivity for Adcirca and the burden imposed on Federal healthcare programs.





323.    Assignors' data for their covered beneficiaries yields similar findings. Assignors paid for Adcirca prescriptions on behalf of covered beneficiaries in a total amount of over $15 million.

324.    Assignors paid over $24.8 million in claims for the UT Hypertension Drugs from

---

[20] UT markets and sells Adcirca under a license agreement with Eli Lilly & Co.

January 1, 2010, through 2017. Information in the exclusive control of Defendants will demonstrate that a significant portion of the co-payments paid on behalf of the beneficiaries of Assignors and Class Members were made by CVC in connection with Defendants' Co-Payment Circumvention Enterprise.

325.    Assignors and Class Members were not privy to which financially needy patients' co-payments were being provided by UT's donations to CVC's PAH fund. Assignors' and Class Members' obligations to cover claims for the UT Hypertension Drugs only arose when covered patients satisfied their co-payment obligations and Assignors and Class Members did not, and could not, have known that their reimbursement obligations were caused by Defendants' misconduct.

326.    Defendants' documents and disclosures clearly demonstrate that they possess information to show exactly which patients received co-payment assistance. For example, CVC's Form 990 Tax Filings state in Supplemental Information to Schedule I, Part I, Line 2:

> Financial grants are given when an individual specifies he/she has a disease supported by Caring Voice and he/she meets stated income guidelines. Individuals fill out an application for financial assistance which must be accompanied by a medical certification from their physician documenting their diagnosis. Grant funds are paid to third party pharmacies or insurance companies after proof is received that the patient has incurred therapy costs associated with the specific diagnosis. ***Caring Voice monitors the use of grant funds for individuals using proprietary database software. The database maintains all records to substantiate the amount of an individual's grant, the grantee's eligibility and payments made on the grant***[21]

327.    CVC's Code of Conduct (adopted by CVC's Board of Directors on July 22, 2017) states that CVC will:

> Maintain accurate and complete books and records, including accounting and financial data, and retain such books and records in accordance with applicable federal, state and local laws and regulations, Company's record retention policies and procedures and Company instructions.[22]

---

[21] *See* CVC's Form 990 Tax Filings, attached as **Exhibit H**.
[22] *See* CVC's Code of Conduct, attached as **Exhibit QQ**.

328.    As noted above, Defendants' Scheme benefited CVC and its executives.

329.    UT intentionally concealed the Scheme, covering up the true nature of its payments and relationship with charities. The payments were in fact bribes and for the purpose of using the foundations as conduits to effectuate its goals of artificially and deceptively inflating the drug prices and increasing the use of the drugs to increase profits at the expense of healthcare payors like the Assignors and Class Members. UT's concealment prevented Assignors and Class Members from reasonably discovering the facts underlying Defendants' Scheme which caused Assignors' and the Class Members' injuries. In other words, UT's concealment lulled Assignors and Class Members into inaction, resulting in substantial damages to Assignors' and Class Members' property and business over the course of the illegal scheme.

330.    Defendants' Scheme caused pharmacies to seek reimbursement from federal health care programs for their purchases of UT Hypertension Drugs. Not only are physicians and pharmacies required to explicitly certify compliance with the AKS, but the act of submitting claims for reimbursement carries with it an implied certification of compliance with governing federal rules that are a precondition of or material to payment. Pharmacies submitting claims for reimbursement therefore implied that the claims complied with federal law, including the AKS. Defendants thus caused pharmacies to provide false certifications.

331.    As UT used CVC as a conduit, CVC did not act as an independent charity. Instead, CVC's conduct violated the AKS. Therefore, those certifications were false.

332.    As a result of UT's collusion with and use of CVC as a conduit, the Assignors and Class Members were harmed by paying for claims that were unpayable, which they would not have paid but for Defendants' concealment of their scheme. Assignors and Class Members also paid for an increased number of dispensed UT Hypertension Drug throughout the United States as a direct result of the Co-Payment Circumvention Enterprise. Assignors and Class Members paid increased

prices for UT Hypertension Drugs, as part of UT's scheme to recoup its "donations" to CVC.

333.     Assignors' data confirms that the volume (or quantity) of the UT Hypertension Drugs paid for by Assignors declined dramatically after Defendants' Co-Payment Circumvention Enterprise was uncovered. This provides direct evidence of the causal effect of Defendants' conspiracy and misconduct.

334.     For example, as set forth in the following chart, AvMed, one of the Assignors, paid $1,024,062.53 in claims for the UT Hypertension Drugs in 2018 while paying merely $81,136.54 in claims for the UT Hypertension Drugs in 2019—a 92 percent decrease.



335.     As noted above, the Charity Scheme benefited CVC and its executives. During the time period UT, Charities, and Specialty Pharmacies carried out the Co-Payment Circumvention Enterprise, CVC's President was Pamela R. Harris. Ms. Harris, along with her daughter, Samantha Harris (Ms. Samantha Harris later changed her name to Samantha Green), who served as CVC's Vice- President, were among a handful of executives whose compensation is set forth in Part VII of

CVC's annual Form 990 Tax Filings. CVC's Form 990 Tax Filings demonstrate that Pamela R. Harris' total executive compensation (not including certain rental income she received from CVC and other potential benefits) rose nearly 70% between 2011 and 2015, from around $248,000 in 2011 to over $421,000 in 2015. (See CVC's Form 990 Tax filings, attached as **Exhibit H**).  Similarly, Samantha Harris' compensation doubled. *See id.*

**THE GENERIC PREVENTION SCHEME**

**<u>The Statutory and Regulatory Framework of the FDA Approval Process</u>**

336.    Patients obtain prescription pharmaceuticals after physician consultation and the physician writing a prescription. The physician generally consults two sources prior to writing a prescription, the patients' health insurance formulary,[23] and the Orange Book.[24]

337.    Under the Federal Food, Drug and Cosmetic Act ("FDCA"), branded drug manufacturers must obtain FDA approval to sell a new drug product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301–392.

338.    The NDA must include information pertaining to the drug's purported safety, efficacy, and pertinent patents.[25]

339.    The FDA does not investigate or verify the identified patents or uses, relying instead on representations made by the manufacturers/patent submitters. As the FDA does not verify patent authenticity, the system is subject to manipulation—a shortcoming that UT has repeatedly taken

---

[23] A list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits. Glossary, U.S. Centers for Medicare & Medicaid Services, available at https://www.healthcare.gov/glossary/formulary/ (last visited October 17, 2022).

[24] The Orange Book is the Food and Drug Administration's book that states a pharmaceutical's approved usage and any approved therapeutic equivalents, including the "patents that can reasonably be asserted against a drug manufacturer that makes, uses, or sells a generic version of the brand before patent expiration." See 21 C.F.R. § 314.53(b)(1); see also, Available online at https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm (last visited October 17, 2022).

[25] Food and Drug Administration, New Drug Application, (last updated January 21, 2022) https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

advantage of.[26]

340.     The FDCA was amended by the Drug Price Competition and Patent Term Restoration Act of 1984, which authorized the manufacture and sale of generic versions of brand-name drugs, thus incentivizing generic manufacturers to bring low-cost generics drugs to the market. 21 U.S.C. § 355. These amendments are known as the Hatch-Waxman Amendments.

341.     The Hatch-Waxman Amendments aim to: (1) induce pioneering research and development of new drugs; and (2) enable competitors to bring low-cost generic copies of existing drugs to market. As a result, the cost of drug prices should be reduced—a benefit to third-party payers and consumers.

342.     Rather than an NDA, generic manufacturers[27] seek approval to sell a generic version of a branded drug by filing an Abbreviated New Drug Application ("ANDA").[28]

343.     Through the ANDA process, the generic manufacturer attempts to show that its product is bioequivalent to its branded counterpart, referred to as the "reference listed drug" ("RLD"). As defined, an RLD is an "approved drug product to which new generic versions are compared to show that they are bioequivalent," that is, the generic version "performs in the same manner as the Reference Listed Drug."[29] A drug company seeking approval to market a generic equivalent must refer to the RLD in its ANDA. *Id.* Once the FDA approves an ANDA, the generic firm may manufacture and market the safe, effective, and affordable generic alternative to the public.

_____

[26] The FDA defers to the Patent and Trademark Office on all matters involving the construction and validity of patent claims. Small Business Assistance: Frequently Asked Questions on the Patent.

[27]   *Hatch-Waxman Letters*, FDA, https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/hatch-waxman-letters (last updated February 3, 2022).

[28] *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

[29]*Glossary of Terms*, U.S. Food & Drug Administration, http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#RLD   (last   updated   Nov.   14, 2017).

*Id.*

344.    A generic drug contains the same active ingredients as the brand-name drug *but typically sells at a lower price than the brand-name drug*. As a result, generic drugs are frequently prescribed as a substitute for brand-name drugs in an effort to control healthcare costs, and they represent an increasing portion of the medicines used in the United States. The Generic Pharmaceutical Association (now known as the Association for Accessible Medicines) estimates that from 2001 through 2010, the nation's healthcare system saved $931 billion from the use of generic drugs. Achieving cost savings through generic substitutions is critical for expensive, life-saving treatments, like Remodulin.

345.    The introduction of a generic drug as an alternative to a brand-name drug typically results in a dramatic reduction in the brand-name drug's market share, and the rate of reduction is particularly dramatic in the first six months.

346.    To achieve the balance between protecting brand manufacturers and promoting generic competition, in addition to demonstrating bioequivalences, Congress requires that a generic drug manufacturer applying for approval certify one of the following:

a.    no patent information for the brand-name drug has been filed with the FDA;

b.    the relevant patent has expired;

c.    the relevant patent will expire, and the applicant does not seek to market its generic drug before the date of expiration; or

d.    the relevant patent is invalid or will not be infringed by the applicant's generic drug product (commonly known as "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii)(I)–(IV).

347.    An applicant filing a Paragraph IV Certification must notify the patent holder of its ANDA. After receiving this notice, the brand manufacturer can obtain a 30-month stay on the generic's market entry by filing a patent infringement suit (regardless of merit) against the applicant

within 45 days of receiving notice of the ANDA. 21 U.S.C. § 355(j)(5)(C)(i)(1)(aa).

348.   *The litigation by the brand manufacturer delays all generic competition* because the FDA is barred from approving the proposed applicant's ANDA until the earliest of: (1) expiration of the patent; (2) district court resolution of the patent litigation in favor of the generic drug manufacturer; or (3) the expiration of the automatic 30-month stay. 21 U.S.C. § 355(j)(5)(B)(iv).

349.   It is no secret that brand manufacturers, like UT, benefit from a lack of competition, which enables them to artificially inflate the prices of their drugs to supra-competitive price levels.

350.   Therefore, in order to avoid substantial price competition and a loss of market share, brand manufacturers, like UT, actively seek to exclude generic manufacturers from competing by misusing the legal framework intended to incentivize generics in the marketplace.

351.   When that fails, however, brand manufactures, like UT, find alternative, unconventional means of excluding competition by creating artificial barriers to cripple generic manufacturers from successfully selling their FDA-approved drugs, as was the case here.

352.   When the artificial barriers are erected by brand manufacturers, like UT in this case, competition is stifled and third-party payers, like Assignors and Class Members, are forced to pay for drugs priced at supra-competitive levels.

353.   In summary, the availability of generic alternatives on the market is critical to maintaining affordable drug prices. To that end, Congress enacted laws to promote competition and combat monopolistic pricing. Federal and state laws encourage cost savings made possible by generic competition.

## The Generic Prevention Scheme

354.   The most common symptoms of PAH are shortness of breath, chest pain, exhaustion, dizziness or fainting, and heart palpitations. The New York Heart Association has created four functional classes for evaluating heart failure, and those classes are often used to classify the severity

of a PAH patient's symptoms. Class I patients have no observable symptoms. Class II patients experience symptoms when active. Class III patients experience symptoms at rest. And Class IV patients are severely affected by PAH at all times.

355.   Doctors typically prescribe treprostinil injections for Class III and Class IV patients because it is necessary to keep a continuous level of treprostinil flushing through their pulmonary arteries 24/7. And the only demonstrated way to achieve this continuously with an absolutely constant level of treprostinil levels is through a parenteral[30] delivery system. Remodulin is a parenterally administered (injected) form of treprostinil. It is administered in one of two ways: (1) under a patient's skin (subcutaneous injections); or (2) directly into a patient's veins (intravenous injections).

356.   More than 55% of Remodulin patients receive subcutaneous treatments.

357.   As of the date of filing, PAH patients who were prescribed subcutaneous treprostinil injections received their Remodulin injections only through the CADD-MS 3 pump, which was manufactured exclusively by Smiths.

---

[30] Parenteral administration are drugs given by routes other than digestive tract. Parenteral usually refers to injection or infusion. Jasmeet Soar & Jon Standing, Chapter 7: Parenteral Drug Administration, in *Medication Safety: An Essential Guide* (2010).



358.    At the time of filing, Smiths also manufactured the only FDA-approved cartridges necessary to use the CADD-MS 3 pump for subcutaneous treprostinil injections.

359.    *At the time of filing, there were no other FDA-approved medical devices to administer subcutaneous treprostinil injections in the United States.*

360.    A CADD-MS 3 pump is a "true durable medical equipment", meaning it can be refurbished and reused by multiple patients.

361.    Each CADD-MS 3 pump can last approximately 10 to 12 years with normal use.

362.    At all relevant times here, Specialty Pharmacies purchased and maintained their own stock of CADD-MS 3 pumps and cartridges.

363.    As discussed below, in furtherance of their anticompetitive and fraudulent schemes, Smiths entered into separate agreements with UT to ensure all pumps and cartridges would be exclusively reserved for the administration of UT's *branded* treprostinil, Remodulin.

364.    These agreements equated to naked restraints of trade with no purpose except to stifle competition.

365.    Accordingly, the agreements were each a per se violations of the antitrust laws for

which a rule-of-reason analysis does not apply as the nature and necessary effects of which are so plainly anticompetitive that no elaborate study of the industry is needed to establish the illegality.

366.    The FDA first approved Remodulin for subcutaneous injections in the United States in 2002. From 2002 until March 25, 2019, there was no generic alternative to Remodulin in the market.

367.    In 2007, UT announced over $200.8 million in revenue from Remodulin, of which "between 35-50% of Remodulin sales in the United States are reimbursed under the Medicare and Medicaid programs." **Exhibit A**, p. 48, 2006 UT 10-K.

368.    UT also announced exclusive distribution agreements with the Specialty Pharmacies, CVS and Accredo. **Exhibit A**, p. 17-18, 2006 UT 10-K.

369.    On February 26, 2010, Defendant CVS filed its 10-K Report expressing concern that "[p]harmacy revenue dollars continue to be negatively impacted in all years *by the conversion of brand-named drugs to equivalent generic drugs*, which typically have a lower selling price." **Exhibit P**, p. 31, 2009 CVS 10-K.

370.    In March and April of 2010, UT increased the price of Remodulin by 9.6% and 13.3%, respectively. **Exhibit S**, October 2010 UT 10-Q.

371.    In 2011, Sandoz submitted an ANDA to the FDA, requesting permission to market a generic version of treprostinil for use in both subcutaneous and intravenous injections.

372.    In its ANDA, Sandoz certified that UT's patents related to Remodulin were invalid or would not otherwise be infringed by its generic version of treprostinil.

373.    On February 3, 2012, UT received a Paragraph IV notification from Sandoz indicating an intent to bring a generic version of Treprostinil to market. **Exhibit T**, p. 7, 2011 UT 10-K.

374.    On February 27, 2012, UT announced that it began "working with Medtronic, Inc. (Medtronic) on demonstrating the safety of its Synchromed® II implantable infusion pump for

intravenous Remodulin." **Exhibit T**, p. 7, 2011 UT 10-K.

375.    UT also informed its investors that it just learned of Sandoz's ANDA application and was considering filing a patent infringement lawsuit as filing one "would automatically preclude the FDA from approving Sandoz's ANDA for up to 30 months or until the issuance of a district court decision that is adverse to us, whichever occurs first." **Exhibit T**, p. 84, 2011 UT 10-K.

376.    On March 14, 2012, UT filed a patent infringement lawsuit against Sandoz, triggering a 30-month-stay of FDA's review of Sandoz's Anda. **Exhibit O**, p. 52, 2012 UT 10-K.

377.    In December 2012, Sandoz notified UT that it had amended its ANDA, and in January 2013, UT filed another patent infringement lawsuit against Sandoz, triggering another 30-month stay of FDA review. **Exhibit O**, p. 52, 2012 UT 10-K.

378.    On February 15, 2013, CVS informed investors that "[p]harmacy revenues continue to be negatively impacted by the conversion of brand name drugs to equivalent generic drugs, which typically have a lower selling price. Pharmacy same store sales were negatively impacted by approximately 700 and 215 basis points for the years ended December 31, 2012 and 2011, respectively, due to recent generic introductions." **Exhibit AA**, p. 10, 2012 CVS 10-K.

379.    On February 26, 2013, UT informed its investors it could provide "no assurance that we will prevail in our defense of our patent rights. Our existing patents could be invalidated, found unenforceable or found not to cover a generic form of Remodulin. If Sandoz or another ANDA filer were to receive approval to sell a generic version of Remodulin and/or prevail in any patent litigation, Remodulin would become subject to increased competition and our revenue would be adversely affected." **Exhibit O**, 2012 UT 10-K.

380.    In July 2014, UT received a third Paragraph IV notification from Sandoz regarding its attempt to market and sell generic treprostinil. UT also received a Paragraph IV notification from TEVA Pharmaceuticals USA, Inc., regarding the submission of its ANDA seeking FDA approval

for its generic treprostinil. **Exhibit LL**, p. 57, 2014 UT 10-K.

381.   Shortly thereafter, *with the encroachment of generic competition,* UT started communicating privately with Smiths to develop a plan to create artificial barriers of entry for generic competition.

382.   In mid-to-late 2014, Smiths and UT privately discussed issuing "End of Life Notices" regarding the CADD-MS 3 pump.

383.   On September 2, 2013, UT filed a patent infringement lawsuit against both Sandoz and UT to trigger a 30-month stay of FDA approval of their ANDAs for generic treprostinil.

384.   In December 2014, UT "entered into an exclusive agreement with DEKA Research & Development Corp. (DEKA) to develop a pre-filled, semi-disposable system for subcutaneous delivery of treprostinil, which we call the RemUnity system." **Exhibit NN**, p. 28, July 2015 UT 10-Q.

385.   UT stated the RemUnity was to be used exclusively with Remodulin, and available "by the end of 2018." This was the first reference in public filings where UT referred signaled a shift in focus to delivery devices (i.e., pumps, cartridges) needed for subcutaneous treprostinil injections.

386.   On December 28, 2014, and December 31, 2014, "founder, Chairman and Chief Executive Officer, Dr. Martine Rothblatt," began internal emails discussing a "make generic barbaric" scheme, by creating new pumps that would "re-proprieterize" Remodulin and be "generic-proof" because they would be restricted to Remodulin only. Rothblatt referred to the pump being developed with Medtronic ("The Implantable System for Remodulin") to maintain UT's monopoly over the intravenous market, and the pump being developed with DEKA ("Unity") to maintain UT's monopoly over the subcutaneous market. The plan was to have these pumps developed and approved by 2018.

387.    Once these plans were in place, UT then worked with Smiths to ensure generic competition could not use any existing pumps on the market.

388.    On January 4, 2015, Rothblatt sent an email stating the eventual launch of new Remodulin-only pumps was her "answer to generic treprostinil."

389.    In early 2015, UT and Smiths continued their private discussions regarding the "discontinuation" of the CADD-MS 3 pump.

390.    On February 24, 2015, a UT executive, Mark Schoenebaum, sent an email regarding UT's expectation to receive FDA approval of the Implantable System for Remodulin by "late 2015."

391.    That same day, UT filed its 2014 10-K report where it, *for the first time,* made reference to a "limited number of pumps" and its potential "discontinuation":

> We are reliant on third parties to supply pumps and other supplies necessary to deliver Remodulin. **There are a limited number of pumps available in the market, and the discontinuation of any particular pump** could have a material, adverse impact on our Remodulin revenues.

**Exhibit LL,** 2014 UT 10-K (emphasis added).

392.    On April 3, 2015, upon inquiry by UT, CVS informed UT that it *owned* 154 *unencumbered* pumps "owned and available for use".

393.    On April 6, 2015, upon inquiry by UT, Accredo told UT it averaged 300 new *unencumbered* pumps per year over the last several years.

394.    UT knew that Accredo accounted for approximately 80% of the patient population on injected treprostinil in the United States.

395.    Approximately 1,500 patients were using the CADD-MS 3 pumps for subcutaneous infusions of Remodulin at the time.

396.    UT knew the pumps owned by the Specialty Pharmacies were refurbished by the Specialty Pharmacies, reused by multiple patients, and each had an average lifespan of 10 to 12 years.

397.   Smiths admits that, during this time, it was in active communication with UT.

398.   On August 21, 2015, a UT executive responsible for UT's communications with Smiths, Jay Watson, sent an email informing Rothblatt that any discontinuation of CADD-MS 3 pumps "should have no immediate impact" on Remodulin sales.

399.   On August 25, 2015, Smiths, in furtherance of its conspiracy with UT to prevent generic competition, issued End of Life Notice, where Smiths stated it was "discontinuing the sale of CADD-MS 3 Ambulatory Infusion *Pump effective immediately*," but it was "continuing to supply the 3 mL Medication *Cartridge*, 21-7450, to be available for use with the CADD-MS 3 pump, *for at least 3 years*."

400.   Smiths' reference to the continued production of cartridges "for at least 3 years", aligned with UT's subsequent settlement with Sandoz providing for generic entry of treprostinil in 3 years, and the planned rollout of UT's new pump, Unity.

401.   In other words, in the event Unity was not developed and approved by 2018 as planned, Smiths' End of Life Notices foreshadowed UT's backup plan, which was to ensure generic competition could not obtain the cartridges necessary to bring generic treprostinil to market.

402.   Smiths then began working with UT to develop a new type of pump.

403.   After this End-of-Life Notice, the Specialty Pharmacies continued to supply Remodulin to patients using their existing, unencumbered, stock of CADD-MS 3 pumps.

404.   The Specialty Pharmacies informed Sandoz that even though the CADD-MS 3 pumps were "discontinued", patients still had continued access to the large supply of unencumbered pumps already owned by the Specialty Pharmacies.

405.   However, as discussed below, in 2018, when UT's plan to bring Unity to market did not come to fruition, UT then implemented the second phase of its plan to restrict cartridges, by first

conspiring with Smiths and the Specialty Pharmacies to agree to only permit use of the Specialty Pharmacies' *unencumbered* pump supply with Remodulin.

406.   With Smiths' help and UT's 3 year plan in place, on September 29, 2015, UT agreed to settle its patent infringement lawsuits with Sandoz and permit Sandoz to start marketing its generic treprostinil alternative in June 2018.

407.   According to UT:

[W]e entered into a Settlement Agreement with Sandoz to settle all ongoing litigation between the parties (all three lawsuits described above, including pending appeals) concerning Remodulin patents. Under the settlement agreement, we granted Sandoz a non-exclusive license to manufacture and commercialize in the United States the generic version of Remodulin described in Sandoz's ANDA filing beginning on June 26, 2018, although Sandoz may be permitted to enter the market earlier under certain circumstances. The settlement agreement does not grant Sandoz a license to manufacture a generic version of any other product, such as Tyvaso or Orenitram, nor does it grant any rights with respect to any technology associated with the Remodulin Implantable System we are developing in conjunction with Medtronic Inc., or the pre-filled semi-disposable pump system we are developing with DEKA Research & Development Corp. The settlement agreement does not grant Sandoz any rights other than those required to launch Sandoz's generic version of Remodulin.

**Exhibit TT**, 2015 UT 10-K.

408.   On January 6, 2016, UT and Smiths met to discuss Smiths' pump inventory.

409.   Smiths informed UT that it had about "1,000 MS-3 pumps left, which provides an MS-3 EOL [end of life] date of June 2017."

410.   On January 30, 2016, Rothblatt sent an email extending The Implantable System for Remodulin launch from "late 2015" to "a hopeful 2016 approval."

411.   On March 24, 2016, after Smiths alleged "discontinuation" of the CADD-MS 3 pumps, Smiths and UT entered into a "Supply Agreement" requiring Smiths ""to produce a final manufacturing run of 7,000 Pumps," and required UTC to "purchase any Pumps unsold by Smiths."

412.   The 2016 Agreement required Smiths to make commercially reasonable efforts to sell pumps in the ordinary course of business.

413.     There were no restrictions on how pumps sold directly from Smiths to third parties (such as the Specialty Pharmacies) could be used.

414.     The 2016 Agreement also required Smiths to manufacture and make available for sale 1.6 million cartridges, with UT purchasing and taking title to any unsold cartridges after six years, *or 2022*.

415.     Under the 2016 Agreement, UTC was not required to purchase, pay for, or take title to any CADD-MS 3 cartridges before 2022.

416.     The 2016 Agreement did not restrict CADD-MS 3 Cartridges to only Remodulin.

417.     As admitted by a UT executive, Matthew Kootman, UT understood that "Smiths will just sell [cartridges] in the ordinary course (no UT involvement), but any leftovers will be purchased by us at the end."

418.     On May 17, 2016, Sandoz made an inquiry to Smiths about the CADD-MS 3 pumps. Smiths ignored it.

419.     On May 27, 2016, Sandoz made an inquiry to Smiths about the CADD-MS 2 pump. Smiths ignored it.

420.     On June 27, 2016, UT's consultant, a Paul Mahon, informed UT that the introduction of generic treprostinil was expected to hamper UT's growth "for the foreseeable future…potentially leading to pricing pressure to defend share."

421.     On July 28, 2016, UT's Schoenebaum sent an email again extending the launch of the Implantable System for Remodulin from a "hopeful 2016" to an "on track for 2017 launch".

422.     On August 7, 2016, Rothblatt sent an internal email expressing concern that looming generic entry was the "reason for [UT's] declining share price" and that prices would continue to erode "until UT prove[d] to be generic-resistant."

87

423.    On August 15, 2016, Rothblatt stated that even though generic would be available in 2018, she did not expect any revenue decline because UT's new pumps would beat generic to the market.

424.    On August 25, 2016, Sandoz met with Accredo to begin planning for launch of generic tresprostinil.

425.    On September 19, 2016, Sandoz again contacted Smiths to inquire into the availability of CADD-MS 3 pumps.

426.    On October 7, 2016, Smiths informed Sandoz that it would not sign an NDA with Sandoz due to an ongoing relationship with UT.

427.    On November 1, 2016, UT and Accredo entered into a Second Distribution Agreement regarding Remodulin and a fourth agreement regarding Tyvaso. **Exhibit XX**, p. 281, 287, 2016 UT 10-K.

428.    On December 7, 2016, Smiths located additional supply to meet demand for CADD-MS 3 *cartridges.*

429.    On December 16, 2016, Rothblatt sent an email stating her "dream of 510k approval" in 2017 for UT's new pumps was "dead". Rothblatt stated, "You may recall that this was so essential because . . . Wall Street wanted to see that we could defeat generic treprostinil in 2018 with a new proprietary, better, method of delivering treprostinil in 2017."

430.    On December 27, 2016, UT entered into a Third Amended Distribution Agreement with Accredo for Remodulin. **Exhibit XX**, p. 284.

431.    On December 28, 2016, Smiths negotiated and procured additional resin to be used to make CADD-MS 3 cartridges.

432.    On January 24, 2017, Smiths received additional resin to make CADD-MS 3 cartridges.

433.    Smiths obtained more than it predicted it would need to meet its contractual obligations to UT.

434.    The amount of resin Smith's procured was more than enough to extend several years beyond the contractual six-year time period in the agreement with UT.

435.    Smiths admits that, due to the demand in the market, it never stopped manufacturing cartridges.

436.    On March 6, 2017, UT stock was downgraded to underperform because of "a potentially real threat from generic Remodulin in 2018."

437.    On March 29, 2017, Smiths allegedly informed UT that it had purchased additional resin to extend the production of cartridges beyond 2022.

438.    As of April 13, 2017, approximately 1,250 patients were receiving subcutaneous infusions of Remodulin through Accredo.

439.    On or around May 23, 2017, UT and Smiths met to discuss an amendment to the 2016 Agreement, where UT expressed a desire for Smiths to restrict the cartridges to Remodluin use only.

440.    UT and Smiths also discussed conspiring with Accredo and CVS to restrict sale of cartridges "to end-users for Remodluin-use only."

441.    Doing so would address the Specialty Pharmacies' concerns regarding pharmacy revenue declining due to the introduction and use of generic alternatives.

442.    In July 2017, UT and Smiths entered into an amended agreement where UT would purchase 2.1 million cartridges from Smiths and Smiths would "use commercially reasonable efforts" to amend its agreements with the Specialty Pharmacies to restrict sale of cartridges to Remodluin users only.

443.    In or around August 2017, Sandoz met with Accredo and CVS to discuss bringing generic treprostinil to market.

444.    The Specialty Pharmacies informed Sandoz that it only needed to supply treprostinil vials, and that they would supply the pumps and cartridges.

445.    On December 16, 2017, expressing her frustration and anxiety of impeding generic entry, Rothblatt stated, "It is the very definition of 'make generic barbaric' because no one will use 'old [R]emodulin' once there is even a nearly painless version of it. Ergo, with one fell swoop, the approval of [UTC's new pump] wipes out the generic threat to UT[C]. . . . I just wish folks worked day and night."

446.    UT increased the price of Remodulin 2018.

447.    On January 11, 2018, Rothblatt sent an email stating she personally negotiated a deal to purchase SteadyMed, a competitor that had been developing a delivery device for use with generic treprostinil because "I also don't feel like competing against a more competent company if they get acquired by someone else."

448.    On January 14, 2018, Rothblatt sent an email stating "OK, just so everyone is aware of the amber verging toward red zone these delays are causing: We would now launch . . . at the same time that generic is launched, making it tougher to have a head start against generic."

449.    On January 30, 2018, UT "resubmitted our NDA for the use of Remodulin in the implantable pump . . . , and we anticipate a two-month review period." **Exhibit YY**, p., 2017 10-K filing.

450.    In April 2018, UT increased the price of Remodulin, generating over $18.1 million increased revenue from U.S. sales.

451.    In May of 2018, upon inquiry, Accredo again informed Sandoz that it would provide pumps and cartridges, and Sandoz need only provide vials of generic treprostinil.

452.    The Specialty Pharmacies informed Sandoz it was "not experiencing any shortage on the pumps on their end" and that all medical devices and accessories needed for use of generic

Treprostinil would be provided by the Specialty Pharmacies. These representations intended to, and did, induce reliance by Sandoz, to the detriment of Sandoz and third-party payors.

453.    As of late 2018, UT had still been unsuccessful in bringing a new pump to market.

454.    During that time, UT reached out to conspire to restrict sale of cartridges needed for use with the CADD-MS 3.

455.    On or around November 28, 2018, UT requested a cartridge inventory from Smiths.

456.    On or around November 29, 2018, Smiths provided UT with a spreadsheet called "MS-3 Cartridge Remodulin USE from Reg Mktg", which identified a number of Smiths' customers had long been using Smiths' cartridges for non-Remodulin medications.

457.    In December of 2018, Smiths and the Specialty Pharmacies agreed to restrict cartridges to Remodulin-use-only, because, as admitted by Smiths, "[it] is very important to UTC to prevent generic drug users."

458.    On or around December 21, 2018, Smiths agreed to put all cartridges "on allocation to United Therapeutics only."

459.    During that same time, the Specialty Pharmacies continued to lie to Sandoz, informing Sandoz that the Specialty Pharmacies would provide all pumps, cartridges, and medical supplies, so long as Sandoz supplies generic treprostinil vials.

460.    On January 25, 2019, UT sent an email to Smiths stating that due to generic entry it was "anxiously awaiting" signed contracts from the Specialty Pharmacies agreeing to restrict cartridges to Remodulin-use only.

461.    On February and March 2019, the Specialty Pharmacies agreed to restrict sale and use of CADD-MS 3 pumps and cartridges to only patients prescribed Remodulin.

462.    On March 25, 2019, Sandoz launched generic treprostinil at a price approximately 48% less than Remodulin's price but was unable to sell its product to more than half of the patients

prescribed treprostinil due to the Generic Scheme Defendants' successful implementation of artificial barriers of entry by removing access to all medical supplies needed for administration of subcutaneous injections of treprostinil.

463.    In April 2019, Smiths and UT entered into a third Supply Agreement giving UT (1) complete control of cartridge distributions, (2) the right to purchase any unsold cartridges, and (3) the right to assume responsibilities for managing the distribution of cartridges.

464.    This agreement with Smiths allowed UT to then enter into restrictive agreements with the Specialty Pharmacies as distributors "of Cartridges solely for supplying patients who have been dispensed Remodulin."

465.    On April 16, 2019, Sandoz sued UT and Smiths. *Sandoz Inc. v. United Therapeutics Corp.*, 2021 WL 4553351, at *3 (D.N.J. Oct. 4, 2021).

466.    As of February 2020, UT had still been unable to bring either of its pumps to market.

467.    After tremendous time and expense wasted, Sandoz was able to develop a cartridge to use with generic treprostinil but was unable to get FDA approval given the CADD-MS 3 pump warning label providing that only cartridges developed by Smiths could be used with the pumps.

468.    In exchange for dismissing Smiths from the ongoing antitrust case referenced above, Smiths agreed to pay Sandoz and remove the warning label from its pumps. *Sandoz, Inc. v. United Therapeutics Corp.*, 2021 WL 287872 (D.N.J. Jan. 28, 2021).

469.    As explained by UT,

As part of this settlement, Smiths Medical paid the plaintiffs $4.25 million, disclosed and made available to the plaintiffs certain specifications and other information related to the MS-3 cartridges, and granted to the plaintiffs a non-exclusive, royalty-free license in the United States to Smiths Medical's patents and copyrights associated with the MS-3 cartridges and certain other information for use of the MS-3 pumps and cartridges.

**Exhibit III**, 2020 UT 10-K.

470.     On May 24, 2021, Sandoz was finally able to bring its cartridge to market, making its generic Treprostinil available for subcutaneous injections.

471.     Defendants' anticompetitive conduct successfully impaired competition by artificially restricting the number of alternatives for subcutaneous treprostinil injections, which has allowed UT to maintain high prices for Remodulin—prices which are ultimately born by Assignors and Class Members.  Assignors are the ones harmed by Defendants' anticompetitive scheme, and the injuries sustained (i.e., paying supra-competitive prices for the only option available for a highly critical medical treatment) are the type of injuries the antitrust laws were meant to prevent, and they flow from the harm to competition caused by Defendants' unlawful conduct.

## CADD-MS3 Pump Exclusive Dealing Relevant Product Market

### (Remodulin)

472.     Three classes of drugs have been approved by the FDA to treat PAH. They are called: (1) Endothelin Receptor Antagonists ("ERAs"); (2) Phospodiesterase Type 5 inhibitors ("PDE-5s"), and (3) Prostacyclins.

473.     The active ingredient in Remodulin is treprostinil, which is a synthetic form of prostacyclin.

474.     The treatment program used by a PAH patient (i.e., the drug and delivery mechanism) is based on the severity of the patient's symptoms and the treating physician's judgment. The selection of one drug class over another, or of a particular administration method, is not based on the underlying price of the treatments. Thus, a small, but significant, and non-transitory increase in the price of one class of drugs would not cause treating physicians and patients to substitute in significant numbers to a different class of drugs; and a small, but significant, and non-transitory increase in the price of one administration method would not cause treating physicians and patients to substitute in significant numbers to a different administration method.

475.     ERA and PDE-5 treatments are not reasonable substitutes for prostacyclin treatments because they are indicated for less severe forms of PAH. As a patient's symptoms become worse, they will typically progress to prostacyclin treatments. As UT's CEO has explained:

> There are the PDE-5 inhibitors of which the two brand names that are most well-known, Viagra and Cialis, are of that category. And those drugs have been rebranded to be used in pulmonary hypertension. You have to take them every day for the rest of your life.
>
> And they are able to effectuate some dilation in those distal pulmonary arteries and help patients for a while. But almost every patient disease ends up progressing through the benefits given by the PDE-5 inhibitors.
>
> So, I will also mention that PD[E]-5 inhibitors are the least expensive drugs for treating this disease and are generally the first line therapy provided to the patient. Once their disease progresses through these PDE-5 inhibitors, the patient[s] next have a line of drugs called endothelium receptor antagonists, or ERAs for short. . . .
>
> They help the group one pulmonary arterial hypertension patient for a while. But as with the PDE-5s, the patient disease progresses through the benefits of the ERAs. And on average the patients will stay on an ERA for something like one to two years before their disease has progressed and they need yet a stronger medicine.
>
> And then at the end of the – at the end of this progression is a third class of medicines of what are called the prostacyclin class. . . .

(*See Sandoz, Inc. v. United Therapeutics, Corp.*, 2020 WL 697137 [No. 3:19-cv-10170-BRM-LHG, Complaint at ¶ 56]).

476.     Within the class of prostacyclin-based PAH treatments, there are at least two relevant antitrust product markets that are affected by Defendants' unlawful conduct: (1) the market for subcutaneously injected treprostinil; and (2) the market for injected prostacyclins.

### Subcutaneously Injected Treprostinil

477.     Prostacyclin-based therapies administered by injection are highly differentiated. At one end of the spectrum are treatments based on epoprostenol (which include the brand-name drugs Flolan and Veletri) and at the other end of the spectrum are treatments based on treprostinil (such as Remodulin). There are significant differences between the two sets of medications that make one of

them, or the other, the best alternative for a particular patient that needs to receive prostacyclin injections.

478.    As UT explained in its 10-K filing with the SEC:

Remodulin is stable at room temperature, so it does not need to be cooled during infusion and patients do not need to use cooling packs or refrigeration to keep it stable. treprostinil is highly soluble and highly potent, which enables us to manufacture Remodulin in concentrated solutions. This allows therapeutic concentrations of Remodulin to be delivered at very low flow rates via miniaturized infusion pumps for both subcutaneous and intravenous infusion. Remodulin can be continuously infused for up to 48 hours intravenously or 72 hours subcutaneously before refilling the external infusion pump. This profile contrasts favorably with the other continuously infused prostacyclin therapies in the market—Flolan, Veletri and generic epoprostenol.

Flolan and generic epoprostenol are not stable at room temperature (and therefore require refrigeration or the use of cooling packs), but Veletri may be stable at room temperature depending on its concentration. Flolan, generic epoprostenol, and Veletri have shorter half-lives than Remodulin, requiring mixing prior to pump refills. None of these competitive products may be administered via subcutaneous infusion, and therefore may only be delivered intravenously.

**Exhibit III**, p. 6, 2020 UT 10-K.

479.    Because of the substantial differences between injected treprostinil treatments and those based on epoprostenol, treprostinil is the only PAH treatment that can be administered through subcutaneous injections in the United States today.

480.    As of March 2020, there are approximately 2,000 patients in the United States who are currently being treated for PAH with subcutaneous Remodulin injections. Those patients have been prescribed Remodulin by their treating physicians and their treatment program relies on subcutaneous injections using the CADD-MS 3 pump. Those patients will not switch to other PAH treatments in response to a small, but significant, and non-transitory increase in the price of subcutaneously injected treprostinil.

481.    Subcutaneously injected treprostinil therefore constitutes a relevant antitrust product market.

95

## **Injected Prostacyclins**

482.    Prostacyclin-based treatments for PAH can be administered through (1) inhaled treatments, such as inhaled treprostinil (including the branded drug Tyvaso, which is sold by UT); (2) oral treatments, such as treprostinil in tablet form (including the branded drug Orenitram, also sold by UT); or (3) injected treatments (such as Remodulin).

483.    Inhaled and oral prostacyclin treatments are not reasonable substitutes for injected prostacyclin treatments.

484.    As UT's CEO has explained, whether patients "go onto Orenitram first and then Tyvaso, or Tyvaso first and then Remodulin, or straight to Remodulin" is "simply a consequence of their doctor's judgment as to how much prostacyclin they require and in what form."

485.    If a patient is diagnosed with PAH before their symptoms become severe, they typically will start a treatment program based on oral prostacyclins, and progress over time to other forms of treatment as their symptoms change. Again, UT's CEO explained:

> [T]here is an entire family of the most potent treatments for pulmonary hypertension across the cyclin family that you can start with orally. As the patient's disease progresses, you can move to an inhaled therapy for them, which is less invasive . . . than parenteral, but still getting the medicine more directly to where it's needed in the distal portions of the pulmonary vascular bed via Tyvaso. And then finally, if the patients and disease continues to progress, which unfortunately the vast majority [do], the kind of drugs you can transition the patient on to parenteral, Remodulin, either subcutaneous or intravenous.

486.    According to UT's CEO, Remodulin "is the medicine that physicians reach for when patients are struggling with managing their pulmonary hypertension due to the oral treatments not being able to halt the progression of the disease."

487.    For all these reasons, patients who have been prescribed injected prostacyclin treatments will not switch to other prostacyclin treatments in response to a small, but significant, and non-transitory increase in the price of injected prostacyclin.

488.     Injected prostacyclins therefore constitute a relevant antitrust product market.

### CADD-MS3 Pump Exclusive Dealing Relevant Geographic Market

489.     The relevant geographic market is the United States and its territories. Due to FDA regulations and the importance of this life-preserving treatment, a small, but significant, and non-transitory increase in the price of subcutaneously injected treprostinil or injected prostacyclins would not cause treating physicians and patients to substitute in significant numbers to other treatments that are not available in the United States or its territories.

### CADD-MS3 Pump Exclusive Dealing Market Share

490.     Before the entry of generic competition, UT sold 100% of the treprostinil administered through subcutaneous injections in the United States, and as a result of the restrictions related to the CADD-MS 3 cartridges, UT continues to sell 100% of the treprostinil administered through subcutaneous injections in the United States.

491.     The market for injected prostacyclins is highly concentrated in the United States, with UT holding a share of the market in excess of 70%. In 2016, for example, UT estimated that it "own[ed] about 82% share in the parenteral market." And as of June 2018, UT boasted "Remodulin is the most prescribed continuous pump therapy for WHO Group 1 pulmonary arterial hypertension (PAH). Seven out of 10 patients on continuous therapy are prescribed Remodulin."[31] "WHO Group 1" refers to PAH caused by arteries in the lungs becoming narrowed, thickened or stiff, which is the type of PAH treated by injected prostacyclins like Remodulin.

492.     At all relevant times, UT had monopoly power over its drugs because it had the power to raise and/or maintain the price of its drugs at supra-competitive levels without losing substantial sales.

_____

[31] Which is also likely due, in large part, to UT's illegal usage of CVC and the Co-Payment Circumvention Enterprise.

493.     As a result of Defendants' anticompetitive conduct, UT was able to sell its drugs well in excess of marginal costs, and in excess of the competitive price, and enjoyed unusually highly and grossly inequitable profit margins.

## CADD-MS3 Pump Exclusive Dealing Barriers to Entry

494.     Barriers to entry into the relevant antitrust markets are high. In the United States, prescription drugs cannot be marketed and sold without FDA approval. Patients in the United States cannot be treated with prescription medications that have not been approved by the FDA. Obtaining FDA approval for new injected prostacyclin treatments is difficult and expensive. There are currently only five forms of injected prostacyclins that have been approved by the FDA (Remodulin, Flolan, Veletri, generic epoprostenol and generic treprostinil).

495.     Even with FDA approval to start marketing generic treprostinil, no firm can sell their generic alternative to Remodulin to treat patients who are being treated with subcutaneous injections. Defendants' unlawful restrictions have entirely foreclosed that segment of the market.

## CADD-MS3 Pump Exclusive Dealing Anticompetitive Effects

496.     Defendants' anticompetitive scheme delayed entry of less expensive generic versions of treprostinil in the United States. Further, it enabled UT to fix, raise, maintain, or stabilize the prices of Remodulin at supra-competitive levels while preserving 100% of the U.S. market for itself.

497.     But for Defendants' conduct, generic alternatives to UT's Hypertension Drugs would have entered the market earlier. As a result, Assignors and Class Members sustained substantial losses in the form of overcharges, the exact amount of which will be the subject of proof at trial.

498.     But for Defendants' conduct (which includes bribing CVC to funnel beneficiaries to UT Hypertension Drugs), UT would not have been able to maintain supra-competitive prices for its drugs. As a result, Assignors and Class Members sustained substantial losses in the form of overcharges, the exact amount of which will be the subject of proof at trial.

499.     During the relevant period, Assignors and Class Members purchased substantial amounts of UT Hypertension Drugs. As a result of Defendants' illegal conduct as alleged herein, Assignors and Class Members were compelled to pay, and did pay, artificially inflated prices for UT Hypertension Drugs. Assignors and Class Members paid prices for UT Hypertension Drugs that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein.

500.     As a consequence, Assignors and Class Members have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

### **CADD-MS3 Pump Exclusive Dealing Effect on Interstate & Intrastate Commerce**

501.     At all material times, UT Hypertension Drugs, manufactured and sold by UT, were shipped across state lines and sold to customers located outside its state of manufacture.

502.     During the relevant time period, in connection with the purchase and sale of UT Hypertension Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

503.     During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of UT, Charities, and Specialty Pharmacies, as alleged in this complaint, were within the flow of, and have substantially affected, interstate commerce.

504.     Defendants' anticompetitive conduct also has substantial intrastate effects in that, *inter alia*, retailers within each state are foreclosed from offering cheaper generic UT Hypertension Drugs to end-payors inside each respective state. The foreclosure of generic forms of UT Hypertension Drugs directly impacts and disrupts commerce for end-payors within each state.

505.     Plaintiffs bring this action on behalf of themselves and the following classes:

Federal RICO / State RICO / State Consumer Protection Statute Class 1:

> All Medicare Advantage Organizations and at-risk, first-tier, and downstream entities in the United States and its territories that from February 1, 2010, through present, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased the subject pharmaceuticals, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of UT Hypertension Drugs resulting from CVC's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal RICO / State RICO / State Consumer Protection Statute Class 2:

> All self-funded, third-party payors and related entities in the United States and its territories that from February 1, 2010, through present, provided services, purchased the subject pharmaceuticals, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of UT Hypertension Drugs resulting from CVC's co-payment assistance. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal Antitrust / State Antitrust:

> All Medicare Advantage Organizations and at-risk, first-tier, and downstream entities in the United States and its territories that from February 1, 2010, through present, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased the Remodulin, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of Remodulin during the UT-Smiths Exclusive Dealing Contracts. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

Federal Antitrust / State Antitrust Class 2:

> All self-funding, third-party payors and related entities in the United States and its territories that from February 1, 2010, through present, who purchased and/or paid for some or all of the purchase price of Remodulin. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families

State Consumer Protection Statute Class 1:

> All Medicare Advantage Organizations and at-risk, first-tier, and downstream entities in the United States and its territories that from February 1, 2010, through present, pursuant to Medicare contracts offering Medicare benefits, provided services, purchased the Remodulin, provided reimbursement, or possess the recovery rights to reimbursement for some or all of the purchase price of Remodulin during the UT-Smiths Exclusive Dealing Contracts. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

State Consumer Protection Class 2:

> All self-funding, third-party payors and related entities in the United States and its territories that from February 1, 2010, through present, who purchased and/or paid for some or all of the purchase price of Remodulin. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

506.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class.

507.   As discussed in this complaint, the Co-Payment Circumvention Enterprise triggered coverage obligations and resulted in increased sales of UT Hypertension Drugs, the cost of which were borne by Assignors and Class Members. All members of the class are subject to the same AKS compliance requirement and are all prohibited from paying for or reimbursing claims that are unpayable due to AKS violations. The damages suffered by Assignors apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations that assigned their rights to Plaintiffs). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Assignors and other third-party payers, class resolution is an effective tool to redress the harm.

508.   Similarly, the UT-SMITH CADD-MS3 Pump exclusive dealing contracts blocked generic competition from entering the market, forcing Assignors and Class Members to pay supra-

competitive prices, even though a generic version of Remodulin had already been approved. The damages suffered by Assignors apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations that assigned their rights to Plaintiffs). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Assignors and other third-party payers, class resolution is an effective tool to redress the harm.

509.   Assignors and Class Members have been deprived of property and money by being caused to pay for prescriptions of UT Hypertension Drugs due to and as a result of Defendants triggering the Assignors' and Class Members' coverage obligations by forming the Co-Payment Circumvention Enterprise and engaging in the anti-competitive conduct and racketeering activities as alleged throughout this complaint.

510.   The Classes are properly brought and should be maintained as nationwide class actions under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

Numerosity: There are hundreds of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States whose coverage obligations and subsequent payment for UT Hypertension Drugs were triggered and caused by the Co-Payment Circumvention Enterprise. Thus, the numerosity element for class certification is met.

Commonality:  Questions of law or fact are common to all members of the Classes. Defendants' co-payment assistance conspiracy scheme and racketeering activity carried out by the Co-Payment Circumvention Enterprise have a common, adverse effect on all Class Members. Defendants' misconduct was directed at all members of these Classes. Defendants' unlawful co-payment assistance conspiracy scheme and racketeering activity carried out by the Co-Payment Circumvention Enterprise had a common, adverse effect on all purchasers of the UT Hypertension Drugs whose coverage obligations were triggered by Defendants' conduct. Therefore, common questions of law or fact are prevalent throughout the classes, i.e., whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' coverage obligations and subsequent payment for UT PAH Drug prescriptions. Each Class Member shares the same needed remedy, i.e., reimbursement for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of

Defendants' co-payment assistance conspiracy scheme and racketeering activity that triggered Class Members' coverage obligations.

Typicality: Plaintiffs' claims are typical of the claims of the Classes because their claims arise from the same course of conduct by Defendants, i.e., Defendants' formation of the Co-Payment Circumvention Enterprise and racketeering activity unlawfully triggering Class Members' coverage obligations and subsequent submission of bills for payment for UT Hypertension Drugs and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Classes.

Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs' interests in vindicating these claims are shared with all members of the Classes. In addition, Plaintiffs are represented by competent and experienced counsel in class action litigation.

511.    The Classes are properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Classes. Defendants deliberately conspired to trigger Assignors' and Class Members' coverage obligations for the UT Hypertension Drugs through the formation of the Co-Payment Circumvention Enterprise that subsequently resulted in the submission and payment of UT Hypertension Drugs by Assignors and Class Members that otherwise would not have been paid. Additionally, Defendants deliberated entered exclusive dealing contracts for the CADD-MS3 Pumps thereby blocking generic Remodulin from being prescribed and dispensed at a cheaper price by Assignors and Class Members.

512.    Assignors and Class Members paid for prescriptions of UT Hypertension Drugs that they otherwise would not have paid but for Defendants' Co-Payment Circumvention Enterprise and racketeering activity.

513.    Members of the Classes are so numerous that joinder is impracticable. Plaintiffs believe the Class includes hundreds of thousands, if not millions, of consumers, and thousands of third-party payors.

514.     Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct by Defendants, i.e., they paid artificially inflated prices for UT Hypertension Drugs and were deprived of the benefits of competition from less-expensive generic versions of UT Hypertension Drugs as a result of Defendants' wrongful conduct.

515.     Plaintiffs will fairly and adequately protect and represent the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Classes.

516.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation in the pharmaceutical industry.

517.     Questions of law and fact common to the members of the Classes predominate over questions, if any, that may affect only individual class members because Defendants acted on grounds generally applicable to the entire class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

518.     Additional questions of law and fact common to some or all the Classes include:

a.     Whether UT unlawfully maintained monopoly power through all or part of its overarching scheme;

b.     Whether Defendants' anticompetitive scheme suppressed generic competition to UT Hypertension Drugs;

c.     As to those parts of Defendants' challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Defendants' challenged conduct was the least restrictive means of achieving, that offset the harm to competition in the market(s) in which UT Hypertension Drugs is sold;

d.     Whether direct proof of UT's monopoly power is available, and if available, whether it is sufficient to prove UT's monopoly power without the need to also define a relevant market;

e.   Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

f.   Whether Defendants' scheme, in whole or in part, caused antitrust injury to the business or property of Plaintiffs and members of the Classes in the nature of overcharges;

g.   Whether Defendants engaged in a kickback scheme and thereby committed commercial bribery;

h.   The effect of such unlawful bribery on the prices on UT Hypertension Drugs;

i.   Whether Defendants participated in a contract, combination, or conspiracy to fix, maintain, and stabilize the price of UT Hypertension Drugs;

j.   The duration and extent of the alleged contract, combination, or conspiracy;

k.   Whether such a contract, combination, or conspiracy is *per se* unlawful under the Sherman Act;

l.   The effect of the contract, combination and conspiracy on the prices of UT Hypertension Drugs; and

m.   The quantum of overcharges paid by the Classes in the aggregate.

519.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

520.   Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Fraudulent Concealment Tolling*

521.    The claims asserted in this complaint have been tolled as a matter of law as Defendants took affirmative steps to conceal the wrongful conduct alleged herein including, *inter alia*, UT utilizing CVC as a conduit and concealing such use under the guise of "donations" or "grants" to an "independent" co-payment assistance charity, as well as the efforts of UT, Smiths, and the Specialty Pharmacies to prevent generic competition.

### *Discovery Rule Tolling*

522.    Assignors and Class Members had no way of knowing about the Co-Payment Circumvention Enterprise until after UT disclosed the DOJ's investigation in their SEC form 10-Q for the period ending June 30, 2016 (published on July 28, 2016), even this disclosure was shrouded in secrecy with no mentionof the UT drugs affected or which PAP's the investigation involved.

523.    Defendants failed to disclose the Co-Payment Circumvention Enterprise. Rather, at all times before the public disclosure and the UT Settlement Agreement, CVC certified compliance with the OIG's requirements and UT certified compliance with the AKS and FCA when seeking payment for UT Hypertension Drugs from Assignors and Class Members. Accordingly, Assignors and Class Members did not have actual or constructive knowledge that they were defrauded and injured by the Co-Payment Circumvention Enterprise.

524.    Assignors and Class Members had no way of knowing about the Generic Prevention Scheme until at least April 2019 when Sandoz filed suit against UT. Accordingly, Assignors and Class Members did not have actual or constructive knowledge that they were injured by the Generic Prevention Scheme until that time.

525.    Plaintiffs, Assignors, and Class Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were participating in the

Co-Payment Circumvention Enterprise and Generic Prevention Scheme. Accordingly, Plaintiffs, Assignors, and Class Members did not know, and could not have known, that they had been defrauded and injured by the Co-Payment Circumvention Enterprise and the Generic Prevention Scheme.

526.   For these reasons, all applicable statutes of limitations are tolled by operation of the discovery rule with respect to Plaintiffs' claims alleged herein.

### *Continuing Violation Doctrine*

527.   This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs can recover for damages that they suffered during any applicable limitations period.

### *Equitable Estoppel*

528.   Defendants were under a continuous duty to disclose to Assignors and Class Members the existence and true nature of the Co-payment Circumvention Enterprise, including the subsequent obligations for payment triggered by Defendant's misconduct.

529.   The existence of Defendants' co-payment assistance scheme was a material fact, and Defendants concealed its existence and instead falsely represented that they were in compliance with federal regulations including the FCA and AKS.  When Defendants made thesemisrepresentations and concealed their co-payment assistance conspiracy scheme, they had knowledge of the facts surrounding the scheme's existence. Defendants concealed the co- payment assistance conspiracy scheme and made misrepresentations about it with the intention that Assignors and Class Members would rely on said misrepresentations and would pay for UT Hypertension Drugs. Defendants' concealment induced Assignors and Class Members to reasonably rely and act upon these misrepresentations and were misled into paying for UT Hypertension Drugs. *See Safe Env't of Am.,*

*Inc. v. Emps. Ins. of Wausau,* 278 F. Supp. 2d 121, 126–27 (D. Mass. 2003).

530.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action and all equitable principles of tolling should apply.

## CLAIMS FOR RELIEF

### COUNT I
### Civil Liability under 18 U.S.C. § 1964(c) for Violations of 18 U.S.C. § 1962(c)
### *Against UT, Charities, and Specialty Pharmacies*

531.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

532.    At all relevant times, UT, Charities, and Specialty Pharmacies have been "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this complaint in violation of 18 U.S.C. § 1962(c).

533.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

534.    The elements of a RICO claim under § 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### *Description of the Co-Payment Circumvention Enterprise*

535.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

536.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-factthat, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

537.     The Co-Payment Circumvention Enterprise is an association-in-fact enterprisewithin the meaning of 18 U.S.C. § 1961(4), consisting of UT, the Charities, and Specialty Pharmacies, including their employees and agents.

538.     The Co-Payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-payment Circumvention Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Enterprise.

539.     The Co-Payment Circumvention Enterprise had a common purpose that united its members. This purpose was to profit from the illegal kickbacks and referrals. The common purpose was accomplished by: (1) growing CVC's PAH fund and CVC's executive compensation and (2) by increasing the number of patients who had their drugs purchased by Assignors and Class Members, thereby increasing the amount of money UT made from the UT Hypertension Drugs. By funneling and steering people into CVC's PAH fund for the UT Hypertension Drugs, the Co-Payment Circumvention Enterprise increased UT's number of Medicare-covered "customers," thereby triggering Assignors' and Class Members' coverage obligations for these Medicare Advantage patients and eliminating price sensitivity to UT Hypertension Drugs. These two strands of the plan worked hand-in-hand and resulted in a vicious cycle that expanded profits for both CVC's officers and directors and UT—at the cost to Assignors, Class Members, and other MA Plans, and UT "customers."

540.     UT, the Charities, and Specialty Pharmacies each received substantial revenue from participating in the Co-Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have been in the absence of such Enterprise. Each portion of the Enterprise benefitted from the existence of the other parts.

541.     The Co-Payment Circumvention Enterprise has a systemic linkage because there are

contractual relationships, financial ties, and continuing coordination of activities between UT, the Charities, and Specialty Pharmacies.

542.     There were interpersonal relationships between those associated with the Co-Payment Circumvention Enterprise. This includes relationships: (1) among CVC's officers and directors and relationships among UT's officers, directors, principals, and agents; and (2) relationships between CVC and UT. This is evidenced by CVC sending UT the data and information UT used to evaluate how much profit it was making from donating money and directing "customers" to CVC. The OIG explicitly warned CVC not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and CVC certified its understanding and compliance with the OIG's warnings.  But CVC and UT participated in this conduct anyway. UT settled the DOJ's AKS and FCA claims for $210 million for this illegal conduct. This conduct shows that CVC and UT were communicating information important to their scheme through the mail and wires to profit illegally and that they had a relationship.

543.     The Co-Payment Circumvention Enterprise had the longevity sufficient to permit its associates to pursue the enterprise's purpose. It lasted for years, during which time its purposes were pursued. CVC grew its fund for the UT Hypertension Drugs as UT increased its annual "donations" to CVC. And CVC's officers and directors increased their annual compensation, as detailed in CVC's Form 990 Tax Filings. Moreover, UT insulated the price sensitivity of its Hypertension Drugs, as demonstrated by the 20.6% annual increase in the price of UT Hypertension Drugs. UT also increased the number of "customers" buying UT Hypertension Drugs, which allowed UT to increase its profits.

544.     UT carried out its business activities both with CVC and without CVC, including marketing and selling UT Hypertension Drugs to other entities besides CVC.

545.     Moreover, CVC carried out its business activities both with UT and without UT as evidenced by CVC's co-payment funding of other diseases besides hypertension.

*Conduct of the Enterprise's Affairs*

546.    UT, the Charities, and Specialty Pharmacies each conducted or participated in, either directly or indirectly, the conduct of the Co-Payment Circumvention Enterprise's affairs. UT, the Charities, and Specialty Pharmacies were associated with the Co-Payment Circumvention Enterprise and operated and managed the Co-Payment Circumvention Enterprise. Such participation included, but is not limited to: (1) CVC managing, collecting, and sharing data with UT so that UT could see its profit margin andreturns on its donations to the CVC PAH fund; (2) UT managing the finances, providing CVC with the "donations" necessary for the co-payments, so the payment obligations of Assignors and Class Members would be triggered; and (3) both CVC and UT steering and funneling patients to CVC's PAH fund.

547.    At all relevant times, UT, the Charities, and Specialty Pharmacies have been aware of the Co-Payment Circumvention Enterprises' conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

*Defendants' Pattern of Racketeering Activity*

548.    To carry out, or attempt to carry out, their scheme to defraud, UT, the Charities, and Specialty Pharmacies knowingly conducted or participated, directly or indirectly, in the affairs of the Co-Payment Circumvention Enterprise through a pattern of racketeering activity within the meaning of 18U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1952(a) (Travel Act), 18 U.S.C. § 1341 (mail fraud), and § 1343 (wire fraud).

549.    UT's, the Charities', and Specialty Pharmacies' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning

of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which UT, the Charities, and Specialty Pharmacies intended to defraud Assignors and Class Members.

550.    As set forth throughout this complaint, UT, the Charities, and Specialty Pharmacies were engaged in a scheme to defraud Medicare and MA Plans, including Assignors and Class Members. They funneled and steered patients into CVC's PAH fund for UT Hypertension Drugs, knowing Medicare, Assignors, and Class Members would ultimately bear the cost of the drugs. Defendants knew their scheme to funnel, steer, and refer violated the AKS and the FCA, and that they were transmitting fraudulent information through mail and wire communications.

551.    UT's, the Charities', and Specialty Pharmacies' use of the mails and wires to perpetuate their fraudulent Co-Payment Circumvention Enterprise involved thousands of communications which involved, among others, the following:

  a. Communications from UT and CVC to people steering them away from UT's manufacturer-sponsored free-drug fund and into CVC's PAH fund;

  b. Transmittal of "donations" by UT to CVC so that CVC could pay the co-payments of UT's "customers" in CVC's PAH fund;

  c. Submission of certifications by UT and CVC in which they claimed to be in compliance with federal law, including the AKS and FCA;

  d. Submissions of data from CVC to UT so that UT could determine how much money it was making from its "donations" to CVC and how much more money it could earn by increasing its "donations";

  e. Certifications by CVC that it would determine the eligibility according to a "uniform measure of financial need that is applied in a consistent manner" when in fact CVC emphasized patients taking UT Hypertension Drugs based on UT's bribes, not financial need;[32] and

  f. Causing False Claims, in violation of the FCA and AKS, to be submitted by pharmacies to Assignors and Class Members;

_____

[32] *See* CVC's Form 990 Filing, attached as **Exhibit H**.

552.     UT, the Charities, and Specialty Pharmacies violated the Travel Act by using the mail and wire facilities to commit, promote, manage, establish, and carry on their bribery scheme in violation of the laws of the United States, namely, the AKS. UT, the Charities, and Specialty Pharmacies further used the mail and wire facilities to distribute the proceeds of their bribery scheme. These Defendants committed more than two violations of the Travel Act to carry out their scheme.

553.     The predicate acts of mail and wire fraud had the same purpose; that is, to make money by growing CVC's PAH fund as large as possible so that CVC's officers and directors could justify increasing their compensation and so that UT could get as many "customers" as possible for its UT Hypertension Drugs at the expense of Assignors, Class Members, and other MA Plans. All of the predicate acts detailed above, including the certifications made by UT and CVC, as well as the wire communications in furtherance of their scheme, were for this purpose. If the certifications by UT to CMS had not been made, Assignors and Class Members would not have purchased UT's Hypertension Drugs. If CVC's certifications had not been made, CVC would not have been permitted to administer its PAH Fund and Assignors and Class Members would not have paid for the claims resulting from the unlawful conduct. The false certifications and contracts caused pharmacies to send over the mail and wires were done so UT could make larger "donations" to CVC's PAH fund and cause damage to Assignors and Class Members.

554.     These predicate acts allowed the continuance of the scheme to increase prescriptions and process for the UT Hypertension Drugs As a result, Assignors and Class Members paid increased claims for prescriptions where CVC paid the co-payment.

555.     UT, the Charities, and Specialty Pharmacies, including officers, directors, agents, and principals of both organizations, participated in all of the predicate acts. These individuals sent or caused to be sent all the fraudulent certifications and false contracts through the mails. And they are the ones who communicated among one another and others in furtherance of the scheme. This

113

includes, but is not limited to, Pamela R. Harris and her daughter Samantha Harris (Green), who increased their compensation every year as CVC took in more "donations."

556.    The victims of the predicate acts and the fraudulent scheme, Assignors, Class Members, Medicare, other Medicare part C and D organizations, and Medicare Advantage health plans, the patients who needed these drugs and paid more in co-payments for them, and the several states that contribute to Medicaid. The fraudulent scheme orchestrated by the Co-Payment Circumvention Enterprise injured multiple people and stakeholders in the United States' healthcare system, causing multiple distinct injuries.

557.    The acts of mail and wire fraud included transmission of fraudulent claims and the unlawful transmission of data and communications to further the racketeering scheme overperiod of at least five years involving harm to multiple parties.

558.    Additionally, CVC was involved in similar fraudulent schemes with other drug manufacturers. It was engaged in similar schemes with Jazz, Lundbeck, and Actelion, each of which resulted in settlements with the United States for violations of the AKS and FCA in 2018. Specifically, Jazz settled for $57 million, Lundbeck settled for $52.6 million, and Actelion settled for $360 million. CVC's multi-faceted fraud involved multiple victims and predicate acts and is the type of broad and persistent racketeering activity that RICO was intended to stop.

559.    The Co-Payment Circumvention Enterprise's fraudulent scheme and its predicate acts affected interstate commerce, distorting drug prices across several states.

560.    Moreover, the Co-Payment Circumvention Enterprise's fraudulent scheme and its predicate acts proximately caused injury to Assignors' and Class Members' business and property. Assignors' and Class Members' duty to purchase UT Hypertension Drugs was triggered by UT's, the Charities', and Specialty Pharmacies' illegal scheme. This proximately caused Assignors' and Class Members' injuries. UT's, Charities', and Specialty Pharmacies' predicate acts directly led to

Assignors and Class Members buying UT Hypertension Drugs for Assignors' and Class Members' enrollees in CVC's PAH fund. Defendants' scheme rendered the claims for the UT Hypertension Drugs unpayable and Assignors and Class Members would not have paid if Defendants had not concealed their scheme.

561.   Accordingly, UT's, the Charities', and Specialty Pharmacies' violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Assignors and Class Members, entitling Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

## COUNT II
### Civil Liability Under 18 U.S.C. § 1964(c) for Violations of 18 U.S.C. § 1962(d)
### *Against UT, Charities, and Specialty Pharmacies*

562.   Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

563.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

564.   UT, Charities, and Specialty Pharmacies violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-Payment Circumvention Enterprise described previously through a pattern of racketeering activity.

565.   UT knowingly agreed with CVC that UT would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that UT performed were steering people away from its manufacturer-sponsored free-drug fund and into CVC's PAH fund. UT also provided CVC with "donations" so that CVC could pay the co-payments of UT's "customers" in CVC's PAH fund. UT also sent certifications over the interstate mails and wires claiming it was in compliance with federal law,

115

including the AKS and FCA. UT also used the data CVC sent it, in violation of the AKS and FCA, to determine how much money it was making from its "donations" to CVC and how much *more* money it could make by increasing its "donations." Indeed, this exchange of data shows that UT and CVC were not engaged in parallel conduct but were working together and had a meeting of the minds that they could both profit from the Co-Payment Circumvention Enterprise. The shared data showed how much money UT made the prior year before from its "donations" to CVC and how much more it could make by increasing its "donations." It thus set out a roadmap of illegal activities and profits.

566.    Further, CVC knowingly agreed with UT that CVC would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that CVC performed were steering people into its CVC PAH fund. CVC also sent certifications over the interstate mails and wires claiming it was in compliance with federal law, including the AKS and FCA. CVC also sent UT data, in violation of the AKS and FCA, so UT could see how much money it was making from its "donations" to CVC and how much *more* money it could make by increasing its "donations." Indeed, this sharing of data shows that UT and CVC were not engaged in parallel conduct but were working together and had a meeting of the minds that they could both profit from the Co-Payment Circumvention Enterprise. CVC knew that the more money it accepted in "donations" from UT, the more money CVC could justify paying its officers and directors in compensation. By illegally giving UT this data, CVC was soliciting greater contributions.

567.    Moreover, UT and CVC knowingly agreed to perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. UT steered people towards CVC's co-payment assistance funds by using CVC data to ensure UT could verify that its "donations" provided co-pays for UT Hypertension Drugs. UT and CVC caused false certifications to be sent over the interstate mail and wire facilities claiming they were in

compliance with federal law, including the AKS and FCA. CVC sent UT data, in violation of the AKS and FCA, so that UT could see how much money it was making from its "donations" to CVC, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Defendants did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-Payment Circumvention Enterprise. UT knew that if it provided more "donations," CVC would provide more co-pay assistance, thereby increasing UT's profits. Thus, by illegally providing data to UT, CVC managed to increase its own profits—as well as UT's profits.

568.    UT knowingly agreed with CVC that one or both of them would commit at least two instances of at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). UT had actual or constructive knowledge that CVC had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer people to particular drugs. In short, UT knew that CVC had certified that it would abide by the AKS and FCA. UT knew that the scheme it was engaged in or was going to engage in was going to make all these certifications false (as well as the 2015 certifications). It also knew that each time a pharmacy filled a prescription for someone in CVC's PAH fund, any certifications the pharmacist made that he or she would abide by federal law would be false. UT also knew that any certifications it made to HHS or the Government about its compliance with federal law would be false.

569.    CVC knowingly agreed with UT that one or both of them would commit at least two instances of at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). CVC knew it had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer people to particular drugs. In short, CVC knew it had certified that it would abide by federal

law and the FCA, and it knew that the scheme it was engaged in or was going to engage in was going to make all these certifications false (as well as its 2015 certifications). It also knew that each time a pharmacy filled a prescription for someone in its PAH Drug fund, any certifications the pharmacist made that he or she would abide by federal law would be false. CVC also knew that any certifications UT made to HHS or the Government about UT's compliance with federal law would be false.

570.    And both UT and CVC knew that any communications they had over the telephone, e-mail, or text message in furtherance of the scheme would be predicate acts.

571.    In short, both UT and CVC agreed to pursue the same objective of profiting illegally from the Co-Payment Circumvention Enterprise. They agreed to divide the work of accomplishing this objective. UT would make the "donations"; CVC would provide data; they would both steer clients and make false certifications.  Both UT and CVC intended to further this endeavor, which, as described above, when completed, amounted to a violation of 18 U.S.C. § 1962(c) that proximately and directly caused injury to Assignors and Class Members.

572.    Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d).

## COUNT III
### Monopolization in Violation of Section 2 of the Sherman Act
### *Against UT*

573.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

574.    UT knowingly and willfully engaged in a course of conduct designed to prevent generic manufacturers from entering the market, and unlawfully extend its monopoly power.

575.    UT intentionally and improperly maintained its monopoly power with respect to Remodulin in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

576.    UT's monopoly power was maintained through anticompetitive exclusionary tactics, and not from growth or development resulting from a superior product, business acumen, or historic accident. Because of this unlawful maintenance of monopoly power, Assignors and Class Members paid artificially inflated prices for Remodulin.

577.    Assignors and Class Members have been injured in its business or property by reason of UT's antitrust violations. Its injury consists of having paid and continuing to pay higher prices for Remodulin between 2011 and the present. Such overcharges are the type of injury the antitrust laws were designed to prevent and flows from that which makes UT's acts unlawful.

578.    Even after generic competition begins, Assignors and Class Members will continue to pay supra-competitive prices for generic versions of Remodulin until the market achieves equilibrium.

579.    At all relevant times, UT possessed substantial market power (i.e., monopoly power) in the relevant market. UT possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

580.    The Co-Payment Scheme and Generic Scheme amounts to anticompetitive and predatory conduct.

581.    By eliminating price sensitivity, the Co-Payment Scheme permitted UT to abuse its illegal monopoly power to inflate prices and ensure that payments, at Assignors' and Class Members' expense, were still made.

582.    The Generic Scheme maintained UT's monopoly power in the relevant market by excluding competition and/or erecting market barriers to prevent competition from entering the market.

583.    UT willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen.

584.    It was UT's conscious objective to further its dominance in the relevant market by and through the overarching anticompetitive scheme.

585.    UT's scheme harmed competition. To the extent UT is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for UT's actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects. Even if there were some conceivable such justification that UT were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose

586.    As a direct and proximate result of UT's illegal and monopolistic conduct, Assignors and Class Members were injured.

587.    Plaintiffs, by assignment, seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for purchases of Remodulin from at least 2011 through the present.

<u>**COUNT IV**</u>
**Attempted Monopolization in Violation of Section 2 of the Sherman Act**
*Against UT*

588.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this Complaint as if fully set forth herein.

589.    UT knowingly and willfully engaged in a course of conduct designed to prevent generic manufacturers from entering the market, and unlawfully extend its monopoly power.

590.    UT knowingly and willfully engaged in predatory and anticompetitive conduct with intent to monopolize the relevant market.

591.    The Co-Payment Scheme and Generic Scheme amounts to predatory and anticompetitive conduct.

592.    The Co-Payment scheme permitted UT to raise Remodulin prices to supra-competitive levels and ensure payment would continue.

593.    The Generic Scheme ensured UT would maintain its monopoly power over the

relevant market by excluding competition and/or erecting market barriers preventing competitors from entering the relevant market.

594.    As a result of the predatory and anticompetitive conduct, UT, aided by the remaining Defendants, achieved and maintained monopoly power.

595.    Assignors and Class Members have been injured in its business or property by reason of UT's antitrust violations. Its injuries consist of having paid and continuing to pay higher prices for Remodulin between 2011 and the present. Such overcharges are the type of injury the antitrust laws were designed to prevent and flows from that which makes UT's acts unlawful.

596.    Even after generic competition begins, Assignors and Class Members will continue to pay supra-competitive prices for generic versions of Remodulin until the market achieves equilibrium.

597.    At all relevant times, UT possessed substantial market power in the relevant market. UT possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

598.    It was UT's conscious objective to further its dominance in the relevant market by and through its anticompetitive and predatory conduct.

599.    UT's anticompetitive and predatory conduct harmed competition. To the extent UT is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for UT's actions comprising the anticompetitive and predatory conduct that outweighs the harmful effects. Even if there were some conceivable justification, UT's conduct is and was broader than necessary to achieve such a purpose.

600.    As a direct and proximate result of UT's anticompetitive and predatory conduct, Assignors and Class Members were injured.

601.    Plaintiffs, by assignment, seek treble damages under Section 4 of the Clayton Act,

15 U.S.C. § 15, for purchases of Remodulin from at least 2011 through the present.

<u>**COUNT V**</u>
**Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act**
***Against All Defendants***

602.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

603.    Defendants deliberately acted in concert with the specific intent of achieving and/or maintaining a UT's monopoly in the relevant market.

604.    In furtherance of Defendants' goal to achieve and/or maintain UT's monopoly in the relevant market, each Defendant perpetrated multiple overt acts.

605.    Defendants entered into separate exclusivity agreements with the intent to exclude actual and potential competitors from the relevant market.

606.     Defendants entered into separate exclusivity agreements with the intent to maintain UT's substantial market power in the relevant markets.

607.    Through the overarching scheme, Defendants conspired to maintain UT's monopoly power in the relevant market to block and delay market entry of generic versions of Remodulin.

608.    As intended, Defendants' conspiratorial scheme permitted UT to raise prices and control output in the relevant market. As intended, Defendants utilized their unlawful monopoly power to inflate prices.

609.    The Schemes amount to predatory and anticompetitive conduct.

610.    By removing price sensitivity, the Co-Payment Scheme permitted Defendants to maintain and inflate Remodulin to supra-competitive prices while ensuring the continuation of payments.

611.    The Generic Scheme ensured UT would maintain its monopoly power over the relevant market by excluding competition and/or erect market barriers to prevent competitors from

entering the relevant market.

612.    As a direct result, Assignors and Class Members were compelled to pay, and did pay, artificially inflated prices.

613.    Defendants knowingly and intentionally conspired to maintain and enhance UT's monopoly power in the relevant market.

614.    Defendants specifically intended that their conspiracy would maintain UT's monopoly power in the relevant market.

615.    As a direct and proximate result of Defendants' concerted conduct, Assignors and Class Members have suffered antitrust injury as alleged herein.

616.    Plaintiffs, by assignment, seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for purchases of Remodulin from at least 2011 through the present.

<u>**COUNT VI**</u>
**Restraint of Trade in Violation of Section 1 of the Sherman Act**
***Against All Defendants***

617.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

618.    At all relevant times, UT possessed substantial market power.

619.    Defendants entered into a contract, combination, or conspiracy that unreasonably restrained trade, that affected interstate or foreign commerce and caused antitrust injuries and damages.

620.    Defendants colluded to exclude and/or prevent entry of generics into the relevant market.

621.    As of the date of filing, PAH patients who were prescribed subcutaneous treprostinil injections received their Remodulin injections only through the CADD-MS 3 pump, which was manufactured exclusively by Smiths

622.    As of the date of filing, Smiths manufactured the only FDA-approved cartridges to use the CADD-MS 3 pump for subcutaneous treprostinil injections.

623.    Smiths and UT entered into separate exclusive agreements to ensure all pumps and cartridges would be exclusively reserved for the administration of UT's Remodulin.

624.    Smiths and UT then colluded with Specialty Pharmacies to restrict the sale of cartridges to Remodulin users only.

625.    As intended, these exclusive agreements resulted in anticompetitive market barriers.

626.    The exclusivity agreements gave Defendants complete control over the price and product output in the relevant market and stifled competition by artificially restricting the number of alternatives in the relevant market.

627.     But-for the exclusivity agreements, Assignors and Class Members would have paid less for delayed/restricted generics or alternatives by substituting purchases of less-expensive generics and alternatives for the more expensive branded Remodulin.

628.    Defendants' unlawful conduct and overarching scheme deprived Assignors and Class Members of the benefits of competition that the antitrust laws were designed to ensure.

629.    During the relevant period, Assignors and Class Members purchased substantial amounts of Remodulin. As a result of Defendants' illegal scheme, Assignors and Class Members were compelled to pay, and did pay, artificially inflated prices. This injury is of the type that antitrust laws were designed to prevent and flows directly from Defendants' unlawful acts.

630.    The Co-Payment Scheme and Generic Scheme amounts to predatory and anticompetitive conduct.

631.    The Co-Payment Scheme eliminated price sensitivity, ensuring payments would continue even after inflating Remodulin to supra-competitive prices.

124

632.     The Generic Scheme ensured UT would maintain its monopoly power over the relevant market by excluding competition and/or erecting market barriers to prevent competitors from entering the relevant market.

633.     As a consequence of Defendants' anticompetitive and predatory conduct, Assignors and Class Members have sustained substantial losses and damage to their business and property in the form of overcharges.

634.     Defendants' scheme harmed competition. To the extent Defendants is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for Defendants' actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects. Even if there were some conceivable such justification that Defendants were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose

635.     Plaintiffs, by assignment, seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for purchases of Remodulin from at least 2011 through the present.

## COUNT VII
### Monopolization in Violation of State Antitrust Laws
### *Against UT*

636.     Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

637.     At all relevant times, UT possessed substantial market power (i.e., monopoly power) in the relevant market. UT possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

638.     Through the overarching anticompetitive scheme alleged herein, and with the aid of CVC, Smiths, and the Specialty Pharmacies, UT willfully maintained its monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff's Assignors and the Class Members thereby.

639.    The Co-Payment Scheme and Generic Scheme amounts to predatory and anticompetitive conduct.

640.    The Co-Payment Scheme further ensured payments for UT Hypertension Drugs would continue even at inflated prices.

641.    The Generic Scheme ensured UT would maintain its monopoly power over the relevant market by excluding competition and/or erecting market barriers to prevent competitors from entering the market.

642.    It was UT's conscious objective to further its dominance in the relevant market by and through the overarching anticompetitive scheme.

643.    UT's scheme harmed competition. To the extent UT is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for UT's actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects. Even if there were some conceivable such justification that UT were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose

644.    As a direct and proximate result of UT's illegal and monopolistic conduct, Assignors and Class Members were injured.

645.    By engaging in the foregoing anticompetitive conduct, UT violated the following state laws:

a.    Cal. Bus. Code §§ 16700 *et seq*., and Cal. Bus. Code §§ 17200 *et seq*., with respect to payments in California by Assignors and Class Members;[33]

b.    Conn. Gen. Stat. §§ 35-24 *et seq*., and Conn. Gen. Stat. §§ 42-110 *et seq*., with respect to payments in Connecticut by Assignors and Class Members;[34]

---

[33] Cal. Bus. & Prof. Code § 16700 et seq. is modeled after the Sherman Act and the same analysis applies. *Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1046 (N.D. Cal. 2014)

[34] The Connecticut Antitrust Act is modeled after the Sherman Act and Courts are instructed to utilize

    c.    Fla. Stat. §§ 542 *et seq*., with respect to payments in Florida by Assignors and Class Members;[35]

    d.    Mass. Gen. Laws Ch. 93, §§ *et seq*., with respect to payments in Massachusetts by Assignors and Class Members, which paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;[36]

    e.    Mich. Comp. Laws §§ 445.771 *et seq*., with respect to payments in Michigan by Assignors and Class Members;[37]

    f.    N.Y. Gen. Bus. Law §§ 340 *et seq*., with respect to payments in New York by Assignors and Class Members;[38]

    g.    Ohio Rev. Code §§ 1331 *et seq*., with respect to payments in Ohio by Assignors and Class Members;[39]

    h.    P.R. Laws Ann. tit. 10, §§ 251 *et seq*., with respect to payments in Puerto Rico by Assignors and Class Members;[40] and

    i.    Wis. Stat. §§ 133.03 *et seq*., with respect to payments in Wisconsin by Assignors and Class Members.[41]

646.    Each of the above referenced statutes allows for Plaintiffs to collect their reasonable attorneys' fees and costs associated with the prosecution of this Action.

---

federal analysis for the state antitrust act. *State of Conn. v. Levi Strauss & Co.*, 471 F. Supp. 363, 368 (D. Conn. 1979).

[35] Florida antitrust claims utilize the same analysis as Sherman Act claims. *Vitacost.com, Inc. v. Gaia Herbs, Inc.*, No. 06-81141-CIV, 2007 WL 951768, at *2 (S.D. Fla. Mar. 28, 2007).

[36] Claims brought under Mass. Chapter 93A § 11 shall be construed under Massachusetts antitrust law, which shall be interpreted in harmony with federal antitrust law. *Winters v. Ocean Spray Cranberries, Inc.*, 296 F. Supp. 3d 311, 325 (D. Mass. 2017).

[37] The Michigan antitrust statute is patterned after the Sherman Act. *Midwest Auto Auction, Inc. v. McNeal*, No. 11-14562, 2012 WL 3478647, at *5 (E.D. Mich. Aug. 14, 2012)

[38] The Donnelly Act should generally be construed in the light of federal antitrust law. *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335, 520 N.E.2d 535, 539 (1988)

[39] Ohio antitrust law is modeled after the Sherman Act and is interpreted consistently with federal antitrust statutes. *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1117 (N.D. Ohio 2004)

[40] Puerto Rico's antitrust laws mirror the federal antitrust statutes. *Ramallo Bros. Printing v. El Dia, Inc.*, 392 F. Supp. 2d 118, 143 (D.P.R. 2005).

[41] Wis. Stat.§133-.03(1)-(2) are analogs to the Sherman Act. *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2019 WL 4796528, at *16 (W.D. Mo. Aug. 21, 2019).

## COUNT VIII
### Attempted Monopolization in Violation of State Antitrust Laws
### *Against UT*

647.   Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

648.   At all relevant times, UT possessed substantial market power (i.e., monopoly power) in the relevant market. UT possessed the power to control prices and exclude competitors from the relevant market.

649.   Through the overarching anticompetitive scheme alleged herein, and with the aid of CVC and Smiths, UT willfully maintained its monopoly power in the relevant market using anticompetitive exclusionary/restrictive conduct, rather than by means of greater business acumen, and injured Assignors and Class Members thereby.

650.   It was UT's conscious objective to further its dominance in the relevant market by and through the overarching anticompetitive scheme.

651.   UT's scheme harmed competition. To the extent UT is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for UT's actions comprising the anticompetitive scheme that outweighs the scheme's harmful effects. Even if there were some conceivable such justification that UT were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose.

652.   Defendants Co-Payment Scheme and Generic Scheme amounts to predatory and anticompetitive conduct.

653.   By eliminating price sensitivity, the Co-Payment Scheme ensured that payment for Remodulin would continue even at supra-competitive prices.

654.   The Generic Scheme ensured UT would maintain its monopoly power in the relevant market by excluding competition and/or erecting market barriers to prevent competitors from

128

entering the relevant market.

655.     As a direct and proximate result of UT's illegal and monopolistic conduct, Assignors and Class Members were injured.

656.     By engaging in the foregoing anticompetitive conduct, UT violated the following state laws:

a.     Cal. Bus. Code §§ 16700 *et seq*., and Cal. Bus. Code §§ 17200 *et seq*., with respect to payments in California by Assignors and Class Members;

b.     Conn. Gen. Stat. §§ 35-24 *et seq*., and Conn. Gen. Stat. §§ 42-110 *et seq*., with respect to payments in Connecticut by Assignors and Class Members;

c.     Fla. Stat. §§ 542 *et seq*., with respect to payments in Florida by Assignors and Class Members;

d.     Mass. Gen. Laws Ch. §§ 93, *et seq*., with respect to payments in Massachusetts by Assignors and Class Members, who paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;

e.     Mich. Comp. Laws §§ 445.771 *et seq*., with respect to payments in Michigan by Assignors and Class Members;

f.     N.Y. Gen. Bus. Law §§ 340 *et seq*., with respect to payments in New York by Assignors and Class Members;

g.     Ohio Rev. Code §§ 1331 *et seq*., with respect to payments in Ohio by Assignors and Class Members;

h.     P.R. Laws Ann. tit. 10, §§ 251 *et seq*., with respect to payments in Puerto Rico by Assignors and Class Members; and

i.     Wis. Stat. §§ 133.03 *et seq*., with respect to payments in Wisconsin by Assignors and Class Members.

657.     Each of the above referenced statutes allows for Plaintiffs to collect their reasonable attorneys' fees and costs associated with the prosecution of this Action.

<u>**COUNT IX**</u>
**Conspiracy to Monopolize in Violation of State Antitrust Laws**
***Against All Defendants***

658.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

659.    Defendants deliberately acted in concert with the specific intent of achieving and/or maintaining a UT's monopoly in the relevant market.

660.    In furtherance of Defendants goal to achieve and/or maintain UT's monopoly in the relevant market, each Defendant perpetrated multiple overt acts.

661.    Defendants entered into separate exclusivity agreements with the intent to exclude actual and potential competitors from the relevant market.

662.    Defendants entered into separate exclusivity agreements with the intent to maintain UT's substantial market power in the relevant markets.

663.    Through the overarching scheme, Defendants conspired to maintain UT's monopoly power in the relevant market to block and delay market entry of generic versions of Remodulin.

664.    As intended, Defendants' conspiratorial scheme permitted UT raise prices and control output in the relevant market. As intended, Defendants utilized their unlawful monopoly power to inflate prices.

665.    As a direct result, Assignors and Class Members were compelled to pay, and did pay, artificially inflated prices.

666.    Defendants knowingly and intentionally conspired to maintain and enhance UT's monopoly power in the relevant market.

667.    Defendants specifically intended that their conspiracy would maintain UT's monopoly power in the relevant market.

668.    The Co-Payment Scheme and Generic Scheme amount to predatory and anticompetitive conduct.

669.    By elimination price sensitivity, the Co-Payment Scheme ensured payment for Remodulin would continue even at supra-competitive prices.

670.    The Generic Scheme ensured UT would maintain its monopoly power in the relevant market by excluding competition and/or erecting market barriers to prevent competitors from entering the market.

671.    As a direct and proximate result of Defendants' concerted conduct, Assignors and Class Members have suffered antitrust injury as alleged herein.

672.    By engaging in the foregoing anticompetitive conduct, Defendants violated the following state laws:

    a.      Cal. Bus. Code §§ 16700 *et seq*., and Cal. Bus. Code §§ 17200 *et seq*., with respect to payments in California by Assignors and Class Members;

    b.      Conn. Gen. Stat. §§ 35-24 *et seq*., and Conn. Gen. Stat. §§ 42-110 *et seq*., with respect to payments in Connecticut by Assignors and Class Members;

    c.      Fla. Stat. §§ 542 *et seq*., with respect to payments in Florida by Assignors and Class Members;

    d.      Mass. Gen. Laws Ch. §§ 93, *et seq*., with respect to payments in Massachusetts by Assignors and Class Members, who paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;

    e.      Mich. Comp. Laws §§ 445.771 *et seq*., with respect to payments in Michigan by Assignors and Class Members;

    f.      N.Y. Gen. Bus. Law §§ 340 *et seq*., with respect to payments in New York by Assignors and Class Members;

    g.      Ohio Rev. Code §§ 1331 *et seq*., with respect to payments in Ohio by Assignors and Class Members;

    h.      P.R. Laws Ann. tit. 10, §§ 251 *et seq*., with respect to payments in Puerto Rico by Assignors and Class Members; and

i. Wis. Stat. §§ 133.03 *et seq*., with respect to payments in Wisconsin by Assignors and Class Members.

673. Each of the above referenced statutes allows for Plaintiffs to collect their reasonable attorneys' fees and costs associated with the prosecution of this Action.

## COUNT X
### Restraint of Trade in Violation of State Antitrust Laws
### *Against All Defendants*

674. Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

675. Defendants entered into a contract, combination, or conspiracy that unreasonably restrained trade, that affected interstate or foreign commerce and caused antitrust injuries and damages.

676. Defendants colluded to exclude and/or prevent entry of generics into the relevant market.

677. As of the date of filing, PAH patients who were prescribed subcutaneous treprostinil injections received their Remodulin injections only through the CADD-MS 3 pump, which was manufactured exclusively by Smiths

678. As of the date of filing, Smiths manufactured the only FDA-approved cartridges to use the CADD-MS 3 pump for subcutaneous treprostinil injections.

679. Smiths and UT entered into separate exclusive agreements to ensure all pumps and cartridges would be exclusively reserved for the administration of UT's Remodulin.

680. Smiths and UT then colluded with Specialty Pharmacies to restrict the sale of cartridges to Remodulin users only.

681. As intended, these exclusive agreements resulted in anticompetitive market barriers.

682.    The exclusivity agreements gave Defendants complete control over the price and product output in the relevant market and stifled competition by artificially restricting the number of alternatives in the relevant market.

683.     But for the exclusivity agreements, Assignors and Class Members would have paid less for delayed/restricted generics or alternatives by substituting purchases of less-expensive generics and alternatives for the more expensive branded Remodulin.

684.    Defendants' unlawful conduct and overarching scheme deprived Assignors and Class Members of the benefits of competition that the antitrust laws were designed to ensure.

685.    During the relevant period, Assignors and Class Members purchased substantial amounts of Remodulin. As a result of Defendants' illegal scheme, Assignors and Class Members were compelled to pay, and did pay, artificially inflated prices. This injury is of the type that antitrust laws were designed to prevent and flows directly from Defendants' unlawful acts.

686.    The Co-Payment Scheme and Generic Scheme amounts to predatory and anticompetitive conduct.

687.    By eliminating price sensitivity, the Co-Payment Scheme ensured payment for Remodulin would continue even at supra-competitive prices.

688.    The Generic Scheme ensured UT would maintain its monopoly power over the relevant market by excluding competition and/or erecting market barriers to prevent competitors from entering the market.

689.    As a consequence of Defendants' anticompetitive and predatory conduct, Assignors and Class Members have sustained substantial losses and damage to their business and property in the form of overcharges.

690.    By engaging in the foregoing conduct, Defendants have intentionally and wrongfully engaged in the restraint of trade in violate of the following state laws:

a.  Cal. Bus. Code §§ 16700 *et seq*., and Cal. Bus. Code §§ 17200 *et seq*., with respect to payments in California by Assignors and Class Members;

b.  Conn. Gen. Stat. §§ 35-24 *et seq*., and Conn. Gen. Stat. §§ 42-110 *et seq*., with respect to payments in Connecticut by Assignors and Class Members;

c.  Fla. Stat. §§ 542 *et seq*., with respect to payments in Florida by Assignors and Class Members;

d.  Mass. Gen. Laws Ch. 93, §§ *et seq*., with respect to payments in Massachusetts by Assignors and Class Members, who paid substantially higher prices for the product in transactions occurring substantially within Massachusetts;

e.  Mich. Comp. Laws §§ 445.771 *et seq*., with respect to payments in Michigan by Assignors and Class Members;

f.  N.Y. Gen. Bus. Law §§ 340 *et seq*., with respect to payments in New York by Assignors and Class Members;

g.  Ohio Rev. Code §§ 1331 *et seq*., with respect to payments in Ohio by Assignors and Class Members;

h.  P.R. Laws Ann. tit. 10, §§ 251 *et seq*., with respect to payments in Puerto Rico by Assignors and Class Members; and

i.  Wis. Stat. §§ 133.03 *et seq*., with respect to payments in Wisconsin by Assignors and Class Members.

691.  Each of the above referenced statutes allows for Plaintiffs to collect their reasonable attorneys' fees and costs associated with the prosecution of this Action.

## COUNT XI
### Violations of State Consumer Protection Laws
### *Against All Defendants*

692.  Plaintiffs re-allege and incorporate by reference paragraphs 1- 530 of this complaint as if fully set forth herein.

693.  Defendants engaged in unfair, false, unconscionable, or deceptive acts or practices in violation of various state consumer protection laws, as set forth below.

694.  Defendants directly misrepresented to Assignors and Class Members that they were complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

695.    Defendants intended payers such as Assignors and Class Members to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose was to procure payment for UT Hypertension Drugs. These representations and certifications were made in an effort by Defendants to have the consuming public use the CVC PAH fund and were addressed to the market generally by having improper and unnecessary prescriptions for UT Hypertension Drugs paid for by Medicare, Assignors, and Class Members. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare.

696.    The Co-Payment Scheme allowed Defendants to eliminate price sensitivity thereby ensuring continued payment of UT Hypertension Drugs at supra-competitive prices.

697.    The Generic Scheme ensured UT would maintain its monopoly power by excluding competition from the relevant market and/or erecting market barriers to prevent competitors from entering the relevant market.

698.    Assignors and Class Members relied on these misrepresentations to their detriment, which were material to their decision to pay for UT Hypertension Drugs.

699.    Assignors and Class Members were directly and proximately injured by Defendants' conduct, suffered an injury in fact, and suffered actual, ascertainable damages.

700.    Assignors and Class Members would not have reimbursed for nearly as much of the UT Hypertension Drugs as they did, had Defendants refrained from engineering the false representations or otherwise disclosed its schemes.

701.    Accordingly, Plaintiffs and other similarly situated payers in the Class in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and cost of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

## California Unfair Competition Law
### (Cal. Bus. Code §§ 17000; 17200, *et seq*.)

702.    Defendants' conduct occurred in "trade" or "commerce" within the meaning of Cal. Bus. Code Article 2 §§ 17020-17031.

703.    The California Unfair Competition Law ("California UCL") provides that "Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty." Cal. Bus. Code §17206(a).

704.    Defendants' conduct constitutes "unfair or deceptive" acts in violation of the California UCL.

705.    Defendants' illegal conduct substantially affected California trade and consumers.

706.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for UT Hypertension Drugs here.

707.    Defendants' conduct alleged in this complaint occurred throughout the United States, including the State of California.

708.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of California.

709.    Plaintiffs are entitled to recover their actual damages.

710.    Plaintiffs also seek punitive damages, attorney fees, and any other just and proper relief under the California UCL.

## Connecticut Unfair Trade Practices Act
### (Conn. Gen. Stat. §§ 42-110a *et seq*.)

711.    Plaintiffs, Assignors, Class Members, and Defendants are "persons" within the meaning of Connecticut Unfair Trade Practices Act ("Connecticut UTPA"). Conn. Gen. Stat. Ann.

§ 42-110a(3).

712.   Defendants challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

713.   The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

714.   Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.

715.   Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

716.   Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

717.   Defendants' conduct alleged in this complaint occurred throughout the United States including in the State of Connecticut.

718.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Connecticut.

719.   Simultaneously with the filing of the original complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. § 42-110g.

720.   Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

## Florida Deceptive & Unfair Trade Practices Act
### (Fla. Stat. §§ 501.201 *et seq.*)

721.   Plaintiffs, Assignors, and Class Members are "interested persons" and "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. § 501.203(6)-(7).

722.   Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

723.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Sta. § 501.204(1).

724.   Defendants' conduct constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

725.   Defendants knew or should have known that their conduct was in violation of FDUTPA.

726.   Defendants' illegal conduct substantially affected Florida commerce and consumers.

727.   Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

728.   Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Florida.

729.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Florida.

730. Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs pursuant to Fla. Stat. §§ 501.211(2) and 501.2105(1).

## Massachusetts Regulation of Business Practice & Consumer Protection Act
### (Mass. Gen. Laws ch. 93A, §§ 1 *et seq.*)

731. Plaintiffs, Assignors, Class Members, and Defendants are "persons" within the meaning of the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA"). Mass. Gen. Laws ch. 93A, § 1(a).

732. Defendants are engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

733. The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws ch. 93A, § 2(a).

734. Defendants conduct constitutes "unfair or deceptive acts or practices" under Massachusetts CPA.

735. Defendants knew or should have known that their conduct was in violation of Massachusetts CPA.

736. Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

737. Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

738. Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Massachusetts.

139

739.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of UT Hypertension Drugs in the State of Massachusetts.

740.   Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws ch. 93A, §§ 9 and 11.

741.   Plaintiffs also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA.

## Michigan Consumer Protection Act
### (Mich. Comp. Laws §§ 445.901 *et seq.*)

742.   Defendants' conduct occurred in "trade" or "commerce" within the meaning of Michigan Consumer Protection Act ("CPA"). Mich. Comp. Laws § 445.902(g).

743.   Defendants are "persons" within the meaning of Michigan CPA. Mich. Comp. Laws §445.902(d).

744.   The Michigan CPA provides that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce are unlawful." Mich. Comp. Laws § 445.903(1).

745.   Defendants' conduct constitutes "unfair, unconscionable, or deceptive" methods, acts, or practices under the Michigan CPA.

746.   Defendants' conduct substantially affected Michigan trade or commerce, and consumers.

747.   Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair, unconscionable, or deceptive

practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for UT Hypertension Drugs herein.

748.   Defendants' conduct alleged in this complaint occurred throughout the United States, including the State of Michigan.

749.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of UT Hypertension Drugs in the State of Michigan.

750.   Plaintiffs are entitled to recover their actual damages and reasonable attorney fees pursuant to Mich. Comp. Laws § 445.911(2)–(3).

**New York General Business Law**
**(N.Y. Gen. Bus. Law §§ 349, *et seq.*)**

751.   The New York General Business Laws ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen.  Bus. Law § 349.

752.   Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

753.   Defendants' illegal conduct substantially affected New York commerce and consumers.

754.   Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

755.   Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of New York.

756.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of New York.

141

757.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available pursuant to N.Y. Gen. Bus. Law § 349.

### Ohio Consumer Protections Laws
**(Ohio Rev. Code Ann. §§ 1345, *et seq.*, 4165, *et seq.*)**

758.    Defendants, Assignors, and the Class Members are "persons" within the meaning of the Ohio CPL. Ohio Rev. Code Ann. §1345.01; §4165.01.

759.    Defendants are "suppliers" within the meaning of Ohio CPL. Ohio Rev. Code Ann. §1345.01

760.    Defendants engaged in trade or commerce within the meaning of Ohio CPL.

761.    Ohio CPL specifies "No supplier shall commit an unfair or deceptive act or practice." Ohio Rev. Code Ann. §1345.02.

762.    Ohio CPL declares it unlawful for any person to engage in a deceptive practice in the course of the person's business, vocation, or occupation. Ohio Rev. Code Ann. §4165.02.

763.    Defendants' conduct constituted "unfair, deceptive acts or practices" in violation of Ohio CPL.

764.    Defendants knew or should have known that their conduct was in violation of Ohio CPL.

765.    Defendants' illegal conduct substantially affected Ohio commerce and consumers.

766.    Assignors and the Class Members relied upon Defendants' material misrepresentations regarding the certifications, their compliance with federal and state laws,

including laws against bribery, kickbacks, and false claims to the government.

767.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for UT Hypertension Drugs described herein.

768.    Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Ohio.

769.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of UT Hypertension Drugs in the State of Ohio.

770.    Plaintiffs seek actual economic losses, punitive damages, attorney's fees, and any other just and proper relief available pursuant to Ohio CPL.

## Pennsylvania Unfair Trade & Consumer Protection Law
### (73 Pa. Cons. Stat. §§ 201-1 *et seq.*)

771.    Plaintiffs, Assignors, Class Members, and Defendants are "persons" within the meaning of the Pennsylvania Unfair Trade and Consumer Protection Law ("Pennsylvania UTPA"). 73 Pa. Cons. Stat. § 201-2(2).

772.    Defendants are engaged in "trade or commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

773.    The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices," including "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

774.    Defendants' conduct constituted "unfair or deceptive acts or practices" in violation of the Pennsylvania UTPA.

775.    Defendants knew or should have known that their conduct was in violation of the Pennsylvania UTPA.

776.    Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

777.    Assignors and Class Members relied upon the Defendants' material misrepresentations regarding the certifications of their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

778.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

779.    Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Pennsylvania.

780.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Pennsylvania.

781.    Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available pursuant to 73 Pa. Cons. Stat. § 201-9.2(a).

## South Carolina Unfair Trade Practices Act
### (S.C. Code Ann. §§ 39-10 *et seq.*)

782.    Plaintiffs, Assignors, Class Members, and Defendants are "person[s]" under the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"). S.C. Code Ann. § 39-5-10(a).

783.    Defendants are engaged in "trade or commerce" as defined by the South Carolina UTPA. S.C. Code Ann. § 39-5-10(b).

784.     The South Carolina UTPA makes unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. S.C. Code Ann. § 39-5-20.

785.     Defendants' conduct constitutes "unfair or deceptive acts or practices" in violation of the South Carolina UTPA. Defendants knew or should have known that their conduct was in violation of the South Carolina UTPA.

786.     Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

787.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

788.     Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of South Carolina.

789.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of South Carolina.

790.     Because Defendants' unfair and deceptive practices caused actual harm to Assignors and Class Members, Plaintiffs seek recovery of actual damages or $200, whichever is greater, discretionary punitive damages, reasonable attorney's fees and costs, injunctive relief, and all other proper and just relief available under the South Carolina UTPA.

**Wisconsin Deceptive Trade Practices Act**
**(Wis. Stat. § 100.18)**

791.     Plaintiffs, Assignors, and Class Members are "the public" within the meaning of the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"). Wis. Stat. § 100.18(1).

792.    Plaintiffs, Assignors, and Class Members are "persons" within the meaning of Wis. Stat. § 100.18(1).

793.    Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

794.    The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

795.    Defendants' conduct constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

796.    Defendants knew or should have known that their conduct was in violation of the Wisconsin DTPA.

797.    Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

798.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for the UT Hypertension Drugs described herein.

799.    Defendants' conduct alleged in this complaint occurred throughout the United States, including in the State of Wisconsin.

800.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the UT Hypertension Drugs in the State of Wisconsin

801.    No business relationship, contractual or otherwise, existed or exists between Assignors, Class Members, and Defendants.

802.    Plaintiffs seek damages, court costs and attorneys' fees under Wis. Stat. §100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

146

## COUNT XII
### Tortious Interference with Assignors' and Class Members' Business Expectancy
#### *Against All Defendants*

803.     Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

804.     To prevail on a tortious interference claim, the plaintiff must provide that (1) the plaintiff had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

805.     Accordingly, Defendants conspired to tortiously interfere with Assignors' and Class Members' business expectancy, entitling Plaintiffs to bring this action on their behalf for their actual damages (including loss of profits), costs of suit, and reasonable attorneys' fees.

## COUNT XIII
### Civil Conspiracy to Tortiously Interfere with Assignors' and Class Members' Business Expectancy
#### *Against All Defendants*

806.     Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

807.     Defendants conspired to tortiously interfere with Assignors' and Class Members' contractual relations with their beneficiaries.

808.     Defendants conspired to increase the number of Medicare-covered "customers" using the CVC PAH, which triggered Assignors' and Class Members' coverage obligations for these Medicare Advantage patients and eliminating price sensitivity to UT Hypertension Drugs.

809.     Accordingly, Defendants conspired to tortiously interfere with Assignors' and Class Members' contractual relations, entitling Plaintiffs to bring this action on their behalf for their actual

damages (including loss of profits), costs of suit, and reasonable attorneys' fees.

**COUNT XIV**
**Unjust Enrichment**
*Against UT, Charities, and Specialty Pharmacies*

810.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

811.    To plead a claim for unjust enrichment, the plaintiff must allege: (1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

812.    As a result of the Co-Payment Circumvention Enterprise and UT's, Charities', and Specialty Pharmacies' unlawful conduct described above, UT, Charities, and Specialty Pharmacies have been unjustly enriched by, at a minimum, receipt of payments for UT Hypertension Drugs from Assignors and Class Members at unlawfully inflated prices.

813.    Because UT, Charities, and Specialty Pharmacies concealed the Co-Payment Circumvention Enterprise and their co-payment assistance conspiracy scheme and deception, Assignors and Class Members were not aware of the true facts concerning the Co-Payment Circumvention Enterprise and co-payment assistance conspiracy scheme described herein and did not benefit from UT's, Charities', and Specialty Pharmacies' misconduct.

814.    UT, Charities, and Specialty Pharmacies knowingly accepted the unjust benefits of their Co-Payment Circumvention Enterprise and co-payment assistance conspiracy scheme.

815.    As UT, Charities, and Specialty Pharmacies benefited from their unlawful conduct with knowledge that it was receiving increased revenues and profits for its UT Hypertension Drugs at inflated prices, it would be inequitable for UT, Charities, and Specialty Pharmacies to be permitted to retain any of the ill-gotten gains.

816.    As a result of UT's, Charities', and Specialty Pharmacies' misconduct, the amount of their unjust enrichment should be returned to Plaintiffs, in an amount to be proven at trial.

## COUNT XV
### Violations of the Florida Civil Remedies for Criminal Practices Act
### (Fla. Stat. § 771.101 *et seq.*)
### *Against UT, Charities, and Specialty Pharmacies*

817.    Plaintiffs re-allege and incorporate by reference paragraphs 1-530 of this complaint as if fully set forth herein.

818.    At all times, as set forth above, UT's, Charities', and Specialty Pharmacies' actions were unlawful under Fla. Stat. § 772.103(3), as they were all "employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity."

819.    UT, Charities, and Specialty Pharmacies violated Fla. Stat. § 772.101 et seq., by participating in or conducting the affairs of the Co-Payment Circumvention Enterprise (as described more fully above) through a pattern of racketeering activity.

820.    Assignors and Class Members are "persons" as defined in Fla. Stat. § 1.01 injured in their business or property, by reason of UT's, Charities', and Specialty Pharmacies' racketeering violations.

### *Description of the Co-Payment Circumvention Enterprise*

821.    UT, Charities, and Specialty Pharmacies are "persons" within the meaning of Fla. Stat. § 1.01.

822.    UT, Charities, and Specialty Pharmacies are members of and constitute an "association-in-fact enterprise."

823.    The Co-Payment Circumvention Enterprise is an association-in-fact of individuals and corporate entities within the meaning of Fla. Stat. § 772.102 and consists of "persons" associated

together for a common purpose.

824.    The purpose of the Co-Payment Circumvention Enterprise was *inter alia* to maximize UT's profits and CVC's executive compensation.

825.    The Co-Payment Circumvention Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. UT is the source of the schemes alleged herein, including providing kickbacks to subsidize payments for UT Hypertension Drugs whose co-payments were provided by CVC.

826.    For CVC's part, CVC accepted these kickbacks and provided the unlawful co-payments for the UT Hypertension Drugs.

827.    UT, Charities, and Specialty Pharmacies, individually and collectively, fulfilled their roles in the Co-Payment Circumvention Enterprise.

828.    UT and CVC were separate and distinct legal entities with distinct purposes. UT is the architect of the Co-Payment Circumvention Enterprise, with the sole purpose to make as much money from the UT Hypertension Drugs as possible before generic competition entered the market. For CVC, it was to raise the amount of money in the funds to justify providing higher salaries to their executives.

829.    The Co-Payment Circumvention Enterprise had an existence that was separate and distinct from the pattern of racketeering in which UT, Charities, and Specialty Pharmacies engaged. Specifically, UT and CVC conspired with each other to minimize and/or conceal the amount of information Assignors and Class Members received regarding the claims for payment of the UT Hypertension Drugs, materially resulting in Assignors and Class Members to reimburse for UT Hypertension Drugs that they would not have paid for. *See* Fla. Stat. § 817.234.

830.    At all relevant times herein, UT, Charities, and Specialty Pharmacies operated, controlled, and managed the Co-Payment Circumvention Enterprise, through a variety of actions.

First, CVC falsely represented the level of control that UT had over CVC in the PAP to the OIG on numerous occasions. Second, UT and CVC failed to disclose a material fact regarding the existence of the kickbacks in violation of Fla. Stat. § 817.234.

831.    UT's, Charities', and Specialty Pharmacies' participation in the Co-Payment Circumvention Enterprise was necessary for the successful operation of the schemes. The members of the Co-Payment Circumvention Enterprise all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was a kickback, while minimizing the amount of information Assignors and Class Members knew about the programs. These affirmative acts and strategic omissions were material to Assignors' and Class Members' decisions to issue payment for the UT Hypertension Drugs. The Co-Payment Circumvention Enterprise's actions maximized the revenue and profitability of the Enterprise's members by knowingly causing payments for the UT Hypertension Drugs alleged herein.

832.    Fla. Stat. § 772.102 provides that criminal activity is any activity chargeable by indictment or information by amongst other statutes Fla. Stat. § 817.234. Section 817.234 criminalizes situations where health care companies, such as Assignors and Class Members, are provided incomplete or misleading information concerning any fact or thing material to a claim for payment. As set forth below, UT, Charities, and Specialty Pharmacies have committed violations of Fla. Stat. § 817.234 by providing incomplete or misleading information material to Assignors' and Class Members' decisions to issue payment for the UT Hypertension Products

833.    UT, Charities, and Specialty Pharmacies committed numerous acts of racketeering by providing incomplete or misleading information related to the UT Hypertension Drugs. UT, Charities, and Specialty Pharmacies knew or had reason to know that they were providing incomplete or misleading information regarding these claims.

834.    UT, Charities, and Specialty Pharmacies knew or had reason to know that they were not providing complete or non-misleading information pursuant to Fla. Stat. § 817.234. Despite knowledge of these facts, they induced Assignors and Class Members to make payment for claims that they otherwise would not have paid. Instead, UT, Charities, and Specialty Pharmacies knowingly provided incomplete information to enrich their bottom line.

835.    Based on these omissions, Assignors and Class Members provided payments for the UT Hypertension Drugs, based on half-truths, inaccurate information, and deliberate omissions. UT and CVC's omissions were material to the OIG's clearance of these programs and material to the payment of the UT Hypertension Drugs for which Assignors and Class Members provided payment. Had Assignors or Class Members known of the Co-Payment Circumvention Enterprise, Assignors and Class Members would not have submitted payment for the UT Hypertension Drugs.

836.    Assignors and Class Members were the primary victims of UT's, Charities', and Specialty Pharmacies' unlawful scheme. Assignors and Class members paid for the UT Hypertension Drugs based on UT, Charities, and Specialty Pharmacies omissions of material information pursuant to Fla. Stat. § 817.234.

837.    As part of this scheme, UT, Charities, and Specialty Pharmacies omitted material information required to be sent to the OIG, and misled Assignors and Class Members when causing the submission of payments to Assignors and Class Members. UT, Charities, and Specialty Pharmacies conducted or participated, directly or indirectly, in the Co-Payment Circumvention Enterprise through a pattern of unlawful activity.

838.    By reason of and as a result of the conduct of UT, Charities, and Specialty Pharmacies, and in particular, their pattern of criminal activity, Assignors and Class Members were injured in its business or property.

839.    UT's, Charities', and Specialty Pharmacies' violations have directly and proximately caused injuries and damages to Assignors and Class Members, and Plaintiff has a right to bring this action for the damages alleged herein.

840.    Pursuant to Fla. Stat. § 772.11, Plaintiff seeks its reasonable attorneys' fees and costs associated with prosecution of this action.

## DEMAND FOR JUDGMENT

Wherefore, Plaintiffs respectfully requests that this Court:

(a)    Certify the classes sought in this complaint;

(b)    Enter judgment against Defendants and in favor of Plaintiffs for violations of the federal and state laws and legal standards invoked herein;

(c)    Order Defendants to pay pre-judgment and post-judgment interest as provided for by law or allowed in equity;

(d)    Award the Plaintiffs damages (e.g., three times the monies paid for the UT Hypertension Drugs) in an amount to be determined at trial;

(e)    Award Plaintiffs its costs of suit, including reasonable attorneys' fees as provided by law, including under RICO and applicable state law;

(f)    Find that Defendants are jointly and severally liable for all claims; and

(g)    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 21, 2022

s/Eduardo Bertran

Eduardo Bertran, FL Bar. No. 94087
ARMAS BERTRAN ZINCONE
4960 SW 72nd Ave., Ste 206
Miami, FL 33155
ebetran@armaslaw.com

Michael O. Mena (FL Bar No. 010664)
John W. Cleary (FL Bar No. 118137)
Attorneys for Plaintiffs
MSP RECOVERY LAW FIRM
2701 S. LeJeune Rd., 10th Floor Coral
Gables, FL 33134
(305) 614-2222
fquesada@msprecoverylawfirm.com
mmena@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com

Shereef H. Akeel (MI Bar No. 54345)
Adam S. Akeel (MI Bar No. 81328)
Sam Simkins (MI Bar No. 81210)
Daniel Cermak (MI Bar No. 84460)
Hayden Pendergrass (DC Bar No. P1645085)
Attorneys for Plaintiffs
AKEEL & VALENTINE, PLC
888 W. Big Beaver Rd. 420,
Troy, MI 48084
Shereef@akeelvalentine.com
adam@akeelvalentine.com
sam@akeelvalentine.com
daniel@akeelvalentine.com
hayden@akeelvalentine.com

*Attorneys for Plaintiffs*

## APPENDIX

### *Representative Assignments to Plaintiffs*

**A1**.    On June 18, 2017, Fallon Community Health Plan, Inc. entered into an assignment with MSP Recovery, LLC.  Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies from Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Massachusetts law. On June 20, 2017, MSP Recovery LLC, entered into an assignment with Series 17-04-631, LLC, a series of MSP Recovery Claims, Series, LLC, irrevocably assigning its right to recover payments as assigned from Fallon Community Health Plan.  Said assignment included the following language "[a]ssignor … hereby … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims," "Claims," "Assigned Assets," and "Assigned Documents"…whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party

pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights andclaims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto." This second assignment contract wasexecuted by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Delaware law.

A2.    On December 14, 2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…." The assignment contract was executed by individuals of majority, of sound mind,and with legal authority to bind the respective parties. The assignment was entered under Floridalaw. On February 20, 2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC). Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.

A3.    On May 3, 2016, Preferred Medical Plan, Inc. entered into an assignment with

MSP Recovery LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and all rights and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and /or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims',[] as also specified in Section 1.1." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On August 8, 2016, MSP Recovery, LLC entered into an assignment with MAO-MSO Recovery II LLC, Series PMPI, irrevocably assigning its right to recover payments as assigned from Preferred Medical Plan, Inc. Said assignment included the following language "[a]signer, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and is successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims . . . whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims.'" This second assignment contract

was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under NewYork law. Consideration was given between each party in executing these assignments.