# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-21317-GAYLES/TORRES

---

MSP RECOVERY CLAIMS, SERIES
LLC, a Delaware series limited liability
company, MSPA CLAIMS I, LLC, a Florida
limited liability company, and Series PMPI, a
segregated series of MAO-MSO RECOVERY II,
LLC, a Delaware series limited liability company,
and MSP RECOVERY CLAIMS SERIES 44, LLC,
on behalf of themselves and all others similarly
situated,

      Plaintiffs,

v.

CARING VOICE COALITION, INC.; UNITED
THERAPEUTICS CORPORATION; SMITHS
MEDICAL ASD, INC.; EXPRESS SCRIPTS,
INC.; EXPRESS SCRIPTS HOLDING
COMPANY; ACCREDO HEALTH GROUP; CVS
HEALTH CORPORATION; and ADIRA
FOUNDATION,

      Defendants.

---

## DEFENDANT SMITHS MEDICAL ASD, INC.'S  MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant Smiths Medical ASD, Inc. ("Smiths"), by the undersigned counsel, hereby moves pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) to dismiss with prejudice Counts 5, 6, 9, 10, 11, 12 and 13 of Plaintiffs' Second Amended Class Action Complaint (D.E. 178 and hereafter "Second Amended Complaint" or "SAC").

## INTRODUCTION

Plaintiffs allege *seven* counts against Smiths, a medical device manufacture, which previously made certain infusion pumps and associated cartridges at issue in this case.  Four of the seven counts assert separate antitrust claims for "restraint of trade" and "conspiracy to monopolize" under both the Sherman Act and under several states' antitrust laws (Counts 5, 6, 9 and 10).  The other three counts allege violations of the consumer protection statutes of several states (Count 11), Tortious Interference with Business Expectancy (Count 12), and Civil Conspiracy to Tortiously Interfere with Business Expectancy (Count 13). All seven counts should be dismissed with prejudice on multiple, independent grounds.

*First*, Plaintiffs lack both Article III standing and antitrust standing because the allegations in the SAC refute the notion that Plaintiffs' purported assignors had "existing" antitrust claims that they could have assigned to Plaintiffs at the time the assignments were executed. Plaintiffs also lack standing to assert antitrust claims that supposedly accrued to the assignor health plans because the three proffered "representative" assignments do not contain the necessary specificity required to validly assign antitrust claims to Plaintiffs.  Finally, Plaintiffs lack standing to assert their federal Sherman Act damages claims because Plaintiffs do not allege that their assignors purchased the pharmaceutical product at issue directly from Smiths.

*Second*, Plaintiffs fail to plead antitrust injury, a prerequisite for pleading antitrust standing, because they fail to adequately allege any injury to any "assignor" tied to any alleged anticompetitive conduct by Defendants. The antitrust counts are based on Smiths' alleged

participation with co-Defendant United Therapeutics Corporation ("UT") and the other Defendants in the so-called "Generic Prevention Scheme." SAC ¶¶336-471. However, Plaintiffs do not plead plausible facts showing that a generic alternative to UT's Remodulin was foreclosed from competing due to Defendants' purported conduct, or that Plaintiffs' assignors suffered antitrust injury by such conduct.

*Third*, Plaintiffs' restraint of trade and conspiracy to monopolize counts fail to state cognizable antitrust claims against Smiths because Plaintiffs do not and cannot allege in good faith, *inter alia*: (1) concerted action involving Smiths intended to achieve an anticompetitive objective, or (2) that Smiths specifically intended to confer a monopoly on UT. Moreover, Plaintiffs fail to allege a viable relevant antitrust product market for "subcutaneously injected treprostinil," and fail to allege ultimate facts demonstrating that competition could have been harmed in the purported market for "injected prostacyclins."

*Finally*, Plaintiffs' consumer protection claims under various state statutes fail for the same reasons as their antitrust claims and because Plaintiffs have not addressed the deficiencies that the Court previously identified when dismissing the same claims in Plaintiffs' First Amended Class Action Complaint ("FAC"). *See* Report & Recommendation at 29-30, D.E. 163 (hereafter "R&R"). Additionally, Plaintiffs' "tortious interference" claims, although styled "Against All Defendants" (SAC ¶¶803-809), are nevertheless clearly premised on the alleged "Co-Payment Circumvention Scheme" in which Smiths is not alleged to have participated. Consequently, those two counts must also be dismissed as to Smiths.

## **BACKGROUND**

Plaintiffs' claims focus on certain pulmonary arterial hypertension ("PAH") medications manufactured by co-Defendant UT.  PAH is a severe disease, and without continuous doses of medications, patients' lifespans would be dramatically shortened.  Remodulin – brand name

treprostinil – is one of several available PAH medications and is a prostacyclin that can be administered to patients either intravenously or subcutaneously, depending on what their doctor prescribes. SAC ¶¶355, 472-74, 482, 484. In a 2015 patent litigation settlement agreement between Sandoz and UT, the parties agreed that Sandoz could launch its generic product no earlier than June 2018.  SAC ¶406.  Sandoz eventually introduced the first generic version of Remodulin in March 2019.  *Id*. ¶462.

Unlike UT and Sandoz, Smiths does not manufacture any pharmaceutical products. Instead, Smiths manufactures medical equipment. SAC ¶60.  Smiths manufactured two pumps used to administer Remodulin and other infused medications: the CADD Legacy, which can be used for intravenous and subcutaneous infusion, and the CADD MS-3, which can be used for subcutaneous infusion. *Id*. ¶357.  Several years ago Smiths discontinued the CADD MS-3 and the cartridges used with the pump to hold the medication.  Smiths initially planned to discontinue the CADD MS-3 in 2015, due to the end of life of key parts and the expense of complying with new regulatory changes. SAC ¶¶389, 399, Ex. III at 6. After learning about Smiths plans to discontinue the CADD MS-3, UT asked Smiths if Smiths would manufacture a last-time supply of pumps, which UT would fund. SAC ¶411.  UT also negotiated a deal for Smiths to supply UT with cartridges needed to operate the last-time pump supply. SAC ¶¶414-15, 442. UT negotiated the deal for the manufacture of pumps and cartridges to ensure that Remodulin patients would have access to a supply of MS-3 pumps and cartridges, notwithstanding Smiths plans to discontinue the CADD MS-3 product line. *See* SAC Ex. III at 6 ("In 2015 Smiths Medical notified us that it was planning to discontinue the manufacture of the MS-3 pumps and associated cartridges. We entered into an agreement to fund the manufacture of additional cartridges for use with branded Remodulin only."); *see also Sandoz*, 2022 WL 17335696, at *4-

5, 17.  At that time, there were no generic versions of Remodulin, just UT's branded product. SAC ¶366. Plaintiffs allege that approximately 2000 patients are treated with Remodulin via subcutaneous injection, with a similar number treated via intravenous injection.  SAC ¶480.

In this action, Plaintiffs—companies that buy legal claims from third parties to assert on their own behalf—have sued Smiths, UT and several pharmacies that distribute pharmaceuticals and associated delivery systems, for allegedly restraining trade and conspiring to allow UT to monopolize the markets in which Plaintiffs allege that UT's pharmaceutical product, Remodulin, competes. Plaintiffs supposedly obtained assignments from several Medicare Advantage health plans that, Plaintiffs argue, give them the contractual right to assert legal claims, purportedly including antitrust claims.  SAC ¶39, Appendix A.

According to the allegations in the SAC, UT, Smiths and the pharmacy Defendants purportedly conspired to "prevent competition and create artificial barriers to entry for generic alternatives to UT's Remodulin, enabling UT to charge supra-competitive prices for Remodulin." SAC ¶32. As Plaintiffs allege it, Defendants purportedly prevented generic competition in the subcutaneous segment by blocking the generic competitors' access to the discontinued CADD MS-3 pump and related cartridges. SAC ¶¶622-624. Plaintiffs allege that UT and Smiths "entered into separate exclusive agreements to ensure all pumps and cartridges would be exclusively reserved for the administration of UT's Remodulin" and "Smiths and UT then colluded with Specialty Pharmacies to restrict the sale of cartridges to Remodulin users only." SAC ¶¶623-24. Plaintiffs further allege that UT's exclusive cartridge agreement with Smiths "made it impossible for generic alternatives to gain a foothold in the market" and that but for the exclusivity agreements, Plaintiffs' representative assignors would have "paid less for delayed/restricted generics or alternatives by substituting purchases of less expensive generics

and alternatives for the more expensive branded Remodulin." *Id*. ¶627. Plaintiffs' antitrust claims mirror those made by Sandoz and recently rejected by the District Court in New Jersey at summary judgment on a full factual record. *Sandoz Inc. v. United Therapeutics Corp.*, No. 2:19-cv-10170-BRM-JSA, 2022 WL 17335696 (D.N.J. Mar. 30, 2022) (hereafter *Sandoz*).

Plaintiffs allege a number of purported "facts" that are directly contradicted by other allegations in their complaint. For example, Plaintiffs allege that "as a result of the restrictions related to the CADD-MS3 cartridges UT *continues to sell 100%* of the Treprostinil administered through subcutaneous injections in United States" SAC ¶490 (emphasis added). Yet Plaintiffs concede elsewhere in the SAC that "on May 24, 2021, Sandoz was finally able to bring its cartridge to market, making its generic Treprostinil available for subcutaneous injections." *Id*. at ¶470. Obviously, UT no longer could continue to sell one hundred percent of treprostinil sales once Sandoz entered the alleged subcutaneous market segment. Consequently, Plaintiffs' paragraph 490 allegation was patently false at the time Plaintiffs filed the SAC in October 2022.

Similarly, Plaintiffs falsely allege *"[A]t the time of filing [the SAC]*, Smiths also manufactured the only FDA-approved cartridges necessary to use the CADD-MS3 pump for subcutaneous treprostinil injections." SAC ¶358 (emphasis added). Plaintiffs repeat the same false claim twice more. SAC ¶¶622, 678. Yet, the Plaintiffs concede elsewhere that Smiths helped Sandoz bring its own generic cartridge onto the market by May 2021 (SAC ¶¶468-69), seventeen months before the Plaintiffs filed their SAC in October 2022.

## LEGAL STANDARDS

Motions to dismiss "serve the useful function of ending non-meritorious cases before a defendant is subjected to possibly extensive discovery and litigation costs. This is especially true in anti-trust litigation, and even more so when the anti-trust case seeks class action status." *Jacobs v. Tempur–Pedic Int'l, Inc*., 2007 WL 4373980, at *2 (N.D. Ga. Dec. 11, 2007). A

complaint that "contains insufficient factual allegations to plead a plausible case" must be dismissed under Rule 12(b)(6).  *Jacobs v. TempuPedic Int'l. Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010).  This "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Simpson v. Sanderson Farms, Inc.,* 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).  "A court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted ... by statements in the complaint itself ...."  *Jacoby v. Cable News Network, Inc.*, 537 F.Supp.3d 1303, n.5 (M.D. Fla. 2021).  In deciding this motion, the Court may consider facts outside the complaint that are subject to judicial notice.  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278, 1280 (11th Cir. 1999) *citing* Fed. R. Evid. 201(b)(2); *see also Chapman v. Abbott Lab'ys*, 930 F.Supp.2d 1321, 1323 (MD. Fla. 2013) (holding that a Court can take judicial notice of a label on the FDA's website).

Additionally, Plaintiffs allege that in deciding the substance of their antitrust claims asserted under the laws of nine different jurisdictions – eight states and one territory – the state statutes are interpreted consistently with federal antitrust statutes.  SAC ¶645 & nn.33-41.

## ARGUMENT

I. **Plaintiffs Lack Standing for their Antitrust Claims.**

    A. **Plaintiffs Assignors Had No Existing Antitrust Claims to Assign, Nor Did The Assignment Agreements Specifically Assign Antitrust Claims.**

The antitrust causes of action alleged by Plaintiffs could not have existed or accrued to the purported Assignors at the time of the representative assignments' execution, rendering any attempted assignment of antitrust claims invalid. Specifically, the representative assignments offered by Plaintiffs were signed in December 2014, May 2016, and June 2017, and purport to

assign only those claims already "existing on the date hereof" and that each Assignor already "had, may have had, or has asserted" at the time of execution. *See* SAC Appendix ¶¶A1-A3; D.E. 178-4 (Ex. C) at PDF 8, D.E. 178-5 (Ex. D) at PDF 11-12, and D.E. 178-6 (Ex. E) at PDF 5. In contrast, the antitrust claims alleged by Plaintiffs are premised on the Defendants' purported conduct occurring *years* after those assignments were executed. As a result of its patent litigation settlement with UT, Sandoz agreed it would not market a generic alternative to UT's Remodulin until at least June 26, 2018 (SAC ¶407), a full year *after* the last of Plaintiffs' representative assignments was executed. Plaintiffs also concede that "there were no restrictions on how pumps sold directly from Smiths to third parties (such as the Specialty Pharmacies) could be used" (SAC ¶413), and that the 2016 agreement between Smiths and UT "did not restrict CADD-MS3 Cartridges to only Remodulin" (SAC ¶416). According to Plaintiffs' own allegations, it was not until "late 2018" that "UT reached out to conspire to restrict sale of cartridges needed for use with the CADD-MS3 [pump]." SAC ¶¶453-54. There are simply no facts plausibly alleging that the Assignors had an "existing" antitrust claim *when the assignments were made* in 2014, 2016, and 2017. As a result, Plaintiffs lack standing to assert any antitrust cause of action on behalf of those Assignors. *See, e.g., MSP Recovery Claims, Series LLC. v. Tech. Ins. Co.*, 2020 WL 91540, at *3 (S.D.N.Y. Jan. 8, 2020); *see also Tyntec Inc. v. Syniverse Techs., LLC* No. 2019 WL 9829361, at *10 (M.D. Fla. Aug 19, 2019), *report and recommendation adopted*, 2020 WL 2786873 (M.D. Fla. May 29, 2020) ("[E]ven if a claim had accrued that could be assigned, an explicit assignment of an antitrust claim . . . would be required."); *Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F.Supp. 3d 465, 511 (D.N.J. 2014) (requiring that "the Complaint had to sufficiently allege a valid cause of action arising *prior to assignment*.") (emphasis added).

Moreover, to validly assign *antitrust* claims – providing for potential treble damages and joint and several liability – the assignment agreements must contain a heightened degree of specificity to demonstrate that the assignor intended to transfer those claims. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp*., 995 F.2d 425, 440 (3d Cir. 1993) ("[G]eneral assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims"). None of the three "representative" assignment agreements offered by Plaintiffs (*see* SAC ¶39, App. ¶¶A1-A3,) attempting to show standing specifically convey *antitrust* claims. Instead, the assignment agreements describe Plaintiffs' role in assisting their assignor clients in obtaining reimbursement for Medicare payments in circumstances where another entity might have the primary payment obligation under the Medicare Secondary Payer Act ("MSPA"). *Id*.  They do not mention antitrust – or any related wording – anywhere in any of the agreements, let alone in their description of the "Assigned Claims." Nor do they mention any of the Defendants or any pharmaceutical products. No "causes of action" are assigned, and the reference to "Assigned Claims" is directly tethered to the Assignor's provision of its existing "claims data" to identify potential "claims" for "recovery and reimbursement" from "primary payers and/or third parties…." D.E. 178-4 at PDF 2-5. The representative assignments are therefore not "unambiguous and all-inclusive" and do not convey to Plaintiffs the contractual right to assert federal antitrust claims.  *See Animal Science*, 34 F.Supp. 3d at 512, n.18.

As to Plaintiffs' state law antitrust claims, the Second Amended Complaint adds nothing to cure the assignment deficiencies that caused the Court to dismiss those exact same claims in Plaintiffs' prior complaint.  Then the Court found that Plaintiffs' assignment allegations do not satisfy "their prima facie burden to plead that they are proper parties to pursue the state antitrust

claims." R&R at 18. Plaintiffs' amended allegations add nothing regarding the assignments, and their antitrust claims under state laws should be dismissed once again.

**B.     Plaintiffs Lack Standing Because They Fail to Plead an "Antitrust Injury" to the Assignors.**

Plaintiffs also lack antitrust standing on their state and federal restraint of trade and conspiracy to monopolize counts because they do not allege sufficient facts to show the requisite "antitrust injury" to the purported assignors. "Antitrust injury is a necessary but insufficient condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (citation omitted). An antitrust plaintiff must prove injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015) (to survive a motion to dismiss, a plaintiff must allege facts connecting the alleged unlawful conduct to the impact on competition in the market). Of course, Plaintiffs must allege facts showing that *the assignors* suffered an antitrust injury to state a valid antitrust claim. *See, e.g., Animal Science.*, 34 F. Supp. 3d at 508-513 (dismissing antitrust claim for lack of specific factual allegations in the complaint demonstrating that assignors had antitrust standing at time of assignment to plaintiffs).

The antitrust injury requirement "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). This means that a private antitrust plaintiff must plead facts showing that it suffered an injury that was caused by a reduction in competition brought about by the defendants' allegedly unlawful conduct, rather than due to other reasons. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir.

1998) (no antitrust injury because injury suffered by the plaintiff resulted not from reduction in competition caused by defendants, but instead from government regulations).

Here, Plaintiffs fail to allege facts demonstrating anticompetitive conduct by Defendants, let alone facts plausibly showing that the assignors were injured by such conduct. Plaintiffs allege that UT, Smiths, and the pharmacy Defendants engaged in a "Generic Prevention Scheme" by which "exclusive dealing contracts blocked generic competition" to UT's Remodulin "from entering the market, forcing Assignors and Class Members to pay supracompetitive prices." SAC ¶¶462, 508. However, those allegations are contradicted by Plaintiffs' other allegations conceding that (a) Sandoz settled patent infringement litigation with UT and agreed not to enter into competition with UT until June, 2018 (SAC ¶¶371, 406-07) and (b) Smiths helped Sandoz introduce a CADD MS-3-compatible cartridge in May, 2021 that facilitated Sandoz's marketing of generic treprostinil. SAC ¶¶468-70. Indeed, in the nearly identical *Sandoz* case, the court there specifically found that Smiths offered to license its cartridge technology to Sandoz in early 2019, and later helped Sandoz in its efforts to develop the cartridge that Sandoz eventually introduced for subcutaneous delivery of generic treprostinil in May 2021. *Sandoz*, 2022 WL 17335696 at *7. Judge Martinotti found that Sandoz was "not foreclosed from an opportunity to compete" and had not demonstrated that "UTC's conduct, as a whole, caused or was likely to cause anticompetitive effects in the relevant market" *Id*. at *16. Specifically, he found that Sandoz "was not foreclosed from contracting with Smiths or other manufacturers to secure cartridges for its own use." *Id*.[1] The absence of anticompetitive conduct,

---

[1] This Court will recall that, in their opposition to Smiths' Motion to Dismiss the FAC, Plaintiffs invoked Judge Martinotti's preliminary injunction opinion in the *Sandoz* case at least 15 times (*see* D.E. 156 at 2, 3, 4, 7, 8, 9, 12, 14, 17, 18) while assuring this Court that it could deny Smiths' motion because Plaintiffs' antitrust claims involved the "same allegations" as the *Sandoz*

in the form of market foreclosure or otherwise, precludes a finding of antitrust injury. *ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254, 269 n.9 (3d Cir. 2012).

Not only do Plaintiffs lack plausible allegations of anticompetitive conduct, they also fail to plausibly allege that any purported injury – in the form of "supracompetitive" pricing allegedly affecting the Assignors – was caused by the Defendants' actions, as opposed to the decisions and inaction of Sandoz. SAC ¶¶443-44, 451-52, 465, 467, 470. This is the same pleading failure that led the Court to dismiss Plaintiffs' prior complaint for lack of factual allegations showing "how Defendants' actions proximately caused antitrust injury to Plaintiffs' Assignors." R&R at 15. Moreover, Judge Martinotti's findings in the *Sandoz* case -- that the Defendants' challenged conduct was merely an "inconvenience for Sandoz at the time of its generic launch, but did not deprive Sandoz from an opportunity to compete" -- demonstrate the implausibility of Plaintiffs' allegations that the conduct alleged foreclosed competition and caused antitrust injury in any relevant market. *Sandoz*, 2022 WL 17335696, at *15. Consequently, Plaintiffs here simply cannot show the necessary antitrust injury to proceed with their antitrust claims.

**C.    Plaintiffs Are Not Direct Purchasers and Are Barred from Bringing Federal Antitrust Damages Claims.**

Plaintiffs do not allege their representative assignors are direct purchasers of any product sold by Smiths, a medical device manufacturer. In *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), the Supreme Court established the rule denying antitrust standing to a plaintiff who did not

---

case. *Id*. at 18. Plaintiffs explicitly argued that "many of the same arguments raised in [the MSP Plaintiffs'] case have already been raised, addressed and rejected in *Sandoz*" and Plaintiffs encouraged the Court to take judicial notice of the similarity of the two cases. *Id*. at 8, n.14. Only when Judge Martinotti – on a fully developed factual record – soon thereafter dismissed all of the "same allegations" in the *Sandoz* case, did the Plaintiffs here execute a U-turn,, suddenly arguing that the Sandoz decision was "not dispositive of Plaintiffs' claims." D.E. 162 at 1.

purchase the product at issue directly from a named Defendant. Plaintiffs are therefore foreclosed

from bringing federal antitrust damage claims.[2]

## II.    Plaintiffs Fail to Allege Viable "Restraint of Trade" and "Conspiracy to Monopolize" Claims Under the Sherman Act and State Antitrust Statutes.

Plaintiffs' SAC erroneously alleges *per se* (SAC ¶365) exclusive dealing violations under

Section 1 of the Sherman Act.  Plaintiffs, however, offer no allegations that Smiths and the other

Defendants are horizontal competitors. To the contrary, Plaintiffs acknowledge that Smiths is a

medical device manufacturer that makes medical pumps and associated cartridges. SAC ¶60. All

of the relationships alleged between and among the Defendants are vertical in nature.  Moreover,

the allegation of an unlawful exclusive agreement requires consideration of possible

procompetitive effects as well as evaluation of the alleged relevant market and the degree of

alleged market foreclosure.  Consequently, alleged vertical agreements, such as those identified

in the SAC, are uniformly subject to the rule-of-reason standard rather than the *per se* rule.  *See,*

*e.g.*, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961) (upholding exclusive

contract and emphasizing the need to "weigh the probable effect of the contract on the relevant

area of effective competition"); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1569

(11th Cir. 1991).

### A.  Plaintiffs Fail to Plausibly Allege Concerted Action Involving Smiths.

A plaintiff alleging an unlawful restraint of trade under the Sherman Act must offer

evidence that each defendant "had a conscious commitment to a common scheme designed to

achieve an unlawful objective." *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 768

---

[2]Plaintiffs are also precluded from bringing state law antitrust claims in several states where *Illinois Brick* has not been repealed. To avoid duplication, Smiths incorporates and adopts the additional arguments and authorities presented in Defendant United Therapeutics Corporation's Motion to Dismiss the Second Amended Complaint and Incorporated Memorandum of Law, Sec. III.A. and III.B.

(1984). The SAC fails to state a valid restraint of trade claim against Smiths because it fails to plausibly allege facts constituting the necessary "concerted action" by Smiths with UT to achieve an anticompetitive objective.  The SAC concedes that Sandoz, a generic treprostinil competitor to UT, could, and did arrange, with the direct assistance of Smiths, to have an alternative cartridge made that patients have been using since May 2021 to administer generic treprostinil subcutaneously. SAC ¶¶468-70 (alleging that Smiths settled the *Sandoz* litigation and helped Sandoz bring a cartridge to market in May 2021). Judge Martinotti in the *Sandoz* case expressly found that Smiths' efforts to assist Sandoz with its generic entry dated back to early 2019. "[T]he record shows Sandoz was not foreclosed from contracting with Smiths or other manufacturers to secure cartridges for its own use.  Indeed, in January 2019, several months prior to Sandoz's planned generic treprostinil launch, *Smiths offered to license its cartridge design to [Sandoz]* so they could secure their own." *Sandoz*, 2022 WL 17335696, at *15 (emphasis added):

> Smiths sent Sandoz a proposed licensing agreement with terms Sandoz requested. Sandoz responded with an additional demand, requesting Smiths provide an "interim supply of cartridges for the period during which we are negotiating our license agreement." Unable to accommodate Sandoz's demand, Smiths and Sandoz ended their proposed licensing agreement discussions.

*Id*. at *7. (citations omitted).  Judge Martinnoti's opinion also re-affirms Plaintiffs' concession that Smiths thereafter provided crucial assistance to Sandoz's partner, Liquidia, in obtaining FDA clearance for a CADD-MS-3 compatible cartridge which provided patients using Sandoz's generic treprostinil with access to Smith's leading subcutaneous delivery mechanism by May 2021:

> [u]ltimately *Smiths worked with Plaintiffs* to facilitate FDA clearance of Sandoz's alternative cartridge for use with the CADD-MS-3 pump . . . . The FDA cleared the alternative cartridges in March 2021, and Sandoz launched its generic treprostinil in the United States for subcutaneous administration in May 2021.

*Id*. at *7 (emphasis added).[3]  Judge Martinotti dismissed the allegation in *Sandoz* that Smiths and UT restricted the sale of all cartridges to Remodulin users only, finding that Sandoz had not been foreclosed from "contracting with Smiths or other manufacturers to secure cartridges for its own use" and was not "driven out or foreclosed from an opportunity to compete…." *Id*. at *16.

Plaintiffs' concession that Smiths was instrumental in early 2021 in helping Sandoz bring a generic treprostinil product to market (SAC ¶¶ 468-70), and the factual record from the *Sandoz* case confirming Smiths' clear willingness in January 2019 to license its cartridge technology to Sandoz, renders implausible Plaintiffs' claim of Smiths concerted action with UT (*i.e.*, "a conscious commitment to a common scheme"). This Circuit has made clear that "a plaintiff must demonstrate a unity of purpose or common design and understanding, or a meeting of minds in an unlawful arrangement." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 ( 11th Cir.1991) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)).  A complaint that "contains insufficient factual allegations to plead a plausible case" must be dismissed under Rule 12(b)(6).  *Jacobs v. Tempurpedic Intl.*, 626 F.3d 1327, 1340 (11th Cir. 2010).  The allegations of concerted action by Smiths with UT (i.e. "a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto,* 465 U.S. at 768, are simply inadequate to survive a motion to dismiss.

### B.  Plaintiffs Fail to Allege Anticompetitive Conduct that Foreclosed Competition.

Plaintiffs' restraint of trade claim fails for the additional reason that Plaintiffs have not alleged ultimate facts showing that any of the alleged exclusive supply arrangements *foreclosed substantial competition in the relevant market* and that the foreclosed competitor lacked an

---

[3]Judge Martinotti found that Sandoz "ultimately entered into an agreement with another manufacturer, Carelife, to produce the cartridges compatible with the CADD-MS 3 pumps they needed for their generic treprostinil – which entailed successfully modifying instructions of the CADD-MS3 pump with the FDA."  *Sandoz*, 2022 WL 17335696, at *7.

alternative means to compete in the relevant market. *See, e.g. Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1573 (11th Cir. 1991) (no anticompetitive impact from exclusivity where plaintiffs were "simply inhibited in competing in one way" with defendant). The SAC concedes that Sandoz, with the assistance of Smiths, arranged to have an alternative cartridge made that patients have been using to administer generic treprostinil subcutaneously for almost two years now. SAC ¶¶468-70. Notwithstanding that dramatic admission, the SAC still alleges several directly contradictory and impossible claims including, *inter alia*:

- *that at the time of filing* [*the SAC*], Smiths also manufactured the only FDA-approved cartridges necessary to use the CADD-MS3 pump for subcutaneous Treprostinil injections. SAC ¶¶358, 622, 678 (emphasis added).

- that "Defendants' anticompetitive scheme delayed entry of less expensive generic versions of Treprostinil in the United States.  Further it enabled UT to fix, raise, maintain or stabilize the prices of Remodulin at supra-competitive levels *while preserving 100% of the U.S. market for itself.*  SAC ¶496 (emphasis added).

- that "as a result of the restrictions related to the CADD-MS3 cartridges *UT continues to sell 100%* of the Treprostinil administered through subcutaneous injections in United States. SAC ¶490 (emphasis added).

The Court should not accept as true any allegations in the SAC that the Plaintiffs themselves contradict with other allegations. Indeed, when inconsistent factual allegations are made for reasons other than the pleader's uncertainty as to which allegation was true, dismissal is appropriate. *See Gordon v. Matthew Bender & Co.*, 562 F. Supp. 1286, 1299 (N.D. Ill. 1983) (neither of two causes of action state a claim when founded upon contradictory factual allegations), *abrogated on other grounds as recognized in Karkomi v. Am. Airlines, Inc.*, 717 F. Supp. 1340, 1345 n.6 (N.D. Ill. 1989); *Battle v. Cent. State Hosp.*, 898 F.2d 126, 130 n.3 (11th Cir. 1990) ("allegations that are contradicted by other allegations in the complaint may also constitute grounds for dismissal.").

Plaintiffs' admission that in May 2021 Sandoz obtained access to an alternative cartridge for use with the CADD-MS pump that would allow patients to administer its generic drug subcutaneously (SAC ¶¶468-70) directly contradicts Plaintiffs' allegations that, *at the time MSP filed the SAC*, the generic competitor could not secure cartridges and was entirely foreclosed from competing in the subcutaneous segment. (SAC ¶¶358, 622, 678, 490, 496).  Additionally, Judge Martinnoti concluded in the *Sandoz* case, that "the challenged restraint [] did not cause the availability of subcutaneous treprostinil to decline."  *Sandoz*, 2022 WL 17335696, at *16.  He found specifically that "[t]he Specialty Pharmacies were free to use the non-UTC cartridges sourced from [Sandoz], free to contract with the device manufacturer that [Sandoz] sponsored to produce non-UTC cartridges, and free to dispense generic treprostinil with the non-UTC cartridges." *Id.* at *15. Consequently, Plaintiffs' contradictory and contradicted allegations cannot plausibly support a claim of generic foreclosure resulting from any alleged anticompetitive conduct involving Smiths.

**C. Plaintiffs' Proposed Product Markets Are Either Not Plausible or Do Not Support Their Case Theory.**

Plaintiffs here allege two different relevant antitrust product markets: "(1) the market for subcutaneously injected treprostinil; and (2) the market for injected prostacyclins." SAC ¶476. The first proposed relevant market definition fails as a matter of law.  Plaintiffs simply have not alleged ultimate facts to justify a separate product market for sales to patients that infuse the drug subcutaneously versus sales to those that infuse intravenously.  The second proposed relevant market, whether or not economically plausible, fails to support Plaintiffs' antitrust case theory (premised on exclusive dealing), for among other reasons that it precludes Plaintiffs from alleging or showing that the Defendants' alleged conduct substantially foreclosed competition in such a broad proposed market.

**1. Plaintiffs' Proposed Product Market for "Subcutaneously Injected Treprostinil" Is Not Plausible.**

The burden of pleading and establishing the relevant product market rests squarely with the plaintiff. *See, e.g.*, *JetAway Aviation LLC v. Bd. of Cnty Comm'rs*, 754 F.3d 824, 850 (10th Cir. 2014); *Aquatherm Indus., Inc. v. Fla.Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997). On a motion to dismiss, this Court can and should consider economic realities and common sense to determine whether Plaintiffs have alleged an economically plausible relevant market. *McCagg v. Marquis Jet Partners Inc.*, 2007 WL 2454192 at *6 (S.D.N.Y. Mar. 29, 2007) (granting motion to dismiss where proposed market "makes no rational or economic sense and is far too narrow."); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F. Supp. 162, 171 (S.D.N.Y. 1995) (failure of an antitrust plaintiff to set out a theoretically rational explanation to support its proposed relevant product market and to allege a plausible market will result in dismissal).

Plaintiffs' alleged product market for "subcutaneously injected treprostinil" is not a viable relevant market because it does not account for substitution with intravenously injected treprostinil. The antitrust laws reject carving up a market for a single product based on how the product is distributed, used, or administered absent a clear showing that different prices are charged based on those differences. *See* S*tubHub, Inc. v. Golden State Warriors, LLC*, 2015 WL 6755594 at *3 (N.D. Cal. 2015) (no separate markets for "primary tickets" and "secondary tickets" when both products are the same – a ticket that provides entry to same event). Courts will typically only recognize separate and distinct product markets for identical products when the product sells at different prices and a particular customer group pays substantially higher prices than others (*i.e.*, where price discrimination is possible). *See DOJ/FTC Horizontal Merger*

*Guidelines*[4] at §4.1.4 (noting possibility of defining product market based on "targeted customers" in "price discrimination markets".); *In the Matter of R.R. Donnelley & Sons Co., et al.*, 120 F.T.C. 36, 205 n.66 (1995).

Here, Plaintiffs' only effort to support their proposed relevant market is the conclusory statement, using language cribbed from the *DOJ/FTC's Horizontal Merger Guidelines* well-known "hypothetical monopolist test," that a "small, but significant, and non-transitory increase in the price of one administration method would not cause treating physicians and patients to substitute in significant numbers to a different administration method." SAC ¶¶474, 480. Plaintiffs offer no real-world product prices – or any other form of factual support – for their conclusory assertion, and their proposed relevant market should be dismissed on that basis as inadequately pled. *See Apple Inc. v Psystar Corp.*, 586 F.Supp. 2d 1190, 1198 (N.D. Cal. 2007) (dismissing counterclaim's relevant market definition that "merely restate[s] a commonly used [hypothetical monopolist test] for market definition without providing any factual basis for the claim.").

Further, the relevant market proposed by Plaintiffs is not plausible because the SAC fails to allege any relevant distinctions between a product that is infused subcutaneously and a product infused intravenously. There are no allegations that the treprostinil that pharmaceutical companies and pharmacies sell – and that patients buy – is *different* based on the route eventually selected to administer the drug to a patient.  The FDA labeling for both the branded and generic drug – facts that the Court may judicially notice – demonstrate that the same exact drug (whether branded or generic) is sold to the patient no matter how the patient will ultimately administer the

---

[4] Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines*, §4.1.1 (Aug. 19, 2000) https://www.justice.gov/atr/horizontal-merger-guidelines-0

drug.[5] Without factual allegations of different prices or the availability of price discrimination, Plaintiffs cannot support a separate narrow market definition for the same product. *See, e.g., PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002*)* (rejecting plaintiffs' effort to divide soda fountain syrup into separate product markets based on different delivery providers).

### 2. Plaintiffs' Proposed Product Market for Injected Prostacyclins Cannot Support Plaintiffs' Antitrust Claims.

Plaintiffs' second proposed broader relevant antitrust product market – one for injected prostacyclins – cannot support Plaintiffs' antitrust claims. A viable claim must allege that the exclusive arrangement foreclosed substantial competition in the relevant market and that the foreclosed competitor lacked alternative means to compete in the relevant market. *See, e.g. B&H Med. LLC v. ABP Admin.*, *Inc.,* 526 F.3d 257, 266-67 (6th Cir. 2008) (plaintiff's exclusive-dealing allegations failed as a matter of law even though defendant's observable foreclosure share was over 46%); *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1573 (11th Cir. 1991) (no anticompetitive impact from exclusivity where plaintiffs were "simply inhibited in competing in one way" with defendant).

The Plaintiffs' SAC, however, lacks any allegations of the percentage share *across* this broader proposed market in which Defendants' exclusive arrangement supposedly foreclosed competition. Without a percentage market share foreclosure allegation, Plaintiffs have not adequately alleged *substantial foreclosure* and the claim must therefore be dismissed. *See*

---

[5] *Compare* U.S. Food and Drug Administration, Remodulin [package insert] https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021272s026lbl.pdf (Revised June 06, 2018), *with* U.S. Food and Drug Administration Sandoz Treprostinil [package insert] U.S. Food and Drug Administration https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/203649Orig1s000lbl.pdf (Revised March, 2017).

*Feitelson v. Google Inc*., 80 F. Supp. 3d 1019, 1031-32 (N.D. Cal. 2015) (dismissing exclusive dealing claim where plaintiff alleged defendant's overall relevant market share but not the alleged share of foreclosure within the relevant market); *Sell It Soc., LLC v. Acumen Brands, Inc.*, 2015 WL 1345927, at *5 (S.D.N.Y. Mar. 20, 2015) (dismissing allegation of attempted monopolization based on exclusive dealing where plaintiff did not allege a substantial foreclosure of competition in the relevant market).

Plaintiffs acknowledge that a relevant market for "injected prostacyclins" would include epoprostenol-based treatments such as Flolan and Veletri in addition to Remodulin (treprostinil) and the generic versions of these drugs. SAC ¶¶477, 482-87. The SAC, however, alleges only that UT currently holds "a share of the market in excess of 70%." SAC ¶491.[6] Critically, however, Plaintiffs only attack alleged cartridge supply exclusivity between Smiths and UT supposedly affecting competition for Remodulin sales to patients administering the drug *through subcutaneous infusion*.  They do not allege that the challenged conduct had any anticompetitive effect on Remodulin or generic treprostinil sales to patients administering the drug intravenously, *or on other* injected prostacyclins, such as Flolan and Veletri, in the proposed relevant markets. Plaintiffs also concede that generic firms have obtained delivery mechanisms to support administering their treprostinil subcutaneously. SAC ¶¶468-470. Consequently, there are no factual allegations in the SAC that the market segment for Remodulin administered subcutaneously comprises the necessary "substantial portion" of the entire proposed injected prostacyclins market, or that alternative means to reach that proposed market were foreclosed. *See Eastman v. Quest Diagnostics Inc.,* No. 15-CV-00415-WHO, 2015 WL 7566805, at *11

---

[6] Plaintiffs' only support for this central claim are two vague UT statements from more than four and six years prior – a time period predating the current generic treprostinil competition from Sandoz and other generic suppliers. SAC ¶491.

(N.D. Cal. Nov. 25, 2015) ("[P]laintiff still must plead facts that support a plausible inference that the exclusive dealing arrangement forecloses a substantial share of the relevant market."); *Int'l Const. Prod. LLC v. Caterpillar Inc*., 2016 WL 264909 at *5 (D. Del. May 1, 2016) (dismissing exclusive dealing claim for failure to adequately plead the absence of alternative channels of distribution).

Moreover, in Plaintiffs' proposed broader injected prostacyclins market, treprostinil (branded and generic) infused subcutaneously necessarily competes with treprostinil (branded and generic) infused intravenously. SAC ¶¶355-356, 474, 478. Consequently, these two supposedly distinct "products" must be regarded as good economic substitutes and generally viewed as reasonably interchangeable within that proposed market. *See Jacobs v. Tempur–Pedic Int'l, Inc*., 626 F.3d 1327, 1337-38 (11th Cir. 2010) (applying reasonable interchangeability analysis and affirming the district court's dismissal of "skimpy" allegations of a narrow "visco-elastic foam mattress" market). According to the SAC, however, generic competitors have been able to sell treprostinil to patients using intravenous infusion since June 26, 2018, and have actually done so since March 25, 2019. SAC ¶¶407, 462. Therefore, "intravenously infused" treprostinil represents an adequate alternative for generic competitors to selling "subcutaneous" treprostinil. Consequently, Plaintiffs' broader proposed injected prostacylins market not only contradicts their narrower proposed "subcutaneously injected treprostinil" market, but also prevents Plaintiffs from plausibly alleging facts to show that any exclusive arrangement between Smiths and UT left generic competitors without a reasonable economic alternative to compete against UT's Remodulin.

**D. Plaintiffs' Conspiracy to Monopolize Claim Fails to Plausibly Allege Required Elements.**

A viable conspiracy to monopolize claim, requires plausible allegations of "(1) an agreement to restrain trade, (2) deliberately entered into with the specific intent of achieving monopoly rather than a legitimate business purpose, (3) which could have had an anticompetitive effect, and (4) the commission of at least one overt act in furtherance of the conspiracy." *U.S. Anchor Mfg. Co. v. Rule Indus.*, 7 F.3d 986, 1001 (11th Cir. 1993). Plaintiffs fail to plausibly allege several of those required elements.

As an initial matter, Plaintiffs have not alleged the necessary concerted action to constitute an agreement to restrain trade. *See supra*, Section II.A. Moreover, the pump and cartridge supply agreements alleged between Smiths and UT were for the *legitimate business purpose* of securing UT a continuing supply of a critical delivery system for its lifesaving drug Remodulin. Judge Martinotti found that "the record here *sufficiently establishes procompetitive justifications* for the 2019 cartridge restrictions" namely "to ensure a supply of cartridges available for use for its Remodulin patients." *Sandoz*, 2022 WL 17335696, at *17 (emphasis added). *Second*, the SAC does not plausibly allege that Smiths intent in reaching those pump and cartridge supply agreements with UT was to help UT achieve a monopoly. In fact, the SAC admits that Smiths actively helped UT's generic competitor, Sandoz to launch a cartridge and enter the market in direct competition with UT. SAC ¶¶ 468-70. Additionally, Judge Martinotti found that Smiths offered to license its cartridge technology to Sandoz in January 2019, months before Sandoz even planned to begin to market generic treprostinil. "The record shows Sandoz was not foreclosed from contracting with Smiths or other manufacturers to secure cartridges for its own use. Indeed, in January 2019, months prior to Sandoz's planned generic launch, Smiths offered to license its cartridge design to [Sandoz] so they could secure their own." *Sandoz*, 2022

WL 17335696, at *15.   In light of Plaintiffs' own admissions in the SAC, and the factual findings in the *Sandoz* case, Plaintiffs cannot plausibly plead that Smiths *specifically intended* to confer a monopoly on UT.

Plaintiffs implausibly imply that Smiths issued an "End of Life Notice" in August 2015 for its CADD M3-3 Pumps" as part of a scheme or conspiracy to confer a monopoly on UT in the alleged relevant market.   *See* SAC ¶¶363, 399, 603.   But logic refutes the idea that Smiths would end production of one of its medical devices and wind down production of an associated cartridge with the *specific intent* for UT to obtain a monopoly.   Indeed, Plaintiffs do not allege any benefit that Smiths would obtain from doing so.  In fact, a UT monopoly for the pharmaceutical product would effectively reduce the number of companies that would potentially seek to buy associated medical devices from Smiths – which goes against Smiths economic interests.  A monopoly in the downstream pharmaceutical market would in turn give UT market power in the upstream market for the purchase of the medical devices used to administer the drug – i.e., Smiths' infusion pump.  An exclusive arrangement between an upstream supplier of a necessary input to a downstream product market, and the dominant firm in that downstream product market, would make no economic sense if the arrangement would allow the downstream firm to obtain a monopoly in the downstream market.  Doing so would reduce competition among downstream firms for purchases of the supplier's product, and thus reduce demand for the suppliers' product. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, §1803c (4th ed. 2018).   In other words, an upstream firm such as Smiths that sells the input would want to sell to as many companies as possible and would not want to create a single dominant buyer.  Accordingly, an

input supplier (such as Smiths) "would refuse to participate in a scheme promising downstream monopoly and lower output." *Id.*

Unsurprisingly, the factual findings in the *Sandoz* case flatly refute Plaintiffs' allegation that Smiths' discontinuation of its pump and cartridges were pursuant to any "conspiracy to monopolize."  Judge Martinotti specifically found that Smiths decided to discontinue making the CADD-MS3 pump in 2015 "primarily due to the lack of ongoing availability of critical components from third party suppliers." *Sandoz*, 2022 WL 17335696, at *3. That Smiths would discuss in advance with UT its discontinuation of a critical medical device used with UT's life-saving drug (SAC ¶¶382, 389, 397) is not indicative of any conspiratorial intent. In fact, Judge Martinotti found that after Smiths pump discontinuation announcement, "UTC discussed with Smiths a 'program to extend [the CADD-]MS 3 pump platform'" and "Smiths ultimately agreed to restart production and develop a partially updated version" of the pump. *Sandoz*, 2022 WL 17335696, at *3.  In light of both Smiths and UT's economic incentives, Plaintiffs' bare, unsupported and contradicted allegations of any intent to monopolize by Smiths are plainly insufficient. *See Am. Football League v. Nat'l Football League*, 205 F.Supp. 60, 65 (D.Md. 1962), *judgment affirmed*, 323 F.2d 124 (4th Cir. 1963) ("[t]he requisite intent to monopolize must be present and predominant.").

## III.    Plaintiffs' Consumer Protection and Common Law Claims Likewise Fail.

Plaintiffs' state consumer protection law claims (Count 11) must be dismissed for the same reasons as their federal and state antitrust claims. Plaintiffs SAC made no effort to address the deficiencies the Court previously identified when it dismissed the same claims alleged in Plaintiffs' earlier FAC. *See* R&R at 29-30. Plaintiffs' "tortious interference" based claims (Counts 12 and 13), although styled "Against All Defendants" (SAC ¶¶803-809), are

nevertheless clearly premised on the alleged "Co-Payment Circumvention Scheme" in which Smiths is not alleged to have participated. *See* SAC ¶808 (alleging that "Defendants conspired to increase the number of Medicare-covered "customers" using the CVC PAH…."). Consequently those two common law counts must also be dismissed as to Smiths.[7]

## IV.    Plaintiffs' Claims Should be Dismissed With Prejudice.

Plaintiffs' latest attempt to assert antitrust claims should be its last, and the SAC should be dismissed *with prejudice* as further amendment would be futile. Judge Martinotti's opinion on summary judgment in the *Sandoz* case demonstrates as much. Despite benefitting from the Court's detailed critique in dismissing Plaintiffs prior FAC without prejudice, Plaintiffs have left uncorrected the litany of pleading deficiencies identified by the Court. Dismissal with prejudice is required in these circumstances. *Morrison v. Brennan*, 2020 WL 2573293, at *3 (M.D. Fla. May 21, 2020) ("[b]ecause Plaintiff has had an opportunity to cure these pleading deficiencies but failed to do so, the second amended complaint is dismissed with prejudice."). Moreover, the deadline for amendment provided in the Amended Scheduling Order has long expired. Accordingly, the Court should dismiss all seven counts against Smiths with prejudice.

**CONCLUSION**

For the foregoing reasons, the Court should grant this motion and dismiss the claims against Smiths in their entirety and without leave to amend.

---

[7] Plaintiffs' antitrust claims also fail because Plaintiffs are not efficient enforcers and because Plaintiffs fail to plead purchases of Remodulin during the time period and states relevant to their antitrust claims, as presented in the Specialty Pharmacies Motion to Dismiss the Second Amended Complaint, Sec. III.B. To avoid duplication, Smiths incorporates and adopts those additional arguments and authorities as well as the arguments and authorities for dismissal of Counts 11, 12 and 13 presented in Defendant United Therapeutics Corporation's Motion to Dismiss the Second Amended Complaint and Incorporated Memorandum of Law, Section IV.

# REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), Defendant Smiths Medical ASD, Inc. respectfully requests that the Court hear oral argument on this Motion to Dismiss the Second Amended Complaint. Smiths respectfully requests a two-hour hearing to provide oral argument, split evenly one-hour per side.  Smiths submits that oral argument will aid the Court in its disposition of this matter in its entirety.

Dated:  March 17, 2023.

Respectfully submitted,

**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone No. (954) 525-4100
Facsimile No.   (954) 525-4300

By:    */s/ David L. Ferguson*
     DAVID L. FERGUSON
     Florida Bar Number:  0981737
     Ferguson@kolawyers.com


     Thomas J. Lang (*pro hac vice*)
     Peter M. Boyle (*pro hac vice*)
     Christina E. Fahmy (*pro hac vice*)
     KILPATRICK TOWNSEND
     & STOCKTON LLP
     607 14th Street, NW, Suite 900
     Washington, DC 20005
     (202) 508-5800
     (202) 508-5858
     tlang@kilpatricktownsend.com
     pboyle@kilpatricktownsend.com
     cfahmy@kilpatricktownsend.com

     *Attorneys for Defendant Smiths Medical ASD, Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via

email via the CM/ECF system to all counsel of record on this 17th day of March 2023.

**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
One W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone No. (954) 525-4100
Facsimile No.  (954) 525-4300
*Attorneys for Defendant Smiths Medical
ASD, Inc.*

By:___*/s/ David L. Ferguson*_____
DAVID L. FERGUSON
Florida Bar Number:  0981737
Ferguson@kolawyers.com